UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ABDULRAHMAN ALHARBI, )<br><br>Plaintiff, )<br><br>− v. − )<br><br>GLENN BECK; THE BLAZE, INC.; )<br>MERCURY RADIO ARTS, INC.; AND )<br>PREMIERE RADIO NETWORKS, INC. )<br><br>Defendants. ) | CIVIL ACTION NO.<br>1:14-cv-11550-PBS |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

GREENBERG TRAURIG, LLP

Michael J. Grygiel (NYS # 2291821)
   (Application for admission *pro hac vice*
   pending)
Mark A. Berthiaume (BBO # 041715)
Zachary C. Kleinsasser (BBO # 664291)
One International Place, 20th Floor
Boston, Massachusetts  02110
Tel.:  617-310-6000
Fax:  617-310-6001
E-mail:  grygielm@gtlaw.com
              berthiaumem@gtlaw.com
              kleinsasserz@gtlaw.com

*Attorneys for Defendants Glenn Beck;
TheBlaze Inc.; Mercury Radio Arts, Inc.;
and Premiere Radio Networks, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ..........................................................................................1

    Introduction..................................................................................................................1

    Summary of Argument ................................................................................................2

STATEMENT OF FACTS ...................................................................................................3

    A.     The Parties. ...........................................................................................3

    B.     Plaintiff's Questioning by Federal Authorities in Connection With
          the 2013 Boston Marathon Bombing. ...................................................4

    C.     The Challenged Broadcasts. ..................................................................4

I.     TO SURVIVE A MOTION TO DISMISS, PLAINTIFF MUST NOT
     MERELY RECITE CONCLUSORY ALLEGATIONS .......................................4

    A.     Summary Disposition of Defamation Actions Against the Press
          Through the Application of Rule 12(b)(6) Promotes First Amendment
          Interests. ................................................................................................4

    B.     The *Twombly* and *Iqbal* Pleading Requirements Compel Dismissal. ......6

II.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE
     IT FAILS PLAUSIBLY TO ALLEGE ACTUAL MALICE ...............................7

    A.     Plaintiff Is a Public Figure Under the First Amendment. .....................7

          1.  Plaintiff Qualifies As a Limited Purpose Public Figure. ...............7

          2.  Plaintiff Is Also an Involuntary Public Figure. ............................12

    B.     The Constitutional "Actual Malice" Standard Precludes the
          Defamation Claims Asserted by Plaintiff. ...........................................14

    C.     The Complaint's Formulaic Recitation of Legal Buzzwords Fails to
          Overcome the Constitutional Privilege. ...............................................16

III.   COUNT ONE FAILS TO STATE A VIABLE CLAIM BECAUSE
     STRICT LIABILITY IN DEFAMATION IS PROHIBITED BY THE
     FIRST AMENDMENT ...........................................................................................17

CONCLUSION ..................................................................................................................18

# TABLE OF AUTHORITIES

**Federal Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................. *passim*

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................... *passim*

*Biro v. Condé Nast*, 963 F. Supp. 2d 255 (S.D.N.Y. 2013) .................................... 4, 5, 6

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984) .......................... 15

*Continental Cablevision, Inc. v. Storer Broad. Co.*,
    653 F. Supp. 451 (D. Mass. 1986) .......................................................................... 7

*Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C. Cir. 1985) .................... 7, 12, 13, 14

*Damon v. Moore*, 520 F.3d 98, 104-07 (1st Cir. 2008) ........................................... 5 n.3

*Earley v. GateHouse Media Pa. Holdings, Inc.*,
    3:12-cv-1886, 2013 WL 5466149 (M.D. Pa. Sept. 30, 2013) .................................. 15

*Egiazaryan v. Zalmayev*, 11-cv-2670, 2011 WL 6097136
    (S.D.N.Y. Dec. 7, 2011) ......................................................................................... 17

*Exum v. Stryker Corp.*, 1:13-cv-10247, 2013 WL 3786469
    (D. Mass. Jul. 17, 2013) ........................................................................................... 6

*Garrison v. Louisiana*, 379 U.S. 64 (1964) .......................................................... 15 n.8

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) .............................................. 2, 7, 9-10

*Gray v. St. Martin's Press, Inc.*, 221 F.3d 243 (1st Cir. 2000) .............................. 7 n.5, 11

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ................ 14

*Hatfill v. New York Times Co.*, 532 F.3d 312 (4th Cir.) ........................................ 9, 12, 13

*Howard v. Antilla*, 294 F.3d 244 (1st Cir. 2002) ................................................... 15

*Islamic American Relief Agency v. Unidentified FBI Agents*,
    394 F. Supp. 2d 34 (D.D.C. 2005) ....................................................................... 14 n.7

*Kosilek v. Spencer*, 889 F. Supp. 2d 190 (D. Mass. 2012) ..................................... 3 n.1

*Lerman v. Flynt Distrib. Co.*, 745 F.2d 123 (2d Cir. 1984) ...................................... 8

*Levesque v. Doocy*, 560 F.3d 821 (1st Cir. 2009) ................................................. 15

*Lluberes v. Uncommon Products, LLC*, 663 F.3d 6 (1st Cir. 2011) ........................7, 8, 10, 12, 15

*Mayfield v. NASCAR, Inc.*, 674 F.3d 369 (4th Cir. 2012)............................................................16

