

MICHAEL T. McCAUL, TEXAS
CHAIRMAN

BENNIE G. THOMPSON, MISSISSIPPI
RANKING MEMBER



**One Hundred Thirteenth Congress**
**U.S. House of Representatives**
**Committee on Homeland Security**
**Washington, DC 20515**

April 18, 2013

The Honorable Eric H. Holder, Jr.
Attorney General
U.S. Department of Justice
Washington, D.C. 20530

The Honorable Janet Napolitano
Secretary
U.S. Department of Homeland Security
Washington, D.C. 20528

Dear Attorney General Holder and Secretary Napolitano:

We write regarding multiple media reports which indicate the original person of interest in the terrorist attack at the Boston Marathon is currently scheduled for immediate deportation to his native country of Saudi Arabia.

If these reports are true, we are concerned about the negative ramifications on the investigation into the attack. Therefore, we ask for an immediate response to the following questions:

1. What is the basis for the deportation of the individual in question, including the charges under the Immigration and Nationality Act?
2. What conditions have been set on his deportation?
3. Will the individual be removed on a commercial flight or a private charter?
4. Has the individual been placed on the no fly list?
5. Under what type of visa did the individual enter the United States and what is the current status of his visa?

We appreciate your attention to this issue and anticipate your prompt reply.

Sincerely,

MICHAEL T. McCAUL
Chairman

PETER T. KING
Chairman
Subcommittee on Counterterrorism
and Intelligence

DEF-0002

MICHAEL T. McCAUL, TEXAS
CHAIRMAN

BENNIE G. THOMPSON, MISSISSIPPI
RANKING MEMBER



One Hundred Thirteenth Congress
U.S. House of Representatives
Committee on Homeland Security
Washington, DC 20515

April 27, 2013

Secretary Janet Napolitano
Department of Homeland Security
Washington, DC 20528

Dear Madam Secretary:

The United States House of Representatives Committee on Homeland Security has begun an investigation into the recent Boston Marathon bombings. In a letter the Committee sent you last week, we inquired into the events surrounding that incident. We write to you again today with questions specific to the Department of Homeland Security (DHS) that the Committee seeks answers to as we progress with our investigation.

Accordingly, in addition to our call for documents of April 20, 2013, we request, pursuant to Rules X 1(j)(3) and X 3(g)(1) of the House of Representatives, answers to the oversight questions listed below. Unless otherwise specified, all questions relate to the period after the date of the Russian internal security service (FSB) request and prior to the attack of April 15, 2013. Furthermore, these questions pertain only to the deceased Tamerlan Tsarnaev, and not his brother, Dzhokar. We request classified and unclassified responses to the questions. There may be follow-up questions in the future related to Dzhokar.

As you are aware, in liaison memoranda, the FSB advised United States government agency(s) that Tamerlan Tsarnaev (Tsarnaev) planned to travel from Massachusetts to the Caucasus; a trip the FSB feared might accelerate his radicalization and lead to terrorist activities. The Russians therefore requested an investigation of Tsarnaev, which the Federal Bureau of Investigation (FBI) undertook.

This is only one example of an area of concern relating to this incident that the Committee seeks to learn more about. According to testimony you provided to Congress, the FBI closed its investigation of Tsarnaev in 2012, unaware that he was on the trip to Dagestan about which the FSB warned. It appears that the FBI was also unaware of Tsarnaev's return travel to Boston later that year.

These and other issues are of particular interest to the Committee. Over eleven years after the September 11, 2001 terror attacks, in which failures to share information between

1

DEF-0003

intelligence and law enforcement agencies played a role, it is crucial that we know whether the same problems continue to exist today.

The following questions reflect the Committee's interests at the present time:

*Contact(s) from Russia*

1. When was DHS first made aware of the Russian government's liaison memorandum to the FBI regarding Tamerlan Tsarnaev? What action, if any, was taken in response?

2. Did any other United States government agencies or entities receive liaison memoranda from the Russians on the same subject? If so, which individuals and organizations received copies?

3. Did the Customs and Border Protection (CBP), DHS's Office of Intelligence and Analysis (I&A), Immigration and Customs Enforcement (ICE), or Homeland Security Investigations (HSI) receive any tearline version of the FSB memo at any time, either before or after the bombing? Did any State or local law enforcement agencies, such as the Massachusetts State Police (MSP), Boston Police Department (BPD), Cambridge Police Department, the Commonwealth Fusion Center (CFC), or the Boston Regional Intelligence Center (BRIC), receive any tearline version of the FSB memo at any time, or were they informed of the Russian concerns about Tsarnaev in any other way?

*Investigation*

4. What role did DHS personnel play in the Tsarnaev investigation?

5. By name, exactly which databases at which agencies were searched for information regarding Tsarnaev? What queries were entered? What results were returned? Do any trace results appear to be more meaningful in retrospect?

