UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
ABDULRAHMAN ALHARBI,           )
                               )
         Plaintiff,            )
                               )
     v.                        )          CIVIL NO. 14-11550-PBS
                               )
GLENN BECK; THEBLAZE, INC.     )
MERCURY RADIO ARTS INC,; AND   )
PREMIERE RADIO NETWORKS, INC.  )
                               )
         Defendant.            )
                               )
_____)
```

**MEMORANDUM AND ORDER**

December 2, 2014

SARIS, Chief Judge.

Abdulrahman Alharbi, a 20 year old student from Saudi Arabia, was a spectator at the Boston Marathon on April 15, 2013, was injured in the bombing, and was questioned by federal authorities investigating the event. He is suing radio and television commentator Glenn Beck, and the owners and distributors of his show, for defamation because they identified him as an active participant in funding the bombing after the authorities exonerated him. The defendants moved to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim, arguing that Alharbi is a limited purpose or involuntary public figure and did not sufficiently plead actual malice in his complaint as required by the First Amendment. After a hearing held on August 11, 2014, the defendants' motion to dismiss is **DENIED**.

1

## I. FACTS

The following facts are drawn from the complaint (Dkt. 1) and are assumed to be true for the purposes of the motion to dismiss. Many of the facts are in dispute.

Plaintiff Alharbi is a student who resides in Revere, Massachusetts. He is a Saudi Arabian citizen. Defendant Beck appears on a daily radio and television show which is broadcast nationwide and also published on the internet, making it available internationally. Beck's show is owned by defendants TheBlaze and parent company Mercury Radio Arts, and distributed and syndicated to United States radio stations by defendant Premiere Radio Networks.

Alharbi was a spectator at the April 15, 2013 Boston Marathon, and was injured by the explosions that occurred near the finish line. Federal authorities questioned Alharbi and, with his permission, searched his apartment. Many news outlets reported on the search and noted that the authorities had questioned a man of Middle Eastern descent in connection with the bombings. Soon afterward, the authorities concluded that Alharbi had no involvement in executing the attacks, and news reports identifying him as a person of interest ceased.

From April 15, 2013 through May 8, 2013 and repeatedly thereafter, Beck made numerous false statements about Alharbi on his radio show, even after he was cleared. He identified Alharbi

2

as an active participant in carrying out the marathon bombings and described him as the "money man" who funded the attacks. Beck accused Alharbi of criminal conduct resulting in loss of life and mass injury, and questioned the motives of federal authorities when they failed to pursue or detain him.

As a result of Beck's statements, Alharbi's reputation has been severely damaged. He has received several messages and has been the subject of online postings calling him "a murderer, child killer, and terrorist."

Alharbi has filed one count of defamation against all defendants, and one count of defamation with malice against Beck individually.

## II. LEGAL STANDARD

To survive a 12(b)(6) motion to dismiss, a complaint must contain sufficient facts which "state a claim to relief which is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). The court "must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). Dismissal for failure to state a claim is appropriate where the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gooley v.

Mobil Oil Corp., 851 F.2d 512, 515 (1st Cir. 1988). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

Typically on a motion to dismiss, the deciding court cannot consider information outside the four corners of the complaint. See Watterson, 987 F.2d at 3. The First Circuit recognizes "narrow exceptions" to this rule "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint." Id.

### III. DISCUSSION

**A. Elements of Defamation**

To establish a defamation claim under Massachusetts law, a plaintiff must allege four elements: "1) that the defendant made a statement, concerning the plaintiff, to a third party; 2) that the statement was defamatory such that it could damage the plaintiff's reputation in the community; 3) that the defendant was at fault in making the statement; and 4) that the statement either caused the plaintiff economic loss . . . or is actionable without proof of economic loss." Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (internal quotation marks omitted), citing Ravnikar v. Bogojavlenksy, 438 Mass. 627, 629-30 (2003). "Four types of statements are actionable without proof of economic loss: statements that constitute libel . . .; statements that

4

charge the plaintiff with a crime; statements that allege the plaintiff has certain diseases; and statements that may prejudice the plaintiff's profession or business." Ravnikar, 438 Mass. at 630 (citations omitted). In most cases,[1] the statement must be false, and truth will constitute a defense. Id. at 630 n.3. Because of the First Amendment's "protection of true speech on matters of public concern," a private figure plaintiff suing a media defendant regarding speech on such matters bears the burden of proving that the speech is false. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 777 (1986); see also Dulgarian v. Stone, 420 Mass. 843, 847 (1995).

