<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS
 2

 3    ABDULRAHMAN ALHARBI,              )
                                        )
 4                   Plaintiff          )
                                        )
 5            -VS-                       )  CA No. 14-11550-PBS
                                        )  Pages 1 - 39
 6    GLENN BECK, et al,                )
                                        )
 7                   Defendants         )


 8

 9                           MOTION HEARING

10            BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES CHIEF DISTRICT JUDGE
11

12

13

14

15                              United States District Court
                                1 Courthouse Way, Courtroom 19
16                              Boston, Massachusetts  02210
                                May 23, 2016, 10:05 a.m.
17

18

19

20

21

22

23                      LEE A. MARZILLI
                   OFFICIAL COURT REPORTER
24            United States District Court
              1 Courthouse Way, Room 7200
25                 Boston, MA  02210
                      (617)345-6787
</pre>

1    A P P E A R A N C E S:

2         PETER J. HALEY, ESQ., Nelson Mullins Rile &
     Scarborough, LLP, One Post Office Square, 30th Floor,
3    Boston, Massachusetts, 02109, for the Plaintiff.

4         MICHAEL J. GRYGIEL, ESQ. and ZACHARY C. KLEINSASSER,
     ESQ., Greenberg Traurig, LLP, One International Place,
5    20th Floor, Boston, Massachusetts, 02110, for the
     Defendants.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2          THE CLERK:  Court calls Civil Action 14-11550,

3    Alharbi v. The Blaze, et al.  Could counsel please identify

4    themselves.

5          MR. HALEY:  Good morning, your Honor.  My name is

6    Peter Haley.  I represent the plaintiff, Abdulrahman

7    Alharbi.

8          THE COURT:  Thank you.

9          MR. GRYGIEL:  Good morning, Chief Judge Saris.

10   Mike Grygiel, Greenberg Traurig, along with Zachary

11   Kleinsasser.  We represent the defendants.

12         THE COURT:  First of all, thank you for being here

13   so early on a Monday morning.  I hope you were able to

14   travel this morning rather than last night, but it's a

15   beautiful day in New England.  Where do you come in from?

16         MR. GRYGIEL:  I traveled from Albany,

17   Chief Judge Saris, last night.

18         THE COURT:  Oh.  And you're from around here,

19   right?

20         MR. HALEY:  I am, yes, your Honor, just a quick

21   walk over the bridge.

22         THE COURT:  This is your motion, but before we do

23   that, as I understand it, I'm about to get three joined

24   motions:  this one, the motion to compel disclosure of

25   confidential sources.  The second is, as I understand it,

```
 1   which is joined at this point, is the issue with respect to
 2   confidential documents, which involves the government, and I
 3   guess both of you are involved.  But we're slowed down a little
 4   in getting to that because my law clerk is currently trying to
 5   get access or permission to see classified documents.  I have
 6   it just by nature of being a federal judge, but to the extent I
 7   need law clerk assistance, that security classification has to
 8   come in.  I'm assuming none of you have seen it or have that
 9   kind of classification, right?
10           MR. HALEY:  That's correct, your Honor.
11           MR. GRYGIEL:  I do not, your Honor.
12           THE COURT:  And then the third issue is, of course,
13   the motion for summary judgment, which, ideally speaking, will
14   be filed at the end of this month?  Right?
15           MR. GRYGIEL:  A week from tomorrow.  We're very
16   acutely aware of the date, Chief Judge Saris.
17           THE COURT:  Yes, and I am, unfortunately for you,
18   going to hold you to the dates because the clerkship year ends,
19   and I'm trying to wrap up all three motions by the end of the
20   summer.  Now, that's not necessary because, of course, I'll
21   transition it -- I have a January-to-January clerk -- we'll
22   transition it there in the event of trial.  But I just know
23   that we have three big issues looming on the horizon, and I'm
24   unlikely to rule, for example, on this one until I also rule on
25   what the classification is in terms of limited figure or not
```

1  because I think, as I read the case law, there's some

2  intertwining of what's the standard of proof, how much do you

3  need it, that kind of thing.

4       So let me start with you, and I'm going to start way

5  back in the beginning.  What are your claims here?  Are they

6  under Massachusetts law only, or are they also under Texas law?

7       MR. HALEY:  Your Honor, the plaintiff's primary claim

8  is under Massachusetts law, but the plaintiff also believes

9  that it can bring a claim under Texas law.  The difference

10  between the laws of the Commonwealth and the State of Texas are

11  that Texas provides for punitive damages and Massachusetts does

12  not.  The plaintiff believes that it's appropriate in this

13  instance, as courts have held in other instances, that the

14  plaintiff be allowed to avail himself of the law of Texas as to

15  punitive damages, in that the defendants are located in Texas

16  and the statements emanated from the state of Texas.

17       THE COURT:  So let me just go from very basics.  What

18  would be the elements that you have to prove under Massachusetts

19  law of defamation?

20       MR. HALEY:  Under Massachusetts law, defamation, your

21  Honor, the plaintiff would need to prove that a statement was

22  made and that the statement was defamatory, that it was the

23  type of statement that would damage the plaintiff's reputation.

24  Thirdly, the plaintiff would need to prove that the defendants

25  were at fault in making the statement and --

1              THE COURT:  At fault means what, negligent?

2              MR. HALEY:  At fault means either negligence or actual

3    malice.

4              THE COURT:  Depending on what kind of figure?

5              MR. HALEY:  Depending on what kind of figure, and also

6    relates to the issue of punitive damages to the extent that

7    becomes relevant.

8              THE COURT:  But not in Massachusetts law?

9              MR. HALEY:  Not in Massachusetts, no, your Honor.

10             THE COURT:  There are no punitives in Massachusetts?

11             MR. HALEY:  There are no punitives in Massachusetts

12   law.

13             The fourth element of the defamation claim in

14   Massachusetts, your Honor, is that there be economic damages,

15   unless the statement is of the type that doesn't require that

16   proof.  The statements of the type that don't require that

17   proof are statements that includes being accused of a crime,

18   which clearly in this instance has taken place.  So those are

19   the basic elements for defamation, as the Court reviewed in its

20   December, 2014 opinion.

21             THE COURT:  All right, so as far as the Texas -- this

22   is why I'm going through this -- Texas is the same, or Texas is

23   different?

