UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ABDULRAHMAN ALHARBI,<br><br>Plaintiff,<br><br>v.<br><br>GLENN BECK; THE BLAZE, INC.;<br>MERCURY RADIO ARTS, INC.; AND<br>PREMIERE RADIO NETWORKS, INC.,<br><br>Defendants. | CIVIL ACTION NO.<br>1:14-cv-11550-PBS |

## DEEFNDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendants Glenn Beck, TheBlaze Inc. (erroneously sued herein as "The Blaze, Inc."), Mercury Radio Arts, Inc., and Premiere Networks, Inc. f/k/a Premiere Radio Networks, Inc. (collectively, "Defendants") hereby submit the following statement of undisputed material facts in support of their motion for summary judgment requesting dismissal of the Complaint in its entirety, with prejudice.

The exhibits, pleadings, and deposition transcripts referenced herein are attached to the following declarations, all of which are served and filed simultaneously herewith: (1) Declaration of Counsel in Support of Defendants' Motion for Summary Judgment ("Grygiel Decl."), attaching Exhibits 1-54; (2) Declaration of George ("Joe") E. Weasel, III in Support of Defendants' Motion for Summary Judgment ("Weasel Decl."), attaching Exhibits 1-23; (3) Declaration of Joel Cheatwood in Support of Defendants' Motion for Summary Judgment ("Cheatwood Decl."), attaching Exhibits 1-6; (4) Declaration of Glenn Beck in Support of Defendants' Motion for Summary Judgment ("Beck Decl."), attaching Exhibits 1-8; (5)

1

Declaration of Michael V. Howard in Support of Defendants' Motion for Summary Judgment ("Howard Decl."), attaching Exhibits 1 and 2; (6) Declaration of Richard J. Egan in Support of Motion for Summary Judgment ("Egan Decl."), attaching Exhibit 1; (7) Declaration of Misty Kawecki in Support of Defendants' Motion for Summary Judgment ("Kawecki Decl."), attaching Exhibit 1; (8) Declaration of Alan Korowitz in Support of Defendants' Motion for Summary Judgment ("Korowitz Decl."), attaching Exhibit 1; and (9) Declaration of Julie Talbott in Support of Defendants' Motion for Summary Judgment ("Talbott Decl."), attaching Exhibit 1.

**Plaintiff Obtains Visa to Attend Findlay University But Never Enrolls**

1.     In October of 2011, Plaintiff Abdulrahman Alharbi ("Plaintiff") submitted an application to attend the University of Findlay located in Ohio.  Grygiel Decl. ¶12 & Ex. 10.

2.     Plaintiff applied for a Visa at the end of 2011 to study in the United States.  Grygiel Decl. ¶11 & Ex. 9.

3.     Plaintiff did not enroll or show up at the University of Findlay after receiving his Visa.  Grygiel Decl. ¶13.

4.     Plaintiff did not notify the University of Findlay that he would not be attending the University of Findlay.  Grygiel Decl. ¶13.

5.     Plaintiff did not notify the Saudi Arabian or United States governments that he would not be attending college in Ohio.  Grygiel Decl. ¶14.

6.     A Student & Exchange Visitor Information (SEVIS) form states that Plaintiff's status was "TERMINATED" because he "entered [the] country and was not registered 60 days after program start date."  Grygiel Decl. ¶15 & Ex. 11.

7.    In or around 2011, Plaintiff posted a photograph of himself taken in Saudi Arabia holding a golden firearm on his Facebook page.  Grygiel Decl. ¶16 & Ex. 12.

8.    Plaintiff was unconcerned about the implications of posting the photograph, testifying that the gun "look[ed] cool" "[b]ecause it is gold."  Grygiel Decl. ¶17.

9.    After viewing the photograph, Plaintiff's cousin advised Plaintiff to "[b]e careful, Man, you are in the U.S.A."  Grygiel Decl. ¶18.

### Law Enforcement Officials Identify Plaintiff as a "Suspected Terrorist" in Connection with the Boston Marathon Bombings

10.    At approximately 2:50 p.m. on April 15, 2013, two bombs exploded near the finish line of the Boston Marathon.  Grygiel Decl. ¶10 & Ex. 8.

11.    Law enforcement officials immediately commenced an intensive and sweeping investigation.  Grygiel Decl. ¶¶4-5, 20-24; Egan Decl. ¶11 & Ex. 1.

12.    Law enforcement officials from the Federal Bureau of Investigation ("FBI"), Customs and Border Protection ("CBP"), Immigration and Customs Enforcement ("ICE"), the Massachusetts State Police, and the Boston Police identified Plaintiff as a "person of interest," a "subject," and a "target" of their investigation into the Boston Marathon bombing.  Grygiel Decl. ¶5 & Ex. 4; Egan Decl. ¶11& Ex. 1; Howard Decl. ¶25 & Ex. 1.

13.    In reporting on the investigation, several news organizations identified Plaintiff as a "suspect" or "person of interest" based on information from law enforcement sources.  Grygiel Decl. ¶4.

14.    These news organizations reported on Plaintiff as a suspect by name before Plaintiff was identified on air by TheBlaze.  Grygiel Decl. ¶4; Beck Decl. ¶12.

15.    Plaintiff was admitted to Brigham & Women's Hospital on April 15, 2013.  Grygiel Decl. ¶¶20, 128 & Ex. 40.

16.     Plaintiff's "burns were superficial and required no treatment."  Grygiel Decl. ¶129 & Ex. 40.

17.     Upon his arrival at the hospital on the afternoon of April 15, 2013, Plaintiff was "immediately" questioned by law enforcement, including FBI agents.  Grygiel Decl. ¶20.

18.     While he was in the hospital, law enforcement authorities treated Plaintiff like he "did something wrong."  Grygiel Decl. ¶21.

19.     That day, April 15, 2013, law enforcement authorities began entering information concerning Plaintiff into the "TECS II" database.  Weasel Decl. ¶76 & Ex. 20; Cheatwood Decl. ¶33; Howard Decl. 13-14 & Ex. 1.

20.     The "TECS II" information-sharing database is managed by the Department of Homeland Security ("DHS") in connection with the United States government's anti-terrorism efforts.  Howard Decl. ¶7.

21.     The TECS II database is used by several federal executive branch agencies with responsibility for national security protection, and contains detailed information about individuals traveling in and out of the United States.  Howard Decl. ¶¶7, 8.

22.     While in the hospital, law enforcement authorities collected fingerprints and a DNA sample from Plaintiff.  Grygiel Decl. ¶¶23-24.

23.     Beginning at around 11:00 p.m. on April 15, 2013, the FBI and other law enforcement officials conducted an extensive search of Plaintiff's apartment located in Revere, Massachusetts.  Grygiel Decl. ¶23; Egan Decl. ¶11 & Ex. 1.

24.     The FBI took numerous photographs of Plaintiff's apartment, and collected laptops, an iPad, multiple mobile phones, a USB drive, several digital cameras, and

paperwork (including bank records, a checkbook, and identification documents).  Egan Decl. ¶11 & Ex. 1.

25.    On April 16, 2013, after Plaintiff's apartment and computer was searched, law enforcement officials entered information into the TECS II database stating that Plaintiff was "ARMED & DANGEROUS"; that Plaintiff was a "SUSPECTED TERRORIST"; that Plaintiff had been placed on the No Fly List; and that law enforcement was instructed that "DETAIN IS MANDATORY WHETHER OR NOT THE OFFICER BELIEVES THERE IS AN EXACT MATCH":



Weasel Decl. ¶¶96-101 & Ex. 20; Howard Decl. ¶¶21-25.

26.    Also on April 16, 2013, after law enforcement authorities had searched Plaintiff's apartment and computer, the government created an "Event File" or an "NTC File" on Plaintiff.  Weasel Decl. ¶77; Cheatwood Decl. ¶34; Beck Decl. ¶13.

