# CHEATWOOD DECLARATION – EXHIBIT 1

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                         FOR THE
 2              DISTRICT OF MASSACHUSETTS
       ----------------------------------------X
 3     ABDUL RAHMAN ALHARBI,
 4                  Plaintiff,
 5     VS.                   Civil Action No:
                             14-11550-PBS
 6
       GLENN BECK; THE BLAZE, INC.; MERCURY RADIO
 7     ARTS, INC., et al.,
 8                  Defendants.
       ----------------------------------------X
 9
10
11             DEPOSITION OF JOEL CHEATWOOD
12               Thursday, March 24, 2016
13                  New York, New York
14
15
16
17
18
19
20
21
22
23     Reported By:
24     LINDA J. GREENSTEIN
25     JOB NO. 326058
```

**Page 2**

```
 1                            March 24, 2016
 2                            10:07 A.M.
 3
 4
 5
 6
 7              Deposition of JOEL CHEATWOOD,
 8     taken by Plaintiff, pursuant to Subpoena,
 9     held at Nelson, Mullins, Riley &
10     Scarborough, L.L.P., 415 Madison Avenue,
11     New York, New York, before Linda J.
12     Greenstein, a Certified Shorthand Reporter
13     and Notary Public of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1     A P P E A R A N C E S :
 2
 3
 4     NELSON, MULLINS, RILEY & SCARBOROUGH,
       L.L.P.
 5     Attorneys for Plaintiff
                  One Post Office Square
 6                30th Floor
                  Boston, Massachusetts 02109
 7
       BY:    PETER J. HALEY, ESQ.
 8            617.573.4714
              peter.haley@nelsonmullins.com
 9
10
11     GREENBERG TRAURIG, L.L.P.
       Attorneys for Defendants
12                54 State Street
                  6th Floor
13                Albany, New York 12207
14     BY:    MICHAEL J. GRYGIEL, ESQ.
              518.689.1406
15            grygielm@gtlaw.com
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              JOEL CHEATWOOD,
 2  having been first duly sworn, was examined
 3  and testified as follows:
 4              MR. GRYGIEL:  Peter, on the
 5  record, the usual stipulations?
 6              MR. HALEY:  Yes.  If we could
 7  agree to to waive the sealing and the
 8  filing of the deposition to the extent
 9  that's required, and reserve all objections
10  except as to the form of the question until
11  the time of trial, if that's acceptable to
12  counsel?
13              MR. GRYGIEL:  Defendants agree.
14  EXAMINATION BY
15  MR. HALEY:
16      Q.   Can you state your name, please.
17      A.   Joel Cheatwood.
18      Q.   And what's your business
19  address, Mr. Cheatwood?
20      A.   381 Park Avenue South; New York,
21  New York.
22      Q.   And how are you employed?
23      A.   I am a partner at a company
24  called Red Sea Ventures.
25      Q.   Are you represented by counsel
```



Page 5

1          JOEL CHEATWOOD
2   here today?
3       A.   Yes.
4       Q.   And who is that?
5       A.   Mike Grygiel.
6       Q.   Do you currently have any
7   financial relationship with the defendants
8   in this action, TheBlaze or Mercury Radio
9   Arts or Premiere Networks?
10      A.   I do not -- can I make one
11   correction to that statement?
12      Q.   Sure.
13      A.   Our company, Red Sea Ventures,
14   does have a relationship with Premiere
15   Radio.  We represent a couple of their
16   clients.
17      Q.   What does Red Sea Ventures do?
18      A.   Red Sea Ventures is a company
19   that partners with celebrities and content
20   creators to form new media companies.
21          In addition, we advise existing
22   media companies on operation, content
23   creation, distribution.
24      Q.   Where did you graduate from
25   college?

Page 6

1          JOEL CHEATWOOD
2       A.   I didn't graduate, but attended
3   California State University, Fresno.
4       Q.   What was the last year you
5   attended there?
6       A.   In terms of the actual year?
7       Q.   Yes.
8       A.   That would have been 1979, I
9   believe.
10      Q.   And in 1989, you were employed
11   by WSVN Miami; is that correct?
12      A.   That's correct.
13      Q.   And between 1979 and 1989, were
14   you employed in the radio, television or
15   media area?
16      A.   Newspaper and television.
17      Q.   And so between 1979 and 1989,
18   where were you employed?
19      A.   I was employed at one point by
20   the Fresno Guide Newspaper while I was
21   still attending college.  Then, from there,
22   I was employed by KFSN-TV in Fresno.
23          From there, KPIX-TV in San
24   Francisco; from there, back to Fresno at
25   KMPH-TV; and then I believe there's one

Page 7

1          JOEL CHEATWOOD
2   more stop before that period of time in
3   Richmond, Virginia at what was WXEX-TV.
4       Q.   Did you start out as a reporter?
5       A.   I started out in newspaper as a
6   reporter.
7       Q.   And with respect to the radio
8   and television experience, did your
9   position change over time?  Did you remain
10   a reporter?
11          At some point, did you take on a
12   management role or take on a supervisory
13   role?
14          MR. GRYGIEL:  Object to the
15   form.
16      A.   I transitioned from a reporter
17   into news management.
18      Q.   Did you have any formal training
19   in those jobs or pursue any professional
20   certification with respect to your
21   experience in journalism?
22          MR. GRYGIEL:  Same objection.
23      A.   Through that period of time, I
24   attended a number of what I would call
25   seminars through RTNDA, which is the Radio

Page 8

1          JOEL CHEATWOOD
2   and Television News Directors Association,
3   and, of course, in college also studied
4   journalism.
5       Q.   Did you receive any awards or
6   -- speaking now of your entire career in
7   journalism -- did you receive any awards or
8   recognition as a result of your
9   professional achievements?
10      A.   I have received a number of
11   regional Emmys for excellence, was
12   nominated for a national Emmy.
13          I have received recognition
14   through industry trades and the like over
15   the years.
16      Q.   When did you first meet Glenn
17   Beck?
18      A.   I met Glenn Beck while I was
19   employed at CNN as the director of
20   development there, and I believe that would
21   have been in 2003, I believe.
22      Q.   And between 1989 and 2003, your
23   employment was at WSVN in Miami, HDH in
24   Boston, WMAQ and WCBS here in New York; is
25   that correct?



Page 9

1        JOEL CHEATWOOD
2     A.   Also KYW in Philadelphia.
3     Q.   When was that, just in relation
4  to -- from Miami, you went to Boston; is
5  that correct?
6     A.   From Miami, I went to Boston;
7  from Boston to Chicago to WMAQ; from WMAQ
8  to KYW in Philadelphia; and then from KYW
9  to WCBS, and CBS in general.
10    Q.   And then following WCBS, you
11  were employed by CNN?
12    A.   That's correct.
13    Q.   And what was you position there?
14    A.   I was the executive director of
15  development for CNN worldwide.
16    Q.   What were your duties in
17  connection with that position?
18    A.   My duties included creating new
19  programming for the CNN networks, and also
20  identifying new talent for the CNN
21  networks.
22    Q.   What was your relationship to
23  Mr. Beck at CNN?  Did you provide
24  supervision or did he report to you, or
25  what was the nature of your professional

Page 10

1        JOEL CHEATWOOD
2  relationship?
3        MR. GRYGIEL:  Object to the
4  form.
5     A.   I recruited Mr. Beck to CNN to
6  do a television show for Headline News, one
7  of their networks, and oversaw the show
8  during my time there.
9     Q.   And what did overseeing the show
10  involve?
11    A.   Basically, being the executive
12  in charge of production, so I had broad
13  oversight working with the executive
14  producer and the staff on show direction,
15  budgeting.  That sort of thing.
16    Q.   Following CNN, what was your
17  next employment?
18    A.   With the Fox News channel, where
19  I was senior vice president of program
20  development.
21    Q.   And did you work with Mr. Beck
22  there as well?
23    A.   I did.
24    Q.   And at some point, you left Fox
25  to go to TheBlaze; is that correct?

Page 11

1        JOEL CHEATWOOD
2     A.   That's correct.
3     Q.   And when was that?
4     A.   That would have been, let's say
5  -- that would have been, I believe, in 2010
6  or '11.
7     Q.   And how long were you with
8  TheBlaze?
9     A.   Four years.
10    Q.   What was your position there
11  when you started?
12    A.   When I started, I was the
13  executive vice president of Mercury Radio
14  Arts.
15    Q.   And at some point, did that
16  change?
17    A.   Yes.  I became the president and
18  chief content officer at TheBlaze.
19    Q.   When did that change take place?
20    A.   That change took place in 2012,
21  I believe.
22    Q.   And as president and chief
23  content officer, what were your duties?
24    A.   I oversaw all content related to
25  TheBlaze on all platforms.

Page 12

1        JOEL CHEATWOOD
2     Q.   When you say "oversaw all
3  content," what do you mean by that?
4     A.   Was ultimately responsible for
5  content placed on the television show, the
6  web, theblaze.com, and the Internet
7  streaming radio network.
8     Q.   And in terms of being
9  responsible, what did that involve on a
10  day-to-day basis?
11    A.   It involved overseeing the staff
12  that produced the television shows and the
13  web content, the radio content on the
14  Internet streaming side, and hiring/firing.
15    Q.   What essentially was the
16  business of TheBlaze at that time?
17        MR. GRYGIEL:  Object to the
18  form.
19    A.   TheBlaze was a multi-platform
20  news information network covering, again,
21  TV, Internet, radio and digital.
22    Q.   With respect to Mr. Beck's role
23  at TheBlaze, he broadcast a radio program
24  and a television program; is that correct?
25    A.   Yes, he did.

JOEL CHEATWOOD                                    March 24, 2016
ALHARBI vs. BECK                                          13–16

Page 13

1              JOEL CHEATWOOD
2      Q.    Were there separate people
3  involved in the production of the radio
4  program and the television program?
5      A.    Yes.
6      Q.    Did you have responsibility for
7  both?
8      A.    I did not have responsibility
9  for radio.  The radio program fell under
10  the Mercury Radio Arts umbrella.
11      Q.    And with respect to your
12  employment at TheBlaze at the time, how
13  many people were employed in the operation?
14      A.    When I arrived, it was 30.  When
15  I departed, it was close to 200.
16      Q.    Why did you depart?
17      A.    I was terminated.
18      Q.    And what was the reason for your
19  termination?
20      A.    Change in direction that Mr.
21  Beck outlined for the company.  He wanted
22  to change the content focus.
23      Q.    And was there any dispute
24  arising out of your termination, any sort
25  of severance agreement, litigation or

Page 14

1              JOEL CHEATWOOD
2  anything else at TheBlaze at the time you
3  departed?
4          MR. GRYGIEL:  Object to the
5  form.
6      A.    There was a severance agreement.
7  No litigation.
8      Q.    Have you been deposed before?
9      A.    Yes.
10      Q.    How many times have you been
11  deposed?
12      A.    One other time.
13      Q.    When was that?
14      A.    That would have been Miami,
15  probably 1989.
16      Q.    What was that matter?
17      A.    That was a suit brought against
18  the station based on an investigative
19  report the station had done.
20      Q.    What was the resolution of that
21  suit?
22      A.    The station won.
23      Q.    Did that go to trial?
24      A.    No.
25      Q.    When you say "won," was it a

Page 15

1              JOEL CHEATWOOD
2  summary judgement motion or some sort of
3  pretrial motion or was there a settlement?
4          MR. GRYGIEL:  Objection to form.
5          You may answer.
6      A.    To the best of my recollection,
7  it was a summary judgement.
8      Q.    Do you know what the name of the
9  case was?
10      A.    I do not.
11      Q.    Do you know who the plaintiff
12  was?
13      A.    I do not.
14      Q.    Do you know what the
15  investigative report involved?
16      A.    Again, to the best of my
17  recollection, it involved a towing service
18  in the City of Miami that was illegally
19  charging people and illegally towing the
20  vehicles.
21      Q.    I represent the plaintiff, Abdul
22  Alharbi, in this action.
23          Do you have any knowledge about
24  Mr. Alharbi's involvement in funding the
25  attacks that took place at the Boston

Page 16

1              JOEL CHEATWOOD
2  Marathon on April 15, 2013?
3      A.    I have knowledge based on what
4  has been provided to us by -- to TheBlaze
5  by their confidential sources.
6      Q.    Other than that knowledge
7  provided to you by confidential sources, do
8  you have any other personal knowledge?
9      A.    The only other personal
10  knowledge has come from the corroborating
11  reporting that was done by experts in the
12  area that we used to, again, bring context
13  and perspective to the confidential source
14  material.
15      Q.    And with respect to Mr.
16  Alharbi's role, what is it that you believe
17  Mr. Alharbi's role to be?
18      A.    I believe he was the funder and
19  perhaps organizer of the Boston bombing.
20      Q.    What's the basis of your belief
21  that he funded the attacks?
22      A.    It's based on the information
23  provided to us by our confidential sources
24  who had a direct connection to the Boston
25  investigation.



Page 17

1              JOEL CHEATWOOD
2      Q.    Who are those confidential
3  sources?
4          MR. GRYGIEL:  Objection.
5      Q.    Just for the record so that
6  we're clear, Mr. Grygiel has objected, as
7  he has in previous depositions, to the
8  question calling for the identification of
9  the confidential sources.
10          And if you could just affirm for
11  me that you don't intend to respond to the
12  question based on Mr. Grygiel's objection.
13      A.    Based on the First Amendment
14  right and Mr. Grygiel's objection, I do not
15  intend to answer that question.
16      Q.    Is TheBlaze or Mercury Radio
17  Arts paying for your legal fees in this
18  action?
19      A.    Yes.
20      Q.    I show you a copy of what's
21  previously been marked as Exhibit 55 in
22  this action -- actually, I'll show you
23  Exhibit 55.
24          This is a document that was
25  produced by the defendants with respect to

Page 18

1              JOEL CHEATWOOD
2  newsroom policies at TheBlaze in 2013.
3          The document is dated
4  December 2, 2015 in the bottom right-hand
5  corner, and appears to be a printout from
6  an Internet source.
7          Have you seen this document
8  before?
9      A.    Yes, I have.
10      Q.    And are you familiar with it?
11      A.    Yes, I am.
12      Q.    What is it?
13      A.    This is a guideline produced by
14  the RTDNA -- actually, the Radio Television
15  Digital News Association -- that outlines
16  the proper use of confidential sources in
17  covering the news.
18      Q.    And during your tenure at
19  TheBlaze, did TheBlaze have its own set of
20  written policies and procedures that
21  related to the reporting of news and
22  information?
23      A.    Not written, no.
24      Q.    How does this document,
25  Exhibit 55, relate to the policies and

Page 19

1              JOEL CHEATWOOD
2  procedures at TheBlaze?  Is this something
3  that was referred to or used?
4          MR. GRYGIEL:  Object to the
5  form.
6      A.    This was used by me in setting
7  the policy, as well as Associated Press
8  basic guidelines.
9      Q.    And the document that was used
10  presumably would have been whatever the
11  version was in 2013; is that correct?
12      A.    Correct.
13      Q.    And other than this source, were
14  there any other sources or documents that
15  you relied upon in reporting in news
16  gathering in 2013?
17      A.    No.
18      Q.    And with respect to your
19  previous employment at CNN or WCBS or any
20  of the other news outlets and stations at
21  which you were employed, were there written
22  policies and procedures that related to
23  news gathering and the reporting of
24  information?
25      A.    It varied depending on the

Page 20

1              JOEL CHEATWOOD
2  organization.
3      Q.    What about at CNN?
4      A.    There were written standards and
5  practices.
6      Q.    And was there a reason why there
7  were not written standards and practices at
8  TheBlaze?
9      A.    The flow of information at
10  TheBlaze funneled up through a very narrow
11  output -- primarily me -- and I was able to
12  really set standards and practices on a
13  daily basis.
14      Q.    Is it fair to say then that you
15  were the person who was responsible for
16  determining what would be published or
17  broadcast or not?
18          MR. GRYGIEL:  Object to the
19  form.
20      A.    Primarily responsible,
21  ultimately responsible.
22          Scott Baker, who runs
23  theblaze.com, oversaw that operation, but I
24  was ultimately responsible.
25      Q.    And what role did Mr. Beck play



Page 21

1          JOEL CHEATWOOD
2    in that?
3        A.   Certainly had input.  Certainly
4    gave his opinion in terms of news coverage
5    and stories and the like.
6            Ultimately, we made the final
7    decisions.
8        Q.   With respect to Exhibit 55, are
9    the statements that are made there
10   statements and policies that you attempted
11   to follow?
12       A.   Very consistent with, yes.
13       Q.   Directing your attention to page
14   2 of the exhibit, the top of the page there
15   says: "Do you understand your newsroom's
16   policy on confidentiality?  Before you
17   promise it to sources, consider a policy
18   that requires you to obtain the consent of
19   your news managers."
20           What was the policy of TheBlaze
21   on the use of confidential sources?
22       A.   Had to have my consent.
23       Q.   Other than your consent, was
24   there any other requirement?
25       A.   Other than following the

Page 22

1          JOEL CHEATWOOD
2    guidelines that we adhered to, no.
3        Q.   When you say "following the
4    guidelines that we adhered to," what do you
5    mean by that?
6        A.   Referring to the basic guideline
7    provided here by the RTNDA.
8        Q.   On page 1 of Exhibit 55, in the
9    middle of the page, which says under the
10   heading "Fulfill All of the Following Four
11   Criteria and Then Consider Questions Listed
12   Below," it says:
13           "You and your news managers must
14   be willing to publicly describe the source
15   in as detailed a manner as anonymity
16   permits, reveal to the public why the
17   source cannot be named, and what, if any,
18   promises the news organization made in
19   order to get the information."
20           With respect to the sources
21   involved, confidential sources involved in
22   the reporting about the Boston Marathon,
23   did you follow that policy?
24       A.   Yes, we did.
25       Q.   And how would you describe the

Page 23

1          JOEL CHEATWOOD
2    confidential sources, or how did you
3    describe the confidential sources?
4            MR. GRYGIEL:  Objection to the
5    extent that the question potentially calls
6    for identification of the confidential
7    sources, so consistent with Mr. Cheatwood's
8    previous objection based on the First
9    Amendment and the Reporter's Privilege, you
10   can answer that question, Joel, to the
11   extent that it doesn't veer into
12   identifying any of the confidential
13   sources.
14       A.   We explained that our
15   confidential sources had a direct
16   connection to the ongoing investigation of
17   the Boston bombing, and that they were high
18   level and respectable organizations.
19       Q.   Did you say anything -- and
20   speaking now as to what you said publicly
21   -- did you say anything about why the
22   sources could not be named?
23       A.   I believe we indicated that it
24   would jeopardize their careers.
25       Q.   Did you make any promises to

Page 24

1          JOEL CHEATWOOD
2    those sources in order to get the
3    information?
4        A.   The only promise made was to
5    preserve their confidentiality.
6        Q.   I'll show you what's previously
7    been marked as Exhibit 56, which is an
8    e-mail message from Patrick Poole to
9    Virginia Grace and Joe Weasel.
10           Who is Patrick Poole?
11       A.   Patrick Poole is a noted expert
12   in terrorism and Middle East radicals.
13       Q.   Is he somebody that you viewed
14   as a credible source?
15       A.   Yes.
16       Q.   Did you view him as trustworthy?
17       A.   Yes.
18       Q.   Who is Virginia Grace?
19       A.   At the time, she was a producer
20   on Glenn's television program.
21       Q.   And how about Joe Weasel?
22       A.   Joe Weasel was an investigative
23   producer for TheBlaze.
24       Q.   Did Ms. Grace and Mr. Weasel
25   report to you?



Page 25

1          JOEL CHEATWOOD
2      A.   Yes.
3      Q.   And what was the relationship
4  between Mr. Poole and TheBlaze?
5      A.   Used as a -- source used as an
6  interview subject on topics that he was
7  expert in for both television and radio.
8      Q.   Did he receive any payment?
9      A.   I believe that at one point in
10  the relationship he was paid as a
11  contributor to TheBlaze.
12      Q.   And what were the amounts of
13  those payments?
14      A.   I don't know.
15      Q.   You said "at one point in the
16  relationship."
17          When was that?  Do you know?
18      A.   I don't recall the exact dates.
19  I know it was for a fairly short
20  period of time.
21      Q.   Do you know if that was true at
22  this time, in April of 2013?
23      A.   I don't believe it was.
24      Q.   I show you what's been marked as
25  Exhibit 57, which is another e-mail from

Page 26

1          JOEL CHEATWOOD
2  Mr. Poole.
3          In the third line of the e-mail,
4  Mr. Poole says:  "Having to take all of
5  this with a grain of salt and caution."
6          Do you know what he was
7  referring to there?
8      A.   I was not included on this
9  e-mail.  I'm not clear on what he might
10  have intended that to mean.
11      Q.   This was on the day of the
12  Marathon bombing.
13          In connection with your
14  experience as a reporter involved in the
15  news industry, is it fair to say that
16  immediately following a large event,
17  there's oftentimes a large amount of
18  information which later proves to be
19  inaccurate or not entirely correct?
20      MR. GRYGIEL:  Objection to the
21  form and also it calls for speculation.
22          You may answer.
23      A.   I think in any news event, there
24  is an initial flood of information that has
25  to be carefully studied and evaluated.

Page 27

1          JOEL CHEATWOOD
2      Q.   And with respect to the Boston
3  Marathon, is that something that you did,
4  carefully studied the information?
5      A.   Absolutely.
6      Q.   I show you what's been marked as
7  Exhibit 59, which is another e-mail from
8  Mr. Poole to Mr. Weasel dated Tuesday,
9  April 16th at 4:23 a.m.
10          Where did Mr. Poole reside, do
11  you know?
12      A.   I do not.
13      Q.   Have you ever met Mr. Poole?
14      A.   Yes.
15      Q.   And Mr. Poole's e-mail to Mr.
16  Weasel says:  "Not for circulation.  Here's
17  the guy they're looking at."
18          Do you know who Mr. Poole is
19  referring to when he says "they're"?
20      A.   I do not.
21      Q.   I show you a copy of what's
22  previously been marked as Exhibit 60.
23          Have you seen this document
24  before?
25      A.   Yes, I have.

Page 28

1          JOEL CHEATWOOD
2      Q.   When did you first see it?
3      A.   I believe I saw this for the
4  first time on April 24th of 2013.
5      Q.   Do you know where the document
6  came from?
7      A.   It came to me through Joe
8  Weasel.
9      Q.   Do you know where he got it?
10      A.   I believe that it was provided
11  him by a confidential source.
12      Q.   Do you know what the document
13  is?
14      A.   I do.
15      Q.   What is it?
16      A.   This is a report generated by
17  the Joint Terrorism Task Force regarding a
18  suspect and an event, the Boston bombing.
19      Q.   On the lower right-hand side of
20  the report on the first three pages of
21  Exhibit 60, it states:  "This record has
22  not yet been approved."
23          Did that statement have any
24  significance to you?
25      A.   Yes, it did.  In fact, we



Page 29

1          JOEL CHEATWOOD
2    immediately, upon seeing this, reconnected
3    with our primary confidential source and
4    asked for an explanation.
5        Q.    What was the explanation?
6        A.    The explanation was this was an
7    organic document that at some point during
8    the course of the day would be
9    authenticated in terms of the designation,
10   but that throughout the day, it was being
11   updated.  This was very common.
12       Q.    And did you ever see any version
13   of this record that was authenticated or
14   updated?
15       A.    Yes, I did.
16       Q.    When did you see that?
17       A.    On the same day.
18       Q.    What was that document that you
19   saw?
20       A.    That was, I believe, page 4 of
21   this series of documents.
22       Q.    And so with respect to the
23   exhibit then, did page 4, with the Bates
24   stamp number of 47613, come to you after
25   the first three pages?

Page 30

1          JOEL CHEATWOOD
2        A.    They came at the same time.
3        Q.    Is it your understanding then
4    that page 4 represents a further iteration
5    of the first three pages?
6        MR. GRYGIEL:  Object to the
7    form.  You may answer.
8        A.    Yes.  Again, we went back to our
9    primary confidential source asking for an
10   explanation, and he indicated that the
11   removal of the previous designation, that
12   the record had not been approved, indicated
13   that it was an approved record.
14       Q.    Did you ever -- other than
15   through your confidential source -- did you
16   ever ask anybody from the government
17   publicly, either the Joint Terrorism Task
18   Force or the Department of Homeland
19   Security, the Department of Justice or
20   anyone else about this document?
21       MR. GRYGIEL:  Object to the
22   form.
23       A.    Yes, we did.
24       We had multiple sources ask
25   virtually every federal law enforcement

Page 31

1          JOEL CHEATWOOD
2    agency in existence, if not all of them.
3        Q.    Did any of them ever make any
4    public response with respect to your
5    inquiries?
6        A.    There were public responses made
7    at various times to us, yes.
8        Q.    And what were those responses?
9        A.    Typically, they were a variety
10   of answers that span the globe from, you
11   know:  "Mis-ID'd" to "The person doesn't
12   exist" to "We made a mistake."
13       Q.    Did you ever publish any of
14   those responses?
15       A.    We reported them, yes.
16       MR. GRYGIEL:  Just to be clear,
17   who's the "we" in that sentence:  "We made
18   a mistake"?
19       THE WITNESS:  The government.
20       Q.    When you say the government made
21   a mistake, what are you referring to?
22       A.    One of the responses was that
23   they had identified Mr. Alharbi mistakenly.
24       Q.    Did you not view that response
25   at credible or accurate?

Page 32

1          JOEL CHEATWOOD
2        A.    We took every response that we
3    received and took it back to our
4    confidential sources and checked against
5    the facts that they had access to.
6        Q.    How many sources were there,
7    when you say "confidential sources"?
8        A.    There were a variety of sources.
9        I would say there were four
10   primary confidential sources.
11       Q.    Were those individuals?
12       A.    Yes.
13       Q.    And were they employed by the
14   government?
15       A.    Yes.
16       MR. GRYGIEL:  You can answer,
17   subject to the qualification, implication
18   of privilege.
19   BY MR. HALEY:
20       Q.    Were they elected officials?
21       A.    No, they were not.
22       Q.    Were they employed by the FBI?
23   DIR     MR. GRYGIEL:  I instruct you not
24   to answer that question based on the
25   Reporter's Privilege.

JOEL CHEATWOOD                                    March 24, 2016
ALHARBI vs. BECK                                            33–36

Page 33

1           JOEL CHEATWOOD
2     A.   I'm not answering based on the
3  advice of counsel.
4     Q.   At any time, did any of the
5  confidential sources that you're referring
6  to disavow the information that you
7  reported and tell you that Mr. Alharbi was
8  not involved in the Boston Marathon
9  attacks?
10    A.   No, they did not.
11    Q.   Mr. Cheatwood, I show you a copy
12 of what's been marked as Exhibit 61.
13         Have you seen this document
14 before?
15    A.   Yes, I have.
16    Q.   And what is it?
17    A.   This was a report generated as
18 part of, as I understand it, the event file
19 relating to Mr. Alharbi.