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ............................................................14, 15

*Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1 (1st Cir. 2011)........................................16 n.9

*Orenstein v. Figel*, 677 F. Supp. 2d 706 (S.D.N.Y. 2009)............................................................16

*Parisi v. Sinclair*, 845 F. Supp. 2d 215 (D.D.C. 2012)................................................................17

*Pendleton v. City of Haverhill*, 156 F.3d 57 (1st Cir. 1998)......................................7 n.5, 8, 9, 10

*Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859 (5th Cir. 1978) ....................................8 n.6

*Rutherford v. Katonah-Lewisboro School District*,
     670 F. Supp. 2d 230 (S.D.N.Y. 2009)......................................................................................16

*Schatz v. Republican State Leadership Committee*,
     669 F.3d 50 (1st Cir. 2012)................................................................................................ 15-16

*SEC v. Tambone*, 597 F.3d 436 (1st Cir. 2010) ............................................................................6

*Shay v. Walters*, 702 F.3d 76 (1st Cir. 2012) ........................................................................17, 18

*Sepúlveda-Villarini v. Department of Education of Puerto Rico*,
     628 F.3d 25 (1st Cir. 2010) ......................................................................................................6

*Smith v. Zipcar, Inc.*, 13-cv-11430, 2013 WL 6720613
     (D. Mass. Dec. 19, 2013) ........................................................................................................6

*Snyder v. Phelps*, 131 S. Ct. 1207 (2011) ...................................................................................1

*Souza v. Bank of America, National Association*, 1:13-cv-10181,
     2013 WL 3457185 (D. Mass. Jul. 8, 2013)..............................................................................6

*St. Amant v. Thompson*, 390 U.S. 727 (1968)..............................................................15, 15 n.8

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)..................................................................3 n.1

*Torrens v. Lockheed Martin Services Group, Inc.*,
     396 F.3d 468 (1st Cir. 2005) ................................................................................................3 n.1

*Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431(5th Cir. 1987) ...............................8, 11

*United States v. Bello*, 194 F.3d 18 (1st Cir. 1999) ...............................................................3 n.1

*Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) ...............................8

*Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999) ............................................................................. 13-14

**State Cases**

*Appleby v. Daily Hampshire Gazette*, 395 Mass. 32 (Mass. 1985) ...............................................5

*Atlanta Journal-Constitution v. Jewell*, 555 S.E.2d 175 (Ga. Ct. App. 2001)....................9, 13, 14

*Burt v. Advertiser Newspaper Co.*, 154 Mass. 238 (1891) ....................................................17 n.10

*Cottrell v. NCAA*, 975 So. 2d 306 (Ala. 2007) ........................................................................12, 14

*Driscoll v. Bd. of Trs. of Milton Academy*, 873 N.E.2d 1177
(Mass. App. Ct. 2007)..........................................................................................................5 n.3

*Dulgarian v. Stone*, 420 Mass. 843 (Mass. 1995)............................................................................5

*Eyal v. Helen Broad. Corp.*, 411 Mass. 426 (Mass. 1991) ............................................................5

*Gilbert v. Bernard*, 1995 WL 809550 (Mass. Super. Ct. Jul. 7, 1995)..................................17 n.10

*King v. Globe Newspaper Co.*, 400 Mass. 705 (Mass. 1987) ...........................................................5

*Lewis v. News Channel 5 Network, L.P.*, 238 S.W.3d 270
(Tenn. Ct. App. 2007) ...........................................................................................................12-13

*Lyons v. Globe Newspaper Co.*, 415 Mass. 258 (Mass. 1993) ........................................................5

*Sweet v. Post Publishing. Co.*, 215 Mass. 450, 102 N.E. 660 (1913)...................................17 n.10

**Statutes**

Fed. R. Civ. P. 12(b)(6)...............................................................................................2, 4, 6, 18

FRE 201(b)...................................................................................................................3 n.1

FRE 902(6)...................................................................................................................3 n.1

## PRELIMINARY STATEMENT

### Introduction

This free speech litigation arises out of the terrorist bombings that took place near the finish line of the 2013 Boston Marathon.  The tragic incident − in which three people were killed and hundreds were wounded − received immediate and pervasive press coverage not only in the greater Boston metropolitan area, but throughout the nation and the world.   In the immediate aftermath of the attack, Plaintiff, a Saudi Arabian citizen, was questioned by federal law enforcement authorities as a person of interest in connection with the bombings, and his apartment was searched.  According to the Complaint, Plaintiff is seeking to punish Defendants for various broadcasts exploring his role at the center of a public controversy arising from the massive law enforcement investigation of this deadly attack on one of the nation's most historic and revered athletic events.

The Complaint alleges that Plaintiff was defamed by Defendants' continued reporting of and commentary on the above and related events.   In doing so, it collides with the established principle that "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."   *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) (citation omitted).  The claims asserted in the Complaint would erode the strong protection derived from those fundamental values, restrict the "breathing space" constitutionally afforded the broadcasts at issue, and abandon the First Amendment by placing off limits speech concerning both the government's investigation into a terrorist attack and its efforts in protecting homeland security, matters of paramount public concern and importance.  Simply put, Plaintiff's claims would deny Defendants − and anyone else choosing to exercise their right to freedom of speech in the course of criticizing the government's efforts at combating terrorism − the

protections guaranteed by the United States Constitution and Massachusetts Declaration of Rights.