6. Did the Joint Terrorism Task Force (JTTF) issue any national security letters (NSLs) in the Tsarnaev investigation? Did the JTTF request any search warrants or Foreign Intelligence Surveillance Act (FISA) applications during the Tsarnaev investigation? If so, were the applications granted? If not, what were the grounds for denial?

7. What were the interactions, if any, between the JTTF and the Department of Justice's National Security Division (DOJ/NSD), the United States Attorney's Office for the District of Massachusetts, the Massachusetts State Attorney General's Office or the Suffolk or Middlesex County District Attorneys' Offices during the 2011 Tsarnaev investigation?

8. Was the JTTF aware of Tsarnaev's radical postings on publicly-available social media?

9. Was counterterrorism analytical support available to those JTTF personnel investigating the Tsarnaev case, and if so, was it utilized? If not, why not?

DEF-0004

10. Were any Task Force Officers assigned to the Tsarnaev investigation? Were any CBP officers, ICE or HSI agents, MSP troopers, or BPD detectives, assigned to work on the investigation?

11. What was the highest level within DHS to be aware of the Tsarnaev investigation before April 15, 2013?

12. Did Tsarnaev obtain firearms before April 15, 2013? If so, how?

13. What are the connections, if any, between Tsarnaev and Saudi national Abdul Rahman Ali al-Harbi?

*Investigation Results?*

14. What did the Tsarnaev investigation reveal?

15. Was Tsarnaev placed into the Terrorist Identities Datamart Environment (TIDE) database? If so, when, and on what grounds? Was he removed from the list, and if so, when, and on what grounds?

16. With whom were the results of the Tsarnaev investigation shared, and how?

17. Were any Intelligence Information Reports issued by the FBI about their Tsarnaev investigation? Were any intelligence reports issued by other entities about Tsarnaev?

18. Was the Tsarnaev investigation referenced in any finished intelligence products disseminated to the wider Intelligence Community, or State and local law enforcement?

*Investigation Closure*

19. Did any DHS officials express disagreement with the closure of the Tsarnaev investigation?

20. What Federal, State or local entities were notified of the closure of the Tsarnaev investigation, and how?

21. Did any DHS employee request that the Tsarnaev investigation be re-opened before April 15, 2013? If so, what was that request based on?

*Travel*

22. Was the JTTF or any other FBI element aware of Tsarnaev's 2012 outbound travel to Russia? If not, why not?

DEF-0005

23. Where any DHS personnel assigned to the Boston JTTF aware of Tsarnaev's 2012 outbound travel to Russia? If so, what actions, if any, did they take? If not, why not?

24. Did Tsarnaev travel under an alias, or his true name?

25. Did Tsarnaev have a Russian visa?

26. Which United States federal entities were aware of Tsarnaev's 2012 travel to Russia?

27. What actions did DHS take when it was "pinged" when Tsarnaev departed for Russia in 2012?

28. Were any State or local entities made aware of Tsarnaev's 2012 travel to Russia? If not, should they have been?

29. Was the JTTF or any other FBI element aware of Tsarnaev's 2012 inbound travel from Russia to the United States? If not, why not?

30. Absent notification by DHS, did the JTTF have any independent means of finding out about Tsarnaev's travel outside the United States?

31. Was DHS "pinged" or otherwise aware when Tsarnaev returned to the United States? If not, Why not?

32. Were any DHS personnel at the Boston JTTF notified when Tsarnaev returned to the United States? If not, why not? If so, what actions, if any, were taken? Were any other members of the JTTF notified of his return, including the personnel who had conducted the initial investigation?

33. If, as reports suggest, Tsarnaev's name was misspelled on his boarding pass, and did not match his identification, why was Tsarnaev allowed to board his outbound flight from Boston in 2012?

34. Regardless of the FBI investigation's status, was Tsarnaev selected for secondary inspection upon his return to Boston, based on immigration or any other reasons? If not, why not?

*Other questions*

35. Was ICE's Office of the Principal Legal Advisor (ICE-OPLA) consulted about deportation/removal options for Tsarnaev in 2011, for either national security reasons, or due to his arrest on domestic violence charges?

36. Did DHS have any terrorism concerns about Tsarnaev prior to April 15, 2013?

4

DEF-0006

35. Was the JTTF or any other FBI element aware of Tsarnaev's 2012 inbound travel from Russia to the United States? If not, why not?

36. Absent notification by DHS, did the JTTF have any independent means of finding out about Tsarnaev's travel?

37. Was anyone in the Boston JTTF notified of Tsarnaev's return from Russia? If so, what actions were taken? Were others in the JTTF, including the personnel who conducted the initial investigation, notified?