"The level of fault required varies between negligence (for statements concerning private persons) and actual malice (for statements concerning public officials and public figures)." Ravnikar, 438 Mass. at 630 (citations omitted). The fault standard takes into account Supreme Court doctrine developed under the First Amendment, which "sets clear limits on the application of defamation law with respect to any factual statement published in the news media about a public official or

---

[1] Massachusetts law is unusual in that, by statute, it permits some true statements to form the basis of libel actions if the plaintiff proves "actual malice," which in this context is defined as "malevolent intent or ill will." Mass. Gen. Laws ch. 231 § 92; Noonan v. Staples, Inc., 556 F.3d 20, 28 (1st Cir. 2009) (interpreting the meaning of "actual malice" in Massachusetts statute). "The scope of the statute, however, is limited by the provisions of the First Amendment to the United States Constitution." Ravnikar, 438 Mass. at 629 n.3.

public figure, even when that statement is shown to be false and defamatory." <u>Murphy v. Boston Herald, Inc.</u>, 449 Mass. 42, 48 (2007). If a plaintiff is a public official or public figure, he "must prove, by clear and convincing evidence, that the defendant published the false and defamatory material with 'actual malice,' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." <u>Id.</u>, quoting <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 279-80 (1964).

The Supreme Court has identified three different types of public figures: 1) all-purpose public figures, who "assume[] roles of especial prominence in the affairs of society," such as those who occupy positions of "persuasive power and influence"; 2) limited purpose public figures, who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved"; and 3), involuntary public figures, who may "hypothetically" arise in "exceedingly rare" instances where, "someone . . . become[s] a public figure through no purposeful action of his own." <u>Gertz v. Welch</u>, 418 U.S. 323, 345 (1974).

Here, the defendants contend that Alharbi is either a limited purpose or an involuntary public figure. They assert that his complaint does not allege sufficient facts to demonstrate actual malice, and accordingly that it should be dismissed. The question of public figure status "is of constitutional dimension

6

and, thus, federal law controls." Pendleton v. City of Haverhill,
156 F.3d 57, 68 (1st Cir. 1998). Further, public figure status is
"a question of law, . . . properly resolved by the court, not by
the jury, regardless of the contestability of the predicate
facts." Id.

**B. Limited Purpose Public Figure**

A person becomes a limited purpose public figure when he
"voluntarily injects himself or is drawn into a particular public
controversy and thereby becomes a public figure for a limited
range of issues." Lluberes v. Uncommon Prods., LLC, 663 F.3d 6,
13 (1st Cir. 2011), quoting Gertz, 418 U.S. at 351. The First
Circuit uses a two-pronged test to determine whether a defamation
plaintiff fits the limited purpose public figure category. First,
it must be shown that "persons actually were discussing some
specific question . . . [and] a reasonable person would have
expected persons beyond the immediate participants in the dispute
to feel the impact of its resolution." Id. at 13 (citation and
internal quotation marks omitted). Second, "[o]nce a controversy
is isolated, the critical question then becomes whether the
plaintiff has attempted to 'influence the resolution' of that
controversy." Id.