24             MR. HALEY:  Texas is essentially the same, your Honor,

25   except that statements that are made with actual malice in

1   Texas allow the plaintiff to afford himself or herself of

2   punitive damages.

3          THE COURT:  And how would you -- many of the cases do

4   the balancing in terms of whether or not somebody has to prove

5   actual malice, the plaintiff has to prove actual malice or not.

6   I was trying to think this through.  Let's assume for a

7   minute -- and I'm not putting any words -- you've got a very

8   outstanding case, A, that a statement was made, B, that it was

9   defamatory, and the last one, that it is an accusation of a

10  crime, it strikes me that the one that's clearly the primary

11  one that's at issue is, was there fault, the third one?

12         MR. HALEY:  Correct, your Honor.

13         THE COURT:  Was there fault?  And the other might --

14  may be whether truth is a defense.  I don't know enough to know

15  whether that is something -- "truth is a defense" is a

16  Massachusetts and Texas?

17         MR. HALEY:  Yes, your Honor.  If the statements were

18  true, that would be a defense.

19         THE COURT:  An affirmative defense in both areas?

20         MR. HALEY:  Yes, your Honor.

21         MR. GRYGIEL:  It is, your Honor, but the plaintiff has

22  the burden at all times of proving falsity in the first

23  instance.

24         THE COURT:  Right, and so I think he will have no

25  problem proving that because he's going to deny it, so there's

1   evidence there.  So then you'll have to come up with an

2   affirmative defense, which is, he's lying.

3          MR. GRYGIEL:  Chief Judge Saris, even on this motion,

4   I think that the ability to prove falsity is uncertain at best.

5   Our documents in the motion record show that the statements

6   made by Secretary Napolitano before the Senate Judiciary

7   Committee on April 23 are flatly contradicted by the face of

8   the government documents.

9          THE COURT:  I'm just saying, I'm sitting there in

10  front of a jury, and he says under oath, the plaintiff, "I was

11  no terrorist.  I did not finance," he's going to get to a jury.

12  That's all I'm saying.  He's going to make his burden.  So the

13  question is how much he needs the evidence.  And then you'll

14  affirmatively assert, "No, truth is a defense," and it will be

15  a fact question for this jury.  But the question really as a

16  matter of law will be, can he get past the negligence or actual

17  malice issue.  Is that right?

18         MR. HALEY:  I believe that's correct, yes, your Honor.

19         THE COURT:  So I'm just trying to focus us in.  And

20  that would be the exact same under Texas law, there's no

21  difference there, because that's the one thing I hadn't quite

22  focused on before is that there's a possible claim under Texas

23  law.

24         MR. HALEY:  The only difference under Texas law, your

25  Honor, is essentially the availability of punitive damages.

```
 1            THE COURT:  All right, so it's just a question of the

 2    damages.  And has any court there ruled whether or not that's

 3    consistent with the First Amendment?

 4            MR. HALEY:  The Texas, the common law which allows the

 5    recovery for punitive damages I don't think has been

 6    successfully challenged on First Amendment grounds, your Honor,

 7    or not that I'm aware of.

 8            THE COURT:  There's no case law on it?

 9            MR. HALEY:  I don't feel confident stating that this

10    morning, your Honor, but I'm not aware of any case law on it.

11            THE COURT:  All right, so, now, on the motion to

12    compel, so let's -- I'm going to jump over the timeliness

13    issue.  I didn't view that as persuasive, but where I'm really

14    struggling with is the bal- -- because you need to weigh it

15    under the case law to see if you can get it somewhere else.

16    Why don't you wait and tell me motion to compel.

17            MR. HALEY:  Certainly, your Honor.  Your Honor, so the

18    Court has narrowed the issues.  The central issue in the case

19    is, were the defendants at fault in making the statements?  And

20    the primary statement that was made was a statement that was

21    made by Mr. Beck on May 8, 2013, and at that time he says, "You

22    know who the Saudi is, the money man.  That's who the Saudi is.

23    He's the guy who actually paid for it.  He's the money man."

24    And his radio cohort at the time says, "Do you think -- I mean,

25    is this speculation, or are you reporting, or something in
```

1   between?  Is that what we're learning?"  And Mr. Beck says

2   without equivocation, "He's the money man."

3          When asked about those statements, Mr. Beck in his

4   deposition said that he found them striking; and then asked why

5   he found them striking, he said, "It's clear that I must know

6   with a certainty that this is true at the time," that the

7   plaintiff funded the Boston Marathon attacks.  While the --

8          THE COURT:  Is that Mr. Beck's language, that he knew

9   with a certainty back then?

10          MR. HALEY:  I don't recall this specifically, but it

11   was, "It's striking language to me to have Stu question me and

12   then say he's the money man.  That's striking language for me.

13   Question:  Why is that striking?  Answer:  Because it's clear

14   that my belief is very clear based on our sources, and I

15   believe that -- I believed that then and I believe that now --

16   based on what our sources were telling us.  So our sources were

17   coming to us with more information.  Question:  And the people

18   that the sources would have reported that information to would

19   be Joel?  Answer:  Would be Joel Cheatwood or Joe.  I'm not

20   sure which."  Joe refers, the plaintiff would submit, to Joe

21   Weasel, who's the person who had the actual contact.

22          So the issue of fault --

23          THE COURT:  Is Weasel the one who always had the

24   contact?

25          MR. HALEY:  Yes, your Honor.

1          THE COURT:  Cheatwood was like his supervisor?

2          MR. HALEY:  Mr. Cheatwood was the supervisor.

3    Mr. Cheatwood did meet with one of the confidential sources,

4    but the primary contact was between Mr. Weasel and the

5    witnesses.  And the witnesses, according to Mr. Weasel, tell

6    him that the plaintiff has financed the Boston Marathon

7    attacks, but they don't tell him anything else.

8          "And when you said he financed it, did he tell you any

9    amounts?

10          "No.

11          "Did he tell you how the financing was accomplished?