27.     Event Files are created by the National Targeting Center ("NTC"), an agency of DHS which accumulates information regarding individuals identified as national security threats.  Howard Decl. ¶26.

28.     The Event File created for Plaintiff stated that Plaintiff's Visa was to be revoked and that Plaintiff was deemed to be inadmissible to the United States under INA § 212(a)(3)(B):

Subject, ALHARBI, ABDULRAHMAN ALI E DOB ███████ Saudi Arabia PP#K358608, is the holder of a F1 (N0008699918) NIV Foil#E3139541 issued on 20-NOV-2011 & Exp 11-NOV-2016.  Subject is an exact match to No Fly TPN# 1037506192.  Derogatory information reviewed by W/C Mayfield and CW/C Maimbourg was found to be sufficient to request a Visa revocation. NTC-P is requesting revocation of Foil# E3139541.  Subject is inadmissible to the U.S under INA 212(a)(3)(B)(i)(II), SAO was not completed prior to Visa issuance. Subject is currently in the United States, admitted F1 student, at Boston POE on 08/28/2012.  Subject is a student at THE UNIVERSITY OF FINDLAY, 1000 NORTH MAIN STREET FINDLAY, OHIO 45840-3695. Subject has One (1) prior event# 1648067, Fins promoted, NT record in place, No scheduled found at this time.

Weasel Decl. ¶¶102-07; 108-110; Cheatwood Decl. ¶39; Howard Decl. ¶¶28-32.

29.     On the evening of April 16, 2013, Plaintiff was visited in the hospital by a representative of the Saudi Arabian Embassy.  Grygiel Decl. ¶25 & Ex. 14.

**TheBlaze's Newsgathing Team in Connection with the Boston Marathon Bombing**

30.     TheBlaze dedicated significant resources and personnel to gathering facts, verifying information, and presenting news concerning the Boston Marathon bombing to the public.  Weasel Decl. ¶28.

31.     At least 24 employees of TheBlaze worked on TheBlaze's reportage regarding Plaintiff.  Weasel Decl. ¶28.

32.     Mr. Beck has over four decades of experience in the professional broadcasting industry.  Beck Decl. ¶1.

33.    Mr. Beck received the Marconi Radio Award for Network Syndicated Personality of the Year in 2008, and has written several books that have reached number 1 on the *New York Times* Bestseller List.  Beck Decl. ¶2.

34.    The Glenn Beck radio and television programs, which are broadcast on TheBlaze network, feature topical coverage and discussion of political, social, and cultural events of general interest to the public.  Beck Decl. ¶1.

35.    A recurrent theme is the inefficiency and ineptitude of United States government investigations in high-profile matters, in particular those implicating national security.  Beck Decl. ¶1.

36.    Joel Cheatwood has more than three decades of experience in the news broadcasting industry, including as Executive Director of Development for CNN; Senior Vice President of Program Development with Fox News; and Executive Vice President of News for CBS.  Cheatwood Decl. ¶¶1, 4-6.

37.    Mr. Cheatwood has been nominated for a national Emmy for his achievements as a professional journalist, and has been awarded numerous regional Emmys for broadcasting excellence.  Cheatwood Decl. ¶1.

38.    At the time of the broadcasts challenged by Plaintiff, Mr. Cheatwood was the President and Chief Content Officer for TheBlaze.  Cheatwood Decl. ¶1.

39.    In that capacity, Mr. Cheatwood was responsible for overseeing all content produced on TheBlaze's various platforms, including broadcasts of Mr. Beck's television show and the Internet streaming of Mr. Beck's radio program.  Cheatwood Decl. ¶¶1, 7.

40.     George ("Joe") E. Weasel, III has more than 25 years of experience as a professional journalist, including five years (1998-2003) as an adjunct professor of journalism and ethics at The Ohio State University.  Weasel Decl. ¶1.

41.     Mr. Weasel is currently employed as Executive Producer of Documentary and Film for TheBlaze.  Weasel Decl. ¶1.

42.     Mr. Weasel has produced more than 50 investigative documentaries in connection with the *For the Record* television series on TheBlaze, many of which involve issues relating to Islamic terrorism and national security.  Weasel Decl. ¶8 & Ex. 2.

**TheBlaze's Reliance Upon Information from Credible Confidential Sources**

43.     TheBlaze often obtains newsworthy information from reliable confidential sources.  Cheatwood Decl. ¶11; Weasel Decl. ¶12.

44.     Mr. Cheatwood was responsible for setting the policy and practice for the use of confidential source information at TheBlaze.  Cheatwood Decl. ¶12.

45.     TheBlaze's policy for the use of confidential source information was based largely on guidelines published by the Radio Television Digital News Association and the Associated Press.  Cheatwood Decl. ¶12; Weasel Decl. ¶13.

46.     As a matter of both policy and practice, the use of confidential sources at TheBlaze was authorized only when:  (1) necessary for news coverage involving matters of significant public concern; (2) there was no other way to obtain the information on the record; (3) the source was reliable and in a position to know the information being provided; (4) the information was verified by other sources; and (5) disclosure of the reasons for confidentiality were provided to the audience.  Cheatwood Decl. ¶13; Weasel Decl. ¶13.

47.     TheBlaze relied upon information provided by a network of confidential sources in connection with TheBlaze's coverage of the government's investigation of the Boston marathon bombing.  Cheatwood Decl. ¶25; Weasel Decl. ¶34.

48.     TheBlaze's use of confidential sources in connection with TheBlaze's reporting about the Boston Marathon bombing investigation was in accordance with the policy guidelines set by Mr. Cheatwood.  Cheatwood Decl. ¶14; Weasel Decl. ¶14.

49.     Each of the confidential sources relied upon in connection with TheBlaze's reporting about the Boston Marathon bombing investigation had a track record of working with TheBlaze on investigative reports and providing information that had proven to be reliable, truthful, and accurate.  Cheatwood Decl. ¶25; Weasel Decl. ¶34; Beck Decl. ¶6.

50.     With one exception, the individual who had direct contact with confidential sources was Mr. Weasel.  Cheatwood Decl. ¶15; Beck Decl. ¶5.

51.     Out of an abundance of caution, in May 2013, Mr. Cheatwood met personally and over the telephone with one of Mr. Weasel's sources (identified as Source 5 below) for the purpose of further verifying the conclusion drawn by TheBlaze's other confidential sources that Plaintiff had been involved in funding the attack.  Cheatwood Decl. ¶32.

52.     Mr. Weasel relied upon information provided by six confidential sources.  Weasel Decl. ¶34.

53.     At no point in the newsgathering or editorial processes did Mr. Beck speak or otherwise communicate directly with any of the confidential sources used by TheBlaze in its reportage.  Beck Decl. ¶6.

54.     Two of Mr. Weasel's confidential sources (identified below as Sources 1 and 2) were directly involved in the government's investigation and had direct access to real-time

records generated in the course of the investigation. Cheatwood Decl. ¶25; Weasel Decl. ¶34; Beck Decl. ¶¶9, 10.

55. Mr. Weasel promised confidentiality to each of his confidential sources because the sources "would be at risk in their profession and could be retaliated against." Weasel Decl. ¶35; Cheatwood Decl. ¶30.

56. None of TheBlaze's confidential sources was paid for information provided in connection with the Boston Marathon bombing investigation. Weasel Decl. ¶37.

**A. Source 1**

[redacted]



62.     Since 2010 or 2011, Source 1 has provided TheBlaze with reliable information

[REDACTED]

law enforcement concepts.  Weasel Decl. ¶¶41-44.

63.     Source 1 had a direct nexus to the ongoing investigation of the Boston

Marathon bombing and was in a position to access reliable official information relative to the

investigation, including real-time JTTF data and information.   Weasel Decl. ¶¶45-46;

Cheatwood Decl. ¶27.