20    Q.   Was this a document that was
21 obtained by TheBlaze?
22    A.   Yes.
23    Q.   And how was it obtained?
24    A.   Obtained by Joe Weasel through a
25 confidential source.

Page 34

1           JOEL CHEATWOOD
2     Q.   Did you understand it to be a
3  nonpublic document?
4     A.   I was unclear whether or not it
5  was a nonpublic document.  I knew it was a
6  law enforcement document.
7     Q.   Did you ever take any steps to
8  determine whether or not it was public?
9     A.   We took steps to ensure we had
10 not gained it illegally.
11    Q.   Why were you concerned about
12 whether you gained it illegally?
13    A.   We understood the sensitivity of
14 the information.
15    Q.   What do you mean by that?
16    A.   We understood the grave nature
17 of the allegation made, and wanted to
18 ensure that we did not violate any laws in
19 securing the information.
20    Q.   And did you make that
21 determination?
22    A.   We did.
23    Q.   How did you make the
24 determination?
25    A.   As I recall, we had a

Page 35

1           JOEL CHEATWOOD
2  consultation with our attorney, and we also
3  worked with all of the confidential sources
4  to ensure that we were not in violation.
5     Q.   And who was your attorney?
6     A.   I don't recall.
7     Q.   Was your attorney someone
8  representing TheBlaze?
9     A.   Yes.
10    Q.   Was there a written opinion or
11 e-mail or anything else confirming that the
12 document was not obtained illegally?
13    A.   No.  I talked to him on the
14 phone.
15    Q.   The person that you talked to on
16 the phone, were they with a law firm in
17 Texas?
18    A.   No.  It was based in New York, I
19 believe.
20    Q.   Somebody that TheBlaze had used
21 before?
22    A.   Yes.
23    Q.   Were they paid for their
24 services?
25    A.   Yes.

Page 36

1           JOEL CHEATWOOD
2     Q.   Other than that phone call, did
3  they provide other services in connection
4  with the reporting of this story?
5     A.   No.
6     Q.   And prior to the phone call, did
7  you provide them with copies of this
8  document?
9     A.   No, we did not.
10    Q.   Did you provide them with any
11 other information or documents relating to
12 your inquiry about whether the information
13 had been obtained illegally?
14    A.   A basic description of the
15 documents that we acquired.
16    Q.   Was that an oral description or
17 written?
18    A.   Oral.
19    Q.   Mr. Cheatwood, I show you what's
20 previously been marked as Exhibit 63 in
21 this action, which is an e-mail between Mr.
22 Weasel and somebody whose name has been
23 redacted, with the subject line:  "Abdul
24 Rahman Ali Alharbi."
25         Have you seen this document

JOEL CHEATWOOD                                      March 24, 2016
ALHARBI vs. BECK                                          37–40

Page 37

1            JOEL CHEATWOOD
2 before?
3      A.   I have not.
4      Q.   In the e-mail, the first e-mail
5 in the chain sent Tuesday, April 16th at
6 9:33 a.m., Mr. Weasel is asking about
7 "somebody who can track this guy."
8           Do you know who he's referring
9 to there?
10     A.   I do not.
11     Q.   Mr. Cheatwood, I show you a copy
12 of what's previously been marked as
13 Exhibit 64 in this action.
14          This is an e-mail from somebody
15 with the address ██████████████ to
16 another group of individuals.
17          Have you seen this e-mail or
18 e-mails like this before?
19     A.   No, I haven't.
20          MR. GRYGIEL:  Object to the
21 form.  You may answer.
22     A.   I have not.
23     Q.   Do you know what this is?
24     A.   I do not.
25     Q.   Do you recognize any of the

Page 38

1            JOEL CHEATWOOD
2 names in the "To" part of the e-mail?
3      A.   I do.
4      Q.   Who is Sara Johnson?
5      A.   Sara Johnson oversaw social
6 media for TheBlaze.
7      Q.   And the text of the e-mail
8 appears to be a transcript of Mr. Beck's
9 radio program.
10          Did you receive copies of
11 transcripts of the radio or television
12 program every day?
13          MR. GRYGIEL:  Object to the
14 form.
15     A.   No, I did not.
16     Q.   And the people in the e-mail,
17 the sender is using an AOL address and
18 there are a number of people using Gmail
19 addresses.
20          Did the people that were
21 employed by TheBlaze have their own company
22 e-mail?
23     A.   Yes, they did.
24     Q.   And who is Dan Andros?
25     A.   Dan Andros is a writer for

Page 39

1            JOEL CHEATWOOD
2 Glenn's radio and television.
3      Q.   Do you know why he's using
4 ██████████████?
5      A.   I do not.
6      Q.   To your knowledge, did he have a
7 Blaze e-mail address?
8      A.   Yes, he did.
9      Q.   Did Mr. Andros report to you?
10     A.   Ultimately, yes.
11     Q.   Mr. Cheatwood, I show you an
12 e-mail that's previously been marked as
13 Exhibit 66 in this action --
14          MR. GRYGIEL:  65 or 66?
15          MR. HALEY:  65, I'm sorry.
16 BY MR. HALEY:
17     Q.   65 in this action from Joe
18 Weasel to you dated April 18th at 3:54 p.m.
19          At the bottom of the e-mail,
20 there's an e-mail from Nick Jones to Joe
21 Weasel.
22          Who is Nick Jones?
23     A.   Nick Jones is a producer/
24 videographer in Joe Weasel's unit.
25     Q.   And he's forwarding a link to a

Page 40

1            JOEL CHEATWOOD
2 story about Walid Shoebat, and your
3 response to Mr. Weasel is:  "I wish we
4 could get this confirmed by someone else."
5          Why were you concerned with
6 getting the story confirmed with somebody
7 else?
8          MR. GRYGIEL:  Object to the
9 form.  You may answer.
10     A.   We did not consider this
11 individual a strong source.
12     Q.   In the next line of your e-mail
13 is:  "I wonder if Sara has a connection on
14 this."
15          Who is Sara?
16     A.   I believe I'm referring to Sara
17 Carter, who is a reporter for TheBlaze.
18     Q.   Did you ever determine whether
19 or not Mr. Alharbi had ties to al Qaeda
20 terrorists?
21     A.   We were told by our confidential
22 sources that there was a belief that he had
23 ties to terrorists, but we were never able
24 to get specifics, so we didn't report it.
25     Q.   And in his response to you, Mr.



Page 41

1          JOEL CHEATWOOD
2 Weasel writes:  "If survives today, he'll
3 give me a paper trail, and then somebody
4 else to -- they will be the best resources.
5          "I was asked to come to" -- and
6 it's redacted there -- "on Wednesday to
7 meet with, so I'll probably go."
8          Was Mr. Weasel asked to go to
9 Washington, D.C.?
10          MR. GRYGIEL:  Object to the
11 form.  You may answer.
12     A.    Yes.
13     Q.    And who was he meeting with
14 there?
15          MR. GRYGIEL:  Objection.
16     A.    Confidential sources.
17     Q.    And when he's saying "it
18 survives today," do you know what he's
19 referring to there?
20     A.    I do not.
21     Q.    Do you personally maintain
22 copies of these e-mail messages that were
23 sent to you at TheBlaze?
24     A.    No, I do not retain copies of
25 these.

Page 42

1          JOEL CHEATWOOD
2     Q.    Mr. Cheatwood, I show you a copy
3 of a document that's previously been marked
4 as Exhibit 66 in this action from Jason
5 Howerton to Joe Weasel.
6          Who is is Jason Howerton?
7     A.    Jason Howerton is a writer for
8 theblaze.com.
9     Q.    Did he report directly to you?
10     A.    He reported to Scott Baker.
11     Q.    In the third-to-last paragraph
12 of the e-mail, Mr. Howerton writes:
13          "It is unclear why federal
14 officials allegedly believed Alharbi was
15 linked to the Boston Marathon attack.
16 Simply being present at the scene could
17 possibly result in such a distinction."
18          Did you believe that that
19 statement was accurate, that Mr. Alharbi
20 may have been linked to the attacks simply
21 because he was present at the scene?
22          MR. GRYGIEL:  Object to the
23 form.  You may answer.
24     A.    No, I did not.
25     Q.    Why didn't you believe it to be

Page 43

1          JOEL CHEATWOOD
2 accurate?
3     A.    Our confidential sources were
4 telling us definitively otherwise.
5     Q.    The last line of the e-mail
6 says:  "Federal officials have denied that
7 Alharbi is a suspect or even a person of
8 interest in the Boston bombings."
9          Did you believe those officials
10 were providing statements that were
11 purposely false?
12     A.    Yes, I did.
13     Q.    What did you believe their
14 motivation was in providing those
15 statements?
16     A.    I have no idea.  You'd have to
17 ask them.
18     Q.    Did you ever ask them?
19     A.    We certainly did.
20     Q.    And what was their response?
21     A.    No response.
22     Q.    And the basis of your belief
23 that their statements were false was the
24 information provided to you by your
25 confidential sources?

Page 44

1          JOEL CHEATWOOD
2          MR. GRYGIEL:  Object to the
3 form.
4     A.    Information provided by multiple
5 confidential sources; perspective and
6 context provided by experts in the field.
7     Q.    So the multiple confidential
8 sources would be the four people employed
9 by the government that you testified to
10 about previously; correct?
11     A.    That's correct.
12     Q.    And the experts providing
13 context in the field, who were they?
14     A.    There were a variety.
15          Eric Stakelbeck was one who is
16 an expert in terms of Middle East
17 jihadists, has done a great deal of
18 research and authored a couple of books on
19 that.
20          Jason Butrell is a former
21 Army intelligence officer attached to Gavin
22 de Becker security detail that was working
23 for Glenn Beck at the time.
24          Patrick Poole was another --
25 there were a variety -- Andrew McCarthy,



Page 45

1          JOEL CHEATWOOD
2   former U.S. Attorney who prosecuted the
3   first World Trade Center bombing.
4          I'm sure I'm leaving several
5   out.
6      Q.   Mr. Poole was one of the experts
7   that you relied upon in placing the matter
8   in context?
9      A.   Yes.
10          (Exhibit 107 for
11   identification, Two-page document, Series
12   of e-mail messages, including e-mail dated
13   4/19 from Mr. Cheatwood to Mr. Weasel,
14   production numbers 35109 through 35110.)
15   BY MR. HALEY:
16      Q.   Mr. Cheatwood, I show you what's
17   been marked as Exhibit 107, which is a
18   two-page e-mail message bearing the Bates
19   stamp numbers 35109 and 35110.
20          And on April 19th at 7:39 a.m.,
21   you're writing to Mr. Weasel saying:
22          "Wonder how our guy fits into
23   this."
24          Were you referring to Mr.
25   Alharbi there?

Page 46

1          JOEL CHEATWOOD
2      A.   Yes.
3          MR. GRYGIEL:   Take your time and
4   read the whole document so you have the
5   full context before you answer.
6   BY MR. HALEY:
7      Q.   And this is in response to a
8   story about three Pakistanis arrested in
9   Watertown, Mass in connection to the Times
10   Square bombing; is that correct?
11      A.   Yes.
12      Q.   And Mr. Weasel replies:
13          "Same age student.  Probably
14   knew each other."
15          Did you ever make any
16   determination about whether Mr. Alharbi
17   knew any of the three Pakistanis who were
18   arrested in connection to the Times Square
19   bombing?
20      A.   We did not.
21      Q.   And your response to Mr. Weasel
22   at 8:17 a.m. is:
23          "Can we get Sara and others to
24   start looking for possible connections?"
25          Who are you referring to there

Page 47

1          JOEL CHEATWOOD
2   with respect to "Sara"?
3      A.   I believe, again, that's Sara
4   Carter.
5      Q.   And at the top, your final
6   response to Mr. Weasel:
7          "Worth asking Patrick to help."
8          That was Mr. Poole?
9      A.   That's correct.
10      Q.   And when you say "worth asking,"
11   was there some cost to asking Mr. Poole to
12   help?
13      A.   Not at all.
14          It was a reference to just
15   whether this would fall into his area of
16   expertise.  And, again, I was reminded that
17   our government actually goes to him to
18   consult on terror cells and connections and
19   the like, so I think we did, in fact, pose
20   the question.
21      Q.   Mr. Cheatwood, I show you a copy
22   of what's been marked as Exhibit 67.
23          And this is an e-mail from, at
24   the top, from Eric Stakelbeck to Joe
25   Weasel, and was this the Eric Stakelbeck

Page 48

1          JOEL CHEATWOOD
2   that you referred to earlier?
3      A.   Yes.
4      Q.   And you're writing to Mr.
5   Stakelbeck in the middle of the page there
6   at 3:47 p.m.
7          Your question to him is:
8          "Do you have any knowledge of
9   the Saudi national's (Al Harby) family or
10   clan connection in Saudi?  I know Walid
11   Shoebat has published, but I'd like to have
12   another source before we go with it."
13          Did you ever make any
14   determinations about Mr. Alharbi's family
15   or clan connections?
16      A.   We did not reach any definitive
17   conclusions that we felt comfortable going
18   forward with.
19      Q.   And Mr. Stackelback's response
20   to you says: "I was just talking to
21   Emerson about this."
22          Do you know who he's referring
23   to there?
24      A.   I believe he's referring to
25   Steve Emerson.



Page 49

1          JOEL CHEATWOOD
2     Q.   Who is that?
3     A.   Another noted authority on
4   terrorism and Middle East radicals.
5          (Exhibit 108 for
6   identification, E-mail from Ms. Grace to
7   Mr. Culligan, production numbers 35124.)
8   BY MR. HALEY:
9     Q.   Mr. Cheatwood, I show you a copy
10  of what's been marked as Exhibit 108, which
11  is an e-mail message, Bates stamp number
12  35124.
13         Have you seen this before?
14    A.   No, I have not.
15    Q.   Do you know who Thomas Culligan
16  is?
17    A.   I do not.
18    Q.   And did Virginia Grace report to
19  you?
20    A.   Ultimately, yes.
21    Q.   And in her message to Mr.
22  Culligan, she's asking about Visa
23  revocation and deportation of Mr. Alharbi,
24  and it says: "I am under a deadline of
25  3 p.m. today so any response would be

Page 50

1          JOEL CHEATWOOD
2   greatly appreciated."
3          Was that a deadline for the
4   production of the television program?
5     A.   I really can't speak to what she
6   was meaning here.  I don't believe that was
7   the deadline for the TV program.
8     Q.   To your knowledge, what was the
9   regular deadline for the TV program?
10    A.   It varied depending on whether
11  the show was live or on tape.  Live
12  programs, really, work was being unraveled
13  until the 5 o'clock air date.
14    Q.   Was there a particular procedure
15  or format that you followed with respect to
16  the broadcast?
17         Did you meet as a group
18  regularly or how did that work?
19         MR. GRYGIEL:  Object to the
20  form.
21    A.   Yes.  There were two editorial
22  meetings per day.
23    Q.   When did those take place?
24    A.   One took place early in the
25  morning prior to Glenn Beck's radio

Page 51

1          JOEL CHEATWOOD
2   program.  The next took place typically 2,
3   2:30 in the afternoon.
4     Q.   Was that in person or a
5   conference call?
6     A.   Since the staff was split
7   between New York and Dallas, it was some in
8   person; some via conference call or Skype.
9     Q.   Did Mr. Beck participate in
10  those meetings?
11    A.   Yes.
12    Q.   And who led those meetings?
13    A.   Typically, he and I led the
14  meetings, especially in the morning.
15         In the afternoon, typically his
16  show producer led the afternoon meeting to
17  update the television show.
18    Q.   And who was that?
19    A.   Tiffany Siegel.
20    Q.   What took place at the meetings?
21    A.   In the morning meeting, there
22  was a basic discussion of current events
23  that had occurred either the previous day
24  or overnight or expected to occur that day.
25         Stories that had been planned,

Page 52

1          JOEL CHEATWOOD
2   reevaluated, reassessed, and a basic
3   outline of what the television show would
4   be that evening.
5     Q.   And what took place in the
6   afternoon meeting?
7     A.   In the afternoon was an update
8   on where stories stood, what had changed,
9   what had been added or subtracted, guests
10  that might have been added or subtracted.
11    Q.   How did the radio program and
12  the television program differ?
13    A.   Radio program was a different
14  production team.  They typically held their
15  own production meeting in addition to the
16  morning one where everyone attended, and
17  they crafted the radio program with Glenn.
18    Q.   Did you participate in that at
19  all?
20    A.   Only to the extent that I was in
21  the morning meeting where everyone
22  attended.
23    Q.   And with respect to the
24  television program, was it scripted in
25  advance?



Page 53

1        JOEL CHEATWOOD
2    A.   Yes.
3    Q.   And did somebody have authority
4  to approve those scripts?
5    A.   Usually the show producer,
6  Tiffany Siegel, would approve the scripts.
7  Glenn Beck, of course, had the final
8  approval.
9    Q.   Did you have any role in their
10 approval?
11   A.   If there was any question or any
12 sort of decision to be made as to whether
13 or not we wanted something, I would be
14 involved in that, yes.
15   Q.   And with respect to the radio
16 program, was that scripted as well?
17   A.   I would say not scripted.
18 Outlined more than scripted.
19      Occasionally, there were
20 monologues that were scripted, but
21 typically outlined.
22   Q.   Mr. Cheatwood, I show you a copy
23 of what's previously marked as Exhibit 68,
24 which is transcripts from the Glenn Beck
25 radio program, and direct your attention to

Page 54

1        JOEL CHEATWOOD
2  page Bates stamp numbered 889 on the bottom
3  right-hand corner, which is page 19 of the
4  transcript.
5       Mr. Beck, on page 19, is talking
6  to Buck Sexton.  Who is Buck Sexton?
7    A.   Buck Sexton is an employee of
8  TheBlaze who is a former CIA analyst and
9  former New York PD Antiterrorism Task Force
10 employee.
11   Q.   And did you believe Mr. Sexton
12 was a credible person?
13   A.   Yes.
14   Q.   And did you think his
15 information was trustworthy and accurate?
16   A.   Yes.
17   Q.   At the top of page 19, Mr. Beck
18 is saying:  "Without getting into details
19 of who this guy is yet, can you tell me, do
20 you believe this was a coincidence that he
21 happened to be standing there, right there
22 by the bomb?  Was he possibly the control?"
23      Was there some reason why on
24 April 19th, to your knowledge, Mr. Beck
25 didn't want to get into details of who Mr.

Page 55

1        JOEL CHEATWOOD
2  Alharbi was?
3       MR. GRYGIEL:  Object to the
4  form.
5    A.   I don't know why he did not want
6  to name Mr. Alharbi at that point.
7    Q.   And on the next page of the
8  exhibit, page 20, Mr. Beck asks Mr. Sexton:
9       "Do you believe that he was
10 there just by happenstance?  Is that very
11 likely?"
12      And Mr. Sexton answers:
13      "Glenn, I don't know."
14      Did you have any information on
15 April 19th that Mr. Alharbi was not there
16 just by happenstance?
17      MR. GRYGIEL:  Objection.
18   A.   We did not.
19   Q.   If I could direct your attention
20 to page 28 of the transcript --
21   A.   Excuse me, could I ask you to go
22 back and ask the previous question again?
23      I just want to make sure I
24 answered that correctly.
25      MR. HALEY:  The easiest way to

Page 56

1        JOEL CHEATWOOD
2  do that is have her read it back.
3       I'll have her read the question
4  and your answer, and then if you want to
5  provide more testimony or a correction,
6  you're welcome to.
7       (Requested portion of record
8  read.)
9    A.   Can you rephrase that question?
10      MR. GRYGIEL:  I think the
11 double-negatives are confusing.
12   A.   I want to make sure I'm
13 understanding the meaning of the question.
14   Q.   Sure.  So my question is this:
15      Mr. Sexton, in response to Mr.
16 Beck's questions about whether, you know,
17 Mr. Sexton believes that Mr. Alharbi was
18 there just by chance or happenstance, Mr.
19 Sexton says:  "I don't know."
20      And my question to you was:
21      Did you have any information
22 that Mr. Alharbi was not there just by
23 happenstance?
24      In other words, that he was
25 there purposely -- at that point,



Page 57

1       JOEL CHEATWOOD
2  April 19th -- that he was there purposely
3  to undertake some criminal or terrorist
4  act?
5       MR. GRYGIEL:  Objection to the
6  form.
7       A.   We had, through confidential
8  sources, information that linked Mr.
9  Alharbi to the crime.  So, yes, we believe
10 that he was there as a part of the crime
11 that was committed.
12      Q.   And was there a reason then why
13 Mr. Beck wasn't speaking about that on the
14 April 19th?  Were you trying to get more
15 verification or information?
16      A.   I can't speak to exactly why he
17 was not identifying Mr. Alharbi on this
18 date.  I just don't recall.
19      Q.   And on page 28 of Exhibit 68,
20 following along in the transcript on
21 April 19th, Mr. Beck, starting on line 5,
22 says:  "But when I found yesterday who that
23 guy is and what we have on him and how our
24 media was rooting for an American to be the
25 killer; and how our president, this

Page 58

1       JOEL CHEATWOOD
2  Administration, the Department of Homeland
3  Security and everything else, how they have
4  covered this up, how they have aided and
5  abetted this guy is obscene and it's
6  criminal," what information did you have,
7  Mr. Cheatwood, that the Department of
8  Homeland Security, President Obama or the
9  Administration was covering up Mr.
10 Alharbi's involvement in the Boston
11 Marathon attacks?
12      MR. GRYGIEL:  Object to the
13 form.  It also might be helpful to read the
14 preceding part of this, Joel, so you get
15 the full context.
16      A.   Okay.  Can you repeat the
17 question, please.
18      (Requested portion of record
19 read.)
20      MR. GRYGIEL:  Object to the
21 form.
22      A.   At this point, we had
23 information from our confidential sources
24 as to Mr. Alharbi's involvement, and
25 evidence that he was connected to the

Page 59

1       JOEL CHEATWOOD
2  Boston bombing.
3       Q.   And it was your belief that the
4  Department of Homeland Security and the
5  Administration was covering up that
6  involvement?
7       A.   Based on the information
8  provided by our confidential sources, it
9  was clear that they were not being
10 forthcoming.
11      Q.   And did you understand why they
12 weren't being forthcoming?
13      A.   I did not.
14      Q.   Directing your attention to the
15 next page of the transcript, on page 29,
16 Mr. Steve Emerson is speaking, and Mr.
17 Emerson was an expert that you relied upon;
18 is that correct?
19      A.   That's correct.
20      Q.   And Mr. Emerson, in referring to
21 Secretary Janet Napolitano, says:
22      "Janet Napolitano" -- the next
23 day -- "yesterday morning, denied any
24 knowledge of this," referring to Mr.
25 Alharbi's alleged violation of his Visa.

Page 60

1       JOEL CHEATWOOD
2       And Mr. Beck says:  "She lied."
3       Did you have any knowledge that
4  Secretary Napolitano was lying when she
5  denied Mr. Alharbi's involvement?
6       MR. GRYGIEL:  Object to the form
7  of the question.
8       A.   Based on the information that
9  was provided to us by our confidential
10 sources, it was clear that her statements
11 were certainly not congruent with the
12 evidence that was in existence.
13      Q.   And at the bottom of the page,
14 Mr. Beck states:  "Steve, I can, because we
15 have six Congressmen follow, go into things
16 that we can't go into, and they looked at
17 documents."
18      Do you know what documents Mr.
19 Beck is referring to there?
20      A.   My understanding was the
21 Congressmen that he's referring to had the
22 same documents that we had acquired.
23      Q.   And those were the documents
24 that we previously reviewed, Document 60
25 and 61; is that correct?

JOEL CHEATWOOD                                  March 24, 2016
ALHARBI vs. BECK                                        61–64

Page 61

1              JOEL CHEATWOOD
2     A.   At least those.  We don't know
3  if they had -- they've had more than we
4  had.  I'm not sure.
5     Q.   With respect to the documents
6  that you had, however, those documents were
7  confined to Exhibits 60 and 61; is that
8  correct?
9          MR. GRYGIEL:  Object to the
10 form.
11    A.   I believe so, yes.
12    Q.   Were the Congressmen themselves
13 your confidential sources?
14         MR. GRYGIEL:  Objection.
15    A.   I can't answer on advice of
16 counsel.
17         MR. GRYGIEL:  And on the basis
18 of the First Amendment Reporter's Privilege
19 that you're independently asserting, apart
20 from my advice.
21    A.   It was also based on the First
22 Amendment Reporter Privilege.
23    Q.   Mr. Cheatwood, I'll direct your
24 attention to page 45 of the transcript of
25 April 19th, which has the Bates stamp

Page 62

1  number 915 in the bottom right-hand corner.
2          Mr. Beck is speaking to Patrick
3  Poole about the events involving the
4  Tsaernaev brothers and the Boston Marathon
5  investigation, and Mr. Poole, on line 19,
6  says: "And we have to implement the
7  75 percent rule.  You know, 75 percent of
8  what we hear just will probably end up
9  being wrong."
10         Was that a statement that you
11 agreed with, Mr. Cheatwood?
12         MR. GRYGIEL:  Object to the
13 form, and object to the context in which
14 the question is presented.
15    A.   I have no understanding of how
16 he bases that opinion.  I couldn't comment
17 on that opinion.
18    Q.   Would you agree, though, that in
19 the immediate aftermath of an event,
20 oftentimes there is a lot of information
21 that turns out to be inaccurate?
22         MR. GRYGIEL:  Object to the
23 form.
24    A.   I think with any news event or

Page 63

1              JOEL CHEATWOOD
2  news story, there is information that does,
3  in fact, turn out to be either out of
4  context or inaccurate.
5     Q.   Directing your attention to page
6  48 of the transcript, Bates stamp number
7  918, and there, Mr. Beck states:
8          "While we have six Congressmen
9  yesterday afternoon that verified that the
10 event, which is basically the name of a
11 file that was opened, says that he was
12 being deported on terrorism charges, and
13 then I believe it was either a dash or a
14 hash, and it said 'Boston Marathon
15 bombing,' so he was related to this somehow
16 or another, but how?  Do you have any idea
17 on any speculation there?"
18         And at that point, Mr. Poole
19 states:
20         "At this point, we don't know
21 how he might be related."
22         Was that statement accurate as
23 of April 19th, Mr. Cheatwood, that at that
24 point, neither Mr. Poole or anyone else at
25 TheBlaze knew how Mr. Alharbi might be

Page 64

1              JOEL CHEATWOOD
2  related to the Boston Marathon attacks?
3          MR. GRYGIEL:  Object to the
4  form, and also there's been no foundation
5  that Mr. Poole was in the employment of
6  TheBlaze at the time this statement was
7  made, unless there's no basis for
8  attributing or ascribing his statement to
9  any defendant in this case.
10 BY MR. HALEY:
11    Q.   Mr. Poole was a source that
12 TheBlaze relied on; correct?
13    A.   Yes.
14    Q.   And you testified earlier that
15 he was a reliable and trustworthy source;
16 is that correct?
17    A.   Yes.
18    Q.   And Mr. Poole is saying -- and
19 he's using the word "we" -- "At this point,
20 we don't know how he might be related," and
21 "he" is referring to Mr. Alharbi.
22         Did you believe that statement
23 was inaccurate?
24         MR. GRYGIEL:  Object to the
25 form.



Page 65

1          JOEL CHEATWOOD
2      A.   I can't speak to what Mr. Poole
3  and what information he was basing that on.
4      I do know that Mr. Poole did not
5  have access to the confidential sources
6  that we were drawing our information from.
7      Q.   And who had access to those
8  sources?
9      A.   Joe Weasel had direct contact
10  with those sources.
11      Q.   Did you ever have any direct
12  contact with those sources?
13      A.   I had direct contact with one.
14      Q.   Other than you and Mr. Weasel,
15  who had contact with the sources?
16      A.   In terms of TheBlaze, that was
17  it.
18      Q.   And what about not in terms of
19  TheBlaze?
20      A.   I can't answer who they had
21  contact with.  I have no idea.
22      Q.   On page 51 of the transcript,
23  Bates stamp number 921, Mr. Beck --
24  continuing a discussion with Mr. Poole --
25  states:

Page 66

1          JOEL CHEATWOOD
2      "There are very good people" --
3  this is line 19 -- "There are very good
4  people that have risked more than their job
5  to give TheBlaze and others now this
6  information.
7      "TheBlaze is the one that is
8  reporting all of it because we have all of
9  it, but we have shared it with other media
10  organizations."
11      Do you know what Mr. Beck is
12  referring to there, that people had risked
13  more than their job to give TheBlaze
14  information?
15      MR. GRYGIEL:  Object to the