## Summary of Argument

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Fundamental First Amendment principles, together with established federal pleading requirements, control the disposition of this motion.  First, because Plaintiff qualifies for purposes of the First Amendment as both a limited purpose public figure and an involuntary public figure with respect to the subject matter of the broadcasts complained of, any defamation claim he asserts must satisfy the rigorous constitutional "actual malice" standard.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 (1974). Second, as U.S. Supreme Court jurisprudence makes plain, to survive this motion the Complaint is required to plead facts sufficient to render the alleged existence of actual malice "plausible on its face," the same pleading obligation imposed on every element of a civil claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("only a complaint that states a plausible claim for relief survives a motion to dismiss.").  Plaintiff is therefore obligated to plead factual allegations plausibly supporting that Defendants knew the broadcast statements to be false, or had serious doubts about their truth, and broadcast the statements anyway.  The Complaint woefully fails to satisfy this obligation.

Count One of the Complaint is completely devoid of any allegations concerning the requisite degree of fault.  Indeed, it makes no reference whatsoever to any fault on the part of Defendants.  (*See* Compl. ¶¶ 23-27)  Plaintiff's ill-advised attempt to disinter the former strict liability standard prevailing at common law is flatly prohibited by the First Amendment, and his first cause of action should therefore be dismissed on its face.  This deficiency is compounded in Count Two, which does not allege any facts that, if proven, could plausibly establish that any of

the challenged broadcast statements were published with actual malice. It contains merely a formulaic recitation of the legal buzzword "actual malice" asserted in a vacuum, untethered either to specific facts or to any broadcast statements at issue. (*Id.*, ¶ 29) It makes no showing that Defendants knew that anything said on the broadcasts concerning Plaintiff was untrue or seriously doubted its truth, and is therefore facially defective. Thus, because the Complaint's allegations are completely bereft of any facts plausibly demonstrating actual malice, it fails to state a valid cause of action.

The absence of the requisite factual allegations makes it inconceivable that the Complaint can withstand the instant motion, where the constitutional balance has been struck firmly in favor of the First Amendment. Plaintiff should not be permitted to inflict the burdens, distractions and costs of litigating a case brought on such patently insufficient allegations. Based on the reasons and authority presented below, the Complaint fails to satisfy the requirements of Rule 12(b)(6). It should therefore be dismissed, in its entirety and with prejudice.

## STATEMENT OF FACTS[1]

### A.   The Parties.

Plaintiff Abdulrahman Alharbi ("Alharbi") is a Saudi Arabian citizen who lives in Revere, Massachusetts. (Compl. ¶ 2)

---

[1] This section is derived from the factual allegations of the Complaint dated March 28, 2014, which Defendants accept as true for the limited purpose of the instant motion. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002). In adjudicating this motion, the Court may take judicial notice of such facts that are not subject to dispute because they are (1) generally known within the territorial jurisdiction of the Court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. FRE 201(b). The official United States government documents submitted herewith by Defendants in support of this motion as Exhibits 1 and 2 are proper subjects of judicial notice. *See Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 472-73 (1st Cir. 2005); *United States v. Bello*, 194 F.3d 18, 23-24 (1st Cir. 1999). The media accounts also included in the motion record as Exhibit 3 are offered solely for purposes of documenting when and what they reported, not for the truth of that reporting. They are therefore not hearsay and admissible for that limited purpose. *Kosilek v. Spencer*, 889 F. Supp. 2d 190, 215 n. 6 (D. Mass. 2012); *see also* FRE 902(6) (news reports are self-authenticating).

Defendant Glenn Beck ("Beck") is a radio and television commentator whose shows are broadcast to the public.  (Compl. ¶ 11)  Defendants TheBlaze Inc. and Mercury Radio Arts, Inc. own Beck's shows.[2]  (*Id.*, ¶ 13)

Defendant Premiere Radio Networks, Inc. syndicates and distributes Beck's radio show to stations in the United States.  (Compl. ¶ 14)

**B.      Plaintiff's Questioning by Federal Authorities in Connection With the 2013 Boston Marathon Bombing.**

Plaintiff was questioned by federal authorities investigating the bombing at the 2013 Boston Marathon, and his apartment was also searched.  (Compl. ¶ 1)  Many news organizations reported on Plaintiff's interrogation and the search of his apartment by law enforcement.  (*Id.*)

**C.      The Challenged Broadcasts.**

Beginning on April 15, 2013, Beck broadcast programs concerning Plaintiff and the Boston Marathon bombing attacks, which included Beck's "question[ing] the motives of federal officials in failing to pursue or detain Alharbi . . . ." (Compl. ¶¶ 1, 15-18)

**I.      TO SURVIVE A MOTION TO DISMISS, PLAINTIFF MUST NOT MERELY RECITE CONCLUSORY ALLEGATIONS**

**A.      Summary Disposition of Defamation Actions Against the Press Through the Application of Rule 12(b)(6) Promotes First Amendment Interests.**

As a federal district court has recently observed, "given the difficulty of proving actual malice, as well as the fact that actual malice must be proven by clear and convincing evidence in order for a plaintiff to succeed, it stands to reason that Rule 12(b)(6) should play a particularly important role in testing the plausibility of a plaintiff's defamation claim."  *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013) (citations omitted).  This reasoning is consonant with