38. What do we know about Tsarnaev's 2012 activities in Russia, and how do we know it? Is there any information which suggests Tsarnaev received terrorist financing, operational guidance, or training in Russia, or elsewhere?

*Retrospect*

39. In retrospect, could additional authorities or resources for the FBI have prevented the April 15, 2013 attack?

Please submit a written response to these questions to the Committee no later than May 20, 2013. If you have any questions regarding this letter, please have your staff contact ▆▆▆▆ ▆▆▆▆▆▆ our Committee staff at (202) 226-8417.

Thank you for your attention to these important questions regarding homeland security.

Sincerely,

MICHAEL T. McCAUL
Chairman

PETER T. KING
Chairman
Subcommittee on Counterterrorism and
Intelligence

5

JEFF DUNCAN
Chairman
Subcommittee on Oversight and Management
Efficiency

PATRICK MEEHAN
Chairman
Subcommittee on Cybersecurity, Infrastructure
Protection, and Security Technologies

SUSAN W. BROOKS
Chairman
Subcommittee on Emergency Preparedness,
Response, and Communications

CANDICE S. MILLER
Chairman
Subcommittee on Border and Maritime
Security

RICHARD HUDSON
Chairman
Subcommittee on Transportation Security

DEF-0008

MICHAEL T. McCAUL, TEXAS
CHAIRMAN

BENNIE G. THOMPSON, MISSISSIPPI
RANKING MEMBER



One Hundred Thirteenth Congress
U.S. House of Representatives
Committee on Homeland Security
Washington, DC 20515

April 27, 2013

The Honorable Robert S. Mueller III
Director, Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, DC 20535

Dear Director Mueller:

The United States House of Representatives Committee on Homeland Security has begun an investigation into the recent Boston Marathon bombings. In a letter the Committee sent you last week, we inquired into the events surrounding that incident. We write to you again today with questions specific to the Federal Bureau of Investigation (FBI) that the Committee seeks answers to as we progress with our investigation.

Accordingly, in addition to our call for documents of April 20, 2013, we request, pursuant to Rules X 1(j)(3) and X 3(g)(1) of the House of Representatives, answers to the oversight questions listed below. Unless otherwise specified, all questions relate to the period after the date of the Russian internal security service (FSB) request and prior to the attack of April 15, 2013. Furthermore, these questions pertain only to the deceased Tamerlan Tsarnaev, and not his brother, Dzhokar. We request classified and unclassified responses to the questions. There may be follow-up questions in the future related to Dzhokar.

As you are aware, in liaison memoranda, the FSB warned that Tamerlan Tsarnaev planned to travel from Massachusetts to the Caucasus; a trip the FSB feared might accelerate his radicalization and lead to terrorist activities. The Russians therefore requested an investigation of Tsarnaev, which the FBI undertook.

This is only one example of an area of concern relating to this incident that the Committee seeks to learn more about. According to testimony Secretary of Homeland Security Janet Napolitano provided to Congress, the FBI closed its investigation of Tsarnaev in 2012, unaware that he was on the trip to Dagestan about which the FSB warned. It appears that the FBI was also unaware of Tsarnaev's return travel to Boston later that year.

These and other issues are of particular interest to the Committee. Over eleven years after the September 11, 2001 terror attacks, in which failures to share information between

1

DEF-0009

intelligence and law enforcement agencies played a role, it is crucial that we know whether the same problems arose in relation to this horrible attack.

The following questions reflect the Committee's interests at the present time:

*Contact(s) from Russia*

1. When did the Russian government first submit a memorandum to the FBI regarding Tsarnaev? What were the contents of that memorandum? What action was taken in response? Were there any other communications by the Russian government regarding Tsarnaev? What were the contents of those communications?

2. Did any other agencies receive liaison memoranda from the Russians on Tamerlan Tsarnaev? If so, which individuals and organizations received those memoranda?

3. Did the Office of the Director of National Intelligence (ODNI), National Counterterrorism Center (NCTC), Customs and Border Protection (CBP), DHS's Office of Intelligence and Analysis (I&A), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), State and local law enforcement agencies such as the Massachusetts State Police (MSP), Boston Police Department (BPD), Cambridge Police Department, or the Commonwealth Fusion Center (CFC) or Boston Regional Intelligence Center (BRIC), receive any tearline version of the FSB memo at any time, or were they informed in any other way?

4. Were any of the entities mentioned above made aware of the FSB's interest in Tsarnaev at any time before April 15, 2013? If so, how, and when?

*Investigation*

5. What actions were taken to follow up on the Tsarnaev lead?

6. Did the FBI or any other United States government agency conduct any interviews with members of Tsarnaev's madrassa or mosque, or of any local Massachusetts based Muslim Student Associations?