In Lluberes, two brothers who managed their family's
Dominican Republic sugar cane conglomerate sued a filmmaker,
alleging that a documentary on the sugar industry identified them

7

as responsible for poor conditions endured by plantation
laborers. Id. at 11. On a motion for summary judgment, the
district court held that the brothers were limited purpose public
figures, and the First Circuit affirmed. Id. at 27. There had
existed an ongoing debate about practices in the sugar industry
for several years before the film's release, and during that
period the plaintiffs had, among other things: retained a public
relations firm to run an international campaign rehabilitating
the industry's image, sent an employee to be interviewed on PBS,
and hosted an industry luncheon where journalists from Dominican
Republic newspapers were invited to come ask questions. Id. at
17. In short, the court held, the brothers "leveraged their
positions and contacts to influence a favorable outcome in the .
. . controversy[; they] enjoyed access to the press and exploited
it by orchestrating a PR blitz to garner public support and mute
their critics." Id.

The First Circuit also found that a plaintiff had limited
purpose public figure status in Pendleton v. City of Haverhill,
where a man who was arrested and then acquitted of a cocaine
possession charge sued the arresting officers for continuing to
suggest his guilt to the press after the case ended. 156 F. 3d at
61-62. Pendleton, who was African-American, had been
unsuccessfully seeking a permanent teaching job in the city and
granted an interview with the press wherein he vented his

frustrations about race and hiring. Id. at 60-61. When he was arrested on the drug charge roughly nine months later, it made front page news in the local newspapers and "a flurry of media reports followed" the resolution of the case, at which point Pendleton granted an interview telling his side of the story. Id. at 61. Subsequently, the arresting officers were publicly quoted stating their belief that Pendleton had been using drugs and should be in rehabilitation, and suggesting it was his own fault if his alleged conduct kept him from securing a teaching job. Id. at 62. On a motion for summary judgment, the district court found – and the First Circuit affirmed – that a public controversy existed over minority hiring in Haverhill schools, and that when Pendleton granted his first interview, "he invited public debate both on the general issue of minority representation and on the specific characteristics that made him suitable (or not) for a teaching position." Id. at 69-70.

Here, there is no question that a public controversy existed, whether it is framed narrowly as a debate over who was responsible for the Marathon bombings, or more broadly as part of an ongoing discussion about public safety, national security, and terrorism. The more significant question is whether Alharbi voluntarily "thrust himself into the vortex of [that] public issue" such that he became a limited purpose public figure. Gertz, 418 U.S. at 352. Given the facts alleged in the complaint,

9

it is clear that he did not. The complaint merely states that Alharbi attended and watched the marathon, he was injured in the explosion, he was questioned by authorities, his home was searched, and his name was cleared in short order. While the complaint does note that Alharbi was the subject of numerous media reports after he was questioned, it does not indicate that he voluntarily sought out this press attention. Thus, apart from his decision to attend the marathon in the first place, the facts alleged in the complaint do not depict a figure thrusting himself into a controversy.

The defendants argue that Alharbi did voluntarily inject himself into the Marathon bombing controversy by granting interviews with news outlets and by "behaving suspiciously" near the finish line after the explosions. In support of these arguments, the defendants urge the court to take judicial notice of several interviews the Plaintiff granted news outlets in the wake of the search of his home, a Homeland Security Committee Report on the marathon bombings, and other news articles. The Plaintiff does not agree to the consideration of any of these documents, arguing that they are not central to his claim, and are not referred to in the complaint.

As for the "official public records" exception to the motion to dismiss standard of review, the First Circuit has held that it "appears limited, or nearly so, to documents or facts subject to

judicial notice under Federal Rule of Evidence 201," which refers to facts "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction; or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013); Fed. R. Evid. 201. Most of the defendants' exhibits fail to meet that definition. The defendants rely on a report by the House Homeland Security Committee, entitled "The Road to Boston: Counterterrorism Challenges and Lessons from the Marathon Bombings", for their contention that Alharbi injected himself into the public eye through suspicious behavior at the time of the explosion. It states:

> Shortly after the attack, the Boston Police Department (BPD) detained a Saudi national who was reportedly behaving suspiciously near the site of the explosions. This individual was questioned for nearly five hours and voluntarily allowed BPD officers, as well as FBI and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) agents to search his apartment. Although his actions and the resulting questioning led to speculation regarding his involvement, the Saudi national was later confirmed by BPD not to be a suspect.