12          "No.

13          "Did he tell you what the financing was used for?

14          "No.

15          "Did he tell you when the financing took place?

16          "No.

17          "Did he tell you how the funds were transferred?

18          "No.

19          "Did he tell you the amounts of the financing?

20          "No."

21          There's no other information that would verify what

22    Mr. Weasel is testifying to.

23          THE COURT:  And that was one source who said that?

24          MR. HALEY:  That was two primary sources.  This is at

25    a meeting with the sources, one who apparently had more

1  certainty than the other.  And then --

2         THE COURT:  Those are the ones who are internal

3  government employees of the Department of Homeland Security?

4         MR. HALEY:  According to Mr. Weasel's testimony,

5  they're employees of the Department of Homeland Security, which

6  is striking because on April 23 in her testimony to Congress,

7  Secretary Napolitano testified that Mr. Alharbi, who was

8  referred to as "the Saudi" in that testimony, had no

9  involvement whatsoever, that he was simply in the wrong place

10 at the wrong time.  So this is May 8, well some 15 days after

11 Secretary Napolitano's testimony that in fact Mr. Alharbi had

12 no involvement in these attacks.

13        Now, the defendants --

14        THE COURT:  Excuse me.  I couldn't tell.  I was trying

15 to understand Exhibits 60 and 61.  I found them very difficult

16 just to even understand what they were trying to say.  Were

17 those documents predated May 8?

18        MR. HALEY:  Yes, they did.

19        THE COURT:  Do we have dates on them?  We couldn't

20 even figure out when they were made.

21        MR. GRYGIEL:  I can answer that, Chief Judge Saris.

22        THE COURT:  Yes, go ahead, go ahead.

23        MR. GRYGIEL:  The Text 2 database screenshots were

24 entered on April 15 and 16, so the Monday of the Boston

25 Marathon bombing and then the subsequent day.  The event file

1    screenshot, which is just the white page with the box in the

2    middle, that is part of a larger file that was created at some

3    point on Tuesday, April 16.

4         THE COURT:  So these two documents, 60 and 61, were

5    immediately following the Marathon bombing.  Okay, well, that's

6    interesting.  That was the initial impression of Homeland.

7    Then Secretary Napolitano says, no, they've been exonerated.

8    Were these source meetings with the sources after her

9    testimony?  Do we know?

10        MR. HALEY:  Yes, your Honor.  The testimony Mr. Weasel

11   provides is that this meeting took place --

12        THE COURT:  With the two Homeland Security people?

13        MR. HALEY:  With the Homeland Security people, that

14   there was constant communication throughout, and I believe the

15   meeting itself took place on or about either the same day or

16   shortly thereafter.

17        THE COURT:  The same day of what?

18        MR. HALEY:  Of Secretary Napolitano's testimony.

19        THE COURT:  So they were April --

20        MR. HALEY:  April 23.

21        THE COURT:  April 23, and so that was the last of the

22   confidential source meetings, and then he uses it again on

23   May 8.

24        MR. HALEY:  Yes.  Well --

25        THE COURT:  As far as you know.

1          MR. HALEY:  As far as the plaintiff knows, he, being

2     Mr. Beck, spoke about it on May 8.  And Mr. Weasel himself is

3     asked, "Did you make any notes of these statements?

4          "No.

5          "Did you make any recordings?

6          "No.

7          "Are you aware of any other way to verify or confirm

8     what the confidential source told you other than by speaking to

9     the confidential source?

10         "No.  FOIA would be the only other way."

11         And referring to FOIA, Mr. Weasel was referring to the

12    Freedom of Information Act.

13         So the defendants --

14         THE COURT:  I saw that.  What could you get under the

15    Freedom of Information Act?  I'm just trying to understand.  Is

16    the theory that -- did the sources ever say to Mr. Weasel or

17    Mr. Cheatwood that they kept documents documenting the

18    financing issues?

19         MR. HALEY:  No.  The only reference to the documents

20    are the two documents that are in front of the Court that the

21    Court just asked questions about, the April 15 text database

22    and the entry in immigration document, both of which

23    Secretary Napolitano said were simply created at the time the

24    investigation started, and then it was quickly determined the

25    plaintiff had no involvement.

1          THE COURT:  So would it be fair to say that when I

2    look at this mass of documents that are produced by the

3    government, hopefully in good faith, going through what we

4    talked about last time, the FOIA issue should go away because I

5    should be seeing anything that was created?

6          MR. HALEY:  I believe that's correct, your Honor.

7          THE COURT:  So if there's nothing in there, let's say

8    that there's a big gaping hole, nothing in there, do you think

9    that that -- or possibly there are things in there.  I don't

10   know.  I haven't seen it yet, literally.  I forget when they

11   all come in, but I should get the onslaught soon.  As a matter

12   of fact, I think I could see them now.

13         THE LAW CLERK:  Judge, they don't come in until

14   June 15.

15         THE COURT:  All right, June 15, all right.  So if in

16   fact there's nothing there, literally nothing to support this,

17   why would you -- would you think that you have enough

18   information now to prevail on a negligence claim?

19         MR. HALEY:  Your Honor, the problem with the claim is

20   this:  The fact that there's nothing there, as the Court noted,

21   is something the plaintiff can -- the falsity, the truth or

22   falsity of the allegation is something the plaintiff can

23   establish by testifying that he didn't do it.  He can rely on

24   Secretary Napolitano's testimony --

25         THE COURT:  Can I stop you there.  Why?  It's quite

1    clear that Glenn Beck cannot rely on these sources.  That's

2    pure hearsay.  So that's only about whether he was negligent or

3    not.  That's hearsay.  So let's say your guy says, "I wasn't

4    the money man," let's assume there's no evidence to the

5    contrary, how do you get in her statement?

6         MR. HALEY:  Your Honor, the plaintiff would submit

7    that either the Secretary's statement or the course of the

8    prosecution against the individuals who did commit the crime

9    would be evidence of government action here.  This was a crime

10   that the government investigated.  The government took action.

11   The government took no action against Mr. Alharbi, and the

12   government source in charge of this investigation testified

13   before Congress that Mr. Alharbi had no involvement.