64.     In connection with its reporting on the Boston Marathon bombing, Source 1

provided TheBlaze with reliable information about the manner in which an individual is

designated under INA § 212(a)(3)(B); Plaintiff's family; the contents and meaning of

Plaintiff's TECS II file and Plaintiff's Event File; the ISB; a timeline of events regarding

Plaintiff; the basis for including Plaintiff on the No Fly List; Plaintiff's role in the Boston

Marathon bombing; and the structure and function of terrorist cells in the United States.

Weasel Decl. ¶¶47-49.

65.     Source 1 was emphatic that Plaintiff was involved in the Boston Marathon

bombing.  Weasel Decl. ¶49.

**B.     Source 2**

[REDACTED]

68.     Since 2010 or 2011, Source 2 has provided TheBlaze with information about

[REDACTED]

69.     Source 2 was directly involved in the Boston Marathon bombing investigation, regularly communicating with field agents on the ground in Boston, including JTTF agents, ICE agents, and FBI agents, and acting as a liaison between law enforcement and Congress. Weasel Decl. ¶56; Cheatwood Decl. ¶28.

70.     TheBlaze relied on Source 2 for information about the status of the government's investigation of Plaintiff, Plaintiff's TECS II database documents and Event File, Plaintiff's 212(a)(3)(B) designation, and the function and structure of terrorist cells. Weasel Decl. ¶57.

**C.      Source 3**

72.     Since 2010 or 2011, Source 3 has provided TheBlaze with information regarding counterterrorism strategy and operations.  Weasel Decl. ¶60.

73.     TheBlaze relied on Source 3 to verify and confirm information it had gathered from other sources, including other confidential sources.  Weasel Decl. ¶61.

74.     Source 3 provided information about the content and meaning of the documents provided by Source 2; provided information about what was likely to be happening on the ground in Boston; and explained certain law enforcement concepts.  Weasel Decl. ¶61.

75.     Source 3 knew and respected Sources 1 and 2, and repeatedly confirmed the veracity of the information Sources 1 and 2 had provided.  Weasel Decl. ¶61.

**D.      Source 4**



77.     TheBlaze relied on Source 4 for information about the typical profile of a terrorist cell and the manner in which terrorist cells operate.  Weasel Decl. ¶64.

78.     Source 4 reinforced what other sources, including confidential sources, had revealed concerning the operation of terrorist cells.  Weasel Decl. ¶64.

**E.      Source 5**

81.     Source 5 confirmed information TheBlaze had gathered from other sources, including confidential sources.  Weasel Decl. ¶69.

**F.      Source 6**

13

83.     Source 6 confirmed information TheBlaze had gathered from other sources, including confidential sources.  Weasel Decl. ¶72.

**TheBlaze's Reliance Upon Information from Credible On-the-Record Sources**

84.     In addition to confidential sources, TheBlaze relied on a number of on-the-record sources in connection with its reporting on the government's investigation into the Boston Marathon bombing, including:  (a) Patrick Poole, a national security and terrorism correspondent; (b) Steve Coughlin, a former Pentagon official considered to be one of the country's leading experts on Islamic law and ideology; (c) Erick Stakelbeck, a leading authority on issues of national security and the Middle East, and regular commentator on national security matters, including the growth of radical Islam, for the BBC, CNN, and Fox News; (d) Andy McCarthy, a former Assistant United States Attorney for the Southern District of New York who led the prosecution against the defendants convicted in connection with the 1993 World Trade Center bombing; and (e) Diane West, a nationally syndicated columnist and author who focuses on Islamic terrorism and counterinsurgency strategy. Weasel Decl. ¶30.

85.     TheBlaze's on-the-record sources confirmed the information TheBlaze received from its confidential sources concerning the government's investigation into Plaintiff's role in the Boston Marathon bombing.  Weasel Decl. ¶33.

86.     TheBlaze also obtained information in connection with its reportage concerning Plaintiff from numerous other individuals, including Steve Emerson; Jake Tapper; Brianna Patterson; Brian Creter; Jason Buttrill; Mark Iglar; Dan Andros; Jenna Diaco; Todd Starnes; and Stephen Yates.  Weasel Decl. ¶32.

14

87.     Notwithstanding the forceful assurances that had been provided by TheBlaze's confidential sources, Mr. Cheatwood and TheBlaze's staff coordinated a reach out campaign to several members of Congress to verify the TECS II documents and Plaintiff's Event File – *i.e.*, to make sure the documents were authentic and that their contents were accurate.  Beck Decl. ¶20.

88.     The members of Congress contacted by TheBlaze verified that the information in the TECS II documents and the Event File was accurate.  Beck Decl. ¶20.

89.     TheBlaze communicated with and obtained information from six members of Congress in connection with its reportage concerning Plaintiff:  Jeff Duncan (R-SC); Michael T. McCaul (R-TX); Peter T. King (R-NY); Candice S. Miller (R-MI); Louis Gohmert (R-TX); and Scott Perry (R-PA).  Weasel Decl. ¶31; Beck ¶16.

**TheBlaze's Editorial Process in Connection with the Boston Marathon Bombing**

90.     In connection with its reporting on the Boston Marathon bombing, TheBlaze gathered and reported information from confidential sources, on-the-record sources, open (or publicly available) sources, and the government itself.  Cheatwood Decl. ¶15; Weasel Decl. ¶19; Beck Decl. ¶¶5, 16.

91.     As a matter of standard practice, TheBlaze's editorial staff conducted two editorial meetings, led by Mr. Beck and Mr. Cheatwood, before each day's broadcasts. Cheatwood Decl. ¶17; Beck Decl. ¶4.

92.     In addition to the daily editorial meetings, Mr. Cheatwood was in frequent communication with Mr. Beck and TheBlaze's investigative journalists.  Cheatwood Decl. ¶18.

93.     TheBlaze's reporters, including Mr. Weasel, provided information and content from their newsgathering to Mr. Cheatwood, who acted as gatekeeper to TheBlaze's broadcasts concerning the government's investigation of Plaintiff.   Cheatwood Decl. ¶16; Weasel Decl. ¶19; Beck Decl. ¶5.

94.     Mr. Cheatwood vetted the information that Mr. Weasel and others brought to him in the course of the newsgathering process, probing and challenging the sourcing and reliability to ensure that the information presented was true and accurate in all respects. Cheatwood Decl. ¶16; Weasel Decl. ¶19; Beck Decl. ¶5.

95.     Mr. Cheatwood required double or triple confirmation of certain information. Cheatwood Decl. ¶16; Weasel Decl. ¶19.

96.     At the conclusion of Mr. Cheatwood's verification process, the information would be funneled to Mr. Beck from Mr. Cheatwood for broadcasting purposes.  Beck Decl. ¶5; Cheatwood ¶16; Weasel Decl. ¶19.

97.     Mr. Beck and Mr. Cheatwood continually emphasized the need for the team to cross-check and verify information provided by confidential and non-confidential sources with additional sources to whom TheBlaze had not promised confidentiality.   Cheatwood Decl. ¶¶18-20; Beck Decl. ¶10.

98.     Mr. Beck and Mr. Cheatwood stressed factual accuracy and consistency, insisting on the need to carefully fact-check the information gathered by TheBlaze's investigative journalists.  Cheatwood Decl. ¶¶19, 21; Weasel Decl. ¶25; Beck Decl. ¶10.

99.     Multiple e-mails demonstrate the lengths to which TheBlaze went to confirm and verify information provided by its sources.  Cheatwood Decl. ¶24; Weasel Decl. ¶29 & Exs. 3-17.