16  form.
17      A.   We believe that the confidential
18  sources were risking their careers in
19  providing that information.
20      Q.   And why was that?
21      A.   Clearly this was information
22  that the government did not want made
23  public.
24      Q.   And Mr. Beck states:  "But we
25  have shared it with other media

Page 67

1          JOEL CHEATWOOD
2  organizations."
3      Do you know what he's referring
4  to there?
5      A.   We shared the basic facts of the
6  story with other news organizations and
7  offered to really allow them to conduct
8  their own investigation/reporting.
9      Q.   And what organizations were
10  those?
11      A.   I know specifically Fox News.
12      I had conversations with the
13  Wall Street Journal.
14      Q.   Anyone else?
15      A.   Let's see -- and I believe ABC
16  News.
17      Q.   Did you have conversations with
18  anyone at ABC News?
19      A.   I did not.
20      Q.   How about Fox News?
21      A.   I did not have a direct
22  conversation.
23      Q.   Who did you speak to at the Wall
24  Street Journal?
25      A.   I don't recall the name.  I

Page 68

1          JOEL CHEATWOOD
2  didn't know the person well.  It was one of
3  their editorial board.
4      Q.   Did Fox News, the Wall Street
5  Journal or ABC News pursue the story?
6      A.   I don't know.
7      Q.   Were you aware of any other
8  media source such as Fox, the Wall Street
9  Journal or ABC that reported that Mr.
10  Alharbi funded the Boston Marathon attacks?
11      MR. GRYGIEL:  Object to the
12  form.
13      A.   I am not aware that they did.
14      Q.   And what was the motivation in
15  speaking to other media organizations?
16      A.   We felt the story was of the
17  importance that it was -- we shouldn't be
18  the exclusive reporter of the story.
19      We were more than willing to
20  share facts and information in order to get
21  the message out to a broader audience.
22      Q.   And was that simply an
23  altruistic public good motivation?
24      MR. GRYGIEL:  Object to the
25  form.



Page 69

1          JOEL CHEATWOOD
2    A.   Yes.
3    Q.   And would the reporting by other
4  media or news organization also lend some
5  additional credibility to your reporting?
6          MR. GRYGIEL:  Object to the
7  form.
8    A.   We weren't concerned about
9  credibility based on the information and
10  the quality of information being provided
11  by multiple confidential sources.
12          We just felt a broader
13  distribution would be meaningful to the
14  public.
15    Q.   Do you have any role in the
16  business side of TheBlaze?
17    A.   Not really, no.
18    Q.   When you say "not really," did
19  you have any role?
20    A.   I was kept apprised.  Did not
21  make decisions regarding the business side.
22    Q.   Was your compensation at all
23  dependant on business returns of TheBlaze
24  or the amount of money that was generated
25  through advertising or otherwise?

Page 70

1          JOEL CHEATWOOD
2    A.   No.
3          MR. GRYGIEL:  We've been going
4  for an hour.  Why don't we take 5 minutes.
5          MR. HALEY:  Sure.
6          (A recess was taken.)
7  BY MR. HALEY:
8    A.   Can I make one addition to my
9  experience, when you were asking about my
10  experience in television?
11    Q.   Yes.
12    A.   While at WCBS, I also served as
13  the executive vice president for news and
14  marketing for all the CBS owned and
15  operated stations.
16    Q.   With respect to CBS's
17  operations, do they have written policies
18  and procedures that govern their reporting?
19    A.   To the best of my recollection,
20  we did not have a written policy that was
21  standard at the station.
22    Q.   How was it that CBS made a
23  determination as to what to air or
24  broadcast or not?
25    A.   Typically relied on the

Page 71

1          JOEL CHEATWOOD
2  judgement of the news managers in charge.
3    Q.   So with respect to things such
4  as the use of confidential sources or the
5  like, CBS had no written policy or
6  statement that governed that?
7    A.   I just don't recall.  I don't
8  recall seeing one.
9    Q.   And was that something that you
10  were involved in, in connection with your
11  role at CBS?
12          Would you the person who would
13  be responsible for ensuring that people
14  complied with uniform policy as to
15  reporting?
16    A.   At the local level, it would
17  have been the news director and the general
18  manager of the specific station.  If it
19  escalated something that was deemed more
20  important than just local, yes.
21    Q.   Is it fair to say with respect
22  to those policies, that the general purpose
23  of them is to ensure that the information
24  that is reported is fair, accurate and
25  truthful?

Page 72

1          JOEL CHEATWOOD
2          MR. GRYGIEL:  Object to the
3  form.
4    A.   Yes.
5    Q.   And one of the reasons for that
6  is that publishing information that's false
7  or inaccurate can have a very adverse
8  effect on, one, misleading the public; and
9  two, can have a demonstrated unfairness to
10  the people who are being reported about?
11          MR. GRYGIEL:  Object to the
12  form.  That's a sermon, Peter.  Not a
13  question.
14    A.   That certainly can be an
15  eventuality.
16          The other aspect of the
17  situation with a station group is you have
18  multiple managers involved in the process,
19  so it's important that they know
20  individually what the process is.
21          At TheBlaze, again, I was the
22  sort of conduit to everything.
23    Q.   During your tenure at TheBlaze,
24  did Mr. Beck ever publish anything or
25  broadcast or say anything publicly on the



Page 73

1        JOEL CHEATWOOD
2   air that you disagreed with or you thought
3   was inconsistent with the policies and
4   procedures that you were in charge of
5   enforcing?
6        MR. GRYGIEL:  Object to the
7   form.
8        A.   I would say Mr. Beck had a
9   three-hour opinion-based radio show.
10       In terms of what I dealt with at
11  TheBlaze, no.
12       Q.   Was the radio show, was it also
13  broadcast?  Was it also televised?
14       A.   Yes, simulcast.
15       Q.   If I could direct your attention
16  to page 66 of Exhibit 68, Bates stamp
17  number 936, continues with the transcript
18  of April 19th.
19       There, Mr. Beck, starting on
20  line 11, states: "I have asked my staff
21  over and over and over again, and my senior
22  staff, Joel Cheatwood, has been in my
23  office about how many times, I don't even
24  know, ten in the last 24 hours for this
25  question:  'Are you sure?' 'Have you

Page 74

1        JOEL CHEATWOOD
2   double-checked?' 'Have you triple-checked?'
3   'Are you sure?'"
4        In this period of time,
5   April 18th to April 19th, were you speaking
6   to Mr. Beck a lot about the Alharbi story?
7        A.   Yes, I was.
8        Q.   And was Mr. Beck asking you for
9   confirmation in terms of, have you
10  double-checked or triple-checked?
11       A.   Absolutely.
12       Q.   And did you provide that
13  information?
14       A.   Yes, I did.
15       Q.   With respect to that question,
16  have you double-checked or triple-checked,
17  is that something that you responded to
18  affirmatively?
19       A.   Yes, I did.
20       Q.   And with respect to something
21  being double-checked or triple-checked,
22  that would refer, I assume, to having
23  multiple sources?
24       A.   Multiple sources, and also going
25  back to those sources as questions arose as

Page 75

1        JOEL CHEATWOOD
2   potential new evidence presented itself, we
3   went back to them hundreds of times.
4        Q.   And the multiple sources that
5   you had were the four confidential sources?
6        A.   Those were the primary
7   confidential sources, yes.
8        Q.   When you say "we went back to
9   them hundreds of times," who are you
10  referring to when you say "we"?
11       A.   Joe Weasel at my direction.
12       Q.   And you testified earlier that
13  you spoke to one confidential source
14  directly.
15       How many times did you speak to
16  that source?
17       A.   I believe only one -- I believe
18  on two occasions.
19       Q.   And when was that?
20       A.   The first occasion would have
21  occurred right around, I believe, the 19th.
22  Maybe the 18th.
23       Q.   And when was the second
24  occasion?
25       A.   I believe the second occasion

Page 76

1        JOEL CHEATWOOD
2   was actually quite a bit later in May.  I
3   don't recall the exact date.
4        Q.   Prior to those occasions, did
5   you know or had you spoken to that source
6   before?
7        A.   No.
8        Q.   And since May of 2013, have you
9   spoken to the source after that?
10       A.   Let me go back, if I may.
11       I knew of the source.  Had not
12  personally spoken to them.
13       Q.   And had you ever met them?
14       A.   Prior to my conversations, no.
15       Q.   And were your conversations by
16  phone or in person?
17       A.   One by phone; one in person.
18       Q.   Which was which, April or May?
19       A.   April was by phone.
20       Q.   And in May you met in person?
21       A.   Yes.
22       Q.   Where did you meet?
23       A.   In Washington, D.C.
24       Q.   What was the purpose of that
25  meeting?



Page 77

1            JOEL CHEATWOOD
2     A.    The --
3            MR. GRYGIEL:  Are we talking
4   about the April phone call or the May
5   meeting?
6            MR. HALEY:  The May meeting.
7     A.    The May meeting was a general
8   information meeting on a variety of topics.
9     Q.    And did the topics include the
10  information about Mr. Alharbi?
11    A.    Yes, I believe it did.
12    Q.    How long did the phone
13  conversation on April 18th or 19th take?
14    A.    To the best of my recollection,
15  it was a 30 or 40-minute phone call.
16    Q.    Was anyone else on the call
17  besides you and the source?
18    A.    No.
19    Q.    To your knowledge, other than
20  you and Mr. Weasel, does anybody else at
21  TheBlaze know the identity of the sources?
22    A.    No, I don't believe so.
23    Q.    Mr. Beck?
24    A.    I don't believe so.
25    Q.    Did Mr. Beck ever ask you the

Page 78

1            JOEL CHEATWOOD
2   identity of the sources?
3     A.    Never asked for their names.
4     Q.    Mr. Cheatwood, if I could direct
5   your attention to page 79 of the
6   transcript, bearing the Bates stamp 949.
7            In there, on line 15, Mr. Beck
8   makes reference to Mr. Alharbi's apartment
9   in Revere, Massachusetts, and then says:
10  "It was raided."
11           Do you know whether Mr. Alharbi
12  gave permission for the authorities to
13  search his apartment or they searched it
14  without his permission?
15    A.    I believe he was notified that
16  the search was going to take place, and I
17  believe he did not try to stop them.
18    Q.    On page 81 of the transcript,
19  Mr. Beck is testifying about a high-ranking
20  Congressional aide "who told us that the
21  deportation order that we had just reported
22  on had just been requested and delivered to
23  his boss."  That's on line 15 ending on
24  line 19.
25           Was the high-ranking

Page 79

1            JOEL CHEATWOOD
2   Congressional aide, do you know who that
3   was?
4            MR. GRYGIEL:  Without
5   identification, if it's a confidential
6   source.
7     A.    I can't say for certain that I
8   know who that is.
9     Q.    And going on, Mr. Beck states:
10           "He requested anonymity to
11  protect those who had secretly provided the
12  report, but proceeded to read to us the
13  eight-page document which confirmed every
14  single detail we reported yesterday and
15  throughout the day."
16           Do you know what document Mr.
17  Beck is referring to there?
18    A.    I believe this would have been
19  the document that contained the tech files.
20    Q.    Which would be the Exhibit 60
21  that we looked at earlier?
22    A.    Yes.
23    Q.    Directing your attention to page
24  94 of Exhibit 68, continuing on the
25  April 19th transcript, Mr. Beck is speaking

Page 80

1            JOEL CHEATWOOD
2   to Glen Hall.
3            Who is Glen Hall?
4     A.    At the time, Glen Hall was the
5   managing editor of theblaze.com.
6     Q.    And there, Mr. Beck asks Mr.
7   Hall on page 94, line 10:
8            "Boy, I tell you, Glen, I mean,
9   you know all about it.  Would you find out
10  where his status is and keep us up to speed
11  on if they're trying to move him out of the
12  country sooner than Tuesday?"
13           And Mr. Hall responds by saying:
14           "We're working on that,
15  absolutely, Glenn.  And you know that early
16  indications from inside the FBI were that
17  they do not consider him to have been
18  involved in this activity, but he was a
19  material witness at the very least."
20           Do you believe that that
21  statement was inaccurate, the FBI's
22  statement that they did not believe Mr.
23  Alharbi was involved in the activity?
24           MR. GRYGIEL:  Object to the
25  form.



Page 81

1       JOEL CHEATWOOD
2    A.   Yes, I believe it was
3    inaccurate.
4         Mr. Hall did not have access to
5    the confidential sources that were being
6    used by TheBlaze television and was relying
7    on FBI information from people who were not
8    directly involved with the investigation.
9    Q.   And is it your belief that the
10   FBI people, FBI personnel who were saying
11   that Mr. Alharbi was not involved were
12   covering something up, or just didn't have
13   the same information that you had?
14        MR. GRYGIEL:  Object to the
15   form.
16   A.   I can't speak for their motives.
17        I can only say that based on the
18   confidential sources that we had providing
19   the information and evidence, they provided
20   the statements that the FBI had were not
21   accurate.
22   Q.   And what exactly did the
23   confidential sources say about Mr.
24   Alharbi's role in funding the attacks?
25   A.   They believe that Mr. Alharbi

Page 82

1       JOEL CHEATWOOD
2    provided funding and probably organization
3    to the group that committed the attacks.
4    Q.   And the basis of that belief was
5    what?
6    A.   The basis of that belief was two
7    things, really.  The evidence that he did
8    not detonate the bombs physically, but that
9    he had been designated as a terrorist
10   212(3)(B).
11        The fact that based on the
12   experience of the senior law enforcement
13   officials, who were our confidential
14   sources, that's how it should have worked,
15   and that would have been his involvement in
16   the organization.
17   Q.   And to your knowledge, did any
18   of those sources have any information that
19   showed a transfer of funds or expenditure
20   of funds by Mr. Alharbi for the benefit of
21   the terrorists?
22   A.   I don't know.
23   Q.   And do you have any
24   understanding or belief as to why Mr.
25   Alharbi was not prosecuted for those

Page 83

1       JOEL CHEATWOOD
2    matters?
3    A.   I do not.
4    Q.   And is it your understanding or
5    belief that the government simply chose not
6    to prosecute him even though they knew he
7    was involved?
8    A.   I can't speak to the
9    government's motivation.
10   Q.   Mr. Cheatwood, I show you what's
11   previously been marked as Exhibit 69 in
12   this matter.
13        Have you seen this before?
14   A.   Yes.
15   Q.   Is this person one of the
16   confidential sources?
17   A.   I don't know.
18   Q.   Did you ever ask Mr. Weasel
19   whether the person in this e-mail was one
20   of the confidential sources?
21   A.   This e-mail was not directed to
22   me so I don't know.
23   Q.   I direct your attention to
24   Exhibit Number 70, which is Mr. Weasel
25   forwarding this e-mail to you on Saturday,

Page 84

1       JOEL CHEATWOOD
2    April 20th at 3:55, and he says "From" --
3    and that's redacted -- "does this help?"
4         So when you received this, did
5    you ask him whether or not -- or did you
6    have an understanding of whether or not
7    this person was one of the confidential
8    sources?
9         MR. GRYGIEL:  Object to the
10   form, and which person, Peter, are you
11   referring to?
12        MR. HALEY:  I'm referring to the
13   person who sent the e-mail dated Saturday,
14   April 20, 2013 at 11:06 a.m.
15        MR. GRYGIEL:  Okay.
16   A.   It was my understanding this was
17   from a confidential source.
18   Q.   To your knowledge, did you make
19   any response to Mr. Weasel's inquiry:
20   "Does this help?"
21   A.   I don't recall.
22   Q.   Do you know what he's referring
23   to there, in terms of helping?
24   A.   To the best of my recollection,
25   I had requested that Mr. Weasel and his



Page 85

1          JOEL CHEATWOOD
2    staff begin a timeline of events as to what
3    transpired in the days following the Boston
4    bombing, including the various government
5    assertions as to what had happened and Mr.
6    Alharbi's involvement.
7        Q.    And is there anything in that
8    Saturday, April 20th e-mail at 11:06 a.m.
9    that led you to believe that Mr. Alharbi
10   played some role in funding the attack?
11       A.    Let me re-read that.
12       Q.    Sure.
13       A.    This e-mail doesn't specifically
14   refer to Mr. Alharbi's role.
15          That information came from
16   direct conversations between Joe Weasel and
17   our confidential sources.
18       Q.    On the line item there,
19   April 17th, it states:
20          "Officials cleared Alharbi, who
21   is reportedly related to al Qaeda Gitmo
22   detainees, as a person of interest."
23          Did you ever receive any
24   information or make any determination that
25   Mr. Alharbi was related to al Qaeda

Page 86

1          JOEL CHEATWOOD
2    detainees at Guantanamo Bay?
3        A.    We did not receive specific
4    information in that regard.
5        Q.    Mr. Cheatwood, I show you what's
6    previously been marked as Exhibit 71 in
7    this action, which is, at the top, an
8    e-mail from Joe Weasel to you dated
9    Saturday at 4:58 p.m.
10          And the e-mails, which start on
11   the second page with a Bates stamp number
12   35535 on April 20th at 4:36 p.m., Mr.
13   Weasel writes: "I think it would be wise
14   to keep the stuff Glenn mentions on air
15   tightly scripted. I have a few concerns.
16          "One, that they will claim this
17   is a police investigation. I want to make
18   sure that I get somebody to look over what
19   we're going to say on air."
20          Was that person that Mr. Weasel
21   is referring to one of the confidential
22   sources?
23       A.    Yes, I believe so.
24       Q.    And did that person review what
25   Mr. Beck said on air?

Page 87

1          JOEL CHEATWOOD
2        A.    They reviewed the facts that we
3    presented on air.
4        Q.    For every broadcast?
5        A.    Not for every broadcast.
6          I think when we were introducing
7    new facts, we always fact-checked not only
8    through our confidential sources, but
9    really our experts as well.
10       Q.    And in the second paragraph
11   there, Mr. Weasel says: "For every serve
12   we make, they are ready to return."
13          Do you know who Mr. Weasel is
14   referring to there, when he says "they are
15   ready to return"?
16       A.    I believe the "they" would refer
17   to the U.S. government.
18       Q.    Was it Mr. Weasel's belief, to
19   your knowledge, that the U.S. government
20   was trying to prevent the accurate
21   information of the story from coming out?
22          MR. GRYGIEL:  Object to the
23   form.
24       A.    Yes.  Mine as well.
25       Q.    That was your belief as well?

Page 88

1          JOEL CHEATWOOD
2        A.    Yes.
3        Q.    And why was it you thought the
4    government was trying to keep the accurate
5    information from coming out?
6        A.    I couldn't answer that question.
7    You'd have to ask them.
8        Q.    What was the basis of your
9    belief?
10       A.    Again, I had no idea what the
11   motivation would be.
12          We only knew that the
13   confidential sources with direct access to
14   the investigation were telling us a set of
15   facts that were not consistent with what
16   the government was saying.
17       Q.    Do you know why Mr. Weasel is
18   expressing a concern that it would be wise
19   to keep the stuff Glenn mentions on air
20   tightly scripted?
21       A.    Any time you're discussing a
22   story with sensitivity and grave
23   allegations, as this one did, it's common
24   practice to want to make sure that the
25   talent stays as close to script as very



Page 89

1        JOEL CHEATWOOD
2  possible because the facts are vetted and
3  you want to keep them close to the facts.
4      Q.   In that case, the talent is Mr.
5  Beck?
6      A.   That's correct.
7      Q.   And this was a story which
8  involved matters of grave concern?  Is that
9  what you testified to?
10     A.   I believe great public interest.
11         The allegations were absolutely
12  grave, and it was important that we stuck
13  strictly to the facts.
14     Q.   And on the first page of
15  Exhibit 71, in your response at 4:57 p.m.
16  to Mr. Weasel, the last line of your
17  response is:  "Need credibility."
18         What are you referring to there?
19     A.   Referring specifically to the
20  detail that we can provide in classifying
21  someone as a 212(3)(B), felt that we needed
22  to provide as much information and
23  explanation as possible, not only as to
24  what the designation meant, but also the
25  process by which someone was designated in

Page 90

1        JOEL CHEATWOOD
2  that way.
3      Q.   And what was your understanding
4  of the process by which somebody was
5  designated under Section 212(3)(B)?
6      A.   According to our confidential
7  sources and other experts in the area that
8  we consulted, it was a tedious process that
9  required the presentation of full evidence
10  in making the accusation.
11         It required the sign-off of all
12  JTTF members in terms of the various
13  agencies that are involved, and it also
14  involved the approval of a high level,
15  usually cabinet member, to make that
16  designation.
17     Q.   And 212(3)(B) refers to what?
18     A.   Terrorism.
19     Q.   Do you have an understanding as
20  to whether or not that's a section of the
21  United States Code or the Criminal Code or
22  where that comes from?
23     A.   I believe that's part of the
24  Criminal Code.  I could be wrong.
25     Q.   Did you review that at all with

Page 91

1        JOEL CHEATWOOD
2  counsel?
3      A.   We reviewed an e-mail that
4  outlined what the definition of 212(3)(B)
5  is.
6      Q.   And who did the e-mail come
7  from?
8      A.   I don't recall.
9      Q.   Was the e-mail from a lawyer or
10  from a confidential source or --
11     A.   I don't recall who originated
12  it.
13     Q.   And was the e-mail sent to you
14  at TheBlaze?
15     A.   Yes.
16     Q.   And was it an e-mail that you
17  solicited or just sent to you
18  independently?
19     A.   I believe that we solicited a
20  definition from this person and they
21  provided it.
22     Q.   Who was it provided to, when you
23  say "we"?
24     A.   I don't recall whether there was
25  anyone else on the e-mail chain besides

Page 92

1        JOEL CHEATWOOD
2  myself.
3      Q.   Do you have any memory as to
4  when you received that?
5      A.   I do not.
6      Q.   And the person who sent it, you
7  testified, was not counsel; is that
8  correct?
9      A.   Was not.
10     Q.   But you don't remember whether
11  they were a confidential source or not?
12     A.   They were not.
13     Q.   And you don't remember who it
14  was?
15     A.   I don't.
16     Q.   Did they work for TheBlaze?
17     A.   No.
18     Q.   Mr. Cheatwood, I show you what's
19  been marked as Exhibit 72 in this matter,
20  which is an e-mail from you to Mr. Weasel
21  on Saturday, April 20th at 5:02 p.m.
22         And Mr. Weasel writes to you at
23  4:58 p.m. and says:  "Is Emerson on this?
24  Mainly going to be his source in asking
25  where the kid is."



Page 93

1            JOEL CHEATWOOD
2    And Emerson there is Steve
3    Emerson; is that correct?
4       A.   That's correct.
5       Q.   And your response is that you
6    don't know. "I think we should reach out
7    to all our friends on this: West;
8    Stakelbeck; Emerson, for certain; Pam
9    Geller has written about it too. I may
10   reach out to Hannity's producer."
11           Who is West?
12      A.   Diana West, an author and noted
13   expert on terrorism.
14      Q.   And Stakelbeck was Eric
15   Stakelbeck; is that correct?
16      A.   That's correct.
17      Q.   Emerson is Steve Emerson?
18      A.   Correct.
19      Q.   And who is Pam Geller?
20      A.   Pam Geller, again, was an author
21   and noted expert in the area of the Middle
22   East and terrorism.
23      Q.   And you're referring to these
24   people as "our friends."
25           What do you mean by that?

Page 94

1            JOEL CHEATWOOD
2       A.   I meant simply people that we
3    have worked with in the past in terms of
4    story development. They've been guests on
5    the shows. People that we just had a
6    history of working with.
7       Q.   And you write: "I may reach out
8    to Hannity's producer."
9            Did you do that?
10      A.   As I recall, I left a voicemail.
11      Q.   And who was Mr. Hannity's
12   producer at the time?
13      A.   At the time, I believe it was
14   John Finley.
15      Q.   Did you consider Mr. Hannity and
16   Mr. Finley as friends?
17      A.   Having worked at Fox News, they
18   were acquaintances.
19      Q.   Why was it that you wanted to
20   reach out to West, Stakelbeck, Emerson,
21   Geller and Mr. Hannity's program?
22      A.   We were continually looking for
23   context and perspective to the facts that
24   we were being provided by our confidential
25   sources, and given their expertise in the

Page 95

1            JOEL CHEATWOOD
2    area of terrorism, we felt it was important
3    to continually get their feedback and
4    expertise in concert with the facts being
5    provided by our confidential sources.
6       Q.   Mr. Cheatwood, I show you what's
7    been marked previously as Exhibit 73 in
8    this action, which is an e-mail from Mr.
9    Weasel to you starting at 7:35 p.m. on
10   Saturday, April 20th.
11           And Mr. Weasel's first e-mail
12   says: "The only way I can get the file is
13   to fly to and take a screenshot off of a
14   laptop. In this case, it would be a
15   smoking gun. Thoughts?"
16           And your response to Mr. Weasel
17   is: "Legal?"
18           Did you make a determination
19   about whether that was legal?
20           MR. GRYGIEL:  Objection to the
21   form.
22      A.   I made the determination that it
23   was not.
24      Q.   And how did you make that
25   determination?

Page 96

1            JOEL CHEATWOOD
2       A.   Just based on my experience and
3    knowledge of dealing with information like
4    this.
5       Q.   And after having made the
6    determination, did you communicate that to
7    Mr. Weasel?
8       A.   I did.
9       Q.   How did you communicate that to
10   him?
11      A.   I believe it was via phone.
12      Q.   And what did you say to him?
13      A.   Indicated that that was not an
14   option for us, that we had to obtain the
15   information physically. We couldn't take
16   it off of a -- basically, a government
17   terminal.
18      Q.   And did you obtain the
19   information physically?
20      A.   We obtained the file, which
21   we've discussed, yes.
22      Q.   And what, to your knowledge,
23   made taking a screenshot of a laptop
24   illegal, but obtaining the physical file
25   not illegal?



Page 97

1      JOEL CHEATWOOD
2      MR. GRYGIEL:  Object to the
3  form.  It also calls for a legal question
4  from a fact witness.  But to the extent you
5  can answer, please feel free.
6      A.    My feeling and opinion was that
7  to violate the privacy of a government
8  terminal would have put us in jeopardy of
9  an illegality, but to be provided
10  information and simply to be a receptive
11  reporting entity with information being
12  provided to us, would not.
13      Q.    And so your understanding was to
14  take a screenshot of somebody's terminal
15  would be illegal, but to have that person
16  print out what was on the screen and
17  provide it to you would not be illegal?
18      MR. GRYGIEL:  Object to the
19  form.
20      A.    Our feeling was, if we were a
21  passive interest in receiving the
22  information, it was fine.
23      Q.    What do you mean by "passive"?
24      A.    Basically, we weren't physically
25  going after and pulling information out of

Page 98

1      JOEL CHEATWOOD
2  what could be a private government
3  terminal.  We were being provided.
4      Q.    So as a result of that
5  conversation with you, Mr. Weasel did not
6  fly to D.C.?
7      A.    He did fly.
8      Q.    And that was to obtain the
9  physical file?
10      A.    Yes.
11      Q.    And that was from the
12  confidential source?
13      A.    Yes.
14      Q.    And the file he obtained was the