---

[2]    Mercury owns the radio broadcasting rights and TheBlaze owns the television broadcasting rights with respect to Beck's programs.  Mercury is TheBlaze's parent corporation.  (Compl. ¶ 13)

the traditional approach of Massachusetts courts in reviewing libel claims which, to protect public debate and safeguard freedom of the press, have long favored dismissal at the earliest possible stage of proceedings. *Eyal v. Helen Broad. Corp.*, 411 Mass. 426, 432 n.7 (Mass. 1991) ("defamation is a traditionally disfavored action"). That is because "[a]llowing a trial to take place in a meritless case 'would put an unjustified and serious damper on freedom of expression.' " *Appleby v. Daily Hampshire Gazette*, 395 Mass. 32, 37 (Mass. 1985) (citation omitted). "Even if a defendant in a libel case is ultimately successful at trial, the costs of litigation may induce an unnecessary and undesirable self-censorship," *Dulgarian v. Stone*, 420 Mass. 843, 846 (Mass. 1995) (quoting *King v. Globe Newspaper Co.*, 400 Mass. 705, 708 (Mass. 1987), *cert. denied*, 485 U.S. 940 (1988)), that is repugnant to core First Amendment values. In addition, the "independent protections" of Article 16 of the Declaration of Rights and Massachusetts common law similarly mandate the summary dismissal of meritless libel claims. *Lyons v. Globe Newspaper Co.*, 415 Mass. 258, 268 (Mass. 1993).

Dispositive motions are therefore recognized as having particular value in libel cases, so as not to protract litigation through discovery and trial thereby chilling the exercise of protected First Amendment rights.[3] *Biro v. Condé Nast*, 963 F. Supp. 2d at 279 ("[I]n defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive.").

On the minimal facts alleged, such protection for free speech is plainly warranted in this case.

---

[3]   In furtherance of these principles, Massachusetts courts routinely dismiss defamation claims on motions to dismiss. *See, e.g., Damon v. Moore*, 520 F.3d 98, 104-07, 109 (1st Cir. 2008) (affirming Rule 12(b)(6) dismissal of defamation claim); *Driscoll v. Bd. of Trs. of Milton Acad.*, 873 N.E.2d 1177, 1188-89 (Mass. App. Ct. 2007) (same).

**B.**     **The *Twombly* and *Iqbal* Pleading Requirements Compel Dismissal.**

In *Bell Atl. Corp. v. Twombly*, the Supreme Court held that a plaintiff seeking to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6) must allege facts that "raise a right to relief above the speculative level." 550 U.S. at 555 (citations omitted). It is not sufficient to allege the mere elements of a cause of action;[4] instead, "[a] claim has facial plausibility when the plaintiff pleads ***factual content*** that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678 (emphasis supplied). "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010) (Souter, J.) (citations omitted); *Souza v. Bank of Am., Nat'l Ass'n*, 1:13-cv-10181, 2013 WL 3457185, at *2 (D. Mass. Jul. 8, 2013) (Saris, C.J.). In reviewing complaints against this standard, the First Circuit has instructed that if the factual allegations are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *Exum v. Stryker Corp.*, 1:13-cv-10247, 2013 WL 3786469, at *2 (D. Mass. Jul. 17, 2013) (Saris, C.J.) (citing *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010)).

As this Court has recognized, the *Twombly* and *Iqbal* pleading standards apply to all aspects of a court's threshold analysis of a complaint's legal sufficiency. *Smith v. Zipcar, Inc.*, 13-cv-11430, 2013 WL 6720613, at *2 (D. Mass. Dec. 19, 2013) (Saris, C.J.) ("Dismissal for failure to state a claim is appropriate where pleadings fail to set forth factual allegations respecting each element necessary to sustain recovery under a legal theory.").

---

[4]     *Twombly*, 550 U.S. at 550 ("a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do") (internal citations, quotation marks, and alterations omitted).

Applying these standards to the present case, the Complaint fails to state a claim upon which relief may be granted, and should be dismissed.

## II.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS PLAUSIBLY TO ALLEGE ACTUAL MALICE

### A.   Plaintiff Is a Public Figure Under the First Amendment.

Courts have recognized three categories of public figures: (1) general purpose, (2) limited purpose, and (3) involuntary. *Gertz v. Robert Welch*, 418 U.S. at 345-46. "General purpose" public figures are those celebrities who have achieved such pervasive fame or notoriety that they are deemed to be public figures for all aspects of their lives. *Id.* "Limited purpose" public figures are those who voluntarily inject their views or are otherwise "drawn into a particular public controversy," and are therefore treated as public figures when they sue about statements bearing on that controversy. *Id.* at 351; *see also Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 13-14 (1st Cir. 2011); *Cont'l Cablevision, Inc. v. Storer Broad. Co.*, 653 F. Supp. 451, 459 (D. Mass. 1986). An "involuntary" public figure is one who becomes well known to the public after finding himself embroiled "through no desire of his own" in a public controversy. *Dameron v. Wash. Magazine, Inc.*, 779 F.2d 736, 742 (D.C. Cir. 1985); *Gertz*, 418 U.S. at 345 (noting that it is "possible for someone to become a public figure through no purposeful action of [one's] own"). In this case, Plaintiff was both a "limited purpose" and an "involuntary" public figure with respect to the broadcasts he has placed at issue.