7. By name, exactly which databases at which agencies were searched for information regarding Tsarnaev? What queries were entered? What results were returned? Do any trace results appear to be more meaningful in retrospect?

8. Did the Joint Terrorism Task Force JTTF issue any national security letters (NSLs) in the Tsarnaev investigation? Did the JTTF request any search warrants or Foreign Intelligence Surveillance Act (FISA) applications during the Tsarnaev investigation? If so, were the applications granted? If not, what were the grounds for denial?

9. What were the interactions, if any, between the JTTF and the Department of Justice's National Security Division (DOJ/NSD), the United States Attorney's Office for the

DEF-0010

District of Massachusetts, the Massachusetts State Attorney General's Office or the Suffolk or Middlesex County District Attorneys' Offices during the 2011 Tsarnaev investigation?

10. Was the JTTF aware of Tsarnaev's radical postings on publicly-available social media?

11. Was counterterrorism analytical support available to those JTTF personnel investigating the Tsarnaev case, and if so, was it utilized? If not, why not?

12. Were any Task Force Officers (TFO) assigned to the Tsarnaev investigation? Were any CBP officers, ICE or HSI agents, Massachusetts State Police troopers, or Boston Police Department detectives, assigned to work on the investigation?

13. What background and training did the FBI Special Agent (S/A) assigned as the case agent for the Tsarnaev investigation have in national security investigations generally, and counterterrorism specifically? What background and training did his or her supervisory special agent have in national security and counterterrorism investigations?

14. How many FBI personnel and how many TFOs, by originating agency, are assigned to the Boston JTTF?

15. What was the highest level within the FBI to be aware of the Tsarnaev investigation before April 15, 2013?

*Investigation Conclusion*

16. What did the FBI's Tsarnaev investigation reveal?

17. Was Tsarnaev placed into the Terrorist Identities Datamart Environment (TIDE) database? If so, when, and on what grounds? Was he removed from the list, and if so, when, and on what grounds?

18. Who were the results of the Tsarnaev investigation shared with, and how were they shared?

19. Were any Intelligence Information Reports issued by the FBI about the Tsarnaev investigation? Were any intelligence reports issued by other United States government entities about Tsarnaev?

20. Was the Tsarnaev investigation referenced in any finished intelligence products disseminated to the wider Intelligence Community, or to State and local law enforcement?

21. Were any U.S. Government entities aware of Tsarnaev's on-line perusal of radical propaganda? If so, who, if anyone, did that agency or entity notify?

3

DEF-0011

22. Did Tsarnaev obtain firearms before April 15, 2013? If so, how?

23. What are the connections, if any, between Tsarnaev and Saudi national Abdul Rahman Ali al-Harbi?

*Investigation Closure*

24. When, and on what basis, was the Tsarnaev investigation closed?  What are the standards for closing such an investigation?  At what level was the decision made to close the investigation?

25. Did any DHS, ODNI, NCTC, or DOJ/NSD officials, or other agent or supervisor in the FBI or on the JTTF, express disagreement with the closure of the Tsarnaev investigation?

26. What Federal, State or local entities were notified of the closure of the Tsarnaev investigation, and how?

27. Did any other Federal, State or local entity, or employee of the same, request that the Tsarnaev investigation be re-opened before April 15, 2013?  If so, what was that request based on?

28. Did any procedures in the FBI Domestic Investigations and Operations Guide (DIOG) prevent the FBI from reviewing open-source material, such as Tsarnaev's radical postings on social media, after the FBI closed the initial investigation into Tsarnaev?

29. Are there procedures for reopening an investigation based on new information surfacing?  If so, were those procedures followed in this case?  Did any FBI personnel, or any other personnel at the JTTF ever consider reopening the Tsarnaev investigation prior to the Boston bombings?  If they were not aware of Tsarnaev's travel to Russia in 2012, would they have considered reopening the investigation had they know of that travel?

*Travel*

30. Was the JTTF or any other FBI element aware of Tsarnaev's 2012 outbound travel to Russia?  If not, why not?

31. Did Tsarnaev travel under an alias, or his true name?

32. Did Tsarnaev have a Russian visa?

33. Which United States Federal entities were aware of Tsarnaev's 2012 travel to Russia?

34. Were any State or local entities made aware of Tsarnaev's 2012 travel to Russia?

4

DEF-0012

37. If so, did DHS relate its terrorism concerns about Tsarnaev, if any, to the JTTF or other FBI entity? If so, how? If not, why not?

38. Were any DHS agencies aware of Tsarnaev's on-line perusal of radical propaganda? If so, who if anyone did that agency or agencies notify?

39. Please explain, in detail, DHS' processing of Tsarnaev's applications for asylum, legal permanent residency, and citizenship from 2003 to 2013.