(Def. Ex. 2, at 0046-47). While a legislative report is a public record properly subject to judicial notice of its "existence and contents, this does not mean that the court must accept the findings in the report as indisputable truth; the findings are

merely evidence of the facts asserted . . . . The credibility of
such evidence will vary according to the thoroughness and
impartiality with which the committee conducted its
investigation, the fairness of its procedure, [and] the fullness
of opportunity it afforded accused individuals or organizations
to develop their side of the story . . . ." <u>Stasiukevich v.
Nicolls</u>, 168 F.2d 474, 479 (1st Cir. 1948). Here the report does
not conclude plaintiff was involved in the bombing, but carefully
cabins its findings by stating he was "reportedly behaving
suspiciously," and referring to "speculation" about his
involvement. It also relies on the press report from the <u>Boston
Herald</u> dated April 16, 2013 that states he was <u>not</u> taken into
custody as a suspect.   The Court declines to take judicial
notice of the truth of any "facts" contained in the documents
submitted by defendants.

While the plaintiffs in <u>Lluberes</u> and <u>Pendleton</u> each
affirmatively sought out press coverage in order to influence
public perception of their respective controversies, based on the
facts alleged, the media attention Alharbi received was
involuntary and, indeed, unwanted. The complaint does not
indicate that he "voluntarily injected" himself into the marathon
bombing controversy, and thus, at this stage of litigation, he
does not qualify for limited public figure status under First
Circuit precedent.

The out-of-Circuit cases that the defendants rely upon are unpersuasive. The defendants point to Hatfill v. New York Times Co., 532 F.3d 312 (4th Cir. 2008), in which the plaintiff, a bio-defense research scientist, sued the New York Times after a columnist published a series of articles presenting evidence that he was responsible for the post-9/11 anthrax attacks. The Fourth Circuit defined the public controversy as broadly concerning bioterrorism and national security, not just who committed the attacks. Id. at 323. In that context, the court found that Hatfill was a limited purpose public figure, noting that he was "a respected figure within the U.S. bioterrorism community, giving public lectures and becoming involved in preparedness training for bioterrorist attacks," and he had briefed government officials, taught, written papers, and spoken in public forums on the subject. Id. at 319-20. Further, he had been interviewed or offered commentary in Quebec Science magazine, Insight, the Washington Times, and The Baltimore Sun, among others, and was generally viewed as an expert in the field. Id. 320-21. Affirming the district court's grant of summary judgment for the defendants, the court stated, "[t]hrough these media, Dr. Hatfill voluntarily thrust himself into the debate," and after the anthrax attacks occurred, "used the attacks as a platform from which to intensify his message about national unpreparedness" for a bioterrorist attack. Id. at 324. While it is true that, like

Alharbi, Hatfill was briefly considered a suspect in a terrorist attack and also had his home searched by the authorities, the similarities between the two end there. Nothing in Alharbi's complaint suggests he was ever considered a public intellectual on the subject of terrorism or any other permutation of the Marathon bombing controversy.

Similarly, Alharbi does not fit the limited purpose public figure mold described in Atlanta-Journal Constitution v. Jewell, 555 S.E.2d 175 (Ga. Ct. App. 2001). In Jewell, the security guard who discovered the bomb and helped evacuate people in the Olympic Park bombing later became a suspect, and sued the Atlanta Journal-Constitution for defamation. Id. at 178. Jewell had initially been hailed in the news media as a hero, and had agreed to a photo shoot and no less than ten interviews in which he described his heroics to media outlets such as the Boston Globe and CNN. Id. at 182. Accordingly, the court found he was a limited purpose public figure because he "voluntarily assumed a position of influence in the controversy" over public safety at the park. Id. at 184. He "was prominent enough to require the assistance of a media handler to field press inquiries and coordinate his media appearances." Id. Here, the complaint indicates that Alharbi never reached a comparable level of engagement with the media after the bombing: he was never publicly lauded as a hero, and while he gave interviews to news

14

outlets, the parties dispute the circumstances of those interviews.[2]

None of the cases cited by the defendants plausibly suggest that, based on the facts alleged in the complaint, Alharbi should be considered a limited purpose public figure.