14        THE COURT:  So let's assume -- I'm assuming -- I was

15   thinking it through as I was reading all your papers -- that

16   the only clear relevance of these sources is Mr. Beck -- and

17   I'm going to ask you the same question -- well, theoretically,

18   anyway, my guess is he will because it's what he said is, "I

19   wasn't negligent.  I wasn't malicious.  I was relying on

20   somewhere between two and six sources," depending on how you

21   count this, "as the basis for my statement.  That's why I was

22   so certain because we heard from these insiders, the Department

23   of Homeland Security."

24        So, in your view, what would the discovery -- suppose

25   for a minute that these insiders did tell Mr. Weasel, "That's

1    what we believed and that's what we told them," is that the end

2    of your case?

3            MR. HALEY:  I don't believe so, your Honor, that it

4    would be the end of the case because the issue is whether or

5    not those sources in and of themselves were credible and

6    sufficient for the defendant to rely upon.  It would obviously

7    be harmful to our case if the sources said that.  But if in

8    fact the sources did not make those statements, do not exist,

9    or made statements that don't suggest at all that Mr. Alharbi

10   provided the funding, then that would substantially prove our

11   case, in that the reliance on them was not reasonable by

12   Mr. Beck, and in fact there was no such information that

13   existed; that there's this general theory that, you know, a

14   terrorist conspiracy must exist, and many people involved in it

15   are from the country of Saudi Arabia, but the statement that

16   Mr. Alharbi himself provided funding isn't supported by

17   anything other than these two confidential sources.

18           THE COURT:  So one of the big arguments when I do the

19   balancing is whether or not you can get it from another source.

20           MR. HALEY:  Correct.

21           THE COURT:  It's quite clear that a FOIA, in my

22   view -- it's not a strong argument -- that a FOIA request will

23   get you anything more than this document request I'm supposed

24   to see.  However, suppose there are documents -- let's just

25   play that out -- saying, "Oh, we still think he's the money

1    man," and there are certain names on those documents of agents,

2    I don't know whether those will be deleted out.  Remember we

3    heard that argument from the government on the agents.  But

4    let's assume for a minute I get those names of people who

5    authored those documents, would taking their depositions be an

6    alternative route?

7              MR. HALEY:  It would be an alternative route relevant

8    to the issue of truth or falsity, but it would not be an

9    alternative route relevant to the issue of reliance.  It's not

10   Mr. Beck's testimony that he was aware of any such documents or

11   he knew of them.  His testimony is that these two individuals

12   told Joe Weasel, and Mr. Weasel's testimony is, "They told me

13   that the Saudi financed it."  That was the basis for his

14   reporting and the statements that he made, if in fact those

15   things are true.  And it's that, the elemental truth or falsity

16   of those statements, "I had two confidential sources.  They

17   told me that the plaintiff financed this terrorist attack,"

18   it's those statements that are central to the plaintiff's case,

19   and it's the centrality of those statements not otherwise

20   discoverable or provable.

21             THE COURT:  You're talking about the statements to

22   Mr. Beck?

23             MR. HALEY:  The statements to Mr. Beck's agent,

24   Mr. Weasel, yes.

25             THE COURT:  Because they'll raise truth, and if the

1    confidential sources are disclosed, my guess is, they'll use

2    those people for the defense of truth because otherwise --

3    well, let me ask you this.  Why don't you sit down for a

4    second.

5            Let me just say this.  Let me ask you this.  So it's a

6    balancing under First Circuit law.  It's not even clear it's a

7    privilege.  I was surprised to see that, actually, but it's

8    nothing.  It's just an important consideration under the First

9    Amendment for me to balance in.  So what's your primary --

10   given those are the -- what are your defenses here?

11           MR. GRYGIEL:  Well, Chief Judge Saris, first, a couple

12   of points, and I think I can help clarify and frame the issue

13   first.  There really, I don't think, can be any serious

14   question on this motion record about the providence or

15   authenticity of the government documents that we have presented

16   that were received from our sources, nothing in the testimony,

17   nothing in the discovery process over the past 15 months.

18           THE COURT:  You're talking about 60 and 61?

19           MR. GRYGIEL:  60 and 61.

20           THE COURT:  What do they mean?  I mean, basically all

21   they say is they're a terrorism suspect without any

22   explanation.

23           MR. GRYGIEL:  Well, it's correct, but then, again,

24   we've explained in our moving affidavits what the 212(a)(3)(B)

25   classification is, its significance and how it's achieved with

1    respect to the plaintiff.  And then I think the issue here, as

2    I see it on the motion, is what Mr. Haley characterized as the

3    elemental truth or falsity of the statements.

4              THE COURT:  Who would you have to put in those

5    documents?

6              MR. GRYGIEL:  I'm sorry, your Honor?

7              THE COURT:  How would you get those documents

8    admitted?

9              MR. GRYGIEL:  Well, we have affidavits, Judge, that we

10   could get them in --

11             THE COURT:  No.

12             MR. GRYGIEL:  -- and I think that would be the

13   cleanest way.  We --

14             THE COURT:  Not after the Secretary -- I was playing

15   out the -- after the Secretary of Homeland Security says that

16   it's not true.  I mean, I think the core issue is reliability.

17   I'm playing this out.  I'm assuming you're going to need

18   someone, other than an agent who in general talks about how

19   these things are prepared, to explain the truth or falsity of

20   it.

21             MR. GRYGIEL:  And we've submitted two affidavits in

22   the APA proceeding from an FBI agent who's familiar with the

23   documents and a Customs and Border Protection agent who's

24   familiar with the documents.  Presumably we could use both of

25   those as witnesses in this case.  We've identified them on

1    our --

2          THE COURT:  But not for the truth or falsity of the

3    contents of the document.

4          MR. GRYGIEL:  Okay, but the truth or falsity, let me

5    come to that because that's the issue on this motion.  The only

6    substantive claim that the plaintiff has raised in trying to

7    demonstrate the essential need for the information that the

8    First Amendment balancing process requires that goes to an

9    element of his claim is contrasting what was said on the air by

10   Mr. Beck with Secretary Napolitano's testimony on April 23.

11         THE COURT:  That's not true.  His own testimony that

12   "I didn't do it."