100.    For example, in an April 20, 2013, e-mail, Mr. Cheatwood stressed the need for credibility in connection with TheBlaze's reportage concerning Plaintiff's 212(a)(3)(B) designation, advising Mr. Weasel that TheBlaze needs to gather "as much detail as we can on classifying someone as 3B. . . . the more detail on the process we can reveal w/o getting [redacted] in trouble the better we'll be.  Need credibility."  Weasel Decl. ¶29 & Ex. 3.

101.    If TheBlaze could not verify the information provided by its sources, TheBlaze did not report the information.  Cheatwood Decl. ¶¶22-23.

102.    Multiple e-mails demonstrate that TheBlaze was cautious not to report information that could not be verified.  Cheatwood Decl. ¶24; Weasel Decl. ¶29 & Exs. 3-17.

103.    For example, in an April 21, 2013, e-mail, Mr. Cheatwood noted that TheBlaze has been advised that Plaintiff's "family connections are very scary," but states that "[w]e are trying to get specifics" and that, in the meantime, TheBlaze "should not go with" the information.  Weasel Decl. ¶29 & Ex. 7.

104.    As instructed by Mr. Cheatwood, Mr. Weasel cross-checked and verified information provided to him by confidential sources with non-confidential sources.  Weasel Decl. ¶¶21, 22.

105.    Mr. Cheatwood repeatedly challenged Mr. Weasel with regard to his sources, asking Mr. Weasel to confirm the accuracy of the information Mr. Weasel had been provided.  Weasel Decl. ¶¶24-25.

106.    Throughout the coverage of the government's investigation, Mr. Beck pressed Mr. Cheatwood and TheBlaze's staff to double- and triple-check the information obtained from confidential sources relied on by TheBlaze.  Beck Decl. ¶49.

107.   Mr. Beck would regularly ask Mr. Cheatwood questions to verify the source information he was being provided, such as how long TheBlaze's staff had known Mr. Weasel's confidential sources; whether there were other sources or experts who could confirm the information; and whether the subject matter experts TheBlaze relied upon, including Mr. Stakelbeck and Mr. Poole, agreed with the information provided by the confidential sources. Weasel Decl. ¶27.

108.   Because of the serious implications of the information in connection with TheBlaze's reporting on the Boston Marathon bombing investigation, Mr. Beck re-confirmed the truth and accuracy of on-air statements concerning Plaintiff by checking with Mr. Cheatwood between broadcast breaks.  Beck Decl. ¶¶50-51.

109.   In Mr. Beck's 40 years of broadcasting, he has "never seen more diligence done on any story [he's] been involved in, than this one."  Beck Decl. ¶53.

### TheBlaze's Network of Sources Informs TheBlaze that Law Enforcement Has Identified Plaintiff as a "Suspected Terrorist"

110.   On April 15, 2013, the day of the Boston Marathon bombing, TheBlaze learned from Sources 1 and 2 that law enforcement authorities began entering information concerning Plaintiff into the TECS II database.   Weasel Decl. ¶76 & Ex. 20; Cheatwood Decl. ¶33; Howard Decl. ¶13-14 & Ex. 1.

111.   On April 16, 2013, Sources 1 and 2 described the contents of the TECS II database data concerning Plaintiff to Mr. Weasel over the telephone.  Weasel Decl. ¶¶78-79; Cheatwood Decl. ¶34; Beck Decl. ¶15.

112.   Sources 1 and 2 explained that, as stated in the TECS II database, Plaintiff was a "suspected terrorist" who was "armed & dangerous" and therefore subject to immediate

mandatory apprehension by law enforcement.   Weasel Decl. ¶78; Cheatwood Decl. ¶38; Beck Decl. ¶15.

113.   According to Sources 1 and 2, the information regarding Plaintiff in the TECS II database confirmed that Plaintiff was linked to the Boston Marathon bombing, was a target of law enforcement's investigation, and was a terror suspect who presented a grave threat to public safety.   Weasel Decl. ¶78; Cheatwood Decl. ¶38; Beck Decl. ¶15.

114.   On April 16, 2013, TheBlaze learned from Sources 1 and 2 that, after law enforcement authorities had searched Plaintiff's apartment and computer in the early morning hours of April 16, 2013, the government had created an "Event File" on Plaintiff.   Weasel Decl. ¶77; Cheatwood Decl. ¶34; Beck Decl. ¶13.

115.   On April 16, 2013, Sources 1 and 2 read excerpts from Plaintiff's Event File over the telephone.   Weasel Decl. ¶79; Cheatwood Decl. ¶35; Beck Decl. ¶13.

116.   The information Sources 1 and 2 communicated to TheBlaze established that the government had designated Plaintiff as a "212(a)(3)(B)(i)(II)," which Sources 1 and 2 explained to TheBlaze is a classification under federal law for those who have engaged in or are likely to engage in terrorist activity.   Weasel Decl. ¶79; Cheatwood Decl. ¶39; Beck Decl. ¶13 & Ex. 2.

117.   TheBlaze's network of sources advised TheBlaze that Plaintiff's student Visa indicated he was enrolled at the University of Findlay in Ohio, but that he never showed up at that institution.   Weasel Decl. ¶69; Beck Decl. ¶13.

### TheBlaze's Investigation Reveals Additional Information About Plaintiff

118.   The ISB is a mosque located at 100 Malcom X Boulevard in Roxbury, Massachusetts.   Weasel Decl. ¶113.

119.   It is well-known among law enforcement officials that there are longstanding questions about the ISB's involvement in financing terrorist activity.  Egan Decl. ¶14; Weasel Decl. ¶113.

120.   Approximately 40 members of the ISB have been or remain under investigation by federal law enforcement authorities based on suspected financial support of terrorism-related activities.  Egan Decl. ¶14; Weasel Decl. ¶113.

121.   Source 1 informed Mr. Weasel that Plaintiff was a member of the Roxbury mosque, and advised Mr. Weasel he was convinced that Plaintiff's connection to the ISB was a factor in Plaintiff's 212(a)(3)(B) classification.  Weasel Decl. ¶114.

### TheBlaze's Efforts to Verify Information with Law Enforcement

122.   Upon receipt of information from the TECS II database and Plaintiff's Event File, TheBlaze contacted officials from DHS and the FBI, among other federal agencies working on the investigation, for clarification of the information TheBlaze was receiving from its sources.  Weasel Decl. ¶121; Cheatwood Decl. ¶¶46, 47; Beck Decl. ¶¶16-17.

123.   The government never provided TheBlaze with the requested evidence or provided any basis for Plaintiff's 212(a)(3)(B) designation.  Weasel Decl. ¶111; Cheatwood Decl. ¶¶47, 48; Beck Decl. ¶17.

124.   The government publicly issued several different explanations for the identification of Plaintiff by law enforcement in connection with the Boston Marathon bombing.  Weasel Decl. ¶121; Cheatwood Decl. ¶47; Beck Decl. ¶17.

125.   The government's explanations contradicted the information contained in Plaintiff's Event File and the TECS II documents, as well as the information TheBlaze was

being provided from TheBlaze's confidential sources, who had direct involvement in the investigation.  Weasel Decl. ¶123; Cheatwood Decl. ¶46; Beck Decl. ¶17.

126.    Notwithstanding the government's public statements regarding Plaintiff, Sources 1, 2, and 3, relying on the information contained in the TECS II documents and the Event file, advised TheBlaze that the government itself had identified Plaintiff as a terrorist involved in the Boston Marathon bombing.  Weasel Decl. ¶122.

127.    TheBlaze took the information the government was disseminating about Plaintiff into consideration and, even though TheBlaze's sources rejected it as erroneous, nevertheless reported the government's version of events on its broadcasts to provide full context for the audience's benefit.  Cheatwood Decl. ¶49.