15  Exhibit 60 and 61 that we reviewed
16  previously; is that correct?
17      A.    That's correct.
18      Q.    On Exhibit 73, Mr. Weasel
19  states:
20          "Just heard reliably that Saudi
21  specifically requested Michelle Obama visit
22  Alharbi to throw off any questions of
23  terror."
24          Do you know who Mr. Weasel heard
25  that from?

Page 99

1      JOEL CHEATWOOD
2      A.    I do not.
3      Q.    Did you make any determination
4  whether that statement was truthful or
5  accurate?
6      A.    We, I remember, did not
7  broadcast that information, didn't get
8  proper confirmation.
9      Q.    Who did you try to get
10  confirmation from?
11      A.    As I recall, a variety of law
12  enforcement officers, the White House as
13  well, DHS.  Kind of the usual sources,
14  couldn't get a secondary confirmation.
15          (Exhibit 109 for
16  identification, E-mail dated 4/20 from Mr.
17  Cheatwood to Mr. Weasel, production numbers
18  35131.)
19  BY MR. HALEY:
20      Q.    Mr. Cheatwood, I show you what's
21  been marked Exhibit 109, which is a
22  response to that e-mail, which we just
23  reviewed, Exhibit 73.
24          It bears the Bates stamp number
25  of 35131 from you to Mr. Weasel dated

Page 100

1      JOEL CHEATWOOD
2  April 20th at 10:29 p.m., and you're asking
3  there:  "Can" -- and it's redacted -- "now
4  tell us about the family clan connections."
5          Was that the confidential source
6  that's redacted there?
7      A.    Yes.
8      Q.    And the family clan connections
9  were connections of Mr. Alharbi's family?
10      MR. GRYGIEL:  Object to the
11  form.
12      A.    That's correct.
13      Q.    Did your source ever provide you
14  with any information regarding his family
15  or clan connections?
16      A.    Our confidential sources
17  provided us with general information, but
18  we couldn't get specific details that made
19  us comfortable with reporting that
20  information.
21      Q.    Mr. Cheatwood, I show you what's
22  been previously marked as Exhibit 74 in
23  this matter, which is an e-mail from David
24  Hemenway to Joe Weasel.
25          Who is David Hemenway?



Page 101

1            JOEL CHEATWOOD
2      A.   I don't know.
3      Q.   Did you ever see this e-mail
4   before?
5      A.   I have not.
6      Q.   Mr. Cheatwood, I show you what's
7   been previously marked Exhibit 75 in this
8   action, which is an e-mail at the top from
9   you to Mr. Weasel on Sunday, April 21st at
10  10:17 a.m.; and Mr. Weasel, at the bottom
11  of the page, is 10:04 a.m., is writing and
12  says: "Do we know if we are allowed to
13  report that there has been a request for a
14  secure briefing on this kid?  It's a
15  critical bit of information."
16         What is Mr. Weasel referring to
17  there, if you know?
18         MR. GRYGIEL:  Object to the
19  form.
20      A.   We had been told by one of our
21  confidential sources that the Congressional
22  Homeland Security Committee had asked for a
23  secure briefing from Janet Napolitano.
24      Q.   And you then say:  "Virginia,
25  can you peruse" -- or I assume you meant

Page 102

1            JOEL CHEATWOOD
2   "pursue" -- "permission on this?"
3         Who are you asking Ms. Grace to
4   pursue permission from?
5         MR. GRYGIEL:  Object to the
6   form.
7      A.   As I recall, Virginia had
8   contacts with aides in the office of that
9   committee, and was seeking permission from
10  Mr. Duncan's office to publicize that they
11  had made the request.
12      Q.   And at the top of Exhibit 75, at
13  10:07, Mr. Weasel has forwarded a link to a
14  Daily Mirror story, and your response is:
15  "God, I wish it weren't the Daily Mirror."
16         Why were you saying that?
17         MR. GRYGIEL:  Object to the
18  form.
19      A.   In spite of the Daily Mirror's
20  pretty incredible track record as an
21  investigative journalism platform, I was
22  hoping that U.S. mainstream media outlets
23  would pick it up.  This was a British
24  publication.
25      Q.   Did they ever pick it up?

Page 103

1            JOEL CHEATWOOD
2      A.   I don't recall to what extent.
3      Q.   And the second sentence of that
4   e-mail says: "A call is a good idea.  I'm
5   drafting a note of what we know to send out
6   in a few to calm nerves."
7         What were you referring to
8   there?
9         MR. GRYGIEL:  Object to the
10  form.
11      A.   My intent to draft an overview
12  of the information that we knew to be
13  factual, along with questions that we were
14  seeking answers to.
15      Q.   And were people nervous?
16      A.   Absolutely.  Any time that
17  you're involved with a story of this
18  magnitude and at the leading edge of
19  reporting, if you're not nervous, something
20  is wrong.
21         There's a great desire to be
22  accurate, to get full information, and
23  that's why we revisited our confidential
24  sources at all hours of the days and night
25  for many, many, many weeks.

Page 104

1            JOEL CHEATWOOD
2      Q.   Mr. Cheatwood, I've handed you a
3   copy of what's previously been marked as
4   Exhibit 76 in this action.
5         And in response to Exhibit 75,
6   on Sunday, April 21st at 10:20 a.m., Mr.
7   Weasel writes:  "They know what we have, so
8   they have to try to Joe McCarthy Glenn.
9         Do you know what Mr. Weasel is
10  referring to there?
11         MR. GRYGIEL:  Object to the
12  form.
13      A.   I believe he is referring to the
14  effort to discredit Glenn as being a
15  reliable source of information.
16      Q.   And was that something that you
17  discussed with Mr. Weasel or Mr. Beck at
18  any time?
19      A.   Not specifically, no.
20      Q.   And in response to Mr. Weasel's
21  statement, that "We need Duncan's guy" --
22  and that refers to Congressman Duncan; is
23  that correct?
24      A.   That's correct.
25      Q.   -- "to call Jake Tapper.  I



Page 105

1          JOEL CHEATWOOD
2    think he'll do it for Virginia and get to
3    the Congressman.  I think Tapper might be
4    more open."
5          Your response is:
6          "Worth a shot.  Glenn says
7    Tapper told him.  Didn't know he reached
8    out (DHS told him mistaken identity.)"
9          What conversations did you have
10   with Mr. Beck about a conversation that he
11   had with Mr. Tapper?
12         MR. GRYGIEL:  Object to the
13   form.
14     A.   He informed me that he had
15   reached out to Mr. Tapper hoping to share
16   elements of the story and with the intent
17   of ABC News picking up the investigation.
18     Q.   And Mr. Tapper told Mr. Beck
19   that he had been told by the Department of
20   Homeland Security that it was simply a case
21   of mistaken identity?
22     A.   I don't know what Mr. Tapper
23   told Glenn.  This is just what Glenn
24   related to me.
25     Q.   To your knowledge, did Mr.

Page 106

1          JOEL CHEATWOOD
2    Tapper ever pursue the story?
3      A.   I don't know.
4      Q.   What Mr. Beck told you was that
5    Mr. Tapper told him that the Department of
6    Homeland Security was saying to him that it
7    was a case of mistaken identity?
8          MR. GRYGIEL:  Object to the
9    form.
10     A.   That's how I interpret this
11   e-mail.
12     Q.   And did you have any reason to
13   question Mr. Beck's accuracy in relating to
14   you what Mr. Tapper said to him?
15     A.   Other than I was not part of the
16   conversation, no.
17     Q.   Mr. Cheatwood, I show you what's
18   previously been marked as Exhibit 77 in
19   this action, which is an e-mail from an
20   unidentified redacted person to Mr. Weasel,
21   and Mr. Weasel is asking that person at
22   11:51 a.m. about:  "Do you know if they got
23   him out of the country?"
24         And the person responding says:
25         "At the moment, only the Wizard

Page 107

1          JOEL CHEATWOOD
2    of Oz knows the answer to that question."
3          Was this person in this e-mail,
4    to your knowledge, one of the confidential
5    sources that you were relying on?
6          MR. GRYGIEL:  Object to the
7    form.
8      A.   I have no knowledge of this
9    e-mail.
10     Q.   Have you seen this before?
11     A.   I have not.
12     Q.   Mr. Cheatwood, I show you what's
13   previously been marked as Exhibit 78 in
14   this matter.
15         This was an e-mail that you sent
16   up to Mr. Weasel and Tiffany Siegel on
17   Sunday at 3:35 p.m.
18         Was this in preparation for a
19   call with Mr. Beck?
20         MR. GRYGIEL:  Object to the
21   form.
22     A.   Yes, it was.
23     Q.   What was the purpose of
24   providing this information to Mr. Weasel
25   and Ms. Siegel?

Page 108

1          JOEL CHEATWOOD
2      A.   Wanted them both to be
3    comfortable with the information to see
4    what we would be discussing in terms of the
5    conversation with Mr. Beck, and basically
6    just as a guideline going forward for the
7    information that we had in place.
8      Q.   And the information in the
9    e-mail, is that information that you typed
10   up?
11     A.   I did.
12     Q.   What was the source of the
13   information?
14     A.   The source of information was
15   from primarily our confidential sources
16   through Joe Weasel.
17     Q.   And on the top of the second
18   page of Exhibit 78, it has a Bates stamp
19   number of 35080, it states:
20         "Tuesday morning Secretary of
21   State John Kerry meets with Saudi Foreign
22   Minister Saud.  The meeting is abruptly
23   closed to the media."
24         What link was it that you
25   thought that piece of information had to



Page 109

1          JOEL CHEATWOOD
2   the investigation of Mr. Alharbi?
3          MR. GRYGIEL:  Object to the
4   form.
5      A.   At that time, we didn't know
6   what the link might be, or if there was a
7   link at all, but it was information
8   provided by confidential sources that felt
9   there was some connection.
10     Q.   Do you know what the basis of
11  their feeling that there was a connection
12  was?
13         MR. GRYGIEL:  Objection.
14     A.   Based primarily on their
15  expertise in terms of dignitaries visiting
16  the White House and this being out of the
17  norm.
18     Q.   And did you ever determine if
19  there was any link between the information
20  reported at the top of the page here and
21  the investigation of Mr. Alharbi?
22     A.   We did not.
23     Q.   With respect to the third bullet
24  point on page 2, where it says "Wednesday,
25  President Obama has a 'chance' in-concert

Page 110

1          JOEL CHEATWOOD
2   with Saudi Foreign Minister Saud and Saudi
3   Ambassador Adel al-Jubeir," what
4   relationship did that fact have to do with
5   the investigation of Mr. Alharbi?
6          MR. GRYGIEL:  Object to the
7   form.
8      A.   Again, this information was
9   provided by a confidential source with
10  knowledge and information as to protocol on
11  these matters who thought that this was
12  unusual and odd, and more than a
13  coincidence.
14     Q.   Did you ever make any
15  determination as to whether it was more
16  than a coincidence?
17     A.   We did not.
18     Q.   And on the third page of
19  Exhibit 78, Bates stamp number 35081, it
20  states:  "We are told his family
21  connections are very scary."
22         Who told you that?
23     A.   Confidential sources.
24     Q.   And what exactly did they tell
25  you about the connections other than they

Page 111

1          JOEL CHEATWOOD
2   were "very scary?
3          MR. GRYGIEL:  Object to the
4   form.
5      A.   The indication from multiple
6   confidential sources was there was a
7   connection to terrorism within the family.
8      Q.   And did you ever make any
9   determination as to whether there was such
10  a connection?
11     A.   We did not develop specific
12  information.
13     Q.   What general information did you
14  develop?
15     A.   General information was just,
16  there were connections from Mr. Alharbi and
17  his family to known terrorists.
18     Q.   And which terrorist?
19     A.   I -- we were not given
20  specifics.
21     Q.   Did you ever seek to verify the
22  information with anyone else besides your
23  confidential sources?
24     A.   Yes, we did.
25     Q.   Who did you seek to verify it

Page 112

1          JOEL CHEATWOOD
2   with?
3      A.   We posed the question to the
4   Department of Homeland Security, the FBI,
5   the Joint Task Force -- Joint Terrorism
6   Task Force, Congressional contacts.
7   Anybody else we could think of.
8      Q.   And what was their response?
9      A.   No response.
10     Q.   Who posed the question?
11     A.   Primarily, Joe Weasel and his
12  staff.  I believe Tom Orr on his staff was
13  part of the reach-out.
14         I don't know if there were
15  others, but those two I know.
16     Q.   When you say there was no
17  response, they just didn't answer the
18  question or made no comment or how did that
19  work?
20     A.   Universally, no response.
21     Q.   I'm trying to get an
22  understanding of when you say "no
23  response," was it because they didn't
24  respond to a phone call, an e-mail, or was
25  it because they just refused to provide an



JOEL CHEATWOOD                                    March 24, 2016
ALHARBI vs. BECK                                  113—116

Page 113

1          JOEL CHEATWOOD
2   answer or just said "no comment"?
3          MR. GRYGIEL:  Object to the
4   form.
5     A.    All of the above.
6     Q.    On the last page of Exhibit 78,
7   with the Bates stamp number 35086, you
8   write:  "There is a pattern.  There is a
9   relationship between the U.S. and Saudi
10  Arabia the American public doesn't know
11  about.  The case of Abdul Rahman Ali
12  Alharbi is only the latest example."
13         What's the basis of that
14  statement?
15    A.    We had done a significant amount
16  of research about the U.S. and Saudi Arabia
17  relationship, and specifically about how
18  Saudi nationals were treated, how they were
19  admitted into the country versus the
20  nationals of other countries.
21    Q.    How did the case of Mr. Alharbi
22  relate to that?
23    A.    At the point that I drafted this
24  note, we were looking at all possibilities,
25  all questions, and looking for answers in a

Page 114

1          JOEL CHEATWOOD
2   variety of different directions, and wanted
3   to know if this relationship -- or this
4   special relationship, as we determined --
5   had anything to do with the government's
6   treatment of Mr. Alharbi.
7     Q.    And did you make any
8   determination as to whether it did or did
9   not?
10    A.    We couldn't definitively come to
11  that conclusion.
12    Q.    Mr. Cheatwood, I show you what's
13  previously been marked as Exhibit 79 in
14  this action, which at the top is an e-mail
15  from you to Tiffany Siegel, copying Joe
16  Weasel, and it includes an earlier e-mail
17  from Tiffany Siegel on April 21st at 3:45
18  p.m., and she makes reference to a story
19  with a date line "Boston," where above the
20  highlighted portion, it says:
21         "He is not a suspect nor is he a
22  person of interest.  He was an individual
23  at the marathon, and therefore, like so
24  many individuals, has been questioned."
25         Did you believe that reporting

Page 115

1          JOEL CHEATWOOD
2   was inaccurate?
3          MR. GRYGIEL:  Object to the
4   form.
5     A.    Yes, I did.
6     Q.    Were you aware that that was
7   what was being reported by most other news
8   sources?
9          MR. GRYGIEL:  Object to the
10  form.
11    A.    Yes.  Yes, I was.
12    Q.    And what made you believe that
13  TheBlaze got the story right and all the
14  other news sources were wrong?
15         MR. GRYGIEL:  Object to the form
16  and also foundation.
17    A.    Based on the information
18  provided by the confidential sources that
19  we had.
20    Q.    Mr. Cheatwood, I show you what's
21  previously been marked as Exhibit 80 in
22  this matter, which is an e-mail from
23  Patrick Poole to Virginia Grace on Sunday
24  at 6:33 p.m.
25         Have you seen this before?

Page 116

1          JOEL CHEATWOOD
2     A.    I have seen this.
3     Q.    Did you see it at the time that
4   it was authored or sent?
5     A.    I don't recall.
6     Q.    And Mr. Poole, in the first
7   sentence there, writes:
8          "On the Saudi, my sense is that
9   there are two issues, since we don't know
10  in what way, if any, he was involved in the
11  bombing incident."
12         Did you agree with that
13  statement as of Sunday night at 6:33 p.m.?
14    A.    I did not.
15    Q.    And the basis for your
16  questioning that statement were the two
17  documents that you had, Exhibit 60 and 61?
18         MR. GRYGIEL:  Object to the
19  form.  It also mischaracterizes the
20  testimony.
21         Mr. Cheatwood didn't say he
22  questioned that.  He said he disagreed with
23  it.
24         MR. HALEY:  I'll rephrase the
25  question.



JOEL CHEATWOOD                                    March 24, 2016
ALHARBI vs. BECK                                       117–120

Page 117

1          JOEL CHEATWOOD
2   BY MR. HALEY:
3       Q.   The basis of your disagreement
4   was what?
5       A.   The information provided by
6   multiple confidential sources with direct
7   ties to the investigation.
8       Q.   And the second-to-last paragraph
9   there, in Mr. Poole's e-mail, where he says
10  "Do we know what's going on in the case of
11  the Saudi?  No, I don't think we do, but we
12  can conclude that the official version spun
13  by the Administration is far different from
14  the facts that we know."
15          Do you know what Mr. Poole is
16  referring to there when he says "from the
17  facts that we know"?
18      A.   I don't know specifically what
19  he meant.  I'm assuming he is referring to
20  the facts that he personally is aware of.
21      Q.   And do you know if Mr. Weasel
22  ever shared with Mr. Poole the information
23  from the confidential sources?
24      A.   I believe Mr. Weasel shared the
25  basis and the facts.  Did not share the

Page 118

1          JOEL CHEATWOOD
2   confidential sources, specifically.
3       Q.   When you said he shared the
4   basis and the facts, essentially, he shared
5   the information, but not the identity of
6   the sources?
7       A.   Exactly.
8       Q.   So with that information,
9   though, Mr. Poole, apparently on Sunday
10  evening, is still stating that as far as he
11  knows, you can't prove a connection between
12  Mr. Alharbi and the attack?
13      A.   Mr. Poole, without direct access
14  to the confidential sources, would have no
15  reason to necessarily just take at face
16  value what Mr. Weasel was providing.
17          I assume he had his own sources
18  that provided the information that he had.
19      Q.   And do you know who Mr. Poole's
20  sources were?
21      A.   I do not.
22      Q.   Did you ever ask him?
23      A.   Not specifically.
24      Q.   How do you make a determination
25  that the confidential sources that Mr.

Page 119

1          JOEL CHEATWOOD
2   Weasel had were somehow more authoritative
3   or more accurate than Mr. Poole's sources?
4          MR. GRYGIEL:  Object to the
5   form.
6       A.   We knew for a fact that our
7   confidential sources were directly involved
8   in the investigation.  There was no
9   indication through Mr. Weasel that Mr.
10  Poole had that access.
11      Q.   Did you ever ask if Mr. Poole
12  had that access?
13      A.   I believe I asked Joe what Mr.
14  Poole's resources were, yes.
15      Q.   And to your knowledge, did Mr.
16  Poole share those with Mr. Weasel?
17      A.   I think he shared generally who
18  he was talking to and acknowledged, to the
19  best of my recollection, that they were not
20  at a level that our sources were.
21      Q.   And your sources were directly
22  involved in the investigation?
23      A.   Yes.
24      Q.   And at some sort of an executive
25  or supervisory level?

Page 120

1          JOEL CHEATWOOD
2       A.   Senior level.
3       Q.   Were they in charge of the
4   investigation?
5          MR. GRYGIEL:  Objection to the
6   extent that disclosure of that information
7   would call for identification of the
8   sources.
9       Q.   What do you mean by "senior
10  level"?
11      A.   They were in positions of
12  authority and had a senior status based on
13  their experience level and performance.
14      Q.   And they were directly involved
15  in the investigation?
16      A.   Our principal confidential
17  source was directly involved in the
18  investigation.  The secondary -- one of the
19  secondary sources had a direct link to it
20  as well.
21      Q.   What about the other two
22  sources?
23      A.   Being kept in the loop and
24  informed.  Not specifically attached to the
25  investigation.



Page 121

1        JOEL CHEATWOOD
2      Q.    And the primary source that you
3    testified to, that was the person that you
4    spoke to on the phone in April and then met
5    with in May?
6          MR. GRYGIEL:  You can answer
7    that, Joel, to the extent it won't result
8    in the identification of the source.
9      A.    No, it was not.
10     Q.    And was that person the
11   secondary source?
12     A.    No, it was not.
13     Q.    So the person that you spoke to
14   in April and met with in May wasn't
15   directly involved in the investigation?
16     A.    The person I spoke to in April
17   and met with in May I approached for the
18   specific reason of further vetting our
19   primary confidential sources.
20     Q.    Because that person was senior
21   to your primary confidential source?
22          MR. GRYGIEL:  Same objection.
23          You can answer to the extent it
24   will not result in disclosure of the
25   source's identification.

Page 122

1        JOEL CHEATWOOD
2      A.    That person had a very close
3    knowledge of the confidential sources, the
4    role they served in their respective
5    organizations and their access and ability
6    to gain information.
7      Q.    Mr. Cheatwood, I show you what's
8    marked as Exhibit 81, which at the top is
9    an e-mail from you to Tiffany Siegel and
10   Joe Weasel on Sunday at 6:42 p.m.
11          It's forwarding Mr. Poole's 6:32
12   p.m. e-mail, and your response to that
13   e-mail to Ms. Siegel and Mr. Weasel is:
14          "Maybe Poole is better than
15   McCarthy tomorrow.  See below."
16          What did you mean by that?
17          MR. GRYGIEL:  Object to the
18   form.  You can answer.
19     A.    I don't recall specifically the
20   -- to the best of my recollection, we were
21   just talking about who could express most
22   broadly the information to provide expert
23   commentary on the story that we were
24   providing.
25          I believe based on Mr. Poole's

Page 123

1        JOEL CHEATWOOD
2    expertise and his knowledge of terrorism, I
3    had made the suggestion that maybe he was a
4    better guest before Mr. McCarthy.
5      Q.    And Mr. McCarthy was Andrew
6    McCarthy?
7      A.    Yes.
8      Q.    And who was he again?
9      A.    A former U.S. Attorney who
10   prosecuted the first World Trade Center
11   bombing.
12     Q.    And Mr. Poole as an expert would
13   be someone who was presumably going to say
14   that he didn't know in what way, if any,
15   Mr. Alharbi was involved in the bombing
16   incident?
17          MR. GRYGIEL:  Objection.
18          Calls for speculation.
19     A.    I wasn't clear specifically what
20   information he would impart other than that
21   of his expertise in the area of terrorism.
22     Q.    But you're making that comment
23   after receiving his e-mail of 6:32 p.m.;
24   right?
25     A.    Right.

Page 124

1        JOEL CHEATWOOD
2      Q.    Did you have some reason to
3    believe in the 10 minutes between 6:32 and
4    6:42 that what Mr. Poole would say would be
5    inconsistent with his e-mail?
6          MR. GRYGIEL:  Objection.
7      A.    To the best of my recollection,
8    I was basing it on just the breadth of
9    information that he would be able to
10   provide versus the breadth of information
11   that Mr. McCarthy would be able to provide.
12     Q.    Directing your attention to the
13   second page of Exhibit 81, the first e-mail
14   there is from Virginia Grace at 5:54 p.m.,
15   and she writes:
16          "Hi, Patrick - looking forward
17   to seeing you tomorrow.  Would love to know
18   your thoughts on the latest on the Saudi
19   national (if you have it) and the
20   connections of the bombers to radical Islam
21   (also hearing they were connected to a
22   12-person sleeper cell.)"
23          At that point, did you have any
24   information about Mr. Alharbi's connection
25   to a sleeper cell?



JOEL CHEATWOOD                                           March 24, 2016
ALHARBI vs. BECK                                              125–128

Page 125

1        JOEL CHEATWOOD
2         MR. GRYGIEL: Object to the
3  form.
4     A.   To the best of my recollection,
5  our confidential sources at this time were
6  indicating that the activities in Boston
7  would have extended beyond the Tsaernaev
8  brothers. That this had to be an
9  operation, not just a two-person event.
10     Q.   What information did you have
11  that Mr. Alharbi was connected to the
12  Tsaernaev brothers?
13     A.   According to our confidential
14  sources, and based on the evidence that
15  they had access to and provided to us, Mr.
16  Alharbi did not detonate the bombs, but
17  they believed had funded and organized the
18  effort.
19     Q.   What did they tell you about his
20  funding and organizing the effort?
21         MR. GRYGIEL: Objection.
22         At what point in time?
23         MR. HALEY: At any point in
24  time.
25     A.   The initial indication was that

Page 126

1        JOEL CHEATWOOD
2  since he had not been the detonator of the
3  bombs physically, but had been classified
4  as a terrorist, 212(3)(B), and knowing,
5  with knowledge that they had in terms of
6  how these terror cells work, that Mr.
7  Alharbi's work would have been the
8  financier and potentially the recruiter and
9  organizer.
10     Q.   Other than his classification as
11  what you refer to, 212(3)(B), and a general
12  knowledge of how terror cells work, was
13  there any specific knowledge or evidence
14  that you're aware of that connected Mr.
15  Alharbi to activities about supporting or
16  funding the attacks?
17         MR. GRYGIEL: Object to the
18  form.
19     A.   Again, are we talking about a
20  specific time or in general?
21     Q.   In general.
22     A.   Yes. The principal confidential
23  source is a leading expert in antiterrorism
24  and terrorism cells in this country, and,
25  in fact, since 2009 has studied in-depth

Page 127

1        JOEL CHEATWOOD
2  the ISB, the Islamic Society of Boston, and
3  their connections to terrorism.
4         And in looking at the evidence
5  and connecting those dots, he came to the
6  definitive conclusion that Mr. Alharbi
7  would have been the financier and most
8  likely organizer of this event.
9     Q.   When you say "would have been,"
10  is that something that he just supposed or
11  something that he had evidence of?
12     A.   This was --
13         MR. GRYGIEL: Object to the
14  form. You can answer.
15     A.   This was based on the evidence,
16  his expertise in knowing how these things
17  work, and his expansive knowledge on,
18  specifically, the Boston situation through
19  the ISB.
20     Q.   And what information did you
21  have connecting Mr. Alharbi to the Islamic
22  Society of Boston?
23     A.   According to our confidential
24  source, he was known to be a member of the
25  Roxbury mosque, which was part of the ISB.

Page 128

1        JOEL CHEATWOOD
2     Q.   Other than the Roxbury mosque,
3  what information did you have?
4         MR. GRYGIEL: Object to the
5  form.
6     A.   The information came strictly
7  from the confidential source who had
8  expertise in this area, and with the
9  evidence, made a definitive conclusion that
10  this was the case.
11         MR. HALEY: Off the record.
12         (A luncheon recess was taken
13  from 12:23 p.m. to 1:18 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25



Page 129

JOEL CHEATWOOD

1    A F T E R N O O N   S E S S I O N
2
3    (Time Resumed:  1:18 p.m.)
4        JOEL CHEATWOOD,
5    resumed and testified as follows:
6    CONTINUED EXAMINATION
7    BY MR. HALEY:
8        Q.    Mr. Cheatwood, I show you what's
9    been marked previously in this matter as
10   Exhibit 82, which is an e-mail from Dan
11   Andros to Stu Burguiere.
12            Who is Mr. Andros?
13       A.    Mr. Andros is a writer on
14   Glenn's television program.
15       Q.    How about Mr. Burguiere?
16       A.    The executive producer and
17   co-host of the radio program.
18       Q.    And starting at 7:01 a.m. in the
19   morning, Mr. Andros is writing to Mr.
20   Burguiere, asking:  "How are you feeling
21   about this story now?"
22            And Mr. Burguiere responds, the
23   first line, at 8:02 a.m.:
24            "Not wonderful.  It seems like
25   it will translate in a difficult to

Page 130

JOEL CHEATWOOD

1    understand set of accusation."
2
3            And then Mr. Andros responds in
4    kind at 9:36 a.m.:
5            "Yeah, we were talking after the
6    meeting, and I said I think as long as we