### 1.   Plaintiff Qualifies As a Limited Purpose Public Figure.

To determine whether a defamation plaintiff is a limited purpose public figure,[5] a court typically considers (1) whether one or more public controversies existed at the time of the

---

[5]   The determination of plaintiff's public figure status is a question of law for the Court. *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 251 (1st Cir. 2000) ("This is treated as an issue of law to be resolved by the district judge and reviewed *de novo* by us."); *Pendleton v. City of Haverhill*, 156 F.3d 57, 68 (1st Cir. 1998) ("we hold

alleged defamation, (2) whether the plaintiff played an important role in such a controversy, and (3) whether the publication or broadcast at issue was germane to the plaintiff's role in the controversy. *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433-34 (5th Cir. 1987) (footnote omitted). For purposes of this analysis, a "public controversy" includes "any topic upon which sizeable segments of society have different, strongly held views," *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 138 (2d Cir. 1984), or a dispute that a reasonable person would expect to affect people beyond its immediate participants, *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296-97 (D.C. Cir. 1980); *Lluberes v. Uncommon Prods.*, 663 F.3d at 13-14. A plaintiff is held to have played a sufficiently important role in such a controversy when he has either voluntarily injected himself into the debate that surrounds it in an attempt to influence its outcome or he has been drawn into the controversy by his own voluntary actions. *Lluberes*, 663 F.3d at 13-14; *Pendleton v. City of Haverhill*, 156 F.3d at 69. Further, a challenged publication or broadcast is "germane" to the public figure's participation in a controversy so long as it is not "wholly unrelated to the controversy" and "could have been relevant to the public's" assessment of the plaintiff and his role in it. *Waldbaum*, 627 F.2d at 1298.

Defamation plaintiffs become limited purpose public figures when they act in a fashion that is reasonably likely to draw public attention and comment, regardless of whether they affirmatively seek out such public scrutiny.[6] In this case, Plaintiff was a limited purpose public figure because he played a prominent role in several overlapping public controversies surrounding the Boston Marathon bombings, including his interrogation by federal authorities as a person of interest and their search of his apartment in the immediate aftermath of the attack.

---

that the question of whether a defamation plaintiff is a public figure is properly resolved by the court, not by the jury, regardless of the contestability of the predicate facts").

[6]   *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 861 (5th Cir. 1978) ("Comment upon people and activities of legitimate public concern often illuminates that which yearns for shadow. It is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be.").

*Hatfill v. New York Times Co.*, 532 F.3d 312, 321 (4th Cir.) ("An FBI search of Dr. Hatfill's apartment was televised live and attracted extensive media coverage, and after Dr. Hatfill's home was searched, news agencies began printing stories about him."), *cert. denied*, 555 U.S. 1085 (2008).  Indeed, as his Complaint concedes, at the time Defendants disseminated the first of their challenged broadcasts on or about April 15, 2013, Plaintiff had already become the subject of reports by "[m]any news outlets" because he had been "questioned by federal authorities investigating the events of that day."  (Compl. ¶ 1)  On a broader level, these controversies also included urgent homeland security concerns and the utility of the United States government's efforts in investigating and preventing domestic terrorist attacks, matters which directly implicated Plaintiff's immigration status.  *See Hatfill*, 532 F.3d at 322-23 ("the particular public controversy in this case [is] the debate on the threat from bioterrorism and the nation's lack of preparation for it, rather than the relatively narrow example of that threat exemplified by the specific anthrax mailings in 2001"); *Atlanta Journal-Constitution v. Jewell*, 555 S.E.2d 175, 183 (Ga. Ct. App. 2001) (the public controversy following the 1996 Olympic Park bombing in Atlanta "included the broader question of the safety of the general public").  The broadcasts Plaintiff has placed at issue were all germane to his involvement in those controversies. *Pendleton*, 156 F.3d at 70.

Plaintiff became a limited purpose public figure by, first, granting multiple interviews to the press through which he voluntarily injected his views into the ongoing public controversies surrounding the investigation into the bombing attacks, his interrogation by the FBI, and the counterterrorism methods of the United States government.  He therefore satisfies the essential attribute of the public figure first identified by the Supreme Court in *Gertz* − *i.e.*, both during and after the broadcasts at issue, he had largely unfettered access to the channels of mass

communication to tell his side of the story.  *See* 418 U.S. at 344; *Pendleton*, 156 F.3d at 69 (libel plaintiff's newspaper interview "possesses great significance for a First Amendment analysis" in establishing limited purpose public figure status).   Indeed, Plaintiff's roommate, Plaintiff's father, and an official with the Saudi Arabian embassy in Washington all gave interviews to the media stating that Plaintiff had been cleared of any involvement in the attacks and was cooperating with the investigation.  (Ex. 3 at DEF 0084-0094)  Further, Plaintiff himself actively courted the press, granting a lengthy interview to *The Islamic Monthly* for the purpose of rebutting the publicity generated by his involvement in the bombing investigation.  (*Id.* at DEF 0099-0105)  In his published statements, Plaintiff described the ordeal of his interrogation by the FBI while in the hospital, expressed suspicion that he had been ethnically profiled by law enforcement, and chastised the media for his predicament.  (*Id.*)  Plaintiff also spoke on the record to the *Arab News* explaining the circumstances in which he was questioned by the FBI (*Id.* at DEF 0095-97), and informed the *Saudi Gazette* that he planned to continue his education in the United States.  (*Id.* at DEF 0098)  Plaintiff thus "enjoyed access to the press and exploited it" in order to "garner public support and mute [his] critics" by presenting his version of events. *Lluberes*, 663 F.3d at 17 (footnote omitted).   "[W]hen an individual freely comments" on a public controversy "in a manner that suggests that he is trying to influence public opinion, he becomes a public figure for the purpose of discussions" on that issue.  *Pendleton*, 156 F.3d at 71. Plaintiff's statements were all made in the context of criticizing his identification as a suspect and questioning the federal government's anti-terrorism campaign − precisely the public controversies addressed by the challenged broadcasts.  *Id.* at 70.   Unlike "private figure" plaintiffs, Plaintiff therefore had extensive access to multiple channels to redress perceived harm