40. What specific immigration status and benefits were awarded to Tsarnaev and were all U.S. Citizenship and Immigration Services (USCIS) processes adhered to during adjudication of that status and benefits?

41. To what extent did USCIS conduct all relevant background and other national security checks when deciding to award immigration status and benefits to Tsarnaev?

42. In retrospect, could additional authorities or resources for DHS and the FBI have prevented the April 15, 2013 attack?

Please submit a written response to these questions to the Committee no later than May 20, 2013. If you have any questions regarding this letter, please have your staff contact ███████ ██████████ our Committee staff at (202) 226-8417.

Thank you for your attention to these important questions regarding homeland security.

Sincerely,

MICHAEL T. McCAUL
Chairman

PETER T. KING
Chairman
Subcommittee on Counterterrorism and
Intelligence

5

JEFF DUNCAN
Chairman
Subcommittee on Oversight and Management
Efficiency

PATRICK MEEHAN
Chairman
Subcommittee on Cybersecurity, Infrastructure
Protection, and Security Technologies

SUSAN W. BROOKS
Chairman
Subcommittee on Emergency Preparedness,
Response, and Communications

CANDICE S. MILLER
Chairman
Subcommittee on Border and Maritime
Security

RICHARD HUDSON
Chairman
Subcommittee on Transportation Security

6

DEF-0014

MICHAEL T. McCAUL, TEXAS
CHAIRMAN

BENNIE G. THOMPSON, MISSISSIPPI
RANKING MEMBER



One Hundred Thirteenth Congress
U.S. House of Representatives
Committee on Homeland Security
Washington, DC 20515
April 27, 2013

Lieutenant General James R. Clapper
Director of National Intelligence
Washington, DC 20511

Dear Director Clapper:

The United States House of Representatives Committee on Homeland Security has begun an investigation into the recent Boston Marathon bombings. In a letter the Committee sent you last week, we inquired into the events surrounding those attacks. We write to you again with questions specific to the Intelligence Community (IC) that the Committee seeks answers to as we progress with our investigation.

Accordingly, in addition to our call for documents of April 20, 2013, we request, pursuant to Rules X 1(j)(3) and X 3(g)(1) of the House of Representatives, answers to the oversight questions listed below. Unless otherwise specified, all questions relate to the period after the date of the Russian internal security service (FSB) request and prior to the attack of April 15, 2013. Furthermore, these questions pertain only to the deceased Tamerlan Tsarnaev, and not his brother, Dzhokar. We request classified and unclassified responses to the questions. There may be follow-up questions in the future related to Dzhokar.

As you are aware, in liaison memoranda, the FSB warned United States agencies that Tamerlan Tsarnaev planned to travel from Massachusetts to the Caucasus; a trip the FSB feared might accelerate his radicalization and lead to terrorist activities. The Russians therefore requested an investigation of Tsarnaev, which the Federal Bureau of Investigation (FBI) undertook.

This is only one example of an area of concern relating to this incident that the Committee seeks to learn more about. According to testimony Secretary of Homeland Security Janet Napolitano recently provided to Congress, the FBI closed its investigation of Tsarnaev in 2012, unaware that he was on the trip to Dagestan about which the FSB warned. It appears that the FBI was also unaware of Tsarnaev's return travel to Boston later that year.

These and other issues are of particular interest to the Committee. Over eleven years after the September 11, 2001 terror attacks, in which failures to share information between

1

DEF-0015

intelligence and law enforcement agencies played a role, it is crucial that we know whether the same problems continue to exist today.

The following questions reflect the Committee's interests at the present time:

*Contact(s) from Russia*

1. When was the IC first made aware of the Russian government's memorandum to the FBI regarding Tsarnaev? What action, if any, was taken in response? Were there any other communications by the Russian government regarding Tsarnaev? What were the contents of those communications?

2. Did any other IC agencies receive liaison memoranda from the Russians on the same subject? Which individuals and organizations received copies?

3. Did the Office of the Director of National Intelligence (ODNI), National Counterterrorism Center (NCTC), or DHS's Office of Intelligence and Analysis (I&A), receive any version of the FSB memo at any time, either before or after the bombing?

4. Were any of the entities mentioned above made aware of the FSB's interest in Tsarnaev at any time before April 15, 2013? How, and when?

*Investigation*

5. What actions were taken to follow up on the Tsarnaev lead?

6. By name, exactly which databases at which agencies were searched for information regarding Tsarnaev? What queries were entered? What results were returned? Do any trace results appear to be more meaningful in retrospect?

7. Was the IC aware of Tsarnaev's radical postings on publicly-available social media?

8. Were any IC agencies aware of Tsarnaev's on-line perusal of radical propaganda? If so, who if anyone did that agency or agencies notify?