## C. Involuntary Public Figure

The viability of the "involuntary public figure" category has been uncertain since the Supreme Court first suggested it as a hypothetical and "exceedingly rare" occurrence in Gertz.[3] In the forty years since, the Supreme Court has never found any defamation plaintiff to be an involuntary public figure, and only a few lower courts have done so.

In Dameron v. Washington Magazine, Inc., 779 F.2d 736 (D.C. Cir. 1985) the sole air traffic controller on duty at Washington Dulles Airport on the day the TWA plane crashed into Mt. Weather

---

[2] Based on this limited record, the Court need not determine whether plaintiff's interviews with the press inserted him into the controversy so as to make him a limited purpose public figure or, on the contrary, render his conduct protected because "an individual should not risk being branded with an unfavorable status determination merely because he defends himself publicly against accusations, especially those of a heinous character." Lluberes, 663 F.3d at 19; see also Time Inc. v. Firestone, 424 U.S. 448, 454 n.3 (1976) (holding that conducting press conferences to respond to reporter questions about highly publicized divorce did not convert plaintiff into public figure).

[3] See, e.g., W. Wat Hopkins, The Involuntary Public Figure: Not So Dead After All, 21 Cardozo Arts & Ent. L.J. 1, 13-14 (2003) (noting that both courts and scholars have "questioned the continued vitality of the involuntary public figure").

in 1974 sued The Washingtonian magazine for suggesting he had
been assigned partial blame for the accident. Id. at 738. The
D.C. Circuit held that Dameron was an involuntary limited purpose
public figure in the controversy over "air safety in general and
the Mt. Weather crash in particular." Id. at 741. Based on the
language in Gertz that acknowledged the hypothetical possibility
that an individual could become a public figure involuntarily,
the court reasoned that "[b]y sheer bad luck, Dameron happened to
be the controller on duty at the time of the Mt. Weather crash. .
. . He became embroiled, through no desire of his own, in the
ensuing controversy over the causes of the accident. He thereby
became well-known to the public in one very limited connection, .
. . [the] same very limited connection that The Washingtonian's
brief and oblique reference to him surfaced years later." Id. at
742. His central role in the controversy sufficed to create
involuntary public figure status.

A handful of other cases have found a plaintiff to be an
involuntary public figure. See, e.g., Zupnik v. Associated Press,
Inc., 31 F. Supp. 2d 70, 73 (D. Conn. 1988) (holding that the
wife of a doctor whose alleged criminal conduct attracted intense
media attention was an involuntary public figure); Bay View
Packing Co. v. Taff, 198 Wis. 2d 653, 682-84 (Wis. Ct. App. 1995)
(holding that food processing company which inadvertently
processed foods using untreated water became involuntary limited

16

purpose public figures in controversy over local water supply contamination); Jewell, 555 S.E.2d at 186 (holding that security guard was at least an involuntary public figure because he "had the misfortune to have a tragedy occur on his watch"). Thus, the involuntary public figure is a rare bird, but not an extinct one.