13         MR. GRYGIEL:  Well, within the four corners of this

14   motion, Chief Judge Saris --

15         THE COURT:  Well, didn't you take his deposition?

16   Didn't he say that?

17         MR. GRYGIEL:  We did.  He did.  Yeah, I mean, no

18   surprise there.  But showing falsity doesn't depend on who said

19   it, the identity of the source.  It depends on what was

20   published, what is the statement?  And here, for example, if I

21   publish in a magazine called Unscientific American and a

22   confidential source I quote in an article that says, "Global

23   warming is not true," you don't need to get the identity of my

24   source to disprove that statement.  Here, there are multiple,

25   abundant other sources of the information that the plaintiff

1 readily could have --

2       THE COURT:  Well, he can.  Do you agree with me that

3 he meets his burden by simply saying, "I didn't do it," that

4 "The statement is false.  I was not the money man"?  Let me put

5 it this way:  I'm going to let that case go to a jury, okay?

6 He says he didn't do it under oath, "I was not the money man."

7 Even if I don't allow in Secretary Napolitano's statement, he

8 gets to a jury.  But my guess is, what you'll say, right, is,

9 "But there's no evidence of negligence or malice"?

10       MR. GRYGIEL:  Well, but that issue, Judge, is nowhere

11 framed in this motion.  The requisite level of constitutional

12 fault is not being presented by the plaintiff as a need for

13 confidential source disclosure.  We're not talking about our

14 client's mental state on this motion at the time of

15 publication.  The only argument is, "I need this to prove

16 falsity."  He doesn't.  There are four names of individuals in

17 Deposition Exhibit 1 and 2, Mayberg, Mayfield, Kevin Considine

18 and Taylor Carmichael, the individuals presumably who created

19 those documents.  We tried to talk to them in the news-

20 gathering process, and the Court will see this on the summary

21 judgment --

22       THE COURT:  I see.  So you're just simply arguing that

23 because he didn't make the argument in his motion, the only

24 argument he makes is truth or falsity, I shouldn't even get to

25 negligence or malice.

1          MR. GRYGIEL:  Correct, on this motion, Judge.  That's

2     not raised by the plaintiff.

3          THE COURT:  Let me think through my process, though.

4     He claims negligence or malice.  My guess is -- you're a good

5     lawyer -- you'll come up and say, "What do you mean, negligence

6     or malice?  He was relying on confidential sources."

7          MR. GRYGIEL:  Correct.

8          THE COURT:  In good faith.  Mr. Weasel is an

9     excellent, probably experienced guy, right?

10         MR. GRYGIEL:  He is.

11         THE COURT:  Cheatwood is probably an experienced

12    supervisor.  Didn't one of them come out of 17 years of CNN?

13         MR. GRYGIEL:  Mr. Cheatwood has been around the block,

14    for certain.

15         THE COURT:  Right, so you're going to say, "He wasn't

16    negligent because we relied on these sources."

17         MR. GRYGIEL:  Absolutely not, and even in this record

18    I think provides --

19         THE COURT:  Oh, you won't say that?

20         MR. GRYGIEL:  Our position, Judge -- and I think you

21    get a preview of it here, but it will be elaborated at length a

22    week from tomorrow -- is that the extensive, painstaking

23    diligence and efforts by our clients in vetting this

24    information, repeatedly going to their confidential sources, as

25    well as others who are identified in their depositions and

1    could have been deposed but weren't, will demonstrate certainly

2    nothing coming anywhere near actual malice.  And, further, it

3    doesn't even amount to negligence.  You've got this network of

4    on-the-record and off-the-record mutually corroborative

5    sources.  There's simply no way, given the exhaustive research

6    and diligence, that this even comes close to negligence.

7          THE COURT:  The reason -- what's weird to me is that

8    when you look at the cases, that there were no notes.  There

9    was no tape recordings.  There were no e-mails that really

10   substantially go through what was said.  There are some e-mails

11   saying, "Oh, we got --" you know, "I'm driving now.  Please

12   don't," you know, "I can't really take this down," and that

13   kind of thing, but really not contemporaneous e-mails

14   documenting what was said or not said.  It's basically totally

15   based on primarily the memory of Mr. Weasel.

16         MR. GRYGIEL:  Well, Chief Judge Saris, I

17   respectfully --

18         THE COURT:  So where are the notes?  Where are the

19   recordings?

20         MR. GRYGIEL:  I'll take the notes question first.

21   Mr. Weasel testified that his normal practice with confidential

22   sources is to take it, post it, Post-It notes with yellow

23   stickies contemporaneously; and then he gets rid of them

24   because he doesn't want to run the risk of having them be

25   compelled.  But Exhibit A to Mr. Haley's moving affidavit on

1    the current motion contains a comprehensive catalog of the

2    e-mails that were exchanged.

3            THE COURT:  All right, so I've got it here.  So what

4    specifically contemporaneously does this report, and I

5    understand -- were any withheld?

6            MR. GRYGIEL:  We turned over everything.

7            THE COURT:  All right, so is there anything in here so

8    I can look at it which contemporaneously describes what these

9    internal employees of the Department of Homeland Security said?

10           MR. GRYGIEL:  Yes, absolutely.

11           THE COURT:  All right, so in terms of anything more

12   than just "He's the money man"?

13           MR. GRYGIEL:  Oh, yes.  There's a great deal of

14   exchanges in there, and what Exhibit A reflects, Chief

15   Judge Saris --

16           THE COURT:  With the source?

17           MR. GRYGIEL:  Yes, with our sources.  Their names are

18   redacted.  It shows that after getting this information, we

19   went and talked to other sources.  Then we came back to our

20   principal confidential sources.

21           THE COURT:  So show it to me.  I'm at A.  All right,

22   so show me what you're relying on.

23           MR. GRYGIEL:  Well, for example, just if you -- I

24   believe they're still in order, but defendant's 035180 --

25           THE COURT:  035 --

1          MR. GRYGIEL:  Exhibit 77.

2          THE COURT:  All right, let me just get there.  Are

3     they in order?