128.    Based on TheBlaze's experience with its confidential sources, their unquestioned expertise in national security and counterterrorism matters, and their direct nexus to the Boston Marathon bombing investigation, TheBlaze was confident that the information provided by its confidential sources was credible and trustworthy, even though it conflicted in certain key respects with the version of events being presented by the government.  Cheatwood Decl. ¶50.

129.    At the time they were broadcast, TheBlaze believed that the statements challenged by Plaintiff concerning his involvement in the Boston Marathon bombing investigation were true and accurate in all respects, and believes them to be true and accurate today.  Beck Decl. ¶54; Cheatwood Decl. ¶54; Weasel Decl. ¶130.

130.    If TheBlaze had any doubt about the veracity of the challenged statements, TheBlaze would not have allowed the broadcast of the statements.  Cheatwood Decl. ¶54.

**TheBlaze's April 19, 2013 Radio Broadcast**

131.    On Friday, April 19, 2013, Mr. Beck stated during his radio program – although he refrained from identifying Plaintiff on the broadcast – that he was a "very bad, bad, bad man." Beck Decl. ¶¶22, 41 & Ex. 3.

132.    Mr. Beck chose this particular phraseology to signal to executive branch authorities that TheBlaze had confirmed the federal government's classification of Plaintiff as a section "3B" terrorist in order that the government would explain the true state of affairs behind that classification.  Beck Decl. ¶¶13-14, 22-23, 41.

133.    In using the "very bad, bad, bad man" wordplay, Mr. Beck was relying upon the government's own designation of Plaintiff as a terrorist under INA § 212(a)(3)(B).  Beck Decl. ¶¶13-14, 22-23, 41.

134.    Mr. Beck hoped that the government would, before TheBlaze's broadcast the following Monday, explain the discrepancies between the information being provided by TheBlaze's sources and the government's pronouncements.  Beck Decl. ¶22.

135.    Mr. Beck also stated during the April 19, 2013 radio program:  "Meanwhile, who has been blowing the legs off of our citizens?"  Beck Decl. ¶41 & Ex. 3.

136.    Mr. Beck's "blowing the legs off" statement refers to the "video of two men" released by the FBI who "were suspects in the Boston bombing" and whose "mom is in jail" and father was "back in Russia" at the time – *i.e.*, Tamerlan and Dzhokhar Tsarnaev, *not* Plaintiff.  Beck Decl. ¶41 & Ex. 3.

**TheBlaze's April 22, 2013 Radio Broadcast**

137.    To prepare for the Monday, April 22, 2013 radio broadcast, a staff conference call was scheduled for Sunday, April 21, 2013.  Beck Decl. ¶24.

138.   The purpose of the call was to review and assess the factual information that TheBlaze had verified as of that date.  Beck Decl. ¶24.

139.   As the investigation progressed and Tamerlan and Dzhokhar Tsarnaev were identified as having perpetrated the attack, TheBlaze's network of sources continued to inform TheBlaze that Plaintiff remained under investigation and was involved in the bombing through his participation in a Boston-based terror cell.  Beck Decl. ¶25.

140.   On April 22, 2013, Mr. Beck stated on the air that Plaintiff was involved in recruiting the Tsarnaev brothers and either funded or gave the "go order" for the bombings. Beck Decl. ¶26 & Ex. 4.

141.   These statements were based on information from TheBlaze's confidential sources – who explained that that information would account for Plaintiff's 212(a)(3)(B) classification as a terrorist – and was cross-checked with experienced members of the national intelligence community and terrorism experts.  Beck Decl. ¶¶13-19, 24-26, 42.

142.   Mr. Beck's statement on the April 22, 2013 radio broadcast that Plaintiff had received a "2123B tag" as a "proven terrorist" was based on Plaintiff's Event File and the high level of proof warranted for 212(a)(3)(B) status.  Beck Decl. ¶42.

143.   Mr. Beck's statement on the April 22, 2013 radio broadcast that there were "three people involved" in the bombing was based on information verified by multiple sources and official government documents designating Plaintiff, among other things, as a "suspected terrorist" and identifying him as a target of JTTF's investigation.  Beck Decl. ¶42.

## Secretary Napolitano's April 23, 2013 Testimony that Plaintiff Was Never a "Subject" or "Person of Interest"

144.   On April 23, 2013, Secretary Napolitano was asked about Plaintiff during a congressional briefing.  She stated as follows:

> He was not on a watch list. What happened is this student was – really, when you back it up, he was in the wrong place at the wrong time. He was never a subject. He was never even really a person of interest. Because he was being interviewed, he was at that point put on a watch list. And then, when it was quickly determined he had nothing to do with the bombing, the watch listing status was removed.

Weasel Decl. ¶¶82, 128 & Ex. 23; Beck Decl. ¶27.

145.   After Secretary Napolitano testified, Mr. Weasel received telephone calls from Sources 1 and 2 informing him they believed Secretary Napolitano's testimony was false. Weasel Decl. ¶83.

146.   Sources 1 and 2 repeatedly and emphatically refuted the April 23, 2013 statements made by Secretary Napolitano, noting that the statements were contradicted by the government's own information contained in the Event File and TECS II documents.  Weasel Decl. ¶129; Beck Decl. ¶27.

147.   On April 24, 2013, Source 2 provided Mr. Weasel a copy of four pages of documents concerning Plaintiff from the TECS II database and a copy of an excerpt from Plaintiff's Event File.  Weasel Decl. ¶85 & Exs. 20, 21; Cheatwood Decl. ¶36 & Exs. 4, 5; Beck Decl. ¶19.

148.   While Sources 1 and 2 had described the information contained on the TECS II database and the Event File to Mr. Weasel over the telephone, TheBlaze did not obtain copies of the documents until April 24, 2013 when Source 2 physically provided them to Mr. Weasel.  Weasel Decl. ¶¶78-79, 84-86.

149.   Source 2 told Mr. Weasel that providing the documents to Mr. Weasel could end Source 2's career.  Weasel Decl. ¶85.

150.   Source 1 explained to Mr. Weasel that the fact that Plaintiff is identified in the Event File as an "exact match" to a particular No Fly number indicates that Plaintiff had been

under surveillance and placed on the No Fly List prior to the Boston Marathon bombing on April 15, 2013.  Weasel Decl. ¶105; Howard Decl. ¶31.

151.    Sources 1 and 2 also noted that the Event File excerpt indicates that Plaintiff had a "prior event," which is identified as "# 1648067."  Weasel Decl. ¶105.

152.    TheBlaze's confidential sources explained that a 212(a)(3)(B) designation:

- means that law enforcement is in possession of material evidence of terrorist activity;

- is the highest level of terrorism that can be assigned;

- typically involves the sharing of information and consultation among law enforcement agencies, and requires significant evidentiary support before it can be applied, with ultimate approval required by a cabinet-rank official.

Weasel Decl. ¶¶108-110; Cheatwood Decl. ¶39; Beck Decl. ¶14.

153.    TheBlaze cross-referenced the meaning of a 212(a)(3)(B) designation with Source 3, formerly a high-ranking member of JTTF, who agreed with Sources 1 and 2; described the threshold required to designate an individual as a 212(a)(3)(B); and stressed that if a 212(a)(3)(B) designation was "opened," then "it was accurate."  Weasel Decl. ¶112.

154.    In addition to obtaining copies of the TECS II documents and Plaintiff's Event File after Secretary Napolitano testified, TheBlaze contacted several members of the U.S. House of Representatives who were "extraordinarily upset" and "perplexed" by Secretary Napolitano's testimony.  Beck Decl. ¶28.

155.    Mr. Beck spoke with Congressman Louis Gohmert (R-TX), who characterized Secretary Napolitano's statements as perjurious.  Beck Decl. ¶29.