7    minimize them connecting the dots and just
8    point out the facts that we were being
9    told, I think it can be strong."
10           Was there a meeting Monday
11   morning to discuss this story?
12       MR. GRYGIEL:  Object to the
13   form.
14       A.    To the best of my recollection,
15   yes.
16       Q.    Were you part of that?
17       A.    I believe so.
18       Q.    Were Mr. Andros and Mr.
19   Burguiere present at that meeting?
20       A.    I believe they were.
21       Q.    Was there some concern expressed
22   at the meeting about the story as it
23   related to Mr. Alharbi?
24       A.    The only concern that I recall
25   being expressed was making it

Page 131

JOEL CHEATWOOD

1    understandable and clear and explaining
2    fully the facts that we were presenting.
3        Q.    Did this sentiment that Mr.
4    Burguiere expressed, is this in response to
5    the inquiry -- "How are you feeling about
6    this story?" "Not wonderful." -- was that
7    something that he expressed at the time of
8    the meeting?
9        MR. GRYGIEL:  Object to the
10   form.
11       A.    Not that I recall, no.
12       Q.    Did anybody else express similar
13   concerns about whether or not you should go
14   forward with the story?
15       A.    No.  The only concerns were that
16   we presented in a clear and completely
17   factual fashion.
18       Q.    Did you have any conversations
19   with Mr. Beck in which you expressed any
20   personal concerns about the story?
21       A.    No concerns about the validity
22   or the facts presented, no.
23            (Exhibit 110 for
24   identification, Series of e-mail messages,

Page 132

JOEL CHEATWOOD

1    including e-mail from Mr. Cheatwood to
2    Messrs. Weasel, Hall & Baker, production
3    numbers 35260 through 35261.)
4    BY MR. HALEY:
5        Q.    Mr. Cheatwood, I show you what's
6    been marked as 110, a series of e-mail
7    messages, Bates stamps 35260 and 35261.
8            In the middle of the page, there
9    is a message from you to Joe Weasel, Glen
10   Hall and Scott Baker saying that:
11           "You can use this information.
12   I like the idea of providing their take and
13   attaching our questions in terms of the TV
14   show."
15           And this is in response to Mr.
16   Weasel's e-mail, with the subject line of
17   which is "On background from Sara."
18           Sara was who?
19       A.    I believe this is Sara Carter.
20       Q.    And where he says:
21           "Just heard from Sara, whose
22   been working her sources inside the" -- and
23   that indication there is redacted.
24           Do you know where that was?



Page 133

1              JOEL CHEATWOOD
2     A.   I believe it was the FBI.
3         MR. GRYGIEL:  Just so the record
4  is clear, I believe that that redaction was
5  incorrect in terms of the identification of
6  a confidential source.
7         That was relied on by TheBlaze
8  personnel for the broadcast at issue in the
9  case.
10 BY MR. HALEY:
11     Q.   So on further down the page
12 there, the next redaction, which says
13 "'blank' officials," that would be FBI
14 officials?
15     A.   I believe that's true.
16     Q.   So then she goes on.
17         It says:  "FBI officials (who
18 she's known for many years) tell her that
19 Alharbi was placed on the no-fly list,
20 terror watch-list, after he was detained as
21 a person of interest.
22         "This was done as a precaution
23 before they had determined whether he was
24 more than a witness from the scene of the
25 crime."

Page 134

1              JOEL CHEATWOOD
2         Why did you discount that
3  information?
4         MR. GRYGIEL:  Object to the
5  form.
6     A.   We took this information back to
7  our confidential sources, checked against
8  their facts, and with their connection to
9  the case, and found this not to be the
10 case.
11         Again, we also determined that
12 Sara's contacts at the FBI did not have a
13 direct connection to the Boston bombing
14 itself, whereas our confidential sources
15 did.
16     Q.   And so your FBI sources you
17 relied on more than Sara's FBI sources?
18         MR. GRYGIEL:  Object to the form
19 of the question.  And in his answer, Mr.
20 Cheatwood did not identify the agency at
21 which the confidential sources he was
22 relying on were employed.
23         MR. HALEY:  Well, I'll rephrase
24 the question then.
25 BY MR. HALEY:

Page 135

1              JOEL CHEATWOOD
2     Q.   The sources that you had you
3  believed were more credible than sources at
4  the FBI that Sara had?
5     A.   The confidential sources that we
6  had we believe had direct access to the
7  investigation in Boston.  We believe Sara's
8  sources did not.
9     Q.   When you say you believe they
10 had direct access, did you know that they
11 had direct access?
12     A.   Yes, we did.
13     Q.   And how did you know they had
14 direct access?
15     A.   Through the documentation they
16 provided, the information they provided,
17 through the further vetting of their
18 accessibility and access to that
19 information that I did independently.
20     Q.   Did those sources ever appear
21 publicly anywhere else?
22         MR. GRYGIEL:  You can only
23 answer that if it won't -- you're talking
24 about his confidential sources, Peter?
25         MR. HALEY:  Yes.

Page 136

1              JOEL CHEATWOOD
2         MR. GRYGIEL:  First of all, do
3  you know?
4         THE WITNESS:  I do not.
5         MR. GRYGIEL:  So I guess that
6  avoids the problem.
7         MR. HALEY:  Good lawyering.
8  BY MR. HALEY:
9     Q.   And when Mr. Beck spoke about
10 Mr. Alharbi's involvement, based on the
11 confidential sources, did you make any
12 effort to script the program or direct Mr.
13 Beck as the talent to also include the fact
14 that sources within the FBI were saying
15 that this was not the case?
16         MR. GRYGIEL:  Object to the
17 form.
18     A.   Yes.  To the best of my
19 recollection, we actually presented the --
20 every response that the U.S. government
21 made to the accusations that we were
22 making.
23     Q.   Mr. Cheatwood, I show you what's
24 been previously marked as Exhibit 83 in
25 this action.  It's an e-mail from Virginia



Page 137

1           JOEL CHEATWOOD
2   Grace to you on Monday at 3:38 p.m.
3           And this is forwarding that same
4   e-mail -- it's not clear to me in the
5   middle of the page there, 2:02 p.m. --
6   where Virginia Grace is thanking you for
7   forwarding the e-mail, and then you say:
8   "Would love to hear what they say."
9           What are you referring to there?
10          MR. GRYGIEL:  Object to the
11  form.
12      A.   I don't recall what that was in
13  reference to.
14      Q.   At the top of the page,
15  Ms. Grace's e-mail says, in reference to a
16  conversation with Andy McCarthy,
17  parenthetically, it says:
18          "In terms of processing
19  212(3)(B) classification, Department of
20  Homeland Security wasn't created when Andy
21  was prosecuting, so he doesn't know the
22  label firsthand.
23          "Steve Emerson said the
24  Department of Homeland Security file has a
25  prior event number on it, is a code.

Page 138

1           JOEL CHEATWOOD
2   Doesn't know what it meant and what
3   transpired beforehand."
4           Did you make an effort to
5   determine from somebody other than Mr.
6   McCarthy or Mr. Emerson the significance of
7   the 212(3)(B) classification?
8           MR. GRYGIEL:  Object to the
9   form.
10      A.   Yes, we did.
11      Q.   And that was by contacting your
12  confidential sources?
13      A.   Primarily, confidential sources.
14          Also, other experts in the
15  field, including a couple of academic
16  professors who actually specialize in this
17  part of the law.  I don't recall who they
18  were and I didn't make the direct contact.
19      Q.   Who made the direct contact?
20      A.   I believe Joe Weasel's team.
21      Q.   When you say "Joe Weasel's
22  team," who is included in that?
23      A.   That would be Tom Orr, Ryan Cost
24  and Nick Jones and Kate Wilke.
25      Q.   Was there any written work

Page 139

1           JOEL CHEATWOOD
2   product as a result of that?
3           Did you receive an opinion or a
4   treatus or anything else as a result from
5   those experts?
6           MR. GRYGIEL:  Object to the
7   form.
8       A.   The only thing that I recall is
9   I recall seeing an e-mail.  I'm not sure if
10  it was directed to me initially or I was
11  copied on it, that outlined the explanation
12  of 212(3)(B).
13          (Exhibit 111 for
14  identification, Series of e-mail messages,
15  including e-mail from Mr. Baker to Mr.
16  Cheatwood, cc to Messrs. Hall & Weasel,
17  production numbers 36227 through 36228.)
18  BY MR. HALEY:
19      Q.   Mr. Cheatwood, I show you what's
20  marked as Exhibit 11, which is a series of
21  e-mail messages with the Bates stamps 36227
22  and 36228, and at the top there's an e-mail
23  from Scott Baker to you, copying Mr. Hall
24  and Mr. Weasel.
25          Who is Mr. Baker referring to

Page 140

1           JOEL CHEATWOOD
2   there where he says: "And if Starnes is
3   right, that he stands by the story, which
4   he told Billy too."
5       A.   I believe he is referring to
6   Todd Starnes, who was a digital reporter
7   for foxnews.com.
8       Q.   And who is Billy?
9       A.   Billy, I believe he's referring
10  to Billy Hallowell, who is a writer for
11  theblaze.com.
12      Q.   Mr. Cheatwood, I show you what's
13  been previously marked as Exhibit 84 in
14  this action, a series of e-mail messages.
15          In the middle of the page,
16  there's an e-mail from you to Joe Weasel
17  dated Monday, April 22nd at 3:52 p.m., and
18  the subject is "On background from Sara,"
19  and you're asking Mr. Weasel:
20          "Have you been able to share
21  with Sara what your sources are saying and
22  the level of confidence you have in them?"
23          Do you know if Mr. Weasel did
24  that?
25      A.   Yes, I believe he did.



Page 141

1        JOEL CHEATWOOD
2    Q.    And Mr. Weasel says:
3        "Yes, but that's what we were
4    reviewing tomorrow, so I can go over all my
5    notes and show her."
6        So that review would have been
7    on Tuesday, April 23rd; is that correct?
8        MR. GRYGIEL:  Object.
9        Calls for speculation.
10    A.    I would have no way of knowing
11    that for sure based on the e-mail.  I would
12    assume that to be.
13    Q.    At the top of the page, your
14    message to Mr. Weasel at 4:05 p.m. on
15    Monday, April 22nd, is:
16        "Still feel solid or did we jump
17    the gun?"
18        Did you have some concern that
19    TheBlaze had jumped the gun in reporting
20    the story?
21        MR. GRYGIEL:  Object to the
22    form.
23    A.    I did not.
24        In fact, this was a question
25    that I asked in a variety of different ways

Page 142

1        JOEL CHEATWOOD
2    of Mr. Weasel, and all of those involved
3    with the story many, many times throughout
4    the process.
5        In my years of experience, what
6    I've always been able to do with this sort
7    of investigative story is challenge those
8    who are working on it, and ensuring that
9    their confidence level remains high, that
10    we're not missing anything, and this was
11    what I was doing with Mr. Weasel.
12    Q.    At this point, had your
13    confidential sources told you that Mr.
14    Alharbi was involved in directing and
15    funding the Boston Marathon attacks?
16    A.    At this time, they believed he
17    was involved in funding and organizing.
18    Q.    Did their statements to you
19    about Mr. Alharbi's involvement change at
20    all during this period?  Did they become
21    more sure or less sure at a certain point
22    in time?
23    A.    I would say they, from the
24    beginning, knew that there was involvement
25    without a shadow of a doubt.

Page 143

1        JOEL CHEATWOOD
2        In the very beginning, they
3    didn't know exactly the role, but that
4    became apparent and specific over a period
5    of time.  I don't think they became more
6    sure.  I think they collected more evidence
7    that supported the finding.
8    Q.    But at this point, on Monday,
9    April 22nd at 4:05 p.m., you are, based on
10    the confidential sources, sure that Mr.
11    Alharbi had a role in funding the Boston
12    Marathon attacks?
13    A.    Yes.  At this time, our
14    confidential sources were adamant that he
15    had a role in funding and organizing.
16    Q.    And they had been adamant as of
17    what date?
18        MR. GRYGIEL:  If you know.
19    A.    I really don't know the exact
20    date.
21    Q.    I direct your attention to
22    Exhibit 68, and the second tab there, which
23    is a transcript from Monday, April 22,
24    2013, and my question relates to page 23 of
25    the transcript, which bears the Bates stamp

Page 144

1        JOEL CHEATWOOD
2    number 294.
3        There, at the top of the page,
4    Mr. Beck says to Mr. Burguiere:
5        "Stu - you know we are working
6    with people at very high levels, and those
7    people are being threatened with 20 years
8    in prison.  20 years in prison for trying
9    to alert the press."
10        Were you aware, Mr. Cheatwood,
11    that the confidential sources were being
12    threatened with 20 years in prison?
13        MR. GRYGIEL:  Again, you can
14    answer the question, Joel, if you're
15    comfortable in doing so, you won't be
16    identifying the source or sources.
17    A.    We had been alerted from our
18    confidential sources that there could be
19    ramifications.  They were not specific to
20    us, necessarily, as to length of time, but
21    that there could be ramifications beyond
22    their termination.
23    Q.    And directing your attention to
24    page 38 of the transcript, at the bottom of
25    the page there, Mr. Beck, starting on line



Page 145

1              JOEL CHEATWOOD
2  21, says:
3         "Because I think it would have
4  been much better if CNN, ABC and NBC would
5  have broken this, and I also think it would
6  have been much better if the federal
7  government would have come out."
8         Did you make efforts, Mr.
9  Cheatwood, to get CNN, ABC and NBC to go
10  with this story?
11         MR. GRYGIEL:  Objection.
12         Asked and answered.  You can
13  answer.
14     A.   We specifically reached out to
15  ABC. I don't recall whether or not we made
16  specific overtures to CNN and NBC.
17     Q.   And those outlets did not
18  proceed with the same story; is that
19  correct?
20     A.   I don't know exactly to what
21  extent they covered the story.
22     Q.   On the next page of the
23  transcript, page 39, Mr. Beck states on
24  line 3: "By Wednesday afternoon, we knew
25  it to be true."  So that would have been on

Page 146

1              JOEL CHEATWOOD
2  April 17th.
3         Is that consistent with your
4  memory of what you knew about Mr. Alharbi's
5  involvement?
6         MR. GRYGIEL:  Object to the
7  form.
8     A.   To the best of my recollection,
9  by Wednesday afternoon, we had a -- what I
10  would term as a critical mass of evidence
11  through our confidential sources that
12  definitively pointed to Mr. Alharbi.
13     Q.   And pointed to him as somebody
14  who funded the Boston Marathon attacks?
15     A.   Definitively pointed to his
16  involvement, most likely as the funder
17  and/or organizer.
18     Q.   At the bottom of the page 39,
19  Mr. Beck says on line 25:
20         "And now the government is out
21  and out lying to you.  They are engaging in
22  a disinformation campaign to discredit and
23  destroy."
24         What information did you have on
25  April 22nd that the United States

Page 147

1              JOEL CHEATWOOD
2  government was engaging in a disinformation
3  campaign about this story?
4         MR. GRYGIEL:  Object to the
5  form.
6     A.   The information provided by our
7  confidential sources who were directly
8  connected to the investigation was in
9  direct contrast to what the U.S. government
10  was putting out in terms of their
11  information.
12         We would take every reason,
13  excuse, remedy to the situation the U.S.
14  government would provide back to our
15  confidential sources, who would refute and
16  disprove it through the evidence that they
17  had direct access to.
18     Q.   And towards the bottom of the
19  page, on page 40, on line 17, Mr. Beck
20  says: "But the first one was caught on
21  Monday, and we don't know at this point.  I
22  can speculate, but I won't at this hour.  I
23  can speculate, and I bet you can draw your
24  own conclusions as well as how he was
25  involved, but we do know that he was

Page 148

1              JOEL CHEATWOOD
2  involved."
3         So was there some uncertainty on
4  Monday, April 22nd about the nature of Mr.
5  Alharbi's involvement?
6         MR. GRYGIEL:  Object to the
7  form.
8     A.   As of April 22nd, we knew that,
9  according to our confidential sources, his
10  involvement had been as fundraiser and
11  organizer.
12     Q.   Do you know why Mr. Beck is
13  saying "We don't know how he was involved"?
14     A.   I do not.
15     Q.   Directing your attention to page
16  49 of the transcript, there on line 12, Mr.
17  Beck is saying: "Our president of
18  information and content and news on
19  TheBlaze, not only did he reach out inside
20  of these monolithic corporations of the
21  mainstream media and say, 'Guys, you know
22  me, this is right.'"
23         Is that you, Mr. Cheatwood?
24         Were you, in fact, at this time,
25  in April of 2013, the president of



Page 149

1          JOEL CHEATWOOD
2  information and content as TheBlaze?
3          MR. GRYGIEL: Object to the
4  form.
5      A.   He is referring to me.
6      Q.   Did you have a conversation with
7  people within the mainstream media
8  referring to: Guys, you know me.  This is
9  right?
10     A.   As I've previously stated, the
11 approach was made to the Wall Street
12 Journal.  The approach -- not by me
13 directly -- to ABC, but I definitively did
14 talk to the Wall Street Journal and made an
15 overture to Fox News.
16     Q.   But you don't remember who you
17 talked to at The Wall Street Journal;
18 right?
19         MR. GRYGIEL: Objection.
20     A.   No.
21     Q.   And the overture to Fox News is
22 you left a voicemail message with Mr.
23 Hannity's producer?
24     A.   That's correct.
25     Q.   What does Mr. Beck mean by the

Page 150

1          JOEL CHEATWOOD
2  word "mainstream media," do you know?
3      A.   Generally speaking, the
4  mainstream media --
5          MR. GRYGIEL: Objection.
6          You can answer if you can read
7  Glenn's mind.
8      A.   I don't know exactly what his
9  definition is.
10         The mainstream media commonly is
11 the primary broadcast and cable news
12 networks and publications.
13     Q.   Directing your attention on page
14 57 of Exhibit 68, and the Bates stamp
15 number 328, continuing with the transcript
16 from Monday, April 22nd, there on 12, Mr.
17 Beck says: "Abdul Rahman Ali Alharbi, his
18 clan is heavy with al Qaeda links."
19         What information did you have on
20 Monday, April 22nd that Mr. Alharbi and his
21 relatives were linked to people who were
22 part of al Qaeda?
23     A.   Our confidential sources had
24 consistently told us that there were links
25 to terrorism in his family and in his

Page 151

1          JOEL CHEATWOOD
2  background, and they were adamant about
3  that, without being completely specific as
4  to what branches of terrorism.
5      Q.   Were you aware that Alharbi was
6  a very common name within Saudi Arabia?
7      A.   Yes, we were.
8      Q.   But you believed there was
9  information that connected Mr. Alharbi's
10 direct family to terrorists that were a
11 part of al Qaeda?
12         MR. GRYGIEL: Object to the
13 form.
14     A.   Based on our confidential
15 sources, that was the case, yes.
16     Q.   What did your confidential
17 sources tell you about those links?
18     A.   Did not specify, again, as to
19 what branch of terrorism or what group
20 necessarily specifically he had the links
21 to, but indicated there was a family
22 history and a connection to known
23 terrorists.
24     Q.   Directing your attention to page
25 80 of the transcript, the Bates stamp

Page 152

1          JOEL CHEATWOOD
2  number 351 in the lower right-hand corner,
3  there, on line 9, Mr. Beck is talking about
4  the staff, saying:
5          "They've been working around the
6  clock.  They are very tired."
7          And says on line 11:
8          "We are very short-staffed."
9          Was that true, that the staff at
10 TheBlaze was less than what it needed to
11 be?
12         MR. GRYGIEL: Object to the
13 form.
14     A.   For the purposes of reporting
15 this story, no.  We had confidential
16 sources that gave us access that no other
17 media outlet had directly to the
18 investigation.
19     Q.   Why was it that you thought the
20 confidential sources were speaking to you
21 instead of other media outlets?
22         MR. GRYGIEL: Objection.
23     A.   I can't answer that.  I don't
24 know.
25     Q.   Mr. Cheatwood, I show you what's



Page 153

1        JOEL CHEATWOOD
2  been marked as Exhibit 85 in this action,
3  which is an e-mail from you to Joe Weasel
4  on Monday evening, April 22nd at 6:53 p.m.,
5  forwarding a message from Mr. Beck in which
6  he is reporting something on Twitter that
7  appears to be information reported from
8  Brett Baier at Fox News; is that correct?
9        MR. GRYGIEL:  Object to the
10 form.
11     A.    I believe that's correct.
12     Q.    Do you know why Mr. Beck was
13 concerned with that?
14        MR. GRYGIEL:  Objection.
15     A.    To the best of my recollection,
16 Mr. Baier had issued a Tweet that talked
17 about the documents regarding Mr. Alharbi
18 and indicated he had been told it was a
19 case of mistaken identity.
20     Q.    Did you believe Mr. Baier was
21 wrong in that instance?
22     A.    Yes, I did.
23     Q.    Mr. Cheatwood, I show you what's
24 been marked as Exhibit 86, which is an
25 e-mail from Scott Baker to you, copy to Joe

Page 154

1        JOEL CHEATWOOD
2  Weasel and Glen Hall, and he says:
3        "He's running Jason's copy by
4  you before we publish."
5     There's a redaction there on
6  line 3 where it says: "The Saudi national
7  who was initially a person of interest in
8  the Boston bombings was placed on a no-fly
9  list or terror watch-list after he was
10 detained, and before federal authorities
11 determined whether he was involved in the
12 attack or just a mere witness."
13     Do you know who that is?
14        MR. GRYGIEL:  Same objection
15 again, if the answer requires
16 identification of a confidential source.
17     A.    I do not.
18     Q.    Do you know if this information
19 was published by TheBlaze?
20     A.    I believe it was, yes.
21        MR. GRYGIEL:  When you say
22 "TheBlaze," we're talking about the
23 website?
24        MR. HALEY:  The website.
25     A.    Yes.

Page 155

1        JOEL CHEATWOOD
2     Q.    Mr. Cheatwood, I show what's
3  marked as Exhibit 87, which is a
4  continuation of the earlier e-mails.
5        The e-mail where Mr. Baker is
6  running copy by you at 6:52 is then
7  forwarded by you at 7:16 back to Mr. Baker,
8  Joe Weasel and Glen Hall.
9        And then you're sending an
10 e-mail at 8:10 p.m. on the first page of
11 the exhibit, to Mr. Weasel:
12        "Sent you the Tweet.  We need to
13 have someone Tweet and ask who they are.
14 He's buying mistaken identity.  Wasn't that
15 last week's excuse?  Can Duncan's office
16 explain?"
17        The "Duncan" that you're
18 referring to there is Congressman Duncan?
19        MR. GRYGIEL:  Object to the
20 form.
21     A.    Yes, that's correct.
22     Q.    And the Tweet you're referring
23 to there, is that the Tweet from Mr. Baier?
24     A.    Yes, it is.
25     Q.    So Mr. Weasel is asking:  "Who

Page 156

1        JOEL CHEATWOOD
2  is our Twitter person?"
3        And then you respond by saying:
4        "Sara Johnson, but she's easily
5  traceable.  Better have someone like Tom
6  O'Ryan Tweet and see what he says.  I
7  thought Duncan's guy talked to Brett."
8        Who is "Duncan's guy"?
9        MR. GRYGIEL:  Object to the
10 form.
11     A.    I don't recall what his guy's
12 name was.
13     Q.    But what was his relationship to
14 Congressman Duncan?
15     A.    My understanding was, he was a
16 top aide in the Congressman's office.
17     Q.    And why were you concerned with
18 whether or not a Tweet from Ms. Johnson
19 would be traceable?
20     A.    At that point, we wanted to
21 reach out to Brett to have him tell us who
22 he was quoting in terms of his information,
23 and we felt that we wanted to do it without
24 bringing any attention that might be
25 negative for him.



Page 157

1        JOEL CHEATWOOD
2     Q.    And why would a Tweet from
3   Ms. Johnson be negative for Mr. Baier?
4     A.    Because Tweets are public.  We
5   didn't want to start anything from a public
6   standpoint.  We had hoped to just reach out
7   to him privately and try to get the source
8   of his information.
9     Q.    What would prevent you from
10  simply calling Mr. Baier and asking him
11  that?
12    A.    I believe, to the best of my
13  recollection, a call was placed, was not
14  successful.  We didn't reach him.  We were
15  looking for alternative means to reach him.
16    Q.    Your e-mail back to Mr. Weasel
17  at 8:15 p.m. says:
18        "Ugh.  Feel like we're pushing
19  the boulder up the hill and a bunch of
20  people keep jumping on for the ride."
21        What did you mean by that?
22    A.    At this point, the government
23  was changing their story and putting out
24  what we regarded, based on our confidential
25  sources, as pure misinformation and

Page 158

1        JOEL CHEATWOOD
2   disinformation to the point that we were
3   spending an enormous amount of time
4   disproving the assertions that the
5   government was offering.  And it felt like
6   we were pushing the boulder up the hill in
7   trying to keep pace with the disinformation
8   they were providing.
9     Q.    When you say "The problem is, we
10  can't maintain momentum," what did you mean
11  by that?
12    A.    In a story like this, where it's
13  unfolding and continuing to be organic in
14  terms of its development, you want to
15  create new information, develop new
16  information through facts and try to expand
17  upon the information you have.
18        It was difficult to maintain
19  that effort because we were spending so
20  much time going back to our confidential
21  sources with the various elements of
22  misinformation and disinformation being put
23  out by the government.
24    Q.    And by "momentum," did you also
25  mean viewership?

Page 159

1        JOEL CHEATWOOD
2     A.    No.
3     Q.    And wouldn't that be part of
4   producing the news, though, would be to
5   attract more viewers to the website, the
6   radio program, the television program?
7        MR. GRYGIEL:  Objection.
8     A.    At this point in time,
9   viewership and the levels of viewership
10  were the least of my concerns.
11    Q.    At some point in time, were they
12  a greater concern?
13    A.    Not in the case of this story,
14  no.
15    Q.    TheBlaze is a for-profit entity;
16  correct?
17    A.    Yes, it is.
18    Q.    And the more people who
19  subscribe to it or view it, the greater its
20  economic portions will be?
21    A.    Theoretically, yes.
22    Q.    When you say "theoretically," is
23  there some reason why practically that
24  wouldn't be the case?
25    A.    There are a variety of aspects

Page 160

1        JOEL CHEATWOOD
2   and conditions that go into running a
3   business, a media business.
4        Additional subscriptions of
5   viewership or readership doesn't always
6   translate into pure profit.
7     Q.    But it generally does translate
8   into greater revenue; is that correct?
9     A.    Greater cash flow.  Not
10  necessarily revenue.
11    Q.    What does the difference between
12  cash flow and revenue mean?
13    A.    Well, net revenue.
14    Q.    So income?
15        What I meant by revenue is cash
16  in, and income being the profit part of
17  that.
18        MR. GRYGIEL:  Object to the
19  form.
20    A.    Well, it can result in greater
21  overall cash flow; not necessarily net
22  revenue, depending on circumstances.
23        (Exhibit 112 for
24  identification, E-mail from Mr. Iglar to
25  Mr. Cheatwood.)



Page 161

1       JOEL CHEATWOOD
2   BY MR. HALEY:
3       Q.   Mr. Cheatwood, I show you what's
4   marked as Exhibit 112, which is an e-mail
5   from Mark Iglar to you on Monday,
6   April 22nd at 10:58 p.m.
7       Who is Mr. Iglar?
8       A.   At that point, Mr. Iglar was the
9   chief security officer from Gavin de Becker
10  attached to Glenn Beck.
11      Q.   Who is Gavin de Becker?
12      A.   Gavin de Becker is the name of a
13  person and also a security firm that
14  provided security for Mr. Beck.
15      Q.   And was Mr. Iglar, part of his
16  role to provide information to TheBlaze?
17      A.   Mr. Iglar's role was to pass
18  along the e-mails to Glenn.  Glenn, for
19  reasons of privacy, did not maintain a