to his reputation and, for this overarching reason, he is properly deemed a public figure for purposes of this litigation.

In addition, Plaintiff embarked on a course of conduct that was reasonably likely to result in public attention and comment on his background, activities, and immigration status. By behaving suspiciously at the Marathon finishing line when the bombs detonated (Ex. 2, DEF 0046), thereby causing his detention and a background check by law enforcement, Plaintiff became the focal point of an ongoing exchange between executive and legislative branch officials at the highest levels of the United States government regarding the efficacy of its counterterrorism program.  (Ex. 1, DEF 0001-0028)  In an official letter addressed to the Attorney General and the Secretary of the Department of Homeland Security, the Chairman of the Committee on Homeland Security ("Committee") of the U.S. House of Representatives inquired, *inter alia*, (1) whether Plaintiff "is currently scheduled for immediate deportation to his native country of Saudi Arabia" (Ex. 1 at DEF 0001); (2) whether he had "been placed on the no fly list" (*id.*); and (3) "[u]nder what type of visa did the individual enter the United States and what is the current status of his visa?"  (*Id.*)  Moreover, as the public controversy over the Marathon bombing investigation continued, the Committee issued a series of official correspondence to cabinet-rank officers in the executive branch, including the Directors of both the FBI and National Intelligence, repeatedly asking "[w]hat are the connections, if any, between [Tamerlan] Tsarnaev and Saudi national Abdul Rahman Ali al-Harbi? [*sic*]" (*Id.* at DEF 0005, 0012, 0017, 0023 and 0026)  As these government documents make clear, Plaintiff "had more than a trivial or tangential role in the controversy." *Trotter*, 818 F.2d at 435.  Rather, he was "a central figure" in public debate over the bombing investigation. *Gray v. St. Martin's Press*, 221 F.3d at 251.

By initiating a series of purposeful actions relative to public controversies in which he continued to play a prominent role, Plaintiff both assumed the risk of adverse public scrutiny and gained access to the channels of mass communication to rebut it. *Lluberes*, 663 F.3d at 17; *Hatfill*, 532 F.3d at 322. Conduct of this sort is the hallmark of the limited purpose public figure. The public's interest in such a person's conduct is heightened where, as here, the activities in which he has voluntarily engaged implicate matters of national security. *Hatfill*, 532 F.3d at 323 (the "debate about national security, the nation's lack of preparedness for bioterrorism, and the example provided by the FBI's investigation of the anthrax attacks" "encourage[s] robust and uninhibited commentary on public issues" in furtherance of "the purpose of the public figure doctrine").

### 2. Plaintiff Is Also an Involuntary Public Figure.

Plaintiff is also required to satisfy the "actual malice" standard imposed on defamation plaintiffs because he is an "involuntary" public figure. *Dameron*, 779 F.2d at 741 ("Persons can become involved in public controversies and affairs without their consent or will."); *Cottrell v. NCAA*, 975 So. 2d 306, 340-41 (Ala. 2007) ("A plaintiff is drawn into a public controversy when his actions invite comment and attention, despite the fact that the plaintiff does not actively try or even want to attract the public's attention."). The "involuntary" public figure is a defamation plaintiff who shares some, but not all of the hallmarks of both his "general purpose" and "limited purpose" counterparts. Like the "general purpose" public figure, the involuntary public figure has become generally well known to the public, although he did not necessarily achieve that status prior to the alleged defamation. Like the "limited purpose" public figure, his notoriety is also a function of his involvement in a "public controversy," but that involvement can arise through no voluntary conduct or "desire of his own" − it can be solely the result of "sheer bad luck." *Dameron*, 779 F.2d at 742; *Lewis v. News Channel 5 Network, L.P.*, 238 S.W.3d 270,

299-300 (Tenn. Ct. App. 2007) ("[a]n involuntary public figure . . . may simply be an unfortunate victim of circumstance pulled into the whirlwind").