9. What was the highest level within the IC aware of the Tsarnaev investigation before April 15, 2013?

*Investigation Results?*

10. What did the Tsarnaev investigation reveal?

11. Was Tsarnaev placed into the Terrorist Identities Datamart Environment (TIDE) database? If so, when, and on what grounds? Was he removed from the list, and if so, when, and on what grounds?

2

DEF-0016

12. With whom were the results of the Tsarnaev investigation shared, and how?

13. Were any intelligence reports issued by IC entities about Tsarnaev?

14. Was the Tsarnaev investigation referenced in any finished intelligence products disseminated to the wider Intelligence Community, or State and local law enforcement?

15. What are the connections, if any, between Tsarnaev and Saudi national Abdul Rahman Ali al-Harbi?

*Investigation Closure*

16. Did any ODNI, NCTC, or other IC agency, or official, express disagreement with the closure of the Tsarnaev investigation?

17. Did any other Federal, State or local entity, or employee of the same, request that the Tsarnaev investigation be re-opened before April 15, 2013? If so, what was that request based on?

18. Did any IC agency request to add Tsarnaev to TIDE separate from the FBIs request? If so, what was the basis for their request?

*Travel*

19. Was the IC aware of Tsarnaev's 2012 outbound travel to Russia?

20. Did Tsarnaev travel under an alias, or his true name?

21. Did Tsarnaev have a Russian visa?

22. Which Federal entities were aware of Tsarnaev's 2012 travel to Russia?

23. Were any State or local entities made aware of Tsarnaev's 2012 travel to Russia?

24. Was the IC aware of Tsarnaev's 2012 inbound travel from Russia to the United States? If not, why not?

25. Absent notification by DHS, did the IC have any independent means of finding out about Tsarnaev's travel?

*In Russia*

26. What do we know about Tsarnaev's 2012 activities in Russia, and how do we know it? Is there any information which suggests Tsarnaev received terrorist financing, operational guidance, or training in Russia, or elsewhere?

3

DEF-0017

*In retrospect*

27. In retrospect, could additional authorities or resources for the IC have prevented the April 15, 2013 attack?

Please submit a written response to these questions to the Committee no later than May 20, 2013. If you have any questions regarding this letter, please have your staff contact ▇▇▇▇ ▇▇▇▇ our Committee staff at (202) 226-8417.

Thank you for your attention to these important questions regarding homeland security.

Sincerely,

MICHAEL T. McCAUL
Chairman

PETER T. KING
Chairman
Subcommittee on Counterterrorism and Intelligence

JEFF DUNCAN
Chairman
Subcommittee on Oversight and Management Efficiency

PATRICK MEEHAN
Chairman
Subcommittee on Cybersecurity, Infrastructure Protection, and Security Technologies

SUSAN W. BROOKS
Chairman
Subcommittee on Emergency Preparedness, Response, and Communications

CANDICE S. MILLER
Chairman
Subcommittee on Border and Maritime Security

4

DEF-0018

RICHARD HUDSON
Chairman
Subcommittee on Transportation Security

5

DEF-0019

UNCLASSIFIED

May 3, 2013

The Honorable Michael T. McCaul
Chairman
Committee on Homeland Security
U.S. House of Representatives
Washington, DC 20515

The Honorable Peter T. King
Chairman
Subcommittee on Counterterrorism and Intelligence
Committee on Homeland Security
U.S. House of Representatives
Washington, DC 20515

Dear Chairman McCaul and Chairman King:

This responds to your letters dated April 20th and April 27th to Department of Homeland Security Secretary Napolitano, Director of National Intelligence Clapper, and Federal Bureau of Investigation Director Mueller seeking answers to specific questions as well as all materials possessed by the U.S. Government related to Tamerlan Tsarnaev prior to April 15th.

During the week of April 22nd, our agencies provided four classified briefings to Congress discussing the substantial information that federal agencies and Massachusetts state authorities have obtained since the identification of Tamerlan and Dzhokhar Tsarnaev as the persons allegedly responsible for the Boston Marathon bombings. Specifically, much of the information requested in your letters relating to Tamerlan Tsarnaev was briefed to Members of the House of Representatives on April 23rd and 24th including his travel to and from Russia, the FBI's previous assessment of Tamerlan Tsarnaev, and the information that was provided to the U.S. Government by a foreign government prior to April 15th.

This is an active, ongoing investigation to understand and successfully prosecute those responsible for this attack. We will continue to keep Congress informed consistent with our responsibility to protect the integrity of the ongoing investigation. We anticipate providing a briefing update to Congress and will continue to work with staff to schedule it.