The Fourth Circuit has delineated a useful test to determine whether a defamation plaintiff is an involuntary public figure. It concluded it was "hesitant to rest involuntary public figure status upon 'sheer bad luck,' [because] Gertz tells us that involuntary public figures 'must be exceedingly rare,' and, unfortunately, bad luck is relatively common." Wells v. Liddy, 186 F.3d 505, 538-39 (4th Cir. 1999) (citations omitted). Wells involved a secretary who was employed at the Democratic National Committee at the time of the Watergate break-in. The defendant published a theory suggesting that the break-in occurred because someone was seeking photographs in Wells's desk "that were used to offer prostitution services to out-of-town guests." Id. at 512. The court rejected the defendant's argument that Wells was an involuntary public figure, stating:

> The Dameron definition of an involuntary public figure,
> someone who by bad luck is an important figure in a
> public controversy, runs the risk of returning us to
> [a] conception of defamation law . . . [under which]
> all defamation plaintiffs were required to prove actual
> malice when the allegedly defamatory statements
> occurred during 'discussion and communication involving
> matters of public or general concern, without regard to
> whether the persons involved are famous or anonymous.'
> Rosenbloom v. Metromedia, 403 U.S. 29, 44 (1971). The

> Supreme Court expressly repudiated the 'public
> interest' test in <u>Gertz</u>, <u>see</u> 418 U.S. at 346, . . .
> and further disavowed it in <u>Wolston</u>, <u>see</u> 443 U.S. at
> 168 . . . ("To accept such reasoning would in effect
> reestablish the doctrine advanced by the plurality
> opinion in <u>Rosenbloom</u>, which concluded that the New
> York Times standard should extend to defamatory
> falsehoods relating to private persons if the
> statements involved matters of public or general
> concern. We repudiated this approach in <u>Gertz</u> and in
> <u>Firestone</u>, however, and we reject it again today.")

<u>Wells</u>, 186 F.3d at 539. Setting its own standard for involuntary

public figures, the court held that an individual must have

"assumed the risk of publicity" to be assigned that status,

meaning that he "has taken some action, or failed to act when

action was required, in circumstances in which a reasonable

person would understand that publicity would likely inhere." <u>Id.</u>

at 540.

As the Fourth Circuit recognized, to accept a definition of

"involuntary public figure" that includes any unfortunate person

swept up into a public tragedy is the functional equivalent of

returning to the rule that any person involved in a matter of

public interest cannot make out a claim for defamation without

alleging actual malice. The Supreme Court has indeed squarely

rejected that logic. <u>See</u> <u>Wolston v. Reader's Digest Ass'n, Inc.</u>,

443 U.S. 157, 167 (1979) ("A private individual is not

automatically transformed into a public figure just by becoming

involved in or associated with a matter that attracts public

attention."). Accordingly, the Court will apply the <u>Wells</u> test

18

for involuntary public figure status.

Choosing to attend a sporting event as one of thousands of spectators is not the kind of conduct that a reasonable person would expect to result in publicity. Quite to the contrary, a spectator at an event like the Boston Marathon would reasonably expect to disappear into the throngs of others, never attracting notice by the press. Because he did not "assume the risk of publicity," Alharbi does not meet the definition of an involuntary public figure under this test. Even if Alharbi were briefly an involuntary public figure, under Gertz and Dameron, the question is whether that status evaporated once he was exonerated by the authorities. The Supreme Court has not decided "whether or when an individual who was once a public figure may lose that status by the passage of time," Wolston, 443 U.S. at 166 n.7. However, the better reading of the policies underpinning Wolston and Gertz leads to the conclusion that even if a private person meets the definition of an involuntary public figure as a matter of bad luck during a public controversy, the status is of limited duration. As such, Alharbi lost that status when his name was cleared.

**D. Fault**

As a private figure, Alharbi is not required to allege actual malice in order to make out a claim for defamation. Instead, the level of fault required on the defendants' part is merely negligence. See Ravnikar, 438 Mass. at 630. The facts alleged in Alharbi's complaint easily permit an inference that

the defendants were negligent as to the truthfulness of their reports after the authorities cleared his name. The Court need not determine whether the allegations create a plausible claim of actual malice.

**<u>ORDER</u>**

The Court **<u>DENIES</u>** the defendants' motion to dismiss (Docket No. 11).


                                    /s/ PATTI B. SARIS
                                    PATTI B. SARIS
                                    United States District Judge