4          MR. HALEY:  They are, your Honor.

5          THE COURT:  Okay, I'm there.

6          MR. GRYGIEL:  And I'm just turning to the first page

7     in the list.  And it's conceivable, Chief Judge Saris, that our

8     production may include more of the confidential source

9     contemporaneous documents, but if you look at this one,

10    Mr. Weasel is going to one of the principal sources that was

11    relied on and saying, "What's the status of the plaintiff?  Is

12    he being flown out of the country?"  And on the next page of

13    Deposition Exhibit 77 --

14         THE COURT:  Wait a minute, I'm not seeing it.

15    Exhibit 77...

16         MR. GRYGIEL:  "Do you know if they got him out of the

17    country?"

18         THE COURT:  All right, so where does that talk about

19    him being the finance man?

20         MR. GRYGIEL:  Well, I didn't take that as your

21    specific question, Chief Judge Saris, but if you look at the

22    next page too, there is a chronology that was provided to us

23    from the confidential source that details the status of the

24    government's investigation with respect to the plaintiff, and

25    points out exactly what information was known at that point in

1  time, which was the basis for the broadcast being made by the

2  defendants.

3         THE COURT:  Okay, so I saw these, but none of these

4  are post-Napolitano.  None of them talk about "money man."

5  Where does it say "money man"?

6         MR. GRYGIEL:  Well, I don't see that in this document,

7  Judge, but what I would say is this:  In Mr. Beck's testimony,

8  when he was asked specifically by plaintiff's counsel about

9  Secretary Napolitano's testimony, he pointed out that upon her

10 statement being made, The Blaze's staff contacted a half a

11 dozen Congressional officers to ask whether or not her

12 statement was true and accurate.  And those Congressmen are

13 named in the deposition.  They could have been subpoenaed.

14 Mr. Beck himself called the Congressman, who said to him, "The

15 Secretary's information that she just presented is incorrect.

16 It's false."  He even used the word -- and I'm going to say

17 this advisedly -- it was perjurious, and it didn't match with

18 the documents that the Congressional offices had.  So this

19 wasn't simply a case --

20        THE COURT:  Is any of that -- what I'm trying to do

21 here is not prejudge this.  I mean, it may be that somebody

22 with the experience of Mr. Weasel, that he did do all this.

23 It's just I'm supposed to look at, can he get it, could the

24 plaintiff get it from any other source?  Wait a minute.  I'm

25 talking about what Mr. Beck relied on post the testimony to

1    state on the air, after exonerated by Boston Police and the

2    Department of Homeland Security, what he relied on in order to

3    say, "I still believe" or "I'm still certain he's the money

4    man."  You know, these are big, thick things, so it's possible

5    in these single-spaced e-mails, it's in here somewhere, but I

6    couldn't find anywhere where post-April 23 there's any

7    documentation of talking to a confidential source to verify

8    that Napolitano was wrong and that in fact he's still the money

9    man.

10        MR. GRYGIEL:  He spoke to on-the-record sources who

11   told him that the Secretary, people in government, Legislative

12   Branch officials.  They could have been deposed.  They were

13   identified by name.

14        THE COURT:  No, but that's different, no, no, no, no,

15   what a Congressman knows from his staff from so-and-so.  You

16   need to know what the source said to know whether he in good

17   faith still believed that, as you would put it, or not you, as

18   somebody else would say it that what the Secretary said was

19   false.

20        MR. GRYGIEL:  Well, your Honor, presumably, again,

21   that information is available from the government.  It doesn't

22   have to require the disclosure of the identity of our sources.

23   And, again, I'm separating out the reliance --

24        THE COURT:  Excuse me.  I understand your point, and

25   I'm going to turn back to the plaintiff for a minute, that it

1    matters whether or not the issue goes to truth or falsity or

2    whether it goes to the standard of care; but on the standard of

3    care, I don't see how interviewing all these people from the

4    government would make any difference because it's what Glenn

5    Beck relied on.

6            So let me ask you this:  It is true what your brother

7    says, actually -- it's why I was asking you in the beginning --

8    that you pitched it in terms of truth and falsity rather than

9    the standard of care.

10           MR. HALEY:  Your Honor, it's the truth or falsity of

11   whether these confidential sources existed and what --

12           THE COURT:  Is that what you meant?

13           MR. HALEY:  Yes, and I apologize to the Court if I was

14   too obtuse there, but the plaintiff --

15           THE COURT:  Excuse me.  Not the truth or falsity of

16   whether he was the money man?

17           MR. HALEY:  Not the truth or falsity of whether he was

18   the money man but the truth or falsity of whether these

19   confidential sources existed, and whether what Mr. Weasel said

20   that they said they actually did, because the argument that the

21   plaintiff makes at the conclusion of his memorandum is that

22   this is central, this information is central to a non-frivolous

23   claim.  And to answer the Court's question, Mr. Weasel in his

24   deposition testimony at Page 33 in Exhibit 8 was asked, "Other

25   than Exhibits 60 and 61, were there any other documents

1   provided to you by your confidential sources?  Answer:  No.

2   Question:  And were there any other documents that you relied

3   upon in determination that Mr. Alharbi was linked to the Boston

4   Marathon events?  Answer:  No."

5          THE COURT:  But what if, for example, one could

6   imagine if there were contemporaneous e-mails documenting the

7   discussions between Mr. Glenn Beck or Mr. Weasel and the

8   sources and what they said contemporaneously on April 24, 2013,

9   April 25, 2013, that could be an alternative source, but I'm

10  taking it you did not see that?

11         MR. HALEY:  No, your Honor, and we did not see it, and

12  the defendant's testimony is clear that it doesn't exist.

13  There isn't reporter's notes.  There isn't a tape recording.

14  There isn't an e-mail that says, "So-and-so just told me this."

15  There's no e-mail from a source.  There's no other independent

16  way to verify the information.  And that was the purpose of the

17  plaintiff's inquiry:  "Well, did he tell you where the money

18  came from, from a bank account or what amounts or what

19  happened?"  Nothing.  All he said was an outright naked

20  statement:  "He financed it."  "And other than Exhibits 60 and

21  61," which don't address that issue at all, "is there anything

22  that you otherwise relied upon?"  Mr. Weasel's testimony:  "No,

23  there is not."