**TheBlaze's April 24, 2013 Radio Broadcast**

156.   On April 24, 2013, Mr. Beck stated on the air that law enforcement officials had "opened a 212(3)(b) on [Plaintiff]" and "designated him a terrorist"; that the creation of the Event File meant that Plaintiff was "actively engaged in terrorist activity"; that a 212(a)(3)(B) designation means an individual is the "worst of the worst"; and that Plaintiff was "armed and dangerous."  Beck Decl. ¶43 & Ex. 5.

157.   Each of these statements was based on the information contained in the TECS II documents, information contained in Plaintiff's Event File, or was a subjective evaluation of the 212(a)(3)(b) designation.  Beck Decl. ¶¶13-15, 43.

**Statements on Bill O'Reilly's April 25, 2013 Show**

158.   Mr. Beck appeared as a guest on Bill O'Reilly's Fox News Program on April 25, 2013.  Beck Decl. ¶44 & Ex. 6.

159.   Mr. Beck's purpose in appearing on Fox News, a competing network, was to publicize Secretary Napolitano's testimony and thereby encourage other networks to join TheBlaze in reporting on the administration's sanitization of Plaintiff's involvement in the Boston Marathon bombing.  Beck Decl. ¶¶38-39, 45 & Ex. 6.

160.   Based on information taken directly from the government's TECS II database and Plaintiff's Event File, during the April 25, 2013 Fox News broadcast, Mr. Beck stated that Plaintiff was "armed and dangerous" and a "terrorist."  Beck Decl. ¶¶13-15, 45-46 & Ex. 6.

**TheBlaze's May 1, 2013 Radio Broadcast**

161.   Based on information that TheBlaze had received (and continued to receive) from a variety of sources, including the government's own TECS II documents and Event File

for Plaintiff, on May 1, 2013, Mr. Beck stated on the air that Plaintiff was "involved" in the Boston Marathon bombings.  Beck Decl. ¶¶13-25, 30-31, 47 & Ex. 7.

**TheBlaze's Conclusion that Plaintiff's Involvement in the**
**Boston Marathon Bombing Was Providing Financial Support**

162.    TheBlaze's network of sources collectively presented a picture of Plaintiff's ties to terrorist activities in connection with the Boston Marathon bombing derived from official government and other information to which they had access.  Cheatwood Decl. ¶¶40-41; Weasel Decl. ¶115.

163.    TheBlaze's confidential sources were emphatic that the 212(a)(3)(B) designation given to Plaintiff was unmistakable evidence of Plaintiff's involvement in the Boston Marathon bombing.  Weasel. Decl. ¶117; Cheatwood Decl. ¶42.

164.    Relying on credible information provided to TheBlaze by its network of on-the-record sources and confidential sources, TheBlaze determined that Plaintiff was involved in the Boston Marathon bombing.  Weasel Decl. ¶116; Cheatwood Decl. ¶43; Beck Decl. ¶18.

165.    Further, TheBlaze's confidential sources became increasingly convinced to the point of adamancy that Plaintiff in all likelihood provided financial support for the attack as the basis for Plaintiff's 212(a)(3)(B) designation.  Weasel Decl. ¶120; Cheatwood Decl. ¶¶43-44; Beck Decl. ¶32.

166.    Terrorist cells are typically comprised of three components:  training, execution, and funding.  Egan Decl. ¶13; Cheatwood Decl. ¶42.

167.    Financial supervisors of terrorist cells are usually separated from and do not participate in the terrorist attacks they sponsor.  Egan Decl. ¶13.

168.    Mr. Weasel understood the three components of terrorist cells based on his experience producing investigative documentaries addressing Islamic terrorism and national security.  Weasel. Decl. ¶119; Cheatwood Decl. ¶42.

169.    Based on the information available to TheBlaze's network of sources, their consensus was that Plaintiff was being investigated as part of a Boston-based terrorist cell that included Dzhokhar and Tamerlan Tsarnaev, who were ultimately identified as the perpetrators of the bombing attack.  Cheatwood Decl. ¶40.

170.    During Mr. Cheatwood's meeting with Source 5 in May of 2013, Source 5 reiterated that the information provided to TheBlaze by Sources 1 and 2 supported the determination that Plaintiff had provided financial support of the Boston Marathon bombing, consistent with the government's classification of Plaintiff as a 212(a)(3)(B) terrorist. Cheatwood Decl. ¶45.

### May 8, 2013 Radio Broadcast

171.    On May 8, 2013, Mr. Beck stated on the air:  "You had the Saudi that they know in advance, and you know who the Saudi is?  The money man.  That's who the Saudi is. He's the – he's the guy who actually paid for it.  He's the money man."  Beck Decl. ¶48 & Ex. 8.

172.    Mr. Beck's statements were based on the conclusion of TheBlaze's confidential sources, which became a near certainty over time, that Plaintiff played a role in providing financial support for the bombings, an act of terrorism falling within the purview of section 212(a)(3)(B).  Beck Decl. ¶¶13-29, 30-33, 48.

**Law Enforcement Continues to Investigate Plaintiff in the**
**Weeks, Months, and Years After the Boston Marathon Bombing**

173.    Plaintiff's deportation status and connection to Tamerlan Tsarnaev were the subject of correspondence between the U.S. House of Representatives Committee on Homeland Security and executive branch officials beginning on April 18, 2013, and continuing through August 6, 2013, including the following:

- an April 18, 2013, letter jointly addressed to Attorney General Eric Holder and DHS Secretary Napolitano;

- an April 27, 2013, letter to DHS Secretary Napolitano;

- an April 27, 2013, letter to FBI Director Mueller;

- an April 27, 2013, letter to Lieutenant General James R. Clapper, Director of National Intelligence;

- a May 15, 2013, letter addressed to Secretary Napolitano, Director Clapper and Director Mueller; and

- an August 6, 2013, letter to Attorney General Holder and Director Mueller.

Grygiel Decl. ¶8 & Ex. 6.

174.    In correspondence dated April 22, 2013, to DHS Secretary Napolitano, Ranking Member of the United States Senate Committee on the Judiciary Charles B. Grassley noted that "U.S. Custom and Border Protection's National Targeting Center (NTC) created a file on Saudi national Abdul Rahman Ali Alharbi at 4 pm on April 15, 2013" indicating that "Alharbi was to be processed for revocation of his visa based on Section 212(a)(3)(B) of the Immigration and Nationality Act, which is for national security grounds." The letter further posed several questions concerning both the process by which Plaintiff obtained a student visa and his deportation status. Grygiel Decl. ¶6 & Ex. 5.

29

175.    In a companion letter of the same date to FBI Director Robert S. Mueller III, Senator Grassley asked whether (1) "Abdul Rahman Ali Alharbi [was] ever on a terror watch list maintained or used by the FBI," and (2) "Alharbi [was] being monitored, using either criminal or national security authorities, at the time of the 2013 Boston Marathon."  Grygiel Decl. ¶7 & Ex. 5.

176.    The FBI and Boston Police Department interviewed Plaintiff for a second time on May 9, 2013.  Grygiel Decl. ¶28

177.    During the May 9, 2013, interview, law enforcement authorities asked Plaintiff about Robel Phillipos, a college friend of Dzhokhar Tsarnaev, who was subsequently conficted of making false statements to investigators with the FBI's Joint Terrorism Task Force.  Grygiel Decl. ¶29 & Exs. 15, 16.

178.    A report produced by the Massachusetts State Police titled "ACISS Tip Information Marathon Bombing-37" states that, as of May 9, 2013, "[t]he Marathon Bombing Task Force is conducting further investigation on ABDULRAHMAN."  Grygiel Decl. ¶30 & Ex. 16.

179.    On May 9, 2013, the FBI also conducted an in-person investigation of an individual who appears to be an acquaintance of Plaintiff.  Egan Decl. ¶12 & Ex. 1.