20  private e-mail account.
21      Q.   And Mr. Iglar acted as, what,
22  somebody who sent along Mr. Beck's e-mails?
23      A.   Typically, an e-mail that was
24  sent to Mark Iglar for Glenn resulted in
25  Mark handing his iPhone to Glenn so he

Page 162

1       JOEL CHEATWOOD
2   could read it.
3       Q.   So your e-mail at Monday,
4   April 22nd at 9:49 p.m. to Mr. Iglar was,
5   by sending it to Mr. Iglar, you were
6   intending that it be received by Mr. Beck?
7       A.   That's correct.
8       Q.   Mr. Cheatwood, I show you what's
9   been previously marked in this matter as
10  Exhibit 88, which is a transcript of a
11  Congressional hearing before the Senate
12  Judiciary Committee on April 23, 2013, and
13  at the page numbered 11550-0013, which
14  appears on the lower right-hand corner of
15  the document, Secretary Napolitano is asked
16  a question by Senator Grassley:
17      "With regard to the Saudi
18  student, was he on a watch-list; and, if
19  so, how did he obtain a student Visa?"
20      And Secretary Napolitano
21  responds by saying:
22      "He was not on a watch-list.
23  What happened is, this student was --
24  really, when you back it -- he was in the
25  wrong place at the wrong time.  He was

Page 163

1       JOEL CHEATWOOD
2   never a subject -- he was never even really
3   a person of interest.
4       "Because he was being
5   interviewed, he was at that point put on a
6   watch-list.  And then when it was quickly
7   determined he had nothing to do with the
8   bombing, the watch-listing status was
9   removed."
10      Q.   Did you become aware of this
11  testimony by Secretary Napolitano?
12      A.   Yes.
13      Q.   And did you believe it to be
14  inaccurate?
15      A.   I believed it to be patently
16  false.
17      Q.   And the basis of that belief was
18  what?
19      A.   The information and evidence
20  provided by multiple confidential sources.
21      Q.   And the multiple confidential
22  sources were the four sources you spoke
23  about earlier; correct?
24      A.   That's correct.
25      Q.   And after this testimony was

Page 164

1       JOEL CHEATWOOD
2   provided by Secretary Napolitano, did you
3   go back to those sources to ask them about
4   this?
5       A.   Absolutely.  One of many, many,
6   many times we went back to our confidential
7   sources to check the information the
8   government was providing against the facts
9   of the case.
10      Q.   And what did the confidential
11  sources say to you?
12      A.   They said the statement was
13  patently false.
14      Q.   And was that all four sources or
15  one?
16      A.   It, as I recall, was all four.
17      Q.   Did you have any of those
18  conversations yourself?
19      A.   I did not.
20      Q.   Who had those conversations?
21      A.   Joe Weasel.
22      Q.   Did you have any understanding
23  or any belief as to why Secretary
24  Napolitano would provide testimony that was
25  false?



JOEL CHEATWOOD                                   March 24, 2016
ALHARBI vs. BECK                                       165–168

Page 165

JOEL CHEATWOOD

1
2      A.   I couldn't tell you.
3      Q.   Mr. Cheatwood, I show you what's
4   been previously marked as Exhibit 89 in
5   this matter, which is an e-mail to Joe
6   Weasel, dated April 23rd at 6:52 a.m., from
7   what appears to be -- do you know if this
8   was from one of your confidential sources?
9      A.   I don't have direct knowledge of
10   that.
11      Q.   Do you know who this was from?
12      A.   I do not.
13      Q.   And the person who is sending
14   the e-mail to Mr. Weasel on Tuesday morning
15   at 6:52 a.m. says, in the next-to-last
16   paragraph: "In all, two Saudis with no
17   proven links to the bombing conspiracy."
18         Did Mr. Weasel ever share that
19   information with you?
20         MR. GRYGIEL:   Just be clear that
21   you read the entire e-mail, Joel, before
22   you answer that question.
23      A.   Okay.  I've read it.
24         Can you repeat the question?
25      Q.   Sure.  Let me do this.  Let me

Page 166

JOEL CHEATWOOD

1
2   also show you Exhibit 90, which Exhibit 90
3   is forwarding that same e-mail to you at
4   9:35 a.m. from Mr. Weasel.
5         And Mr. Weasel forwards it
6   saying: "Absolutely don't forward.  Can't
7   out his e-mail address or code name."
8         Did one of the confidential
9   sources have a code name?
10         MR. GRYGIEL:   If you can answer
11   without identifying the source.
12      A.   I don't recall.  I don't recall
13   a code name.
14      Q.   Does this refresh your
15   recollection about whether the person who
16   sent the 6:52 a.m. e-mail was one of the
17   confidential sources?
18      A.   To the best of my recollection,
19   this was not one of the primary
20   confidential sources.
21      Q.   So when you say "not one of the
22   primary," so that would have been one of
23   the four people that you testified about
24   earlier?
25      A.   This was not one of the four.

Page 167

JOEL CHEATWOOD

1
2      Q.   So in addition to the four
3   primary confidential sources, there was a
4   further confidential or fifth confidential
5   source?
6      A.   There were actually several
7   other confidential sources that we relied
8   on for context and perspective, primarily.
9      Q.   And when Mr. Weasel sent this to
10   you, in which this source is saying "In
11   all, two Saudis with no proven links to the
12   bombing conspiracy," did you ever discuss
13   that with him?
14      A.   Yes, I did.
15      Q.   What discussion did you have
16   with him?
17         MR. GRYGIEL:   Be clear which two
18   Saudis we're talking about here.  You can
19   answer with that --
20         THE WITNESS:   Right.
21      A.   The first thing we did is went
22   back to our primary confidential sources to
23   check the information that had been
24   provided by this source.
25         And, again, they were adamant in

Page 168

JOEL CHEATWOOD

1
2   that the evidence that had been presented
3   and that was continuing to be presented to
4   them linked Alharbi to the conspiracy.
5         The two Saudis that were
6   mentioned in the final -- the
7   second-to-last paragraph did not include
8   Alharbi.
9      Q.   And in the first paragraph,
10   where it says that "Alharbi was not free to
11   leave custody until Wednesday at 5:35 p.m.,
12   when his record was changed and they
13   rescinded the INA 212(a)(3)(B)(i)(II),"
14   that information, that the 212(3)(B) status
15   had been rescinded, did you believe that to
16   be accurate?
17         MR. GRYGIEL:   Object to the
18   form.
19      A.   We knew, according to our
20   confidential sources, that at that point,
21   on Wednesday, the record had been not only
22   rescinded, but removed from circulation.
23      Q.   And did you ever report that?
24      A.   We did.
25      Q.   And when did you report that?



Page 169

1          JOEL CHEATWOOD
2     A.   I believe we reported it, to the
3  best of my recollection, on Wednesday.  It
4  may have been Tuesday.
5     Q.   And Wednesday, the 24th; or
6  Wednesday, the 17th?
7     A.   No.  I'm sorry, it would have
8  been Wednesday, the week of the actual
9  bombing.
10    Q.   So that Wednesday, by the week
11 of the actual bombing, you knew that Mr.
12 Alharbi had not been designated or did not
13 remain as a person designated under
14 212(a)(3)(B)?
15         MR. GRYGIEL:  Object to the
16 form.
17    A.   We knew as of Wednesday that his
18 file had been removed.
19    Q.   Here the source is saying that
20 the status had been rescinded.
21         Did you regard that as meaning
22 the file had been removed?
23    A.   We actually -- almost, as I
24 recall, it was an act that happened in
25 succession.

Page 170

1          JOEL CHEATWOOD
2     They rescinded the 212(a)(3)(B)
3  at the same time that his entire event file
4  was removed from access to law enforcement.
5         MR. HALEY:  Off the record.
6         (A recess was taken.)
7  BY MR. HALEY:
8     Q.   Mr. Cheatwood, if I can direct
9  your attention again to the next tab in
10 Exhibit 68, the transcript, and this is a
11 transcript from the program on April 24,
12 2013, and my question relates to page 10,
13 which has the Bates stamp number 470 on it.
14 On line 14, Mr. Beck says:
15         "I will tell you that, you know,
16 we are working with some extraordinarily
17 brave men and women in the federal law
18 enforcement community, as well as the
19 federal government, that are risking not
20 only their livelihoods, but at this point,
21 are risking their lives to bring this
22 information to us."
23         Did you have any information
24 that people who were providing information
25 to you were risking their lives?

Page 171

1          JOEL CHEATWOOD
2         MR. GRYGIEL:  Objection.
3     A.   We knew based on the information
4  provided to us by our confidential sources
5  that they were taking a risk that certainly
6  would have significant impact on their
7  lives.  That was clear.
8     Q.   Directing your attention to page
9  49 in the transcript, Bates stamp number
10 509, there Mr. Beck is making reference to
11 the event file, and says on line 5:
12         "What does this mean?  That
13 means this guy doesn't have one event.
14 When they opened this while he was at the
15 hospital, they found he's already in the
16 system.  He's already a 212(3)(B)."
17         Was that something that your
18 confidential sources told you, that prior
19 to the Boston Marathon attacks on April 15,
20 2013, Mr. Alharbi had already been
21 classified under Section 212(3)(B)?
22         MR. GRYGIEL:  Object to the
23 form.
24    A.   Our confidential sources, and
25 based on the evidence they provided,

Page 172

1          JOEL CHEATWOOD
2  indicated that there was a prior event, to
3  the best of my knowledge.  The nature of
4  the event was not specified.
5     Q.   If I could direct your attention
6  to the next tab, which is dated May 1,
7  2013, and specifically page 8, which bears
8  the Bates stamp number 830.
9         On line 12, Mr. Beck says:
10         "Theblaze.com had record traffic
11 last month."
12         And goes on, on line 15, to say:
13         "Last month, we had 14 million
14 unique visitors and more than 115 million
15 page views."
16         Was that information accurate,
17 as far as you know?
18    A.   I do not know.
19    Q.   Do you have any reason to
20 believe it's inaccurate?
21    A.   I don't recall the specific
22 numbers.  I really can't speak to its
23 accuracy otherwise.
24    Q.   And then on line 17 at page 12,
25 Bates stamp number 834, on line 17, Mr.



Page 173

1          JOEL CHEATWOOD
2    Beck says:  "If you remember, the person of
3    interest from Saudi Arabia in the Boston
4    Marathon bombing was Alharbi, completely
5    off the DHS radar screen."
6          And then he goes on, on page 13,
7    at line 2, to say:
8          "Nobody from the media cares
9    about this guy."
10         And then he says at line 4:
11         "I don't know how this guy was
12   involved, but he's involved."
13         On May 1st, was it accurate to
14   say that TheBlaze did not know how Mr.
15   Alharbi was involved in the Boston Marathon
16   attacks?
17     A.   No.  Based on the information
18   provided by our chief confidential source
19   and verified by the other confidential
20   sources, the understanding was that he was
21   involved with financing and organizing the
22   Boston bombing.
23     Q.   Do you know why Mr. Beck is
24   saying:  "I don't know how he's involved"?
25     A.   I do not.

Page 174

1          JOEL CHEATWOOD
2      Q.   Do you know why up until this
3    point, May 1, 2013, there's never any
4    reference to Mr. Alharbi's role in funding
5    the attacks?
6          MR. GRYGIEL:  Objection to the
7    question.
8      A.   I don't understand the question.
9      Q.   So from the date of the event,
10   April 15, 2013, to May 1, 2013, shortly
11   thereafter, your testimony was based on
12   your confidential sources, you determined
13   that Mr. Alharbi had a role in funding the
14   attacks.
15         My question is:  Why is there no
16   reference to his role as a funder of the
17   attacks between April 15th and May 1, 2013?
18         MR. GRYGIEL:  Object to the
19   form.
20     A.   At that point, for the period
21   leading up to May 1st, it seemed more
22   important to us to establish his
23   involvement.
24         It was less of a concern as to
25   what specific role he played, but as the

Page 175

1          JOEL CHEATWOOD
2    investigation progressed and as it
3    developed organically, our confidential
4    sources became completely convinced that
5    that had been his role.
6      Q.   And when you say "completely
7    convinced," at what point were they
8    completely convinced, or did they
9    communicate that to you?
10         MR. GRYGIEL:  Object to the
11   form.
12     A.   I don't know what date that they
13   arrived at that.  That was certainly their
14   considered judgement going into this, once
15   the event occurred and once they
16   established he had not actually triggered
17   the bombs themselves.
18         But certainly I would say
19   between May 1st and May 8th, our chief
20   confidential source, who has a deep
21   background in investigating terror cells --
22   how they're created, how they're funded,
23   how they're executed, has a deep background
24   since 2009 in ISB and the operations of
25   that organization, its links to terror --

Page 176

1          JOEL CHEATWOOD
2    became absolutely convinced that that was
3    the role.
4      Q.   Did you know if he ever
5    communicated that to anyone else?
6      A.   I have no idea.
7      Q.   Are you aware of why the
8    government wouldn't have pursued Mr.
9    Alharbi if he had been the person who
10   funded the attacks?
11     A.   You would have to ask them.
12     Q.   Did you ever ask them?
13     A.   Hundreds and hundreds of times.
14     Q.   And what was their response?
15     A.   Typically, no response.
16     Q.   If I could direct your attention
17   to the transcript of broadcast May 8, 2013,
18   and page 21.
19         During this period, May 1st to
20   May 8, 2013, was there continuing
21   communication with the confidential
22   sources?
23     A.   Continuous, yes.
24     Q.   And who was having that
25   communication?



Page 177

JOEL CHEATWOOD

1
2      A.    Joe Weasel.
3      Q.    And what form did the
4   communication take:  E-mail, meetings in
5   person, phone?  Do you know?
6      A.    You would have to ask Joe what
7   the specific connection was.
8          I would -- to the best of my
9   recollection, phone.
10     Q.    And is this a story that you
11  were still pursuing in this period, May 1st
12  to May 8th?
13     A.    Absolutely.
14     Q.    Was there a particular
15  communication between May 1st and May 8th
16  that changed the story or changed the
17  reporting?
18         MR. GRYGIEL:  Object to the
19  form.  There's been no foundation that any
20  reporting has been changed.
21     A.    I would agree.
22         I don't think that the nature of
23  the reporting changed at all.
24     Q.    Well, on May 1, 2013, Mr. Beck
25  states:  "I don't know how Mr. Alharbi was

Page 178

JOEL CHEATWOOD

1
2   involved."
3          Correct?
4      A.    According to the transcript.
5      Q.    Do you have some reason to
6   believe the transcript is inaccurate?
7      A.    I can't verify it myself, but I
8   would assume it's accurate.
9      Q.    And so then, on May 8th, on page
10  21 of the Exhibit 68, Mr. Beck states at
11  line 21:
12         "You have the Saudi that they
13  know in advance, and you know who the Saudi
14  is?  The money man.  That's who the Saudi
15  is.  He's the guy who actually paid for it.
16  He's the money man."
17         So was there something between
18  May 1st and May 8th that you're aware of
19  that would have changed Mr. Beck's
20  reporting or statements on this?
21         MR. GRYGIEL:  Object to the
22  form.
23     A.    To the best of my recollection,
24  there were multiple conversations with our
25  chief confidential source who had continued

Page 179

JOEL CHEATWOOD

1
2   to work that angle of the investigation.
3          And, again, based on his deep
4   knowledge of ISB and terrorism and
5   terrorism cells specifically in that area,
6   combined with the evidence that he had
7   complete access to, had absolutely without
8   a shadow of a doubt come to that
9   conclusion.
10     Q.    And was there a meeting on the
11  morning of May 8th and the afternoon of
12  May 8th to discuss the program?
13     A.    I don't have a specific
14  recollection.  I would assume there was.
15     Q.    And was the Boston Marathon
16  attack to be a subject of the program on
17  that day?
18     A.    I believe it was.
19     Q.    And other than this reference,
20  how come there are no remarks or statements
21  about the attack?
22         MR. GRYGIEL:  Objection.
23     A.    Remarks or statements where?
24     Q.    Well, so the program that day
25  seems to be focused on what's going on in

Page 180

JOEL CHEATWOOD

1
2   Cleveland or what's going on someplace
3   else.  There really isn't a focus on the
4   Boston Marathon attack.
5          This seems to come up as a
6   sideline issue, reviewing the transcript.
7          MR. GRYGIEL:  Objection.
8          You can answer the question if
9   you understand it.
10     A.    Not being involved in the
11  production of the radio program, I don't
12  know why the choice was made.
13     Q.    On page 22 of the transcript,
14  Mr. Burguiere asked Mr. Beck:
15         "I mean, is this -- is this
16  speculation or are you reporting something
17  or somewhere in between?  Is that what
18  we're learning?"
19         Was that an unusual question for
20  Mr. Burguiere to ask?
21     A.    No.  It's in keeping with the
22  nature of their relationship, the roles
23  that they play on the radio show, and
24  Steve, or "Stu," as he's more commonly
25  known as, is always the sort of person who



Page 181

1          JOEL CHEATWOOD
2    asks the questions and forces Glenn to
3    answer.
4        Q.    Your meeting with the primary
5    confidential source in May in D.C., was
6    that before or after May 8th?
7          MR. GRYGIEL: Objection to the
8    question. Can I have it read pack.
9          (Requested portion of record
10    read.)
11          MR. GRYGIEL: The only thing I
12    object to, Peter, just so the record is
13    clear, I don't think Mr. Cheatwood
14    characterized the source he met with as the
15    primary confidential source, as you've been
16    using the term throughout the deposition.
17          MR. HALEY: Okay. Fair enough.
18    BY MR. HALEY:
19        Q.    So your meeting with the source
20    in D.C. in May, was that before or after
21    May 8th?
22        A.    I believe it was after May 8th.
23        Q.    Mr. Cheatwood, I show you what's
24    been marked as Exhibit 96 in this matter,
25    which is an e-mail from Sara Johnson to

Page 182

1          JOEL CHEATWOOD
2    Glen Hall.
3          Have you seen this before?
4        A.    Yes.
5        Q.    And it says there that:
6          "Mr. Beck is going to be pushing
7    212(3)(B) to help spread this story on
8    social. Would you mind asking the editors
9    to use hashtags and Tweets about the doc
10    and related stories."
11          And then in the e-mail at the
12    top of the page, she changes that to:
13          "Glenn Beck would like to use
14    the hashtag Blaze 212(3)(B) instead."
15          Is this something that you were
16    involved with at all?
17        A.    I was made aware of it. I was
18    not directly involved.
19        Q.    And was spreading the story on
20    social media something that was important
21    to TheBlaze?
22        A.    It was important from the
23    context of trying to generate basically a
24    broader exposure to the story.
25        Q.    And why was that important?

Page 183

1          JOEL CHEATWOOD
2        A.    We felt this was a story of
3    great public interest.
4        Q.    Did you receive reports of
5    income and revenues on TheBlaze?
6        A.    I was copied on some. Not all.
7        Q.    Mr. Cheatwood, I show you what's
8    been previously marked as Exhibit 100 in
9    this matter, and it is an e-mail attaching
10    what's referred to as an April SEO report.
11          Have you seen this before?
12        A.    I have not.
13        Q.    Do you know what this is?
14        A.    I do not.
15          (Exhibit 113 for
16    identification, E-mail from Mr. Creter to
17    Mr. Cheatwood, production numbers 35052.)
18    BY MR. HALEY:
19        Q.    Mr. Cheatwood, I show you what's
20    been marked as Exhibit 113, which is an
21    e-mail bearing the Bates stamp number
22    35052.
23          It's an e-mail to you from Mr.
24    Creter at the Gavin de Becker agency.
25          It says that: "We have received

Page 184

1          JOEL CHEATWOOD
2    the below request for further information
3    regarding Abdul Rahman Ali Alharbi."
4          And then it says:
5          "We are not aware of or able to
6    confirm anything related to Abdul Rahman
7    Ali Alharbi."
8          Is this a request that was made
9    by you to the de Becker agency?
10        A.    Yes.
11        Q.    And other than your request to
12    the de Becker agency, did you use any other
13    outside sources to try and develop
14    information on Mr. Alharbi?
15        A.    We used confidential sources,
16    yes.
17        Q.    And those are the confidential
18    sources that you've testified to
19    previously; is that correct?
20        A.    That's correct.
21        Q.    Was there anyone else that you
22    used? Did you employ any law firms or any
23    other investigative agencies?
24        A.    We did not.
25        Q.    And the cc here on Thursday,



JOEL CHEATWOOD                                          March 24, 2016
ALHARBI vs. BECK                                          185–188

Page 185

1        JOEL CHEATWOOD
2  April 25th to Mark Iglar, or, more
3  importantly, your message at the bottom of
4  the page at 7:43 a.m., that was a message
5  that was intended to be directed to Mr.
6  Beck?
7      A.   No.  This was directed to Mark
8  Iglar, who was the chief agent for Gavin de
9  Becker attached to Glenn's security detail.
10     Q.   So why is the subject:  "For
11  GB"?
12     A.   This was, as I recall, resulting
13  in a conversation that I had had with
14  Glenn, where he suggested that Gavin de
15  Becker's organization might be able to
16  develop information on Mr. Alharbi in Saudi
17  Arabia.
18     Q.   Mr. Cheatwood, I show you what's
19  previously been marked as Exhibit 101,
20  which is a message from Joe Weasel to
21  Patrick Poole.
22         And Mr. Poole, in the first
23  e-mail message at 11:10 a.m., is stating
24  that:  "Somebody is calling in this week
25  and he's meeting -- he will have his union

Page 186

1  rep with him."
2         Was this person one of your
3  confidential sources?
4         MR. GRYGIEL:  Object to the
5  extent, if answering this question, Joel,
6  would provide information that could lead
7  to disclosure of the source's identity, if
8  it's a situation where you would want to
9  invoke the First Amendment Reporter's
10  Privilege, if you know.
11     A.   I have no direct knowledge of
12  who he was speaking about.
13     Q.   Do you know why Mr. Weasel is
14  writing to Mr. Poole at the top of the
15  page:  "Maybe in the end this will be a
16  good thing"?
17     A.   I do not.
18         (Exhibit 114 for
19  identification, Series of e-mail messages,
20  including e-mail from Mr. Joe Strupp to
21  Virginia Grace.)
22  BY MR. HALEY:
23     Q.   Mr. Cheatwood, I show you what's
24  marked as Exhibit 114, which is a series of

Page 187

1        JOEL CHEATWOOD
2  e-mail messages.
3         On the second page is an e-mail
4  from Mr. Joe Strupp at Media Matters to
5  Virginia Grace asking about an e-mail that
6  starts at the bottom of the second page,
7  1136, and goes over to the second page --
8  or the third page, rather, 1137.
9         It appears to be directed to
10  members of Congress.
11         Is this an e-mail that TheBlaze
12  sent out?
13         MR. GRYGIEL:  Which e-mail are
14  we talking about?
15         MR. HALEY:  The e-mail in
16  italics.
17  BY MR. HALEY:
18     Q.   So Mr. Strupp writes:
19         "I'm a reporter working on a
20  potential story on this e-mail (below) you
21  sent to most members of Congress related to
22  the Boston Marathon bombing."
23         And my question to you, Mr.
24  Cheatwood, is:  Did TheBlaze send out this
25  e-mail in italics to most members of

Page 188

1        JOEL CHEATWOOD
2  Congress?
3     A.   Can I take a moment to read
4  this?
5     Q.   Of course.
6     A.   Yes, I believe this was
7  generated by TheBlaze.
8     Q.   What was the purpose of the
9  e-mail?
10         MR. GRYGIEL:  Just so we're
11  clear on the record, when you say
12  "TheBlaze" in that sentence, who are you
13  referring to?
14     A.   This, I believe, was generated
15  -- this actually, I believe, was composed
16  and sent by a producer on Glenn's program,
17  Glenn Beck's program.
18     Q.   Who was the producer?
19     A.   Virginia Grace.
20     Q.   And what was the purpose, if you
21  know, in sending it out?
22     A.   This was a result of I think
23  overall frustration at the stonewalling and
24  disinformation that was being -- really the
25  norm in dealing with government agencies,

Page 189

1          JOEL CHEATWOOD
2    trying to get information and confirmation
3    on this case.
4          The decision was made to reach
5    out to members of Congress to see if they
6    would, in fact, demand action on the part
7    of Janet Napolitano in releasing
8    information and addressing the questions
9    that we had been raising as a news
10   organization.
11       Q.    And on the first page of the
12   exhibit, there's an e-mail from Josh
13   Raffel.
14       Who is Mr. Raffel?
15       A.    At that time, Josh Raffel was a
16   media relations person employed by an
17   outside agency.
18       Q.    And that was HS Strategies or --
19       A.    Yes.
20       Q.    And and Mr. Raffel in his e-mail
21   of April 25th, 3:32 p.m.:  "Can we find the
22   leak?"
23       Do you know what he's referring
24   to there?
25       A.    I believe he's referring to the

Page 190

1          JOEL CHEATWOOD
2    person or individual who might have given
3    this to the Media Matters reporter.
4          MR. HALEY:  I don't think I have
5    too much more.
6          I'll take a few minutes to look
7    at my notes, make sure I don't have
8    anything else, and I'll get you guys out of
9    here.
10         (A recess was taken.)
11   BY MR. HALEY:
12       Q.    Mr. Cheatwood, with respect to
13   the story about Mr. Alharbi's funding the
14   Boston Marathon attacks, is it fair to say
15   that TheBlaze was unsuccessful in ever
16   getting a source to publicly go on the
17   record to verify that story?
18         MR. GRYGIEL:  Object to the
19   form.
20       A.    The information came from
21   confidential sources.  They did not
22   publicly go on the record.
23       Q.    And was that a concern to you,
24   that you couldn't get anyone to publicly go
25   on the record?

Page 191

1          JOEL CHEATWOOD
2    A.    Not in the sense of the validity
3    of the information.
4          As a journalist, you always want
5    someone to step forward, if at all
6    possible, and reveal themselves with the
7    information.  This was not possible in this
8    case and we understood that.  Never doubted
9    the validity of the information.
10       Q.    And with respect to the
11   verifying the information that was provided
12   by the confidential sources, you had the
13   two documents that we reviewed, Exhibit 60
14   and 61, and the information provided to you
15   by the confidential sources; is that
16   correct?
17         MR. GRYGIEL:  Objection.
18         I think that seriously
19   mischaracterizes the testimony, Peter, but
20   you may answer.
21       A.    We literally had hundreds of
22   hours of conversation with multiple
23   conversational sources that supported the
24   facts that we presented.
25       Q.    And those sources were the

Page 192

1          JOEL CHEATWOOD
2    confidential sources?
3    A.    Primarily the confidential
4    sources, but also experts in the area that
5    we relied upon for perspective, context,
6    confirmation, that aided in our painting
7    the full picture.
8        Q.    And those were the experts that
9    you testified about earlier; is that
10   correct?
11       A.    That's correct.
12         MR. HALEY:  I don't have any
13   further questions.
14         I'll suspend to the extent the
15   Court may order the confidential sources
16   disclosed, I'll reserve the right to
17   question Mr. Cheatwood about those sources
18   at that time.
19         MR. GRYGIEL:  And of course we
20   will oppose any such effort to disclose the
21   identity of the sources.
22         One thing we ought to talk
23   about, Peter, is a 30(b)(6) for Premiere.
24         Do you still intend to do that?
25         MR. HALEY:  Can we go off the



Page 193