Involuntary public figures have included individuals like Richard Jewell, the security guard falsely accused of the Atlanta Olympics bombing, and Steven Hatfill, the person wrongly named a "person of interest" in the investigation of the 2001 anthrax mailings. *Atlanta Journal-Constitution v. Jewell*, *supra*; *Hatfill v. New York Times Co.*, 488 F. Supp. 2d 522 (E.D. Va. 2007), *aff'd on other grounds*, 532 F.3d 312 (4th Cir. 2008). The rationale of the decision in *Jewell* is instructive:

> Jewell was an ordinary citizen who was unknown to the public before the Olympic Park bombing, never sought to capitalize on the fame he achieved through his actions in events surrounding the bombing, and never acquired any notoriety apart from the bombing and the investigation which followed. However, there is no question that Jewell played a central, albeit possibly involuntary, role in the controversy over Olympic Park safety. Jewell happened to be the security guard on duty at the time of the bombing, happened to be the security guard who found the bomb, and happened to be involved in the evacuation of the public from the area where the bomb was located. He became embroiled in the ensuing discussion and controversy over park safety and became well known to the public in this one very limited connection. Whether he liked it or not, Jewell became a central figure in the specific public controversy with respect to which he was allegedly defamed: the controversy over park safety.

555 S.E.2d at 186.

Plaintiff is an involuntary public figure under this analysis. His questioning by law enforcement authorities after "reportedly behaving suspiciously near the site of the explosions" (Ex. 2 at DEF 0046) and their search of his apartment "were widely publicized." *Dameron*, 779 F.2d at 742; Compl. ¶ 1. By that time, the government's effort to identify and apprehend those responsible for the bombings had become a full-blown controversy and Plaintiff had already "been the regular focus of media reports on the controversy." *Wells v. Liddy*, 186, F.3d 505, 540 (4th Cir.

1999); *see* Ex. 3 at DEF 0067-0087.  "We think that, like it or not, [plaintiff] was embroiled in a public controversy" before the first broadcast at issue was published.  *Dameron*, 779 F.2d at 742; *Jewell*, 555 S.E.2d at 186 (same).  He became the central figure in what quickly became a national, and indeed international, public controversy, encompassing not only whether Plaintiff was involved in the Boston Marathon bombing attacks but also the broader issue of homeland security, including questions raised by officials at the highest echelon of the United States government over his deportation status as it related to the government's efforts in combating terrorism.  (*See* Ex. 1) The challenged broadcasts were unquestionably aired during the ongoing debate surrounding that controversy, which "would affect the general public or some segment of it in an appreciable way" and the ramifications of which "would be felt by persons who were not direct participants in the public discussion."  *Jewell,* 555 S.E.2d at 183-84 (footnote omitted).  At the very least, Plaintiff's "role in a major public occurrence resulted in his becoming an involuntary" public figure. *Dameron*, 779 F.2d at 737.  In short, he was "drawn into a public controversy based on his status, position, or association to the public controversy."  *Cottrell*, 975 So. 2d at 341 (citation omitted).

### B.  The Constitutional "Actual Malice" Standard Precludes the Defamation Claims Asserted by Plaintiff.

To ensure that libel plaintiffs such as Alharbi do not misuse state tort law to punish those who report about legitimate matters of public concern,[7] the U.S. Supreme Court recognized five decades ago in a landmark decision that "erroneous statement is inevitable in free debate and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.' " *New York Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964).  To carve out the necessary "breathing space" in order that "protected speech is not discouraged," *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989), the *Sullivan* court established

---

[7]   "It cannot be reasonably argued that protecting the public from terrorist attacks is not an important governmental and public interest."  *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 49 (D.D.C. 2005).

the "actual malice" standard, 376 U.S. at 279-80. This standard, which protects "uninhibited, robust, and wide-open" debate on public issues, requires proof that a libel defendant published a false statement with knowledge that it was false, or with reckless disregard as to its truth or falsity (the "constitutional malice" standard).[8]   *Sullivan*, 376 U.S. at 270; *Lluberes*, 663 F.3d at 12.

"The standard of actual malice is a daunting one." *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002). It is provable only by evidence that the defendant "realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984). Constitutional malice therefore requires proof here of Defendants' subjective state of mind at the time of publication. *St. Amant v. Thompson*, 390 U.S. at 731. The test is entirely a subjective one, and proof of negligence alone is insufficient. *Sullivan*, 376 U.S. at 279-80; *Levesque v. Doocy*, 560 F.3d 82, 91 (1st Cir. 2009).

"In the wake of *Iqbal* and *Twombly*, adequately pleading actual malice is an onerous task." *Earley v. GateHouse Media Pa. Holdings, Inc.*, 3:12-cv-1886, 2013 WL 5466149, at *6 (M.D. Pa. Sept. 30, 2013). Given that the "simplest way to pinpoint [the Complaint's] problem" in this instance is to "focus on whether it plausibly alleges actual malice" − and, as discussed more fully below, its flimsy allegations plainly do not − its two causes of action sounding in defamation should be dismissed for failure to state a claim. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012) (complaint asserting defamation claim

---

[8] "Reckless disregard" has been specifically defined by the U.S. Supreme Court as publishing while actually entertaining "serious doubts as to the truth of publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or publishing while subjectively possessing a "high degree of awareness of the probable falsity of the publication," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).

dismissed pursuant to Rule 12(b)(6) based on inadequate pleading of facts sufficient to support a

plausible inference of actual malice).