Extraordinary collaborative efforts by law enforcement, intelligence, and public safety agencies with the help and cooperation of the public resulted in the identification of Tamerlan and Dzhokhar Tsarnaev and the capture and charging of Dzhokhar Tsarnaev. This exhaustive investigation will continue in order to seek answers and justice for those affected by this tragedy.

Sincerely,



Office of Legislative Affairs
United States Department of Homeland Security

UNCLASSIFIED

UNCLASSIFIED

SUBJECT: Letter to Honorable Michael T. McCaul and Honorable Peter T. King



Legislative Affairs
Office of the Director of National Intelligence



Office of Congressional Affairs
Federal Bureau of Investigation

UNCLASSIFIED

2

DEF-0021

MICHAEL T. McCAUL, TEXAS
CHAIRMAN



DENNIS G. THOMPSON, MISSISSIPPI
RANKING MEMBER

One Hundred Thirteenth Congress
U.S. House of Representatives
Committee on Homeland Security
Washington, DC 20515

May 15, 2013

The Honorable Janet Napolitano
Secretary, Department of Homeland Security
Washington, DC 20528

Lieutenant General James R. Clapper
Director of National Intelligence
Washington, DC 20511

The Honorable Robert S. Mueller III
Director, Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, DC 20535

Dear Secretary Napolitano, Director Clapper, and Director Mueller:

We write in regards to your May 3, 2013 response to our requests for information and documents relating to Tamerlan Tsarnaev and the Boston Bombings that claimed four lives and wounded hundreds of innocent victims. Your letter fails to respond in a meaningful way to our repeated requests for information related to the attacks.

It is the duty of the Department of Homeland Security (DHS), the Federal Bureau of Investigation (FBI) and the National Counterterrorism Center (NCTC) to prevent terrorist attacks in the United States.

It is this Committee's Constitutional responsibility to oversee the Executive Branch in the performance of its domestic counterterrorism efforts. In light of the three domestic terrorist attacks that the nation has suffered since 2009, and the specific alerts received from the Russian government regarding the Tsarnaevs, it is our duty to examine the events leading to the Boston Bombing. Our goal is not to determine culpability for the attack itself. While the Committee is aware that there is an ongoing investigation of Dzhokhar Tsarnaev's role in the attack, recent experience demonstrates that this effort may last for several years. We cannot wait to carry out our oversight duties on behalf of the American people. It is our Constitutional obligation to examine any specific or systemic failures that need to be addressed to prevent potential future attacks upon the Homeland.

DEF-0022

The longer this Committee is prevented from performing its oversight duties, the longer Americans must wait for revelations that could improve our counterterrorism efforts. Therefore, timely consideration of the details surrounding these events is absolutely paramount.

Accordingly, pursuant Clause 1(j)(3) and Clause 3(g)(1) of Rule X of the House of Representatives we repeat our call for documents of April 20, 2013, and our questions sent to your respective agencies sent on April 27, 2013. We require written answers to all of our questions, and all of the requested documents no later than May 20, 2013.

We note, again, that these questions relate to the period prior to the attack of April 15, 2013. Furthermore, these pertain only to the deceased Tamerlan Tsarnaev, and not his brother Dzhokhar, therefore our reviewing them will pose no threat to the ongoing investigation

Finally, in your May 3, 2013 letter you indicate "much of the information requested" in our previous letters was briefed to Members of the House of Representatives on April 23rd and 24th, 2013. Such briefings, including the one provided to Committee staff, while informative, did not address many of our written questions and do not constitute the full and complete answers we expect from each from each agency.

We request all briefing materials, including notes and transcripts, from these meetings. As this information has already been shared with Members of Congress and staff, it should be available to this Committee as it carries out its investigation.

We expect your full and complete cooperation with our investigation as we seek to identify solutions to any specific or systemic issues that will help all of us in our efforts to prevent future attacks upon the homeland. We owe the American people nothing less. As we continue our investigation, please be advised the Committee intends to invite you or your designated representatives to testify under oath in a closed hearing to further examine these matters.

If you have any questions regarding this letter, please have your staffs contact ▮▮▮ ▮▮▮▮▮▮▮▮ our Committee staff at 202-226-8417.