24         THE COURT:  So you're looking to interview all six

25  confidential sources?

1          MR. HALEY:  The plaintiff believes that to the extent

2     that those sources are the source for the May 8 broadcast, he's

3     entitled to do that.  It seems to come down to, for

4     Mr. Weasel's testimony, most of the confidential sources seem

5     to have this same kind of general knowledge about terrorism,

6     but there are these two alleged sources who supposedly told him

7     that Mr. Alharbi financed the attack.

8          THE COURT:  So the two would be your priority at this

9     point?

10          MR. HALEY:  That's correct, your Honor.

11          THE COURT:  So if I were to order this -- and I'm

12     going to want to see all the classified documents, all the

13     documents, and also would it matter to you if I viewed your

14     client as a limited public figure or not?

15          MR. HALEY:  I don't -- I don't believe that it would,

16     your Honor.

17          THE COURT:  I'm just trying to think whether it would

18     or not, and --

19          MR. HALEY:  I don't think that that issue is

20     dispositive of this question because whether or not the

21     standard is malice or negligence, Mr. Beck is still going to

22     say the same thing that he said at his deposition:

23          "Why did you say this on May 8?

24          "I had a confidential source."

25          And that's the question that's central to the case.

1    It's not -- the defendants conflate the issue of truth or

2    falsity of whether the plaintiff funded it.  It's the truth or

3    falsity of whether these confidential sources existed and what

4    they allegedly said, and the only way to prove that is to

5    identify them and have them speak to that because, otherwise,

6    there's no independent indicia to prove the veracity of what

7    they allegedly said.

8           THE COURT:  Let's assume for a minute you have two

9    people from within the Department of Homeland Security who are

10   the ones communicating with Mr. Beck, and they confirm

11   everything Mr. Beck said; they believe he's the money man of

12   the Marathon.  Secretary Napolitano speaks on April 23 before

13   Congress, says, "No, he's not."  Glenn Beck then calls them up

14   again and says, "Are you sure?" or Mr. Weasel on his behalf or

15   Mr. Cheatwood, "Are you sure?"  And they go, "Yeah, we're sure.

16   He was the money man.  She's just ironing it over."  Is that

17   the end of your case?

18          MR. HALEY:  I don't believe it is, your Honor, because

19   one would think that you have the secretary of an agency saying

20   something, someone else in the agency says something else, that

21   you'd seek some further verification of that:  "Well, what's

22   the basis of your statement?  Do you have any evidence that he

23   transferred funds?  Do you have any evidence that he made

24   payment?  Is there something else that I can go to and rely

25   upon in trying to say what you said is true and you're not just

1   some cranky, unhappy government employee"?  I don't think that

2   it's the end of the plaintiff's case.

3         THE COURT:  Well, what if -- I don't know what you

4   found out so far about your client, but if he's a wealthy

5   individual from Saudi Arabia who comes from a family that funds

6   these things, I mean, would that be enough?

7         MR. HALEY:  No, your Honor.

8         THE COURT:  I don't know if that's the case but --

9         MR. HALEY:  It wouldn't be enough to say that "Many

10  Saudi Arabians have funded terrorists.  Your client is a Saudi

11  Arabian --"

12        THE COURT:  No, but what if it was his family?  It

13  isn't?  That's not the truth?

14        MR. HALEY:  No, it's not --

15        THE COURT:  So this really does boils down to what the

16  informants say.  There's no information that's come to light,

17  is that correct?

18        MR. HALEY:  That's certainly correct.

19        THE COURT:  Is that right?  I mean, this is all about

20  what Mr. Glenn Beck knew on May 8 and what he didn't know.

21        MR. GRYGIEL:  In terms of his state of mind and

22  depending on what's in the government's investigative records.

23        THE COURT:  Because it must be -- I mean, he's got to

24  be careful enough not to just simply have the say-so of someone

25  from the Department of Homeland Security, "Oh, yeah, I think

1    he's the money man."  There's got to be more to it than that.

2              MR. HALEY:  And yet there isn't.

3              MR. GRYGIEL:  Well, again, Judge, I think that the

4    record will show in the summary judgment motion that we're

5    filing next Tuesday that there was much, much more than that.

6    There was extensive cross-referencing with multiple sources on

7    and off the record that supported that position.

8              THE COURT:  No, but in terms of the details behind the

9    conclusory statement he was the money man, there must have been

10   some, as he was saying, wealth in his background or

11   transferring of accounts.  There must have been something.

12             MR. GRYGIEL:  What there was, your Honor, was there

13   were sources, confidential sources explaining that

14   Mr. Alharbi's family was wealthy.

15             THE COURT:  Yes, I thought I read that somewhere.

16             MR. GRYGIEL:  And that his family, in particular his

17   father, had some association with questionable activities.

18   That was never sufficiently verified to Mr. Cheatwood's

19   satisfaction, so it was never broadcast.  It's not at issue in

20   the case.  No one ever said Alharbi's family was involved in

21   sponsoring terrorism.  They didn't go with it for precisely

22   that reason.  They didn't feel with respect to that particular

23   piece --

24             THE COURT:  So it will be part of your case too to

25   show that, right, which is, you know, "We did hear this

```
1    information, but we couldn't verify it, so we were careful and

2    we didn't publish it."  I'm just saying, I don't know how the

3    plaintiff -- the First Circuit talks about do you need this

4    information -- I don't see how he presents his case without

5    knowing what these gentlemen -- I'm assuming they're men, maybe

6    not -- told Mr. Beck because he's going to defend that way, and

7    maybe correctly so.  I mean, that's the respect for the

8    journalistic -- I don't see how he defends that.

9         MR. GRYGIEL:  Well, you know, even -- again, I think

10   there's two separate issues here.

11        THE COURT:  You want to introduce that information,

12   right?  You're not willing to waive that as we stand here

13   today?

14        MR. GRYGIEL:  No, we're not, your Honor.

15        THE COURT:  Sure.

16        MR. GRYGIEL:  Believe me, if we could get our sources

17   to come on the record, that would be an extraordinarily happy

18   turn of events for us.  They can't for the reasons set forth in

19   the moving affidavits in front of your Honor, and, again, that

20   plays back into the balancing test, which is, what is the harm

21   going to be visited upon the free flow of information to the

22   public if the extraordinary and drastic remedy of forcing a

23   news organization to identify confidential sources is

24   undertaken?

25        THE COURT:  What if I were to do a protective order?
```