180.    A U.S. House Homeland Security Committee Report prepared in March of 2014 titled "The Road to Boston: Counterterrorism Challenges and Lessons from the Marathon Bombings" states, at page 17/37:  "Shortly after the attack, the Boston Police Department (BPD) detained a Saudi national who was reportedly behaving suspiciously near the site of the explosions."  Grygiel Decl. ¶9 & Ex. 8.

181.    On June 13, 2014, the FBI continued its investigation, obtaining a DNA sample and finger-prints from Plaintiff.  Egan Decl. ¶12 & Ex. 1.

182.    Law enforcement authorities interviewed Plaintiff a third time in October 2014. Grygiel Decl. ¶¶31-32 & Ex. 17.

183.    Law enforcement officials never informed Plaintiff that he was cleared as a suspect in connection with the Boston Marathon bombing investigation, nor did Plaintiff receive any documentation to that effect.  Grygiel Decl. ¶34.

### Plaintiff "Tells His Story" to the Press and to the Public

184.    Plaintiff granted at least four interviews to the press after April 15, 2013: one interview with *The Islamic Monthly*; one interview with television personality Dawood al-Shirian; and two interviews with the *Al Hayat* newspaper.  Grygiel Decl. ¶¶36-98.

**A.      Plaintiff's Interview with *The Islamic Monthly***

185.    Plaintiff granted an interview to Amina Chaudary of *The Islamic Monthly*. Grygiel Decl. ¶36 & Ex. 19.

186.    Plaintiff granted an interview to *The Islamic Monthly* in order to "tell his story" – *i.e.*, present his version of events in connection with the Boston Marathon bombing investigation.  Grygiel Decl. ¶49.

187.    In telling his story to *The Islamic Monthly*, Plaintiff:

- stated that he objected to having been ethnically profiled by law enforcement authorities;
- criticized law enforcement authorities for the way he was treated in the hospital; and
- expressed his frustration at the media coverage of his apartment search.

Grygiel Decl. ¶¶ 50-53.

188.    Ms. Chaudary offered Plaintiff the opportunity to approve the content of his audio interview before it was published by *The Islamic Monthly*.  Grygiel Decl. ¶46.

189.    Plaintiff directed Ms. Chaudary not to include certain audio segments of his interview on *The Islamic Monthly's* website.  Grygiel Decl. ¶48.

190.    On May 21, 2013, a transcript and an audio recording of the interview, two photographs of Plaintiff at the finish line of the Boston Marathon, and a commentary titled "Abdulrahman Ali Alharbi In His Own Voice" written by Ms. Chaudary was posted to *The Islamic Monthly's* website.   Grygiel Decl. ¶¶37-39 & Exs. 19-21.

191.    On May 22, 2013 – the day after his interview was published – Plaintiff received a phone call from the Saudi Arabian Embassy seeking not to have the interview posted on *The Islamic Monthly's* website.  Grygiel Decl. ¶64

192.    As a result of the Saudi Arabian government's request, Plaintiff asked Ms. Chaudary to delay posting his interview.  Grygiel Decl. ¶66.

193.    Ms. Chaudary advised Plaintiff that the interview could not be taken down from *The Islamic Monthly's* website.  Grygiel Decl. ¶67.

194.    On March 23, 2014, five days before Plaintiff filed his Complaint in this matter, Plaintiff asked Ms. Chaudary that his interview from the previous year be deleted from *The Islamic Monthly's* website.  Grygiel Decl. ¶68.

**B.      Plaintiff's Interview with Dawood al-Shirian**

195.    Plaintiff granted a telephone interview from his hospital room that was broadcast on Saudi Arabian television.  Grygiel Decl. ¶¶71, 74 & Ex. 25.

32

196.   Plaintiff's interview was with Dawood al-Shirian, a well-known television personality in Saudi Arabia and host of a popular program called "8 O'Clock with Dawood." Grygiel Decl. ¶¶73, 75, 77 & Exs. 26, 28.

197.   In his television interview broadcast on "8 O'Clock With Dawood," Plaintiff chastised "[a]ll media, newspapers, TV channels, every and anything" for telling "lies" about him and publishing photos of the FBI's search of his apartment.  Grygiel Decl. ¶80.

**C.   Plaintiff's Interviews with *Al Hayat***

198.   Plaintiff granted two interviews to the *Al Hayat* newspaper:  one on or about April 19, 2013, and another on or about April 23, 2013.  Grygiel Decl. ¶¶90, 96 & Exs. 30-31.

199.   *Al Hayat* published two separate news articles concerning Plaintiff.  Grygiel Decl. ¶¶88, 90, 96 & Exs. 29-31.

200.   The first *Al Hayat* newspaper article was published on or about April 19, 2013 under the headline "Saudi student injured in Boston tells *Al Hayat*:  I was questioned for only two hours."  Grygiel Decl. ¶90 & Ex. 30.

201.   The second *Al Hayat* newspaper article was published on or about April 23, 2013 under the headline "Al Harbi after leaving the hospital:  I will continue my studies as usual."  Grygiel Decl. ¶96 & Ex. 31.

202.   As reported in the April 23, 2013 article, Plaintiff criticized the media for identifying him as a suspect in the Boston Marathon bombing investigation and for reporting on the search of his apartment.  Grygiel Decl. ¶96 & Ex. 31.

203.   As reported in the April 23, 2013 article, Plaintiff "said that the visit from First Lady Michelle Obama was effective in demonstrating his innocence to the American media." Grygiel Decl. ¶97 & Ex. 31.

**D.      Article in *Okaz* About Plaintiff**

204.    *Okaz*, a Saudi Arabian daily newspaper published in Arabic and based in Jeddah, published an article headlined "Boston Casualty:  This Is My Story," which included a photograph of Plaintiff in his hospital room.  Grygiel Decl. ¶98 & Ex. 32.

**E.      Plaintiff's Facebook Posts Concerning Profiling**

205.    In a Facebook message sent on April 25, 2013 to Sharon Nambudripad Schiffer, one of Plaintiff's teachers at the New England School of English, Plaintiff asked Ms. Schiffer if he could share a blog post she wrote about him.  Grygiel Decl. ¶102 & Exs. 33, 34.

206.    In the blog post, Ms. Schiffer characterized law enforcement's investigation of Plaintiff's potential involvement in the Boston Marathon bombing as the "epitome of profiling."  Grygiel Decl. ¶104 & Ex. 34.

207.    Plaintiff wanted to share the blog post written by Ms. Schiffer because it told "the truth" about his identity.  Grygiel Decl. ¶103.

208.    After receiving Ms. Schiffer's permission to share the blog post, Plaintiff posted Ms. Schiffer's blog post on Plaintiff's own Facebook page.  Grygiel Decl. ¶¶102, 105 & Ex. 33.

**Plaintiff Accepts $300,000 from The One Fund for "Superficial" Injuries**

209.    The Discharge Summary form from Brigham and Women's Hospital stated that Plaintiff's "burns were superficial and required no treatment."  Grygiel Decl. ¶129 & Ex. 40.

210.    After his discharge from the hospital, Plaintiff did not seek any follow-up counseling or medical treatment.  Grygiel Decl. ¶129.

211.    Upon Plaintiff's discharge from the hospital, there were no restrictions on Plaintiff's activities.  Grygiel Decl. ¶130 & Ex. 42.

212.    Shortly after his discharge from the hospital, Plaintiff posted a message to his Facebook page that he was "fine."  Grygiel Decl. ¶131 & Ex. 43.

213.    After his discharge from the hospital on April 20, 2013, Plaintiff was asked by law enforcement officials to submit to a polygraph examination.  Plaintiff declined to do so on advice of counsel.  Grygiel Decl. ¶27.

214.    Upon meeting with his friends on April 20, 2013, after leaving the hospital, Plaintiff told them that he was "feeling good."  Grygiel Decl. ¶132.