```
1        JOEL CHEATWOOD
2   record on it?
3        MR. GRYGIEL:  Sure.
4        (Time noted:  2:48 p.m.)
5
6        JOEL CHEATWOOD
7   this _____ day of _____ , 2016.

8   _____
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Subscribed and sworn to before me

Page 194

```
 1         C E R T I F I C A T E
 2
 3       I, Linda J. Greenstein, Professional
 4   Shorthand Reporter and Notary Public in and
 5   for the State of New York, do hereby
 6   certify that, JOEL CHEATWOOD, the witness
 7   whose deposition is hereinbefore set forth,
 8   was duly sworn and that such deposition is
 9   a true record of the testimony given by the
10   witness to the best of my skill and
11   ability.
12       I further certify that I am neither
13   related to or employed by any of the
14   parties in or counsel to this action, nor
15   am I financially interested in the outcome
16   of this action.
17       IN WITNESS WHEREOF, I have hereunto set
18   my hand this 28th day of March 2016.
19
20                    Linda J. Greenstein
21                    Linda J. Greenstein
22
23   My commission expires:   May 17, 2018
24
25
```

Page 195

```
 1                I N D E X
 2
 3
 4   WITNESS          EXAMINED BY       PAGE
 5   JOEL CHEATWOOD    Mr. Haley          4
 6
 7   ---------- INFORMATION REQUESTS ---------
 8   DIRECTIONS:
 9   RULINGS:
10   TO BE FURNISHED:
11   REQUESTS:
12   MOTIONS:
13   -----------  E X H I B I T S  ------------
14   NO.                              PAGE
15
16   (Exhibit 107 for identification,    45
17     Two-page document, Series of
       e-mail messages, including e-mail
18     dated 4/19 from Mr. Cheatwood to
       Mr. Weasel, production numbers
19     35109 through 35110.)
       (Exhibit 108 for identification,   49
20     E-mail from Ms. Grace to Mr.
       Culligan, production numbers
21     35124.)
       (Exhibit 109 for identification,   99
22     E-mail dated 4/20 from Mr.
       Cheatwood to Mr. Weasel,
23     production numbers 35131.)
       (Exhibit 110 for identification,  131
24     Series of e-mail messages,
       including e-mail from Mr.
25     Cheatwood to Messrs. Weasel, Hall
       & Baker, production numbers 35260
       through 35261.)
```