### C.   The Complaint's Formulaic Recitation of Legal Buzzwords Fails to Overcome the Constitutional Privilege.

As a fundamental starting point, the Complaint's unadorned assertion of actual malice

(Compl. ¶ 29) does not satisfy Plaintiff's pleading burden because it is a pure legal conclusion.[9]

*Iqbal*, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained

in a complaint is inapplicable to legal conclusions").  "This kind of conclusory allegation − a

mere recitation of the legal standard − is precisely the sort of allegation[] that *Twombly* and *Iqbal*

rejected."  *Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012); *see also Orenstein v.*

*Figel*, 677 F. Supp. 2d 706, 711 (S.D.N.Y. 2009) (complaint's "bald allegations that defendants

acted with malice − unadulterated by any factual support whatsoever − do not meet" the burden

of stating a plausible claim for relief under *Twombly*).

> Plaintiff asserts that Defendants' conduct was "malicious."  But that buzzword is, after *Twombly* and *Iqbal*, insufficient; it must be backed up with allegations of fact from which malice can be fairly inferred.  ***Unfortunately for Plaintiff, her pleading contains not a single allegation of fact that would support her conclusory allegation of malice.***

*Rutherford v. Katonah-Lewisboro Sch. Dist.*, 670 F. Supp. 2d 230, 242 (S.D.N.Y. 2009) (em-

phasis supplied) (reference omitted).

The same can certainly be said of the Complaint's allegations here, which are devoid of

any well-pleaded facts that would support the governing constitutional standard.  Plaintiff's

claim that the broadcast statements he objects to were published with malice is therefore

"unavailing because it is a legal conclusion not entitled to presumption of truth, and he alleges no

---

[9]   An important principle underlying *Twombly* and *Iqbal* is that a court's obligation to accept as true all of the factual allegations pleaded in a Complaint does *not* apply to legal conclusions.  *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678; *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 10 (1st Cir. 2011).

facts plausibly supporting that conclusion." *Egiazaryan v. Zalmayev*, 11-cv-2670, 2011 WL 6097136, at *8 (S.D.N.Y. Dec. 7, 2011); *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218-19 (D.D.C. 2012) (granting Rule 12(b)(6) motion to dismiss where "complaint contain[ed] *no* factual allegations" to support actual malice claim) (emphasis in original).  Because of this deficiency, the Complaint should be dismissed.

### III.   COUNT ONE FAILS TO STATE A VIABLE CLAIM BECAUSE STRICT LIABILITY IN DEFAMATION IS PROHIBITED BY THE FIRST AMENDMENT

As elaborated above, because he qualifies as a public figure, Plaintiff is required to plead and prove actual malice to sustain any defamation claim he may assert arising out of press coverage relating to his questioning by federal authorities in connection with the Boston Marathon bombings and their investigation of his related activities.  However, Count One of the Complaint fails to allege any fault standard whatsoever, let alone plausibly supporting facts, in violation of longstanding First Amendment principles.  *Shay v. Walters*, 702 F.3d 76, 82 (1st Cir. 2012) ("As a matter of constitutional bedrock, a plaintiff must show fault in order to impose liability upon a defendant for defamation.").

Contrary to the theory of recovery apparently espoused by Plaintiff, defamation is no longer a strict liability tort,[10] as "*some* showing of fault is essential" to sustain a claim.  *Shay*, 702 F.3d at 82 (emphasis in original).  The Complaint may not disregard this constitutional imperative as if it does not exist or ignore it as if it does not apply.  For this independent reason,

---

[10]   "Before the common law of defamation became infused with, and/or controlled by, First Amendment principles, the standard [in Massachusetts] was one of strict or absolute liability."  *Gilbert v. Bernard*, 1995 WL 809550, at *1 (Mass. Super. Ct. Jul. 7, 1995) (citing *Sweet v. Post Publ'g. Co.*, 215 Mass. 450, 453-54, 102 N.E. 660 (1913)); *Burt v. Advertiser Newspaper Co.*, 154 Mass. 238, 244-45 (1891) ("It is not a justification that the defendant had reasonable cause to believe [the charges in an investigative report] to be true.  A person publishes libellous [*sic*] matter at his peril.").  These strict liability cases pre-date the constitutionalization of state libel law beginning in 1964 with the Supreme Court's decision in *New York Times Co. v. Sullivan* and have been invalidated by *Gertz v. Robert Welch, Inc.* and its progeny.

the broadcasts challenged in the first cause of action are not actionable unless and until the Complaint sets out a showing of fault supported by plausible factual allegations. *Id.* at 82-3.

## CONCLUSION

Based on the foregoing reasons and authority, Plaintiff's allegations do not come even remotely close to "nudg[ing]" his defamation claims "across the line from conceivable to plausible," as required by Fed. R. Civ. P. 12. *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680. The Complaint should therefore be dismissed, in its entirety and with prejudice, for failure to state a cause of action.

GREENBERG TRAURIG, LLP

Dated:   May 27, 2014

*/s/ Mark A. Berthiaume*
Michael J. Grygiel (Application for
    admission *pro hac vice* pending)
Mark A. Berthiaume (BBO # 041715)
Zachary C. Kleinsasser (BBO # 664291)
One International Place
Boston, Massachusetts 02110
Tel:  (617) 310-6000
Fax:  (617) 897-0993
Email:   grygielm@gtlaw.com
            berthiaumem@gtlaw.com
            kleinsasserz@gtlaw.com

*Attorneys for Defendants Glenn Beck;*
*TheBlaze Inc.; Mercury Radio Arts, Inc.;*
*and Premiere Radio Networks, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing on May 27, 2014.

*/s/ Mark A. Berthiaume*