Sincerely,

MICHAEL T. McCAUL,
Chairman

PETER T. KING
Chairman
Subcommittee on Counterterrorism
and Intelligence

CANDICE MILLER
Chairman
Subcommittee on Border
and Maritime Security

PATRICK L. MEEHAN
Chairman
Subcommittee on Cybersecurity, Infrastructure
Protection, and Security Technologies

SUSAN W. BROOKS
Chairman
Subcommittee on Emergency
Preparedness, Response and
Communications

JEFF DUNCAN
Chairman
Subcommittee on Oversight and Management
Efficiency

RICHARD HUDSON
Chairman
Subcommittee on Transportation Security

MICHAEL T. McCAUL, TEXAS
CHAIRMAN



One Hundred Thirteenth Congress
U.S. House of Representatives
Committee on Homeland Security
Washington, DC 20515

BENNIE G. THOMPSON, MISSISSIPPI
RANKING MEMBER

August 6, 2013

The Honorable Eric H. Holder, Jr.
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

The Honorable Robert S. Mueller, III
Director, Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, D.C. 20535

Dear Attorney General Holder and Director Mueller:

The House Committee on Homeland Security ("Committee") is currently investigating the lethal Boston Marathon bombings of April 15, 2013 in order to understand how our Nation's counterterror efforts may be improved. Specifically, the Committee hopes to identify whether the Boston Marathon bombing was the result of systemic communication failures among various intelligence entities, and, if so, whether particular legislation might improve coordination and effectiveness among those federal entities charged with protecting the United States from acts of terror.

To date, the Committee repeatedly has requested documents and briefings from your Bureau to discuss the specifics of Tamerlan Tsarnaev's travel history, among other matters, and information held by the various Executive Branch entities about the threat he posed. The Committee has offered to accommodate any security concerns that the Department or Bureau might have regarding confidential or law-enforcement sensitive information. Nevertheless, the Committee's requests have been denied or largely ignored based on the Bureau's assessment that the Committee's inquiries in this area constitute "non-oversight activities."

This assessment is wrong, and the Committee is troubled and concerned the Bureau would invoke such an interpretation resulting in obstruction of the Committee's work. The Rules of the House of Representatives specifically vest the Committee with broad jurisdiction in the area of "[o]verall homeland security policy," Rule X.1(j)(1), Rules of the House of Representatives, 113th Cong. (2013), in addition to issues relating to functions of the Department of Homeland Security, including: "Border and post security;" "Customs;" "Integration, analysis, and dissemination of homeland security information;" "Domestic preparedness for and collective response to terrorism;"

DEF-0025

"Research and development;" and "Transportation security." *Id.* Rule X.1(j)(3). Accordingly, the Committee has jurisdiction over all homeland security policy issues and specifically is entitled to the information it seeks from the Department and Bureau.

The Committee – as a congressional body – has a constitutionally rooted right of access to the information it needs to perform its Article I legislative and oversight functions. The Supreme Court has made clear that the scope of Congress' power to inquire through its committees is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution, *Eastland v. U.S. Serviceman's Fund*, 421 U.S. 491, 504 n.15 (1975); *see also Watkins v. United States*, 354 U.S. 178, 187 (1957) ("The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them."), and that "where the legislative body does not itself possess the requisite information – which is not infrequently true – recourse must be had to others who do possess it." *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927); *accord Eastland*, 421 U.S. at 504-05. Any suggestion that the Department or Bureau may challenge the Committee's authority in an area specifically committed to it by the Rules of the House is wrong. *See Barenblatt v. United States*, 360 U.S. 109, 124 (1959) ("[T]he scope of the Committee's authority was for the House, not a witness, to determine, subject to the ultimate reviewing responsibility of [the Supreme Court].") Accordingly, the Committee has the constitutional right and obligation to obtain information about matters within its jurisdiction from any relevant source – including, particularly, Executive Branch entities.

Failure to provide the requested information to the Committee will obstruct the ability of the Committee to conduct its legislative and oversight duties to help ensure that our Nation is adequately prepared to prevent future acts of domestic terror. Just as the Department and the Bureau are committed to bringing Dzhokhar Tsarnaev – and any others responsible for the horrific Boston Marathon bombings – to justice, this Committee is equally committed to ensuring that our Nation's counterterrorism efforts are as effective as they can, and need, to be. The Committee stands ready to work with the Department and Bureau, and the entire federal, state, and local intelligence and law enforcement community to prevent future terrorist attacks.

To that end, the Committee once again requests prompt answers to the questions contained in our April 27, 2013 letter (attached as Exhibit A), and access to the documents described in our April 20, 2013 letter (attached as Exhibit B). For your reference, we are enclosing a complete record of the correspondence between the Committee and the Bureau on this topic. The Committee recognizes the important work that the Department and Bureau routinely undertake to improve our Nation's security, and hope that you will be willing partners going forward in the Committee's investigation.

Should you or your staff have any questions or need additional information, please contact ████████████████████████ (202) 226-8417.

Sincerely,

MICHAEL T. MCCAUL
Chairman

Enclosures

cc:

The Honorable Janet Napolitano
Secretary
Department of Homeland Security
Washington, D.C.  20528

The Honorable Robert Goodlatte
Chairman
Committee on the Judiciary
2138 Rayburn House Office Building
Washington, D.C.  20515

DEF-0028