1            MR. GRYGIEL:  Well, your Honor, I still don't think

2    that necessarily will solve the problem because here's why:

3    Eventually this would come into the summary judgment record.

4            THE COURT:  Yes, but you could do Mr. X, Y, Z, you

5    know, Mr. A, B, C, Ms. A, B, C.  I mean, in other words, you

6    could do it that way, and there could be a deposition.  We

7    could protect the person's confidentiality.  I think -- I don't

8    know whether it was the First Circuit -- I think it was the

9    First Circuit urged District Courts to be creative to do

10   justice, and so it was one of the thoughts that crossed my

11   mind.

12           MR. GRYGIEL:  It is a creative suggestion,

13   Chief Judge Saris.  I don't disagree with that.  It still is

14   problematic, as far as we're concerned, simply because if the

15   word ever got out that a confidential source was conscripted

16   into the civil litigation process, as was made clear in no

17   uncertain terms by both Mr. Weasel and Mr. Cheatwood, no one

18   will talk to them again.

19           THE COURT:  But they all know, we all have watched

20   cases go forward where it's compelled.  It's the extreme case;

21   it's the unusual.  What was the name of that woman in the CIA

22   and Washington?  I can't remember who.  It does come out, and

23   it's -- I have enormous respect for the press.  That's why I'm

24   struggling with this.  And so the question is, is there some

25   way where I can protect the sources?  Maybe only do the two

1     rather than the six, and maybe wait until I've ruled on the

2     summary judgment motion; in other words, wait till the tail end

3     of the litigation.  Is there any chance this thing is going to

4     settle, by the way?

5            MR. GRYGIEL:  I think that's extremely doubtful,

6     Chief Judge Saris.

7            THE COURT:  Okay, so I just wait till the tail end.

8     And then the issue becomes -- let's say I do that and let's say

9     it gets past summary judgment, then the question is what to do

10    about trial.  That's the real issue.  It isn't really the

11    depositions.  It's really, how do I protect them during trial?

12    And maybe there would be some agreement about having their

13    deposition testimony read in rather than -- in other words, you

14    would treat it like a trial deposition, for want of a better

15    word, and then you'd both make a decision as to whether or not

16    you needed to press for the actual live testimony or whether

17    you could use the video with the face -- I'm being very

18    creative here -- blurred out, if you will.  But, anyway, I'm

19    thinking about it.  I'm thinking hard about it.  I was actually

20    surprised to see that Massachusetts, of all places, did not

21    have a reporter shield law, so it's really just a balancing,

22    not even a privilege here, and I'm balancing away.

23           So let me think about it.  I probably won't rule until

24    after I've ruled on the summary judgment and the documents.  I

25    want the full picture because I want to make sure it's the only

1   resort available.  But if you do, my guess is, I'm going to

2   start only with the two that you most rely on, and I'd do

3   something along the lines of what we just talked about.  We'd

4   talk about a trial deposition, face blurred out, videoed.  And

5   so therefore, if we needed to use it at court, I can protect

6   the source while at the same time getting at the truth of the

7   information.

8          MR. GRYGIEL:  Even there, Chief Judge Saris, I think

9   we'd have to add voice distortion to avoid recognition by the

10  government because, as our sources made very clear, when the

11  one of them hand delivered Exhibits 60 and 61 -- I know this is

12  real Deep Throat stuff -- to Mr. Weasel in an office building

13  in Washington, he said, "If this comes out, it's the end of my

14  career."  So we are very concerned about that.

15         THE COURT:  And I am very cognizant of that statement,

16  which is why I'm trying to be creative here, and I will wait to

17  do it as a last resort.

18         So the motion to compel is reserved.  I will do it

19  last, but I will go through the documents, hopefully, by the

20  15th.  I am making this case a really high priority.  It's an

21  important case.  And then I will go through the motion for

22  summary judgment on limited public figure.  I will make a

23  ruling.  I am likely to start with the two and see if we need

24  more, so I will be the least, you know, restrictive.  I'm

25  likely to go with a protective order that you can negotiate and

1    maybe a trial deposition so that we don't have to have the

2    person here.  I don't know about voice recognition.  I don't

3    know.  I don't know.  I don't know.  That does sound Deep

4    Throaty, but I'll think about it.  Would that make sense from

5    your point of view?

6           MR. HALEY:  It would, your Honor.

7           THE COURT:  Okay.  Let me take this under advisement.

8    Thank you, and let me -- do we need to schedule -- I'm going to

9    just go through -- everything -- you don't need to brief

10   anymore the documents, right, because at this point this is me

11   going through them and just making rulings on the documents,

12   but do we need to schedule a hearing on the motion for summary

13   judgment?

14          MR. GRYGIEL:  I think it's scheduled for July 20.

15          MR. HALEY:  The Court has already scheduled it.

16          THE COURT:  Perfect, okay.  And then the big thing is

17   whether we can get that done by the end of the summer.  We'll

18   see.  Okay, thank you very much.

19          MR. GRYGIEL:  Thank you very much, your Honor.

20          MR. HALEY:  Thank you, your Honor.

21          THE CLERK:  All rise.

22          (Adjourned, 10:53 a.m.)

23

24

25

1                       C E R T I F I C A T E

2

3
UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 39 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 14-11550-PBS,

11  Abdulrahman Alharbi v. Glenn Beck, et al, and thereafter by me

12  reduced to typewriting and is a true and accurate record of the

13  proceedings.

14       Dated this 25th day of May, 2016.

15

16

17

18

19           /s/ Lee A. Marzilli

20           _____
             LEE A. MARZILLI, CRR
21           OFFICIAL COURT REPORTER

22

23

24

25