215.    In the television interview Plaintiff granted from his hospital room to Saudi Arabian journalist Dawood al-Shirian, Plaintiff confirmed that his injuries from the Boston Marathon bombing were "minor" and "not to be worried about."  Grygiel Decl. ¶127 & Ex. 25.

216.    Plaintiff did not attend any support group meetings held by the Boston Public Health Commission.  Grygiel Decl. ¶134.

217.    In or around June 2013, Plaintiff submitted a Claim Form to The One Fund. Grygiel Decl. ¶137, 139, 140 & Ex. 49.

218.    In addition to stating that he "got burned" and had "breakdown in my muscles," Plaintiff wrote that "I was accused by the media."  Grygiel Decl. ¶140 & Ex. 49.

219.    Plaintiff received a financial award of ▊▊▊▊ from The One Fund in or around June 2013.  Grygiel Decl. ¶141 & Ex. 50.

220.    Plaintiff received a second financial award of ▊▊▊ from The One Fund in 2014.  Grygiel Decl. ¶144 & Ex. 52.

## Plaintiff Suffered No Injury to His Reputation

221.    Plaintiff did not receive any medical or psychiatric treatment because of the broadcast statements he disputes.  Grygiel Decl. ¶147.

222.    Plaintiff did not lose any job opportunities, income, or other economic loss because of the broadcast statements he disputes.  Grygiel Decl. ¶148.

223.    The broadcast statements Plaintiff disputes did not interfere with Plaintiff's family relationships.  Grygiel Decl. ¶150.

224.    Plaintiff cannot recall anyone ever mentioning to him the April 19, April 22, and April 24, 2013 broadcasts he disputes, nor could he recall anyone mentioning Glenn Beck's appearance on Bill O'Reilly's Fox News television program on April 25, 2013. Grygiel Decl. ¶151.

225.    Plaintiff could not identify anyone who communicated with him about the May 1 and May 8, 2013 broadcasts he disputes.  Grygiel Decl. ¶¶152, 153.

226.    Plaintiff does not possess any records reflecting communications about the May 1 and May 8, 2013 broadcasts he disputes.  Grygiel Decl. ¶¶152, 153.

227.    None of Plaintiff's friends think any less of Plaintiff as a result of the broadcasts Plaintiff disputes.  Grygiel Decl. ¶154.

228.    Plaintiff did not lose any friends as a result of the broadcasts Plaintiff disputes. Grygiel Decl. ¶154.

## Defendants Generate No Revenue or Ratings Increase
## as a Result of TheBlaze's Reportage Concerning Plaintiff

229.    An event-driven or short-term increase in ratings has little, if any, impact on advertising revenue because TheBlaze's advertisers are locked into a year-long rate structure. Beck Decl. ¶34; Korowitz Decl. ¶7.

230.    A meaningful jump in advertising revenue requires a sustained ratings increase over an extended period of time.  Beck Decl. ¶34; Korowitz Decl. ¶7.

231.    The business model of TheBlaze's radio and television broadcasts is not predicated on episodic or monthly ratings, which were not a factor in TheBlaze's coverage of the Boston Marathon bombing.  Beck Decl. ¶35.

232.    If TheBlaze was looking to maximize revenue through increased subscription sales, TheBlaze would have held back the information from the radio program and reported the information about Plaintiff exclusively on television.  Beck Decl. ¶36.

233.    Mercury is a multimedia production company and the parent company of TheBlaze.  Kawecki Decl. ¶5.

234.    Premiere syndicates ninety radio programs and services to more than 5,500 radio affiliations across the nation.  Talbott Decl. ¶1.

235.    Pursuant to an agreement between Mercury and Premiere, Premiere is the distributor of *The Glenn Beck Radio Program*.  Kawecki Decl. ¶7; Talbott Decl. ¶4 & Ex. 1.

236.    Premiere earns revenue primarily based on advertising sales with respect to *The Glenn Beck Radio Program*.  Korowitz Decl. ¶4 & Ex. 1.

237.    Premiere's revenues relating to *The Glenn Beck Radio Program* in April and May of 2013, when the challenged broadcasts were aired, were ████████████ and ██████████ respectively.  These amounts are less than the revenues earned by Premiere in March and June, 2013.  Revenues were highest during March of 2013, before the challenged broadcasts were aired.  Korowitz Decl. ¶6 & Ex. 1.

238.    The revenue received by Mercury pursuant to the agreement for the second quarter of 2013, when the challenged broadcasts were aired, was $2,125,000, which is

consistent with the amounts received for the other quarters of 2013.  Kawecki Decl. ¶10 & Ex. 1.

239.    The advertising revenue received by Mercury for the second quarter of 2013, when the challenged broadcasts were aired, was ███████ which is consistent with the amounts received for the other quarters of 2013.  Kawecki Decl. ¶12 & Ex. 1.

240.    Overall, Mercury was not profitable in either second quarter or full year 2013. Kawecki Decl. ¶13.

241.    During the second quarter of 2013, when the challenged broadcasts were aired, TheBlaze's revenues relating to advertising were ███████ which is consistent with the amounts received for the other quarters of 2013.  Kawecki Decl. ¶17 & Ex. 1.

242.    During the second quarter of 2013, when the challenged broadcasts were aired, TheBlaze's revenues relating to subscription sales were ███████ which is consistent with the amounts received for the other quarters of 2013.  Kawecki Decl. ¶17 & Ex. 1.

243.    The number of subscriptions for TheBlaze did not increase during either the second or third quarters of 2013.  Kawecki Decl. ¶18.

244.    Subscription sales for TheBlaze have steadily declined year over year since 2011.  Kawecki Decl. ¶18.

245.    During the second quarter of 2013, when the challenged broadcasts were aired, TheBlaze's revenues relating to affiliate fees were $744,770, which was consistent with the amounts earned during the other quarters of 2013.

246.    The number of affiliates of TheBlaze did not increase during either the second or third quarters of 2013.

247.   Overall, TheBlaze was not profitable in either second quarter or full year 2013. Kawecki Decl. ¶20.

248.   Mr. Beck receives a fixed annual salary from Mercury and TheBlaze.  Kawecki Decl. ¶21.

249.   Mr. Beck did not obtain increased or additional income from Mercury or TheBlaze as a result of the challenged broadcasts.  Kawecki Decl. ¶22; Beck Decl. ¶37.

250.   The distributions Mr. Beck receives from Mercury are not based on increased viewership or advertising.  Kawecki Decl. ¶23.

251.   Premiere exercises no editorial control over *The Glenn Beck Radio Program*, and has no right or ability to control, manage, modify or oversee the content of *The Glenn Beck Radio Program*.  Talbott Decl. ¶5.

252.   Premiere does not and has no ability to preview or screen the programs it distributes, including *The Glenn Beck Radio Program*.  Talbott Decl. ¶6.

253.   Premiere had no prior knowledge of the statements that Plaintiff is challenging in this litigation or the facts supporting those statements.  Talbott Decl. ¶7.

Respectfully submitted,

Counsel for Defendants,

/s/ Zachary C. Kleinsasser
Michael J. Grygiel (admitted *pro hac vice*)
grygielm@gtlaw.com
Zachary C. Kleinsasser (BBO # 664291)
kleinsasserz@gtlaw.com
Emily C. Hannigan (BBO # 687935)
hannigane@gtlaw.com
GREENBERG TRAURIG, LLP
One International Place
Boston, Massachusetts 02110
Tel:  (617) 310-6000
Fax:  (617) 897-0993

## CERTIFICATE OF SERVICE

I, Zachary C. Kleinsasser, hereby certify that on May 31, 2016, this document was served upon counsel to Plaintiff in this action.

/s/ Zachary C. Kleinsasser