Page 196

```
 1   (Exhibit 111 for identification,   139
     Series of e-mail messages,
 2     including e-mail from Mr. Baker
     to Mr. Cheatwood, cc to Messrs.
 3   Hall & Weasel, production numbers
     36227 through 36228.)
 4   (Exhibit 112 for identification,   160
     E-mail from Mr. Iglar to Mr.
 5   Cheatwood.)
     (Exhibit 113 for identification,   183
 6   E-mail from Mr. Creter to Mr.
     Cheatwood, production numbers
 7   35052.)
     (Exhibit 114 for identification,   186
 8   Series of e-mail messages,
     including e-mail from Mr. Joe
 9   Strupp to Virginia Grace.)
10   (Exhibits retained by counsel)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



JOEL CHEATWOOD                                        March 24, 2016
ALHARBI vs. BECK                                          197–199

Page 197

```
1                    DEPOSITION ERRATA SHEET
2
3
4    Our Assignment No.:  326058
5    Case Caption:  Alharbi v. Glenn Beck, et
6    al.
7
8        DECLARATION UNDER PENALTY OF PERJURY
9
10           I declare under penalty of
11   perjury that I have read the entire
12   transcript of my Deposition taken in the
13   captioned matter or the same has been read
14   to me, and the same is true and accurate,
15   save and except for changes and/or
16   corrections, if any, as indicated by me on
17   the DEPOSITION ERRATA SHEET hereof, with
18   the understanding that I offer these
19   changes as if still under oath.
20        _____
21                    JOEL CHEATWOOD
22   Subscribed and sworn to on the ____ day of
23   _____, 20 ____ before me.
24   _____
     Notary Public,
25   in and for the State of
     _____.
```

Page 198

```
1                    DEPOSITION ERRATA SHEET
2    Page No.____Line No.____Change to:_____
3    _____
4    Reason for change:_____
5    Page No.____Line No.____Change to:_____
6    _____
7    Reason for change:_____
8    Page No.____Line No.____Change to:_____
9    _____
10   Reason for change:_____
11   Page No.____Line No.____Change to:_____
12   _____
13   Reason for change:_____
14   Page No.____Line No.____Change to:_____
15   _____
16   Reason for change:_____
17   Page No.____Line No.____Change to:_____
18   _____
19   Reason for change:_____
20   Page No.____Line No.____Change to:_____
21   _____
22   Reason for change:_____
23   Page No.____Line No.____Change to:_____
24   _____
25   Reason for change:_____
```

Page 199

```
1                    DEPOSITION ERRATA SHEET
2    Page No.____Line No.____Change to:_____
3    _____
4    Reason for change:_____
5    Page No.____Line No.____Change to:_____
6    _____
7    Reason for change:_____
8    Page No.____Line No.____Change to:_____
9    _____
10   Reason for change:_____
11   Page No.____Line No.____Change to:_____
12   _____
13   Reason for change:_____
14   Page No.____Line No.____Change to:_____
15   _____
16   Reason for change:_____
17   Page No.____Line No.____Change to:_____
18   _____
19   Reason for change:_____
20   Page No.____Line No.____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25                    JOEL CHEATWOOD
```



# CHEATWOOD DECLARATION – EXHIBIT 2

**From:** Weasel, Joe
**Sent:** Saturday, April 20, 2013 04:58 PM
**To:** Cheatwood, Joel
**Subject:** Re: just to be safe

EXHIBIT
71
TC 3/7/16

I will get it

Joe Weasel
Sent from my iPhone

On Apr 20, 2013, at 4:57 PM, "Cheatwood, Joel" <████████████> wrote:

if possible need as much detail as we can get on classifying someone 3B. I'd like to show it's not something you would likely do and then say oops we screwed up. the more detail on the process we can reveal w/o getting ███ in trouble the better we'll be. Need credibility.
On Apr 20, 2013, at 4:54 PM, Weasel, Joe wrote:

We will need a few other items - when I get ███ timeline I will forward

Joe Weasel
Sent from my iPhone

On Apr 20, 2013, at 4:48 PM, "Cheatwood, Joel" ███████████████ wrote:

Agree that's why I've been asking for the info so I can craft a narrative. Based on what we know right now (and I'm hoping we know more before Monday) I think the story is…

Who is Abdul Rahman Ali Alharbi?
Where is he?
Why did the FBI consider him a suspect in the first place - is it true that, as law enforcement sources said, he was arrested due to suspicious activity after the bombings; was heard to say "i thought there was a second bomb" when arrested.
Why did they raid his apartment and remove items?
Why did he go from suspect to person of interest to nothing but a victim of the bombing within 24 hours
Why was an event file created that ordered his deportation based on terrorist activity - code 3B with the added verbiage "linked to Boston bombing" - even as the FBI was telling the media he was not in any way connected to the bombing.
Explain how difficult it is to justify that classification - must have evidence/proof; not easily attained and rarely given.
Why was the file abruptly altered 24 hours after it was created…remember, a 3B designation is nearly impossible to get.
Why did the President have a chance meeting with the Saudi Prince?
Why did ICE claim there was another Saudi student about to be deported not Ali Aharbi?
Why did Janet Napalitano call reports of the deportation order patently false?

1

Why did multiple media sources, veteran reporters with multiple sources report the FBI had identified a dark skin male and in fact had him in custody and he was scheduled to appear in federal court before a mysterious bomb threat there and a cancellation of the news conference expected to announce the arrest?

This is kind of where I'm headed right now…not necessarily in that order but really posing questions without drawing the conclusions. Letting the audience do that. Need to look at the column in investor.com again to see if the chance meeting Obama had was with the same Saudi Prince that helped get the families of the 9/11 hijackers out of the country.

thoughts?


On Apr 20, 2013, at 4:36 PM, Weasel, Joe wrote:


I think it would be wise to keep the stuff Glenn mentions on air tightly scripted. I have a few concerns… one, that they will claim this was a police investigation. I want to make sure I get ▓▓▓to look over what we're going to say on air.

For every serve we make they are ready to return. ▓▓▓is very good at knowing their next move.

The one thing that did happen is Congress is taking action and Glenn said if they didn't he was going to let it all out. I say we pound the question: where is he? Did he help identify the two subjects? Did he cut a deal?

We know the file was changed… I suggest we use that, too. I think stating dates and times helps us.

But, let's review it together before he goes public… I really think that would be wise.
--
Joe Weasel
Senior Producer
TheBlaze Documentary & Films
██████████

Confidential                                                                                    DEF-035535

**CHEATWOOD DECLARATION – EXHIBIT 3**

| | |
|---|---|
| From: | Iglar, Mark < ▓▓▓▓▓▓▓▓▓ > |
| Sent: | Monday, April 22, 2013 10:58 PM |
| To: | Cheatwood, Joel; Siegel, Tiffany |
| Cc: | Weasel, Joe |
| Subject: | Re: Questions |

Got it.


Emergencies:
Email is not a reliable method for communicating emergency needs. Senders cannot be certain every email has been send by their server, nor that it has been received by the addressee, nor that it will be seen within the time needed or expected. If you have an emergency matter, it is always wise to make initial contact by telephone.


Confidentiality:
This email, like all GDBA communication, is privileged and confidential. If you are not the addressee or responsible for delivery of the message to the addressee, please notify us immediately, and then delete this email.

........................................................................................................................................

**From:** Cheatwood, Joel
**Sent:** Monday, April 22, 2013 9:49 PM
**To:** Iglar, Mark; Siegel, Tiffany
**Cc:** Weasel, Joe
**Subject:** Questions

Recommended questions for tomorrow.

1) We've had multiple sources confirm that an event file was created by the NTC accusing Abdul Rahman Ali Al-Harbi of being involved in terrorist activities related to the Boston bombing. That file was created Tuesday, the day after the bombing, at 4pm. Since then, according to the various agencies investigating the bombing, Al-Harbi has gone from suspect in custody, to material witness, to witness, to victim. His association with the NTC report has been explained at various times by the FBI, ICE, and DHS as a completely false accusation, a case of mistaken identity, to finally yesterday the DHS calling it basically a rush to judgement on the part of the FBI in the chaos that followed the bombing. They admitted he was placed on the "no fly" list for a time but said that was the FBI's mistake. In fact, the DHS is apparently so confident the FBI made a mistake in originally thinking he was a suspect that they told TheBlaze yesterday that they didn't even know where Al-Harbi was anymore. They did tell us that they WERE deporting a Saudi national. A poor schmuck they say was at the port of Boston just after the bombing buying dates. He too was detained and they found out his visa had expired so they're sending him home. By the way they had no explanation why Al-Harbi had originally been given the worst designation possible on a deportation form - section 212, 3B...terrorism. They're treating it as if that file doesn't exist but we know it does.

2) We'd like to ask the FBI what it was they found in their nine hour search of Abdul Rahman Ali-Harbi's apartment or at the scene of the bombing that led them to ask for and get the section 212, 3B - terrorist activities designation. Every expert in the field we've talked to has said that it's a charge nearly impossible to get approved and yet they somehow did...and then 24 hours later...after two visits to the White House by Saudi ministers...the order was rescinded. Mr. Muller can you explain how this all happened? The House Committee

Confidential                                                                  DEF-035303

on Homeland Security would like to know and I'm sure the American public would as well.

3) On Friday a source at ███ who refused to be named told TheBlaze and other media outlets that our reporting was a clear cut case of mistaken identity, that there were two Saudi nationals that had been in custody by the same or similar name. That the Abdul Rahman Ali Al-Harbi that had been held in custody in the hospital following the bombing...the one we reported had the event file declaring him a terrorist just wasn't the right Abdul Rahman Ali Al-Harbi. There was another, not connected with the Boston bombing, and he was the one being deported. Yesterday ███ told TheBlaze, no it wasn't mistaken identity...it was just an overall mistake by the FBI. Which is it?

4) When asked why Al-Harbi was in Boston when his Visa was issued for attendance at a school in Ohio, DHS initially said again there were two Abdul Rahman Ali Al-Harbi's...one in Findlay, Ohio and one in Boston. Yesterday they told us, no there's only one but he transferred from the Ohio school to one in Boston. No harm, no foul. The University of Findlay, by the way, has no record of a transfer.

A few other questions:

5) Who are the other two men that are living in the Revere, Massachussetts apartment occupied by Al-Harbi and do they have a legal right to be in this country? Might be worth a check INS.

6) Back to the FBI...did the recent decision to purge the manuals of sections dealing with islamic extremism and the resulting change in investigative technique have anything to do with not being able to track the two young men accused of the Boston bombings...even after you were warned by Russia to keep an eye?

7) DHS Secretary Janet Napolitano why are you refusing to give even a classified briefing about the Saudi national or nationals or lack thereof who were going to be or are being deported to the House Committee on Homeland Security? Wouldn't it just be easier to set the record straight? What have you got to hide?

So to the FBI, ICE, and DHS...maybe you should get together, get your stories straight, and try again because I think you can understand why the American public might be a little confused.

Confidential

DEF-035304

# CHEATWOOD DECLARATION – EXHIBIT 4



```
          TECS II - PERSON SUBJECT DISPLAY (1 OF 4)

  TECS RECORD ID P6A29201600CD4              ENTRY 041513 UPDATE 041513
  NAME- LAST ALHARBI                      PHYSICAL IDENTIFIERS
  FIRST ABDULRAHMAN     MID ALI       HISPANIC N RACE U SEX N HAIR      EYES
       IMAGE _        ALIAS ▮ NICKNAME    STC _   HT 000 000 WT 000 000 ENGLSH
  PERSONAL- _                               S/N/T                       MORE _
     DOB ▮▮▮▮▮▮    POB- CNTRY SA ST   CITY                  CTZN SA MORE _
     SSN          MORE _ AFN          MORE  RES      EXC/SITE            MORE _
     PPN K358608         TYPE I CNTRY SA ISSDT         EXPDT             MORE _
  ADDRESS- DATE         STREET                         APT
     CITY                        STATE   CNTRY   ZIP        TYPE   MORE _
  CONTACT- CBP FIELD OPS - BOSTON MA          PHONE     8577531938
     OWNER        KEVIN R CONSIDINE          CASE NBR                   MORE _
  PRIMARY 5  REFER TO CUSTOMS           START 04152013 STOP 04152014 DRY NTFY 1
     STATUS SO SUSPECT, OTHER             NOFLY N SLCTE N CAT
  REMARKS- DATE 041513                                                  MORE _
  SUBJECT OF INTEREST TO THE BOSTON JTTF.  IF ENCOUNTERED PLEASE CONTACT
  RECORD OWNER AT 857-753-1938.
     FIN NUMBER:  1126155934

  NG-SBJ RECORDS
                            THIS RECORD HAS NOT YET BEEN APPROVED
  (F1/F2=HELP) (F3=MENU) (F4=HITLIST) (F8=NEXT PAGE) (F9=VIEW ACCESS) (F11=DISCLOSURE)
  *  3 NCIC RESPONSES; <F12>=CK NCIC*    (F14/15=LNKLIST) (F16=PRINT) (F17=HOMEREC)
  NP ▮ * a                                                          06/Q30
```

Confidential

```
     21:03          TECS II - PERSON SUBJECT DISPLAY (1 OF 4)    D41013  T2MRG0
TID= T:28                                                                T2PRG015
TECS RECORD ID P6A29201600C04                          ENTRY 041513 UPDATE 041513
NAME- LAST ALHARBI                             PHYSICAL IDENTIFIERS
FIRST ABDULRAHMAN    MID ALI         HISPANIC N RACE U SEX M HAIR       EYES
     IMAGE          ALIAS █ NICKNAME        STC _  HT 000 000 WT 000 000 ENGLSH
PERSONAL-                                           S/M/T                 MORE
    DOB ████████     POB- CNTRY SA ST    CITY                   CTZN SA MORE
    SSN         MORE _ FPN          MORE _ RES     EXC/SITE           MORE
    PPN K358606            TYPE I CNTRY SA ISSDT        EXPDT          MORE
ADDRESS- DATE          STREET                                 APT
    CITY                          STATE    CNTRY    ZIP        TYPE     MORE
CONTACT- CBP FIELD OPS - BOSTON MA           PHONE       8577531838
    OWNER        KEVIN R CONSIDINE        CASE NBR                     MORE
PRIMARY 5  REFER TO CUSTOMS              START 04152013 STOP 04152014 ORY NTFY 1
    STATUS SO SUSPECT, OTHER          NOFLY N SLCTE N CAT
REMARKS- DATE 041513                                                  MORE
SUBJECT OF INTEREST TO THE BOSTON JTTF.  IF ENCOUNTERED PLEASE CONTACT
RECORD OWNER AT 857-753-1938.
    FIN NUMBER: 1126155934
NO SUB-RECORDS
                             THIS RECORD HAS NOT YET BEEN APPROVED
(F1/F2=HELP) (F3=MENU) (F4=HITLIST) (F8=NEXT PAGE) (F9=VIEW ACCESS) (F11=DISCLOSURE)
   3 NCIC RESPONSES: <F12>=CK NCIC*   (F14/15=LNKLIST) (F16=PRINT) (F17=HOMEREC)
MR█ _ o                                                               06/030
```

Confidential

DEF-047611

```
                TECS II - PERSON SUBJECT DISPLAY (1 OF 4)

TECS RECORD ID P8A30562100CTG                    ENTRY 041813 UPDATE 041813
NAME- LAST ALHARBI                               PHYSICAL IDENTIFIERS
FIRST ABDULRAHMAN AL HAD          HISPANIC N RACE U SEX M HAIR   EYES
      IMAGE        ALIAS N NICKNAME   STC    HT 000 000 WT 000 000 ENGLSH
PERSONAL-                                   S/M/T                    MORE
DOB ████████      POB- CNTRY SA ST   CITY ALBUKAIRYAH          CTZN SA MORE
SSN         MORE   RFN         MORE   RES       EXC/SITE              MORE
PPN K358608                TYPE I CNTRY SA ISSDT 09262011 EXPDT 09022015  MORE
ADDRESS- DATE 041813   STREET ALOUREEN ALORMAN STREET         APT
CITY ALOASSEM                  STATE      CNTRY SA ZIP      TYPE     MORE
CONTACT- HQ - NATL TARGETING CNTR, OFF OF BO   PHONE    5714681234
OWNER      CARMICHAEL TAYLOR      CASE NBR                           MORE
PRIMARY 4  REFER TO IMMIGRATION      START 04162013 STOP 04162014 QRY NTFY I
STATUS SA SUSPECT, ALIEN         NOFLY N SLCTE N CAT N1 NTC LOOKOUT
REMARKS- DATE 041813                                                MORE
SUBJECT OF RECORD WAS SUBMITTED FOR VISA REVOCATION ON 16 APRIL 2013. IF
ENCOUNTERED, CONTACT THE NTC-P AT 571-468-1000 AND REFERENCE EVENT# 1648943.

NO SUB-RECORDS
PF10 = STANDARDIZED ADDRESS          THIS RECORD HAS NOT YET BEEN APPROVED
(F1/F2=HELP) (F3=MENU) (F4=HITLIST) (F8=NEXT PAGE) (F9=VIEW ACCESS) (F11=DISCLOSURE)
*  3 NCIC RESPONSES, <F12>=CK NCIC*   (F14/15=LNKLIST) (F16=PRINT) (F17=HOMEREC)
NP  ▪  a                                                            06/090
```

Confidential

DEF-047612

```
      21:33             TECS II - PERSON SUBJECT DISPLAY (1 OF 4)    041613   T2NRGO
  TID= T/23                                                                  T2PRG015
  TECS RECORD ID P6A30092800B10   ARMED & DANGEROUS   ENTRY 041613 UPDATE 041613
  NAME- LAST ALHARBI                             PHYSICAL IDENTIFIERS
  FIRST ABDULRAHMAN AL MID              HISPANIC   RACE    SEX M HAIR      EYES
     IMAGE        ALIAS M NICKNAME     STC      HT 000 000 WT            ENGLISH
  PERSONAL-                                      S/MKT                    MORE
     DOB [REDACTED]       POB- CNTRY SA ST   CITY                  CTZN   MORE
  SSN          MORE  AFN           MORE   RES        EXC/SITE  TIP        MORE
  PPN K358608          TYPE   CNTRY SA ISSDT          EXPDT             MORE
  ADDRESS- DATE        STREET                             APT
  CITY                      STATE   CNTRY   ZIP       TYPE   MORE
  CONTACT- NTC 24X7 LOOKOUT DUTY OFFICER         PHONE 5714861000
  OWNER       TERRORIST  SCREENING-CTR  CASE NBR                         MORE
  PRIMARY 1  ARMED & DANGEROUS          START         STOP        CRV NTFY 0
  STATUS ST SUSPECTED TERRORIST        NOFLY Y SLCTE N CAT
  REMARKS- DATE 041613                                                   MORE M
  IF YOU ARE NOT A CBP OFFICER - CONTACT THE TSC AT 866-872-9001.
  ESCORT TO CBP SECONDARY AND DETAIN IS MANDATORY WHETHER OR NOT
  THE OFFICER BELIEVES THERE IS AN EXACT MATCH.
  NO SUB-RECORDS

  (F1/F2=HELP) (F3=MENU) (F4=HITLIST) (F8=NEXT PAGE) (F9=VIEW ACCESS) (F11=DISCLOSURE)
  1  3 NCIC RESPONSES   <F12>=CK NCIC*   (F14/16=LNKLIST) (F16=PRINT) (F17=HOMEREC)
  MC        4                                                           06/030
```

Confidential

DEF-047613

# CHEATWOOD DECLARATION – EXHIBIT 5



Subject, ALHARBI   ABDULRAHMAN ALI E DOB ▇▇▇▇ COC Saudi Arabia PP#K358608, is the holder of a F1 (N0008699918) NIV Foil#E3139541 issued on 20-NOV-2011 & Exp 11-NOV-2016.   Subject is an exact match to No Fly TPN# 1037506192. Derogatory information reviewed by W/C Mayfield and CW/C Maimbourg was found to be sufficient to request a Visa revocation. NTC-P is requesting revocation of Foil# E3139541.   Subject is inadmissible to the U.S under INA 212(a)(3)(B)(i)(II), SAO was not completed prior to Visa issuance.   Subject is currently in the United States, admitted F1 student, at Boston POE on 08/28/2012.   Subject is a student at THE UNIVERSITY OF FINDLAY, 1000 NORTH MAIN STREET FINDLAY, OHIO 45840-3695.   Subject has One (1) prior event# 1648067, Fins promoted, NT record in place. No scheduled found at this time.

DEF-047614

Confidential

# CHEATWOOD DECLARATION – EXHIBIT 6

**From:** Cheatwood, Joel
**Sent:** Monday, April 22, 2013 6:53 PM
**To:** Weasel, Joe
**Subject:** Fwd: Real News

See below

Sent from my iPhone

Begin forwarded message:

> **From:** "Beck, Glenn" ███████████████
> **Date:** April 22, 2013, 6:45:49 PM EDT
> **To:** "Cheatwood, Joel" ███████████████
> **Subject: Re: Real News**
>
> Twitter is saying that Brett says he has docs that shows mistaken identity on our part. Did not show docs!
>
>
> Glenn Beck
> New York City - Dallas - Salt Lake
> MERCURY RADIO ARTS
> THE BLAZE
> AMERICAN DREAM LABS
> 1791.COM
> MERCURY ONE
>
>
> On Apr 22, 2013, at 5:37 PM, "Cheatwood, Joel" ███████████████ wrote:
>
>
> Good segment on the story. Congressman Perry, also on the Homeland Security Committee is pissed. Says we've asked specific questions about this individual and can't get a response from Janet Napolitano. Was asked about the Findlay, Ohio portion of the story and said that is one of the many questions we've asked without any response. Buck led block and laid out the story then to the Congressman.
>
>
> Joel

1

Confidential