**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
ABDULRAHMAN ALHARBI,                    )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )          Civil Action
                                        )          No. 14-11550-PBS
THEBLAZE, INC.; GLENN BECK;             )
MERCURY RADIO ARTS, INC.; and           )
PREMIERE RADIO NETWORKS. INC.;          )
                                        )
                    Defendants.         )
_____)

**MEMORANDUM AND ORDER**

August 9, 2016

Saris, C.J.

**INTRODUCTION**

    Plaintiff Abdulrahman Alharbi is a twenty-three-year-old student from Saudi Arabia, who resides in Revere, Massachusetts. He was a spectator at the Boston Marathon on April 15, 2013, was injured in the bombing, and was questioned by federal authorities investigating the event while he was still being treated for his injuries at Brigham and Women's Hospital. Plaintiff brings this suit against radio and television commentator Glenn Beck, and the owners and distributor of The Glenn Beck Show, for defamation (Count I) and unjust enrichment (Count III) because Beck identified Alharbi as an active participant in the bombing, even after the authorities had

1

publically exonerated him. The plaintiff also brings a claim against Glenn Beck for punitive damages (Count II). Between April 19, 2013 and May 8, 2013, Beck stated in radio broadcasts that Alharbi was involved in recruiting the Tsarnaev brothers, gave the "go order" for the bombing, and was the "money man" who funded the attacks.

The defendants maintain that the statements were true, and that they relied on several confidential government sources in developing the broadcasts. The plaintiff has moved to compel the identity of the confidential sources (Docket No. 78), and the defendants have moved for summary judgment (Docket No. 97).

Alharbi argues that the confidential source information is directly relevant to his claims, and cannot otherwise be determined from a less sensitive source. The defendants respond that the motion to compel is untimely, and that the sources' identities are protected by a qualified privilege under the First Amendment.

The defendants contend that they are entitled to summary judgment because the plaintiff has not met his burden to put forward evidence of negligence or malice. The defendants maintain that Alharbi is a limited-purpose public figure, and/or an involuntary public figure, and therefore must prove that the defendants acted with knowledge that the statements were false, or with reckless disregard as to their truth or falsity, under

the constitutional malice standard. The plaintiff maintains that he is not a public figure. After hearing, the Court **ALLOWS** in part and **DENIES** in part both the motion to compel the identity of the confidential sources and the motion for summary judgment.

**UNDISPUTED FACTS**

With all reasonable inferences drawn in favor of the nonmoving party, Alharbi, the following facts are not in dispute, except where noted.

## I.   **The Boston Marathon Bombing**

The plaintiff is a citizen of Saudi Arabia. On April 15, 2013, he was a twenty-year-old student at the New England School of English, living in Revere, Massachusetts. He attended the Boston Marathon as a spectator to watch the event.[1] He was injured when two bombs exploded near the marathon finish line, and he was transported to Brigham and Women's Hospital in an ambulance. At the hospital, he was treated for burn injuries on his back and leg. The defendants contend that Alharbi's burns were "superficial and required no treatment." Grygiel Decl., Docket No. 110, ¶ 128, Ex. 40, at 115. He was discharged from the hospital five days later on April 20, 2013.

---

[1] The defendants maintain that he was involved in the attacks that occurred that day, but have produced no admissible evidence to support this contention.

Law enforcement, including agents from the Federal Bureau of Investigation (FBI), questioned the plaintiff immediately upon his arrival at the hospital, and collected fingerprints and a DNA sample from him. The plaintiff consented to a search of his apartment in Revere, which took place at 11:00 pm on April 15. The defendants learned from confidential sources that law enforcement officials from the FBI, Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), the Massachusetts State Police, and the Boston Police identified the plaintiff as a person of interest, a subject, and a target of their investigation into the Boston Marathon bombing. On April 15 and 16, several other news organizations, such as Fox News and the New York Post, published online articles reporting that the plaintiff was a "person of interest" and a "potential suspect." Id. ¶ 4.

## II.  Secretary Napolitano's Testimony

On April 23, 2013, then-Secretary of Homeland Security Janet Napolitano testified before Congress at a Senate Judiciary Committee hearing on comprehensive immigration reform. As part of her testimony, she discussed the Boston Marathon bombing. In response to a question from Senator Grassley about "a Saudi student who reportedly was on a terrorist watch list," Secretary Napolitano replied:

> He was not on a watch list. What happened is this student was—really, when you back (ph) it (ph), he was in the wrong place at the wrong time. He was never a subject. He was never even really a person of interest. Because he was interviewed, he was at that point put on a watch list. And then, when it was quickly determined he had nothing to do with the bombing, the watch listing status was removed.

Transcript of Secretary Napolitano's Testimony, Haley Decl., Docket No. 109, Ex. C, at 89. The plaintiff contends that her "testimony is consistent with the way [he] was treated by the government and what happened to [him] at the Boston Marathon." Alharbi Aff., Docket No. 107, ¶ 16. In contrast, the defendants maintain that Secretary Napolitano's testimony was not "truthful and accurate," based on conversations they had with confidential sources, including congressional staff. Docket No. 121, at 85.

## III. __Beck's Allegedly Defamatory Statements__

Between April 19 and May 8, Beck repeatedly identified Alharbi as being involved in the Boston Marathon bombing on his radio program, broadcasted on TheBlaze network. On April 19, Beck stated that Alharbi was a "very, bad, bad, bad man." Beck Decl., Docket No. 112, Ex. 3, at 66. The plaintiff alleges that he further stated that Alharbi was involved in "blowing the legs off of our citizens," while the defendants contend that this statement did not refer to the plaintiff. Id. at 65.

On April 22, Beck stated that Alharbi was one of three people involved in the attacks—along with the Tsarnaev brothers—

and that Alharbi's "clan is heavy with Al Qaeda links." Beck
Decl., Docket No. 112, Ex. 4, at 72. Beck further stated that he
believed Alharbi's "mission was to recruit fighters that are
already in the country," and that "[o]nce he recruits, that he
could fund and provide the go order when the time came." Id. at
72-73. He explained that the Tsarnaev brothers "would've been
easy targets for an Al Qaeda recruiter," and that "Al-Harbi
would've jumped at it." Id. at 73. Finally, he said that Alharbi
had been "tagged" as a "proven terrorist," because Alharbi was
allegedly designated as a person who has engaged or "is likely
to engage" in terrorist activity in the United States under
§ 212(a)(3)(B)(i)(II) of the Immigration and Naturalization Act
(INA), 8 U.S.C. § 1182(a)(3)(B)(i)(II). Beck Decl., Docket No.
112, Ex. 4, at 71. According to the defendants, this designation
occurred shortly after the bombing on April 16.

On April 24, after Secretary Napolitano testified before
Congress, Beck continued to say that Alharbi was involved in the
Boston Marathon bombing. He referred to Alharbi as "the worst of
the worst," again due to the § 212(a)(3)(B) designation. Beck
Decl., Docket No. 112, Ex. 5, at 78. On April 25, Beck appeared
on the Bill O'Reilly Show on Fox News, and reiterated that
Alharbi was designated as a terrorist, who was "armed and
dangerous," according to government documents he received from
confidential sources. Id. Ex. 6, at 87.

On May 1, Beck stated on TheBlaze, that he didn't know how
Alharbi was involved in the attacks, "but he's involved." Id.
Ex. 7, at 96. Finally, on May 8, Beck stated that Alharbi was
"the money man," "the guy who actually paid for it." Id. Ex. 8,
at 99. When asked whether the statement that Alharbi funded the
attacks was "speculation," "reporting," or "somewhere in
between," Beck simply repeated, "He's the money man." Id. at
100.

## IV.  Confidential Sources

The plaintiff deposed Beck on February 17, 2016, and Beck
identified Joel Cheatwood and Joe Weasel as persons with
knowledge of the sources the defendants relied on for the
broadcasts about Alharbi's involvement in the Boston Marathon
bombing. Cheatwood was TheBlaze's President and Chief Content
Officer at the time of the broadcasts, and Weasel was the head
of TheBlaze's investigatory documentary unit. Cheatwood has more
than thirty years of experience in the news broadcasting
industry, including as an Executive Director of Development for
CNN, Senior Vice President of Program Development for Fox News,
and Executive Vice President of News for CBS. Weasel has more
than twenty-five years of experience as a professional
journalist, and served as an adjunct professor of journalism and
ethics at The Ohio State University from 1998 to 2003. The

plaintiff deposed Cheatwood and Weasel on March 24, 2016 and
March 30, 2016, respectively.

Weasel testified at his deposition that he had direct
contact with six confidential sources in gathering information
for the allegedly defamatory broadcasts, while Cheatwood had
direct contact with just one of these sources. According to the
defendants, these sources were only willing to cooperate
pursuant to a promise of strict confidentiality. Weasel provided
a detailed description of each of the sources in a declaration
the defendants submitted in support of their summary judgment
motion. See Weasel Decl., Docket No. 117, ¶¶ 38-73. The
following descriptions come from that declaration. The plaintiff
disputes these descriptions, as he has not had the opportunity
to depose, or otherwise verify the identity of, the confidential
sources.

Source 1 is a founding member of the Department of Homeland
Security (DHS), where Source 1 has worked for thirteen years.
Source 1's responsibilities include investigating and analyzing
terrorists and their support networks. Source 1 is considered
one of the country's leading experts on Islamic terrorism.
Source 1 has trained Joint Terrorist Task Force (JTTF) agents,
including some of those who were involved in the Boston Marathon
bombing investigation. Weasel first met Source 1 in 2010 or 2011

in Washington, D.C., and has spoken to Source 1 "hundreds of times" since. Id. ¶ 41.

Source 1 served as a "key resource for law enforcement personnel who were on the ground conducting the investigation" surrounding the Boston Marathon attacks, starting on April 15. Id. ¶ 46. More specifically, Source 1 answered questions from law enforcement agents about the Islamic Society of Boston (ISB) because Source 1 is a subject matter expert on the ISB. Source 1 explained the meaning of two government documents provided to the defendants by Source 2, which are discussed in greater detail below. Source 1 also provided information about Alharbi's family, a timeline of events regarding Alharbi, the basis for including him on the No Fly List, Alharbi's role in the Boston Marathon bombing investigation, and the structure and function of terrorist cells in the United States. Source 1 was allegedly "emphatic that Plaintiff was involved in the Boston Marathon bombing." Id. ¶ 49.

Source 2 is a senior investigator at DHS, where Source 2 has worked for more than twenty years. Weasel first met Source 2 in Washington, D.C., in 2010 or 2011. Weasel "routinely" relies on Source 2 "for information regarding the United States government's counterterrorism efforts." Id. ¶ 53. Source 2 served as a liaison between law enforcement and Congress during the Boston Marathon bombing investigation, and "regularly

communicated with field agents on the ground in Boston, including JTTF agents, ICE agents, and FBI agents." Id. ¶ 56. Weasel relied on Source 2 for information regarding the status of the government's investigation of Alharbi, the plaintiff's § 212(a)(3)(B) designation, and the function and structure of terrorist cells.

Source 2 also provided Weasel with two official government documents, produced in this case as Exhibits 60 and 61. Exhibit 60 is a four-page printout of screen shots from the federal government's Treasury Enforcement Communications System II (TECS II) database, which appears to identify the plaintiff as a "suspected terrorist," who is "armed & dangerous" on the fourth page. Haley Decl., Docket No. 109, Ex. B, at 70-73. The first three pages of the print out state, "This record has not yet been approved," in all capital letters at the bottom of the screen. Id. at 70-72. The fourth page does not include this line. The first two pages are dated April 15, 2013, and the final two pages are dated April 16, 2013.

Exhibit 61 is a one-page excerpt from the plaintiff's "Event File," which states the plaintiff is "inadmissible to the U.S. under INA 212(a)(3)(B)(i)(II)." Id. at 75. Section 212(a)(3)(B)(i)(II) of the INA states: "Any alien who . . . a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is

engaged in or is likely to engage after entry in any terrorist activity . . . is inadmissible." 8 U.S.C. § 1182(a)(3)(B)(i)(II). Section 212 further provides that "aliens who are inadmissible under [this section] are ineligible to receive visas and ineligible to be admitted to the United States." Id. § 1182(a).

According to Weasel, on or around April 18, a member of Congress asked Source 2 to obtain these two documents. Source 1 sent the documents to Source 2 via fax at Source 2's request. Source 2 received the documents in a congressional member's office. After Secretary Napolitano testified, Sources 1 and 2 called Weasel to report that they believed her testimony was false. Also, on April 23, Weasel traveled to Washington, D.C., to meet with Source 2. Source 2 showed him a copy of the documents that day, and provided Weasel a copy in an envelope the following day. Weasel returned to New York, where he opened and reviewed the documents with Cheatwood.

Source 3 is a former JTTF agent, with more than thirty years of experience as a law enforcement officer. Weasel first met Source 3 in Washington, D.C. in 2010 or 2011, and has spoken with him/her "on numerous occasions about counterterrorism strategy and operations." Weasel Decl., Docket No. 117, ¶ 60. Weasel relied on Source 3 primarily to verify and confirm information gathered from other sources. Source 3 "educated"

Weasel about the content and meaning of the documents provided by Source 2 (although the defendants never shared the documents themselves with Source 3), and provided information about "what was likely to be happening on the ground in Boston." Id. ¶ 61.

Source 4 is a former DHS agent, whom Weasel has known for many years. Source 4 has never served as a direct source for a particular story for Weasel, but has provided background information and explained law enforcement concepts. "Source 4 is an expert in terrorist cells and the manner in which terrorist cells are structured and operate." Id. ¶ 63. With respect to the defendants' reporting about Alharbi, Source 4 described how the Boston Marathon bombing "fit the profile of a typical terrorist cell." Id. ¶ 64.

Sources 5 and 6 are both congressional aides, who had "direct knowledge of the Boston Marathon bombing investigation." Id. ¶¶ 67, 71. Both sources suggested that Secretary Napolitano had been "less than honest" in her April 23 testimony before the Senate Judiciary Committee. Id. ¶¶ 68, 72. These sources also confirmed that members of Congress possessed the documents provided to the defendants by Source 2, and were concerned about the Secretary's testimony.

Weasel spoke with Source 5 "as often as three times per day" during the defendants' reporting surrounding the Boston Marathon bombing, met with Source 6 once in person, and spoke

with Source 6 on the phone more than ten times. Id. ¶ 68, 71.
Source 5 is the only source that Cheatwood also met with. He met
with Source 5 once on April 18 or April 19, and again in late
May.

According to Weasel, by May 1, two of the sources were
increasingly convinced to "a high level of probability, nearly
90 percent" that Alharbi was involved in funding the attacks,
and that this involvement was the basis for Alharbi's
§ 212(a)(3)(B)(i)(II) designation. Id. ¶ 120, Ex. 1, at 159-60.
He does not specify which two sources these were, but based on
his declaration they appear to be Sources 2 and 3. A third
source was "more adamant and said [Alharbi] financed it." Id.
¶ 120, Ex. 1, at 160. Again, based on the declaration this
appears to be Source 1.

Beck never met with or spoke to any of the confidential
sources. Weasel took notes of his discussions with the sources
on post-its, which he then discarded. Cheatwood "acted as
gatekeeper to TheBlaze's broadcasts," and vetted the information
and materials provided by Weasel and other staff members.
Cheatwood Decl., Docket No. 111, ¶ 16. Another staff member of
TheBlaze, Sara Carter, reached out to the FBI and ICE on the
record to ask about the plaintiff's involvement and the
government documents provided by Source 2. An email from Weasel
to Cheatwood on April 22, states that Carter was "getting a very

different picture" from her sources. Weasel Decl., Docket No.

117, Ex. 18, at 84. According to Weasel, TheBlaze's

determination that Alharbi was involved in the Boston Marathon

bombing was ultimately based on:

> (1) the creation of Plaintiff's Event File on April 16,
> 2013, shortly after his apartment was searched by law
> enforcement authorities; (2) the entry of data into the
> TECS II database concerning Plaintiff following the
> attacks in Boston; (3) the information reported in the
> TECS II database, including that Plaintiff was a
> 'suspected terrorist' and was 'armed & dangerous;'
> (4) the information reported in Plaintiff's Event File,
> including that Plaintiff had received a 212(a)(3)(B)
> designation; and (5) the explanations provided by
> Sources 1 and 2 regarding the government's
> investigation, including explanations as to the specific
> information included in the TECS II database and the
> Event File.

Id. ¶ 116.

## V.   **Plaintiff's Interaction with the Press**

Several members of the Saudi Arabian press contacted the

plaintiff while he was still hospitalized. According to Alharbi,

his father had informed him that people in Saudi Arabia were

saying that he was suspected of being involved in the Boston

Marathon attacks. Alharbi was concerned about this, and, when

contacted by members of the press, agreed to several interviews

in order to speak about his lack of involvement. The defendants

dispute whether Alharbi's goal in granting the interviews was to

tell the truth.

14

First, on or around April 19, the plaintiff had a telephone interview in Arabic with the reporter Dawood al-Shirian for a Saudi television program called "8 O'Clock with Dawood." In the interview, Alharbi explained that he was not involved in the bombing, but that he "was thrown to the street" when the second bomb exploded behind him. Grygiel Decl., Docket No. 110, Ex. 25, at 57. Alharbi stated that he was the first individual to be transported to the hospital by ambulance, and that his injuries were "minor." Id. at 56-57. He recounted that the FBI interrogated him when he arrived at the hospital, he gave the FBI permission to search his residence, the FBI took photos of his apartment, and the media followed the FBI there. Finally, he said that the media was telling "lies" about him. Id. at 57-58.

Next, Alharbi granted at least one, and possibly two, telephone interviews to the newspaper Al Hayat, which subsequently published two articles about the plaintiff in Arabic on April 19 and 23. Id. Ex. 30-31, at 73, 78. The plaintiff alleges that he only spoke with Al Hayat once, but the articles Al Hayat published refer to two different phone interviews. The first interview and article focused on the explosion and initial investigation. See id., Ex. 30, at 73. Alharbi told Al Hayat that he was injured in the second explosion, that he did not flee the scene, and that he was not arrested. He was quoted as saying:

> There was an explosion and I was very mildly injured. I asked a police officer and he told me where to go. No one stood in my way, I didn't flee, and I didn't run away from the explosion. All of this was written in the American press, and none of it happened. I went to the ambulance and I was the first of the injured to arrive at the hospital.

Id. He explained that the police and FBI asked to search his apartment "as a precautionary measure," because he "was the first Boston explosion casualty to reach the hospital," and he agreed. Id. He stated that the search only lasted for two hours, but that he planned to move to a new apartment because the media had photographed his apartment and published his address, violating his privacy.

The second article was published after he left the hospital, and focused on his plans for the future and alleged mistreatment by the media. See id., Ex. 31, at 78. Alharbi reiterated that he did not plan to return to his residence because it was photographed by the media. He explained that he was staying in a hotel until he could find a new apartment. He said that "the accusations, libel, and mistreatment by some media would not interrupt his studies, affirming that it would be a motivator for him to acquire learning and knowledge." Id. He noted that the Saudi consulate, American authorities, and hospital all treated him well, but that he felt mistreated by the media that had "maligned" him. Id. He said that the visit from First Lady Michelle Obama, who visited all those injured in

the bombing at Brigham and Women's hospital, helped to demonstrate "his innocence to the American media." Id.

Okaz, a daily Saudi Arabian newspaper, also published an article about the plaintiff in Arabic on April 17 or 18, with a photograph of Alharbi in the hospital. See id., Ex. 32, at 86. The plaintiff does not recall speaking to anyone from the newspaper, but the article states Alharbi "narrated to Okaz the details of the moment of the bombing . . . ." Id. The article describes that Alharbi fell to the ground after the explosion, and was transported to the hospital in an ambulance. It states that Alharbi was able to contact his father roughly a day and a half after the explosion. The article also notes that Alharbi was suffering from dehydration and muscle contraction, and that he "thanked the U.S. authorities who refuted media allegations about his being suspected . . . ." Id.

Finally, the plaintiff granted an interview to Amina Chaudary, the Editor-in-Chief of The Islamic Monthly. On May 21, a transcript and audio recording of the interview, two photographs of the plaintiff at the finish line of the Boston Marathon, and a commentary written by Ms. Chaudary were posted to The Islamic Monthly website. See id., Ex. 20-21. The parties do not know exactly when the interview took place, but agreed at the summary judgment hearing that it occurred after Beck's final comment about the plaintiff on May 8.

17

In the interview, the plaintiff once again recounted his experience of being injured in the second explosion, being transported to the hospital in an ambulance, and being questioned by government officials upon his arrival. He suggested that the EMTs in the ambulance appeared afraid of him, and that the government officials and hospital staff may have racially profiled him when he arrived based on the color of his skin or the name of his country. He complained about the fact that the FBI or other officials informed the media that he was a suspect and gave the media access to his apartment. He repeated that the media was telling lies about him. He explained that he had "read a lot of articles that talked about [him] very badly," and generated negative comments calling him a terrorist. Id. at 183. He expressed concern for his safety due to the loss of privacy.

Ms. Chaudary's commentary is more critical of the media's treatment of Alharbi, and described Alharbi as "suffering the effects of sensationalist (and often-times racist) media reports, enough to disturb him and prevent him from moving back to his home and resuming his normal life." Id. Ex. 21, at 7. She explained that it is not clear whether the FBI or hospital staff released his name to the media, but that there were no press in the hospital, and within two hours of the bombing, the media appeared to know quite a bit about Alharbi. She concluded the

piece by stating: "The leak, regardless of where it came from, must be investigated and we must be sure this never happens again." Id. at 8.

The plaintiff stated in an affidavit that he was also contacted by many local and national news outlets in the United States, such as The Boston Globe and George Stephanopoulos from ABC News. Alharbi Aff., Docket No. 107, ¶ 27. Alharbi did not respond to these requests for comments or interviews. The defendants do not dispute this fact.

## DISCUSSION

## I.   Motion to Compel the Identify of the Confidential Sources

### A. Timeliness

The defendants argue that the plaintiff's motion to compel should be denied as untimely because it was filed one month after the close of discovery. They acknowledge that Federal Rule of Civil Procedure 37 "imposes no deadline for the filing of a motion to compel," but argue that the plaintiff was aware of the need for such a motion from the early stages of the case, and that the Court's scheduling order "clearly contemplated" that any such motion would be filed prior to the close of discovery. Docket No. 87, at 13. The plaintiff does not specifically address whether the motion is timely, but explains that the depositions of Cheatwood and Weasel did not take place until the final week of discovery. Discovery closed on March 31, 2016;

19

Cheatwood was deposed on March 24, and Weasel was deposed on March 30. The plaintiff did not receive the transcript from Weasel's deposition until April 12, 2016, and filed the motion to compel roughly two and a half weeks later, on April 29, 2016.

District courts have "broad discretion in ruling on pre-trial management matters." Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship, S.E., 615 F.3d 45, 58 (1st Cir. 2010) (quoting Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 91 (1st Cir. 1996)). Although the plaintiff knew that the defendants intended to rely on confidential sources since at least August 2015—when the plaintiff received the defendants' discovery responses refusing to identify the sources—the plaintiff did not know how little information Beck, Cheatwood, and Weasel would provide in their depositions about the sources until those depositions occurred in February and March 2016. The deposition testimony from these individuals was confusing and sometimes contradictory with respect to the number of confidential sources, where they worked, what information they provided, and when they provided this information. There are no contemporaneous notes from the conversations with the confidential sources.

Beck first testified that there were "two, possibly three" sources, and then later stated he believed "there were three or four," but that there "may have been more." Beck Dep., Docket

No. 82, Ex. F, at 36, 145. Meanwhile, Cheatwood testified that
there were "four primary confidential sources," while Weasel
testified that there were six. Compare Cheatwood Dep., Docket
No. 82, Ex. G, at 32, with Weasel Dep., Docket No. 82, Ex. H, at
15. Beck stated that at least two of the sources worked for the
FBI, while Weasel asserted that four of them worked for DHS, one
was a government contractor, and did not specify where the final
source worked.[2]

Case law suggests that the plaintiff should not have filed
the motion sooner, and that if he had, the correct course of
action would have been for the Court to deny the motion. The
First Circuit and Massachusetts appellate courts have reversed
and remanded where trial courts ruled on motions to compel the
identities of confidential sources before the parties obtained
critical information from discovery, such as whether the
confidential sources received promises of confidentiality from
the reporters and to what extent the reporter relied on
confidential source information in the broadcasts or articles at
issue. See, e.g., Bruno & Stillman, Inc. v. Globe Newspaper Co.,
633 F.2d 583, 599 (1st Cir. 1980) (emphasizing that the court
did not know whether there was a "commitment to confidentiality

---

[2] In a subsequent declaration, submitted in support of the
defendants' motion for summary judgment, Weasel stated that two
worked for DHS, one was a former JTTF agent, one was a former
DHS employee, and two were congressional aides.

pertaining to various sources"); Wojcik v. Boston Herald, Inc., 803 N.E.2d 1261, 1266 (Mass. App. Ct. 2004) (stressing the need for additional discovery, and specifically a deposition of the reporter, to "clarify what [the reporter] contends she was told by her unnamed sources and the extent to which the articles as written relied on that information").

If the plaintiff had moved to compel disclosure before taking the depositions of Cheatwood and Weasel, the Court would have denied the motion because it would have been difficult to discern the importance of the sources' identities to the plaintiff's case or the defendants' defenses at an earlier stage in the litigation. Therefore, the Court finds that the motion to compel is timely.

## B. First Amendment Balancing Test for Compelling Disclosure of Confidential Sources

The defendants argue that they are not required to disclose the identities of their confidential sources because this information is protected by a qualified privilege. The First Circuit has not decided the "semantic question of whether the protection afforded to a journalist's sources and research is a type of privilege." Cusumano v. Microsoft Corp., 162 F.3d 708, 716 (1st Cir. 1998) (internal alterations omitted). Instead, the First Circuit applies a "heightened sensitivity to First Amendment concerns and invite[s] a balancing of considerations."

22

In re Special Proceedings, 373 F.3d 37, 45 (1st Cir. 2004)
(internal quotation marks omitted). Under this approach, "courts
must balance the potential harm to the free flow of information
that might result against the asserted need for the requested
information." Bruno & Stillman, 633 F.2d at 596. "This test
contemplates consideration of a myriad of factors, often
uniquely drawn out of the factual circumstances of the
particular case." Cusumano, 162 F.3d at 716. Similarly,
Massachusetts state courts conduct a case-by-case analysis, in
which they weigh "(a) the public interest in having every
person's evidence available against (b) the public interest in
the free flow of information." Matter of John Doe Grand Jury
Investigation, 574 N.E.2d 373, 375 (Mass. 1991).

　　　"Each party comes to this test holding a burden." Cusumano,
162 F.3d at 716. "Initially, the movant must make a prima facie
showing that his claim of need and relevance is not frivolous."
Id.; see also In re Special Proceedings, 373 F.3d at 45 (holding
"the disclosure of a reporter's confidential sources may not be
compelled unless directly relevant to a nonfrivolous claim or
inquiry undertaken in good faith"). "Upon such a showing, the
burden shifts to the objector to demonstrate the basis for
withholding the information." Cusumano, 162 F.3d at 716. "The
court then must place those factors that relate to the movant's
need for the information on one pan of the scales and those that

reflect the objector's interest in confidentiality and the potential injury to the free flow of information that disclosure portends on the opposite pan." Id. The "task is one that demands sensitivity, invites flexibility, and defies formula." Bruno & Stillman, 633 F.2d at 598.

The First Circuit has suggested that the Court should consider whether the information is available from non-confidential sources and any "reasonable expectation of confidentiality" on the part of the sources themselves. Id. at 597; see also In re Special Proceedings, 373 F.3d at 45 (noting that "disclosure may be denied where the same information is readily available from a less sensitive source"). However, the Supreme Court has "twice rejected any automatic requirement that non-confidential sources be exhausted." In re Special Proceedings, 373 F.3d at 45 (citing Univ. of Pa. v. EEOC, 493 U.S. 182, 201 (1990); Branzburg v. Hayes, 408 U.S. 655, 701–02 (1972)).

Here, the plaintiff contends that the sources' identities are necessary to his defamation claim because the defendants' arguments that the statements were true, and that the defendants did not act negligently or maliciously, hinge on whether the confidential sources confirmed Alharbi's role in funding the Boston Marathon bombing. The plaintiff emphasizes that Glenn Beck broadcasted some of the allegedly defamatory statements

<u>after</u> the Secretary of Homeland Security publically testified before Congress, on April 23, 2013, that the plaintiff was not involved in the attacks. Furthermore, according to the plaintiff, Beck's, Cheatwood's, and Weasel's deposition testimony about the confidential sources is "confusing and inconsistent," and they took no notes and made no recordings of the meetings. Docket No. 81, at 15. Thus, the plaintiff claims that the only way to verify or confirm what the confidential sources told the defendants would be to speak with the sources themselves. The Court agrees with the plaintiff.

The defendants respond that the plaintiff's motion must fail because the plaintiff has failed to exhaust alternative sources of information with respect to the confidential sources' identities and the truth of their statements to The Glenn Beck Show staff. According to the defendants, the plaintiff has made no effort to use standard discovery procedures, or the Freedom of Information Act, to identify "the provenance, source and location of documents relevant to the government's investigation of Plaintiff." Docket No. 87, at 21. The plaintiff never sought to depose the government officials listed in Exhibits 60 and 61, nor any of the non-confidential sources identified by the defendants. Beck allegedly conferred with the non-confidential sources to confirm the information obtained from the confidential sources.

The defendants further claim that the plaintiff has failed to meet his burden to demonstrate that the sources' identities are crucial to the plaintiff's case. In short, the defendants contend that the plaintiff should be able to produce "his own independent proof concerning the truth or falsity of Mr. Beck's on-air statements, particularly at this late date." Id. at 23.

Finally, the defendants maintain that the harm that would result from compelled disclosure outweighs the plaintiff's need for the sources' identities. The sources, here, were only willing to speak with the defendants after they received promises of confidentiality because they could face "loss of employment and even criminal charges" if their identities are disclosed. Id. at 25. Thus, the defendants contend that compelled disclosure would impede the free flow of information by making confidential sources reluctant to speak with news reporters, like the defendants.

The balancing test weighs in favor of allowing the motion to compel here. Defendants' reliance on Wojcik is misplaced because the parties had only engaged in limited discovery at the time the motion to compel the identity of confidential sources was filed, and the plaintiff had not yet taken the reporter's deposition. See 803 N.E.2d at 1265 ("It is unclear at the present limited stage of discovery precisely what [the reporter] claims to have been told by her sources, and precisely how it

relates to the essential elements of Wojcik's defamation claim."). The court emphasized that additional discovery, including the reporter's deposition, would "likely clarify what [the reporter] contends she was told by her unnamed sources and the extent to which the articles as written relied on that information, and will thereby illuminate whether the identities of her sources are in fact essential to Wojcik's claim." Id. at 1266.

In contrast, here, the plaintiff has already taken the depositions of Beck, Cheatwood, and Weasel. As discussed above, their deposition testimony about what the confidential sources told them, and when, is vague and often contradictory. When asked what the confidential sources told the defendants about the plaintiff's role in financing the attacks, Weasel could not recall specifically what the confidential sources told him about the nature of the plaintiff's involvement. There are no notes to confirm the information. Thus, the plaintiff has a strong need for the sources' identities to meet his burden of demonstrating that the defendants did not act with the proper standard of care in their reporting about Alharbi. The plaintiff has satisfied his initial burden to demonstrate "that his claim of need and relevance is not frivolous." Cusumano, 162 F.3d at 716.

Furthermore, the plaintiff could not obtain information to verify the truth of what the confidential sources allegedly told

27

the defendants from a less sensitive source. In his deposition testimony, Weasel suggested that the only other way for the plaintiff to confirm what the confidential sources told the defendants, besides speaking with the sources, would be for the plaintiff to file a Freedom of Information Act request. The defendants sought all documents related to the federal government's investigation of Alharbi surrounding the Boston Marathon bombing in a separate, related case before this Court. After *in camera* review, I ordered several government agencies, including the FBI, CBP, ICE, the National Security Division of the Department of Justice, and the Boston U.S. Attorney's Office, to provide redacted copies of the information requested to the plaintiff and defendants in this case. None of the documents supports the idea that Alharbi was "the money man" financing the Boston Marathon attacks. Thus, these documents do not offer an alternative means for the plaintiff to verify what the confidential sources allegedly told Weasel and Cheatwood.

On the other side of the scale, the defendants' promise of confidentiality to the sources weighs against compelled disclosure. The First Circuit has indicated that district courts have wide discretion to impose appropriate conditions to balance the plaintiff's need for information with First Amendment concerns, such as allowing "a deposition with limited attendance and with dissemination proscribed to others than counsel." Bruno

& Stillman, 633 F.2d at 598. At the summary judgment hearing, the plaintiff narrowed his request for the Court to compel the identity of all six confidential sources, to just the sources who told the defendants that Alharbi was the financier. Based on the record, this appears to be Sources 1 and 2. It is unclear from the current record whether Source 3 had direct knowledge of the Boston Marathon bombing investigation, and also told the defendants that the plaintiff was the money man.

I **ALLOW** the motion to compel and order the defendants to disclose the identities of Sources 1 and 2, who allegedly were adamant that Alharbi was involved in financing the attacks. If Source 3 made similar statements to Weasel, then the defendants must also disclose Source 3's identity. The Court further orders the parties to confer and propose conditions for their depositions, such as limited attendance and dissemination proscribed to others than counsel.

## II.  **Summary Judgment**

### A. Legal Standard

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed on a motion for summary judgment, the moving party must demonstrate that there is an "absence of evidence to support the nonmoving party's case." Sands v. Ridefilm Corp., 212 F.3d 657,

661 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once such a showing is made, the burden shifts to the nonmoving party, who must, with respect to each issue on which it would bear the burden of proof at trial, come forward with facts that demonstrate a genuine issue. Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citing Celotex, 477 U.S. at 324).

"A genuine issue exists where a reasonable jury could resolve the point in favor of the nonmoving party." Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (internal quotation marks omitted). "A party cannot survive summary judgment simply by articulating conclusions the jury might imaginably reach; it must point to evidence that would support those conclusions." Packgen v. BP Expl. & Prod., Inc., 754 F.3d 61, 67 (1st Cir. 2014). A material fact is "one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

In its review of the evidence, the Court must examine the facts in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor, to "determine if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Sands, 212 F.3d at 661 (internal quotation marks omitted). The Court must ignore "conclusory allegations, improbable inferences, and unsupported

speculation" at the summary judgment stage. Chiang v. Verizon
New England Inc., 595 F.3d 26, 30 (1st Cir. 2010). "Ultimately,
credibility determinations, the weighing of the evidence, and
the drawing of legitimate inferences from the facts are jury
functions, not those of a judge." Sensing v. Outback Steakhouse
of Fla., LLC, 575 F.3d 145, 163 (1st Cir. 2009) (internal
quotation marks and alterations omitted).

### B. Elements of Defamation

To establish a defamation claim under Massachusetts law, a
plaintiff must allege four elements: "(1) that the defendant
made a statement, concerning the plaintiff, to a third party;
(2) that the statement was defamatory such that it could damage
the plaintiff's reputation in the community; (3) that the
defendant was at fault in making the statement; and (4) that the
statement either caused the plaintiff economic loss . . . or is
actionable without proof of economic loss." Shay v. Walters, 702
F.3d 76, 81 (1st Cir. 2012) (internal quotation marks and
alterations omitted) (citing Ravnikar v. Bogojavlenksy, 782
N.E.2d 508, 510-11 (Mass. 2003)). "Four types of statements are
actionable without proof of economic loss: statements that
constitute libel; statements that charge the plaintiff with a
crime; statements that allege the plaintiff has certain
diseases; and statements that may prejudice the plaintiff's
profession or business." Ravnikar, 782 N.E.2d at 511 (internal

citations omitted). In most cases, the statement must be false, and truth will constitute a defense. Id. at 510 n.3. Due to the First Amendment's "protection of true speech on matters of public concern," a private figure plaintiff suing a media defendant regarding speech on such matters bears the burden of proving that the speech is false. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 777 (1986).

"The level of fault required varies between negligence (for statements concerning private persons) and actual malice (for statements concerning public officials and public figures)." Ravnikar, 782 N.E.2d at 511. The fault standard takes into account Supreme Court doctrine developed under the First Amendment, which "sets clear limits on the application of defamation law with respect to any factual statement published in the news media about a public official or public figure, even when that statement is shown to be false and defamatory." Murphy v. Boston Herald, Inc., 865 N.E.2d 746, 752 (Mass. 2007). If a plaintiff is a public official or public figure, he "must prove, by clear and convincing evidence, that the defendant published the false and defamatory material with 'actual malice,'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id. (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)).

**C. Fair Report Privilege**

In their reply brief, the defendants assert for the first time that the fair report privilege protects the broadcast statements. "Massachusetts has long recognized a privilege for fair and accurate reports of official actions and statements." Howell v. Enter. Publ'g Co., LLC, 920 N.E.2d 1, 13 (Mass. 2010). The privilege "establishes a safe harbor for those who report on statements and actions so long as the statements or actions are official and so long as the report about them is fair and accurate." Id. "The privilege recognizes that (1) the public has a right to know of official government actions that affect the public interest, (2) the only practical way many citizens can learn of these actions is through a report by the news media, and (3) the only way news outlets would be willing to make such a report is if they are free from liability, provided that their report was fair and accurate." Id. at 14. Here, the defendants have not met their burden to demonstrate either that the statements were reporting on "official" government actions, or that the statements constitute a "fair and accurate" report.

First, the defendants have not shown that they were reporting on "official" government action. "A textbook form of an official action or proceeding is a public hearing before a judge or the Legislature or some other governmental body," but "the privilege also covers proceedings and actions taken out of

33

the public view so long as they are official." Id. at 17. The

defendants have provided no evidence to authenticate the TECS II

database documents or the Event File with the alleged

§ 212(a)(3)(B)(i)(II) designation as official statements.

Arguably these documents reflect official government action

during the first few days after the Marathon bombing (like

placing the plaintiff temporarily on a watch or no fly list).[3] It

is not clear, however, in the present summary judgment record,

whether the documents or statements from the confidential

sources constituted official actions or statements.

Furthermore, the Massachusetts Supreme Judicial Court has

explained that "an anonymous statement is not an official one."

Howell, 920 N.E.2d at 18. Although the privilege extends to

reports of official actions from unofficial and anonymous

sources, reports from such sources run "a risk that the

underlying official action will not be accurately and fairly

described by the source, and therefore will not be protected by

the privilege, or that the information provided will go beyond

the bounds of the official action and into unprivileged

territory." Id. at 19. In this case, the defendants have

provided no evidence of what official act or proceeding the

confidential sources based their reports on.

---

[3] Evidence from the confidential sources would be helpful on this
point.

Second, the defendants have not shown that all the statements were a "fair and accurate" report of what the TECS II database documents and Event File contain or what the confidential sources told the defendants. "Whether a report was fair and accurate is a matter of law to be determined by a judge unless there is a basis for divergent views." Id. at 21. To determine whether a report is fair and accurate, the Court examines whether it is "sufficiently factually incorrect or sufficiently mischaracterized that the impression on the reader is so unfair to the plaintiff as to warrant placing it outside the privilege." Id. at 22.

Here, the TECS II database and Event File do not state that Alharbi was "the money man" or was otherwise involved in the Boston Marathon bombing. Again, while some of Beck's earlier statements on April 19 and 22 may have been a fair and accurate report of the initial stages of the Boston Marathon bombing investigation, the defendants have produced no evidence to show that his later statements after Secretary Napolitano's testimony remained so. Thus, the Court finds that the defendants have not met their burden to demonstrate that the fair report privilege applies at this stage in the case.

### D. Expressions of Opinion Versus Facts

The defendants argue that two of Beck's statements are not statements of fact, but expressions of opinion, which "are

35

constitutionally protected, and therefore are not actionable as
defamation." Docket No. 98, at 20. More specifically, the
defendants contend that Beck's April 19 statement that the
plaintiff was "a very bad, bad, bad man," and April 24
description of Alharbi as the "worst of the worst," are
protected opinions because they are "imprecise, inherently
subjective, and not readily capable of being proven true or
false." Id. at 21. The plaintiff responds that the Court must
evaluate these statements in context, and that these statements
are actionable because they were part of Beck's contention that
the plaintiff was involved in the Boston Marathon bombing.

"[O]nly statements that are 'provable as false' are
actionable; hyperbole and expressions of opinion unprovable as
false are constitutionally protected." Veilleux v. Nat'l Broad.
Co., 206 F.3d 92, 108 (1st Cir. 2000) (quoting Milkovich v.
Lorain Journal Co., 497 U.S. 1, 19-20 (1990)). However, the
"First Amendment does not inoculate all opinions against the
ravages of defamation suits. A statement couched as an opinion
that presents or implies the existence of facts which are
capable of being proven true or false can be actionable."
Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 127
(1st Cir. 1997); see also Restatement (Second) of Torts § 566
(1977) ("A defamatory communication may consist of a statement
in the form of an opinion, but a statement of this nature is

actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."). "The determination whether a . . . statement is protected opinion or an unprotected factual assertion is a matter of law for the court." Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1016 (1st Cir. 1988). In making this determination, the Court must examine the statement itself and the broadcast as a whole. See id.

Here, Beck explained in the allegedly defamatory broadcasts, and in his declaration submitted in support of the summary judgment motion, that both statements referred to the fact that the government had designated the plaintiff a terrorist under § 212(a)(3)(B)(i)(II). The "wordplay" "a very bad, bad, bad" man was code for (3)(B), and the "worst of the worst" referred to the fact that § 212(a)(3)(B)(i)(II) is "the worst designation you can give somebody." Beck Decl., Docket No. 112, ¶¶ 41, 43. Thus, both of these statements present or imply "the existence of facts which are capable of being proven true or false," and are actionable. See Levinsky's, 127 F.3d at 127.

### E. "Of and Concerning" Requirement

The defendants argue that the one of Beck's allegedly defamatory statements was not "of and concerning" the plaintiff. Docket No. 98, at 20. "It is a fundamental principle of the law of defamation that a plaintiff must show, inter alia, that the allegedly defamatory words published by a defendant were of and

concerning the plaintiff." <u>New England Tractor-Trailer Training of Conn., Inc. v. Globe Newspaper Co.</u>, 480 N.E.2d 1005, 1007 (Mass. 1985). In the April 19 broadcast, Beck stated:

> Meanwhile, who has been blowing the legs off of our citizens? People who are foreign nationals here on a Visa, here under amnesty but because our immigration and amnesty situation is so screwed up that these guys, did they really escape persecution?
>
> We're finding out now that mom is in jail because she was a thief. This summer she was stealing. We just heard audio of dad back Russia. He sounds pretty much like an extremist.
>
> But that's not the worst of it. I want you to listen carefully. Yesterday, the FBI released the pictures—and video of two men they say were suspects in the Boston bombing. These are the ones that one was killed last night.

Beck Decl., Docket No. 112, Ex. 3, at 65. Based on the plain language and context of the statement, including the description of the parents, the defendants maintain that this statement referred to the Tsarnaev brothers, not the plaintiff. The Court agrees and finds that this statement is not "of and concerning" Alharbi. Thus, the Court **ALLOWS** the motion for summary judgment on the defamation claim with respect to this statement.

### F. Public Figure Status

The Supreme Court has identified three different types of public figures: (1) all-purpose public figures, who "assume[] roles of especial prominence in the affairs of society," such as those who occupy positions of "persuasive power and influence;"

(2) limited-purpose public figures, who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved;" and (3), involuntary public figures, who may "hypothetically" arise in "exceedingly rare" instances where, "someone . . . become[s] a public figure through no purposeful action of his own." Gertz v. Welch, 418 U.S. 323, 345 (1974). Here, the defendants contend that Alharbi is a limited-purpose and an involuntary public figure with respect to the broadcast statements.

In the First Circuit, "the question of whether a defamation plaintiff is a public figure is properly resolved by the court, not by the jury, regardless of the contestability of the predicate facts." Pendleton v. City of Haverhill, 156 F.3d 57, 68 (1st Cir. 1998). "Given the significance of status determinations in libel-law litigation, it is often perfectly reasonable to attempt to decide whether a plaintiff is a public official or public figure during pretrial proceedings." Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 204 (1st Cir. 2006). The Court recognizes that "there are cases in which it may not be possible to resolve the public-figure issue until trial." Id. (internal quotation marks and alterations omitted). Here, however, there is no conflict as to any material fact, and the Court can thus resolve whether the plaintiff acted in a way sufficient to make him a public figure at the summary judgment

stage. See Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 14 (1st Cir. 2011). The defendants bear the burden of demonstrating that the plaintiff is a public figure. See Lerman v. Flynt Distrib. Co., 745 F.2d 123, 136-37 (2d Cir. 1984); Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 592-93 (1st Cir. 1980).

### 1.  Limited-Purpose Public Figure

A person becomes a limited-purpose public figure when he "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Lluberes, 663 F.3d at 13 (quoting Gertz, 418 U.S. at 351). To determine whether a defamation plaintiff is a limited-purpose public figure, the First Circuit employs a two-pronged test: the defendants must prove (1) that a public controversy existed prior to the alleged defamation, and (2) that "the plaintiff has attempted to influence the resolution of that controversy." Id. at 13-14 (internal quotation marks omitted). This Court already determined that a public controversy existed, "whether it is framed narrowly as a debate over who was responsible for the Marathon bombings, or more broadly as part of an ongoing discussion about public safety, national security, and terrorism." Alharbi v. Beck, 62 F. Supp. 3d 202, 208 (D. Mass. 2014). The defendants now argue that Alharbi voluntarily injected himself into this debate by

granting five interviews to the press between April 16 and May 21, 2013.

The parties dispute the precise number of press interviews. The defendants maintain that Alharbi granted five interviews: one with Dawood al-Shirian from the Saudi television program 8 O'Clock with Dawood on April 19, two with the Al Hayat newspaper on April 19 and April 23, one with the Okaz newspaper on April 17 or 18, and one with The Islamic Monthly sometime between May 8 and May 21. The plaintiff does not recall a second interview with Al Hayat or an interview with Okaz. Even assuming that the plaintiff granted all five interviews, the defendants have not met their burden to show that the plaintiff "thrust himself into the vortex" of the debate surrounding the Boston Marathon bombings. See Gertz, 418 U.S. at 352.

The defendants argue that the plaintiff engaged in "an orchestrated propaganda campaign" similar to the actions of the plaintiffs in Lluberes, 663 F.3d at 15-17. Docket No. 98, at 26. In Lluberes, two brothers, who managed their family's Dominican sugar conglomerate, sued the filmmakers of a documentary about the poor treatment of Haitian laborers on sugarcane plantations in the Dominican Republic. 663 F.3d at 10-11. The First Circuit affirmed the district court's determination that the brothers were limited-purpose public figures because the brothers had engaged in a coordinated effort to influence the outcome of a

public controversy surrounding practices in the sugar industry
for several years prior to the allegedly defamatory remarks. Id.
at 17. Among other actions, the plaintiffs had: retained a U.S.
public relations firm to run a $1.2 million, international
campaign to rehabilitate the industry's image; sent an employee
to be interviewed on PBS; led a U.S. congressional delegation on
a tour of company towns, covered by CNN; and hosted an industry
luncheon, where journalists from Dominican newspapers were
invited to ask questions. Id. at 14-17. The First Circuit
emphasized that the brothers "enjoyed access to the press and
exploited it by orchestrating a PR blitz to garner public
support and mute their critics." Id. at 17. "In doing so, both
assumed roles of prominence for this limited purpose and the
risk of closer public scrutiny that came with it." Id.

In contrast here, the plaintiff gave at most five press
interviews over a relatively brief period of time in the
aftermath of the Marathon bombing. With the exception of The
Islamic Monthly's commentary, the resulting articles were short
pieces that described the plaintiff's experience during and
after the attacks. The interview for 8 O'Clock with Dawood
lasted for roughly five and a half minutes. The two Al Hayat
articles were less than one page in length. The Okaz article was
roughly one and a half pages. Finally, the piece in The Islamic
Monthly was the longest, at roughly five pages, including a

photo of the plaintiff at the finish line and a photo of the
site of the second explosion, where Alharbi was injured.
Although this last article engaged in a broader critique of how
law enforcement and the media treated Alharbi, it was published
two weeks after Beck made the last allegedly defamatory comment.
The Lluberes court focused its analysis on the plaintiffs'
"relevant conduct up to the film's release in March 2007," as
opposed to their actions after the allegedly defamatory remarks.
Id. at 15. This Court adopts the same approach, and finds that
the relevant interviews and articles predating Beck's allegedly
defamatory broadcasts do not come close to approaching the
multi-year, international "PR blitz" in Lluberes.

The defendants also cite to Pendleton for the proposition
that "a defamation plaintiff's granting of a press interview to
address a public controversy 'possesses great significance for a
First Amendment analysis.'" Docket No. 98, at 25 (quoting
Pendleton, 156 F.3d at 69). In Pendleton, an African-American
substitute teacher, who was arrested and then acquitted for
cocaine possession, sued his arresting officers for continuing
to suggest his guilt to the press after the case ended. 156 F.3d
at 61-62. Nine months before the arrest, he had unsuccessfully
sought a permanent teaching job in the city and granted a press
interview in which he vented his frustrations about race and
hiring. Id. at 60-61. In the article, "Pendleton effectively

announced his candidacy to become a permanent teacher within the Haverhill school system." Id. at 68. The arresting officers were quoted in a local newspaper as saying that Pendleton "should be in rehab," and had only himself to blame if the negative publicity hampered his bid to become a teacher. Id. at 61-62.

The First Circuit explained that "by granting an interview to [a reporter] and lobbying for a permanent teaching post at a time when the racial composition of the public school faculty had become a matter of intense interest in the community, Pendleton invited public scrutiny of the qualities that equipped him to teach in the Haverhill school system." Id. at 69 (emphasis added). As a result of this combination of activities, he became a limited-purpose public figure. Id. The Pendleton court based its decision, in part, on the case law concerning candidates for public office. The First Circuit noted:

> Pendleton was not running for an elected political office—but it is at least arguable that if a person holds (or aspires to hold) any public post which entails control over matters of substantial public concern, then his qualifications for serving in that capacity are likely to engender the type of public debate and discussion that the First Amendment protects.

Id. The court concluded that Pendleton had "invited public debate both on the general issue of minority representation and on the specific characteristics that made him suitable (or not) for a teaching position." Id. at 70. Here, Alharbi had not announced a candidacy for any public position. While The Islamic

44

_Monthly_'s commentary raised the broader issue of racial profiling, the most pointed criticism came from the journalist. Alharbi's comments themselves did not invite a public debate on racial profiling in law enforcement or the media.

The plaintiff argues "that an individual does not become a public figure simply because he is investigated in connection with a crime and then publicly declares that he is innocent of those crimes." Docket No. 106, at 17. The First Circuit emphasized this point in both _Pendleton_ and _Lluberes_. In _Pendleton_, the First Circuit explicitly rejected an argument that Pendleton was a public figure based on his denial of the drug charges he faced: "It is by now apodictic that an individual's involvement in a criminal proceeding—even one that attracts substantial notoriety—is not enough, in itself, to ingeminate public figure status. By like token, one does not become a public figure merely by defending oneself publicly against accusations." 156 F.3d at 68 (internal citation omitted). Citing _Pendleton_, the _Lluberes_ court noted: "an individual should not risk being branded with an unfavorable status determination merely because he defends himself against accusations, especially those of a heinous character." 663 F.3d at 19.

In short, although Alharbi had access to the media, he did not exploit it. Rather, he defended himself against public

accusations in at most five interviews over the course of
several weeks.[4] The defendants conceded at the summary judgment
hearing that the plaintiff did not proactively reach out to any
media outlets, but rather responded to some of the interview
requests he received. The parties agree that Alharbi declined
interview and comment requests from several local and national
news outlets in the United States, including the Boston Globe
and ABC News. I find that the plaintiff's actions were not
enough to make him a limited-purpose public figure in this case.

### 2. *Involuntary Public Figure*

The defendants also argue that Alharbi undertook several
volitional acts before and during the Boston Marathon bombing
that demonstrate he placed "himself in the crosshairs of law
enforcement's investigation," such that he became an involuntary
public figure under the First Amendment. Docket No. 98, at 30.
This Court adopted the Wells test for involuntary public figure
status in its previous order on the defendants' motion to

---

[4] In a footnote, the defendants argue that Alharbi "'voluntarily
entered the public arena' in two additional ways": by displaying
a blog post written by his English teacher on his Facebook page,
and by encouraging two other individuals to defend him on
websites. Docket No. 98, at 16 n.9. The defendants have
submitted no evidence that Alharbi encouraged his teacher or the
other two individuals, Victor Tiffany and Gregory Simmons, to
defend him on websites or continue writing about him. For
example, Tiffany was a "long-time critic of Glenn Beck," who had
been writing about Beck for three years before he began writing
about Alharbi. Grygiel Decl., Docket No. 110, Ex. 37, at 106,
108.

dismiss, see Alharbi, 62 F. Supp. 3d at 211-12, and assumes familiarity with that order. In Wells v. Liddy, the Fourth Circuit held an individual must have "assumed the risk of publicity" to be assigned involuntary public figure status, meaning that he "has taken some action, or failed to act when action was required, in circumstances in which a reasonable person would understand that publicity would likely inhere." 186 F.3d 505, 540 (4th Cir. 1999).

The defendants argue that Alharbi assumed the risk of publicity by displaying a photo of himself with a gold-plated gun on Facebook when he was seventeen or eighteen years old, two to three years before the Boston Marathon bombing; entering the United States on a student visa two years before the bombing; deciding not to attend the University of Findlay in Ohio, where he had originally applied; and attending the Boston Marathon bombing, where he engaged in "suspicious behavior post-blast," by "running from the scene." Docket No. 98, at 30-31. As this Court explained in the motion to dismiss order:

> Choosing to attend a sporting event as one of thousands of spectators is not the kind of conduct that a reasonable person would expect to result in publicity. Quite to the contrary, a spectator at an event like the Boston Marathon would reasonably expect to disappear into the throngs of others, never attracting notice by the press.

Alharbi, 62 F. Supp. 3d at 212. The plaintiff disputes whether he ran from the blast after the bombs went off, but even if he

did, running away from the explosion would have been an understandable response to the bomb blast, and not one that a reasonable person would assume is likely to lead to publicity. The fact that Alharbi posted a photo of himself on Facebook several years before the bombing with a gold-plated gun that he thought looked "cool" as a seventeen- or eighteen-year-old does not change this analysis. Similarly, the fact that Alharbi changed his mind about what school to attend in the United States, well in advance of the Marathon bombing, does not transform his course of conduct into "circumstances in which a reasonable person would understand that publicity would likely inhere." See Wells, 186 F.3d at 540. Therefore, the Court finds that the plaintiff is not an involuntary public figure.

### G. Fault

As a private figure, Alharbi is only required to prove negligence as opposed to malice. See Ravnikar, 782 N.E.2d at 510-11. Under the negligence standard, "the defendants are required to act reasonably in checking on the truth or falsity of the communication before publishing it." Jones v. Taibbi, 512 N.E.2d 260, 269 (Mass. 1987) (internal quotation marks and alterations omitted). At this stage, the plaintiff has put forward enough evidence for a reasonable jury to conclude that the defendants did not act reasonably in verifying the truth of the broadcasts about

Alharbi, particularly the May 8 statement that Alharbi was
the "money man."

To begin with, the defendants have put forth no admissible
evidence that the statements are true. At the summary judgment
hearing, the plaintiff highlighted an email from Weasel to
Cheatwood on April 22, which states that another staff member of
TheBlaze, Sara Carter, was "getting a very different picture"
about Alharbi's connection to the Boston Marathon bombing from
her sources. Weasel Decl., Docket No. 117, Ex. 18, at 84.
According to Weasel, Carter reached out to the FBI and ICE on
the record to ask about the plaintiff's involvement and the
government documents provided by Source 2. Her sources allegedly
responded that "Alharbi is considered innocent and not connected
to the bombings or the suspects." Id. at 85. Her sources also
corroborated Secretary Napolitano's testimony that Alharbi was
temporarily placed on the terror watch list as a "precaution"
before the government "determined whether he was more than a
witness from the scene of the crime." Id. at 84.

According to the defendants, TheBlaze's determination that
Alharbi was involved in the Boston Marathon bombing was
ultimately based on the two government documents they received
from Source 2, and Source 1's and 2's explanation of these
documents. The documents themselves are dated April 15 and 16,
and the defendants agree that they were created in the immediate

aftermath of the bombing. Although the documents refer to Alharbi as a "suspected terrorist," who is "armed & dangerous," and mention the § 212(a)(3)(B)(i)(II) designation, they do not say anything about Alharbi being the "money man" or otherwise funding the attacks.

When asked specifics about what Sources 1 and 2 told the defendants at his deposition, Weasel testified that the sources did not explain when the alleged financing took place, how any funds were transferred, the amounts of financing, what the financing was used for, or how the financing was otherwise accomplished. See Weasel Dep., Docket No. 109, Ex. H, at 160. Thus, the plaintiff has put forward enough evidence to demonstrate a genuine issue with respect to whether the defendants were negligent. The Court **DENIES** the defendants' motion for summary judgment on this issue.

The Court notes, however, that the plaintiff has not provided a comprehensive list with direct quotations of the exact statements the plaintiff alleges are defamatory. Depending on what the confidential sources say in their depositions, there may not be proof of negligence, especially with respect to some of the earlier statements that were made before Secretary Napolitano's testimony. The Court will resolve this issue at or after trial, and will not accept additional summary judgment briefs.

**H. Compensatory Damages for Injury to Reputation and Emotional Distress**

The defendants argue that the plaintiff has produced no evidence that the broadcasts actually injured his reputation or caused him emotional distress, and that he is therefore only entitled to nominal damages. More specifically, the defendants maintain that the plaintiff "has not identified a single person who holds him in diminished regard," and has "received no medical or psychiatric treatment because of the broadcasts." Docket No. 98, at 45-46.[5] The plaintiff responds that the defendant misstates the plaintiff's burden with respect to damages.

"Damages in a defamation case are limited to actual damages, which are compensatory for the wrong that has been

---

[5] In passing, the defendants also note that the plaintiff "applied for and received $275,000 from the Boston One Fund, notwithstanding the One Fund's knowledge that Plaintiff 'was accused by the media.'" Docket No. 98, at 47. In his application to the One Fund, the plaintiff described his burn injuries and hospital stay, but also mentioned that he "was accused by the media." Docket No. 110, Ex. 49, at 150. In his Payment Determination Letter, the Fund Administrator explained that Alharbi's $275,000 initial disbursement was for his five nights of hospitalization. Id. Ex. 50, at 153. He also received a second disbursement of $25,000. Although the Fund did not specify precisely what the second disbursement was for, they stated that the second distribution was made to the following groups: "Loss of life; Extremity injury; Survivors who spent 12 nights or more in the hospital; Survivors who spent fewer than 12 nights in the hospital; and Survivors who received out-patient treatment." Id. Ex. 52, at 161. There is no evidence in the record that the One Fund compensated Alharbi, or anyone else, for their treatment by the media.

done." <u>Draghetti v. Chmielewski</u>, 626 N.E.2d 862, 868 (Mass. 1994). "Actual injury includes not only out-of-pocket expenses, but also harm inflicted by impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." <u>Id.</u> "With mental suffering the plaintiff is entitled to recover for the distress and anxiety which may have been the natural result of the legal wrong." <u>Shafir v. Steele</u>, 727 N.E.2d 1140, 1146 (Mass. 2000) (holding that "feelings of being bludgeoned, stunned, and then outrage and anger" are "the natural result of the defamation, sufficient to prove mental suffering") (internal quotation marks and alterations omitted). "However, if a plaintiff cannot prove damages but can prove libel, the plaintiff is entitled to nominal damages." <u>Id.</u>

Here, the plaintiff has put forward sufficient evidence of injury to his reputation and emotional distress to present his claim for compensatory damages to a jury. In an affidavit submitted in support of his opposition to summary judgment, the plaintiff stated that he was "embarrassed to see [his] name associated with this crime;" that he feels "very sad about what Mr. Beck has said about [him];" that he is afraid that people will think less of him and is now "shy and hesitant" among people he does not know well; that he is "generally afraid for [his] own safety" because he is concerned that "those who listen to, or agree with, Mr. Beck will attack [him];" and that he is

worried about his future and his "ability to get a job because

of what Beck has said about [him]." Alharbi Aff., Docket No.

107, ¶¶ 21-23. The plaintiff also testified at his deposition

that he has had "sleeping problems" due to "really scary dreams"

about what the media said. Alharbi Dep., Docket No. 110, Ex. 2,

at 605. Finally, the plaintiff submitted a series of disparaging

messages he received through his Facebook page in the first few

weeks after the Marathon bombing. For example, one post read:

> People know you are a terrorist, and you were involved
> in the Boston marathon..the government had you on a
> watch list, and yet you were at the marathon the day
> the bomb went off..that was no coincidence...may you
> burn in Hell!

Alharbi Aff., Docket No. 107, Ex. A, at 11. Thus, the Court

finds the plaintiff has put forward sufficient evidence to

seek compensatory damages caused by any defamatory

statements.

### I. Punitive Damages

The defendants argue that Massachusetts law governs the

damages issues in this case, and bars the plaintiff's claim for

punitive damages against Glenn Beck. The plaintiff contends that

Texas law applies to the punitive damages claim because the

defendants' allegedly wrongful conduct occurred in Texas. "The

first step in a choice of law analysis is to determine whether

an actual conflict exists between the substantive laws of the

interested jurisdictions," here, Massachusetts and Texas.

Reicher v. Berkshire Life Ins. Co. of Am., 360 F.3d 1, 4 (1st Cir. 2004). In Massachusetts, both statutory and common law proscribe the recovery of punitive damages for defamation. Mass. Gen. Laws. ch. 231 § 93; Stone v. Essex Cty. Newspapers, Inc., 330 N.E.2d 161, 169 (Mass. 1975) ("We reject the allowance of punitive damages in this Commonwealth in any defamation action, on any state of proof, whether based in negligence, or reckless or wilful conduct."). In contrast, Texas law allows the award of punitive damages against defamation defendants "based upon the same rules governing punitive damage awards for all torts." Peshak v. Greer, 13 S.W.3d 421, 426 (Tex. App. 2000). Thus, there is an actual conflict in this case.

When exercising diversity jurisdiction, federal courts apply the choice-of-law rules of the forum state. See In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 17 (1st Cir. 2012) (citing Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). "Massachusetts state courts apply 'a functional choice of law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole.'" Reicher, 360 F.3d at 5 (quoting Bushkin Assocs., Inc. v. Raytheon Co., 473 N.E.2d 662, 668 (Mass. 1985)). "Under the functional approach, the forum applies the substantive law of the state which has the more significant relationship to the transaction in litigation." Hendricks & Assocs., Inc. v. Daewoo

Corp., 923 F.2d 209, 212 n.3 (1st Cir. 1991). The analysis is
heavily guided by the Restatement (Second) of Conflict of Laws
(1971). See Reicher, 360 F.3d at 5.

"Pursuant to section 150 of the Restatement (Second) of
Conflict of Laws, the law of the state where the defamed person
was domiciled at the time of publication applies if the matter
complained of was published in that state." Green v. Cosby, 138
F. Supp. 3d 114, 124 (D. Mass. 2015) (internal quotation marks
omitted); Restatement (Second) of Conflict of Laws § 150 (1971)
("When a natural person claims that he has been defamed by an
aggregate communication, the state of most significant
relationship will usually be the state where the person was
domiciled at the time, if the matter complained of was published
in that state."). Here, the plaintiff was domiciled in
Massachusetts at the time of the allegedly defamatory
broadcasts.

The plaintiff argues that Texas has a more significant
relationship than Massachusetts because the defendants
"broadcast their statements about Plaintiff from their
headquarters in Texas." Docket No. 106, at 31. However, the
defendants contend that at least Beck's April 25 statement on
the Bill O'Reilly Show was broadcast from the Fox News studio in
New York, not Texas. Given that the plaintiff was domiciled
here, the statements all concerned events occurring in

Massachusetts, and the plaintiff filed suit here, I find that
Massachusetts has the most significant relationship to the
conduct underlying this case. Thus, the Court finds that
Massachusetts, and not Texas law applies, and the defendants'
motion for summary judgment on the punitive damages claim (Count
II) is **ALLOWED**.

### J. Unjust Enrichment

The defendants argue that the plaintiff's unjust enrichment
claim is not legally viable because the plaintiff has an
adequate legal remedy at law and disgorgement of profits is not
a permissible remedy for defamation under the First Amendment
and Massachusetts law. The basic theory behind the plaintiff's
unjust enrichment claim is that the defendants were unjustly
enriched by advertising and subscriber revenue from defaming the
plaintiff as the financier of the Marathon bombing. This Court
gave the plaintiff leave to amend the complaint to add the count
for unjust enrichment in May 2015 because the case law in other
courts was divided on whether a defamation plaintiff could also
bring an unjust enrichment claim. See Docket No. 52, at 2-3.
Since May 2015, however, the case law has shifted.

In June 2016, the Eighth Circuit held that a defamation
plaintiff's unjust enrichment claim failed as a matter of law
because the plaintiff had not established an implied-in-fact or
quasi contract through which the defendant received a benefit of

value, and the plaintiff had adequate legal remedies through the defamation action. Ventura v. Kyle, No. 14-3876, 2016 WL 3228373, at *9-10 (8th Cir. June 13, 2016). The Ventura court further found that the unjust enrichment claim was inconsistent with Minnesota law because the plaintiff did not confer a benefit on the defendant by merely being someone who inspired others "to make up stories about him." Id. at *8-9. Although the Eighth Circuit was interpreting Minnesota as opposed to Massachusetts law, this Court agrees with its analysis. The plaintiff has not cited any cases awarding profits in a defamation case under an unjust enrichment theory, or suggesting that money damages would be inadequate.[6] Therefore, the Court **ALLOWS** the defendants' motion for summary judgment on the unjust enrichment claim (Count III).

### K. Distributor Liability

The defendants argue that Premiere Radio Networks Inc. (Premiere) cannot be held liable for defamation in this case

---

[6] The plaintiff cites Diaz Rodriguez v. Torres Martir, where the court denied summary judgment on an unjust enrichment claim. 394 F. Supp. 2d 389, 394 (D.P.R. 2005). However, that case is distinct because the unjust enrichment theory was that the defendant benefited financially from the publication of the plaintiff's photograph and the statement that he was a client of the defendant doctor. See id. The plaintiff there argued that he was "entitled to disgorgement of any unjust enrichment obtained as a result of the use of his widely-known name and image" because "famous individuals customarily lend their image and persona for a fee in order to promote or endorse products and services." Id.

because it acted as a "mere distributor" that transmitted The
Glenn Beck Show with no knowledge of its content. Docket No. 98,
at 61. Premiere syndicates ninety radio programs and services to
more than 5,500 radio affiliates across the country. Premiere
distributes The Glenn Beck Show pursuant to a contract with
Mercury Radio Arts, Inc. (Mercury), a multimedia production
company and the parent company of TheBlaze.

The briefs address this issue in cursory fashion. The
defendants cite to Nicholson v. Promotors on Listings, 159
F.R.D. 343, 356 (D. Mass. 1994) and the Restatement (Second) of
Torts § 581 (1977) for the proposition that "one who only
delivers or transmits defamatory matter published by a third
person is subject to liability if, but only if, he knows or had
reason to know of its defamatory matter."[7] Nicholson, however,
addressed the republication in print of information from a prior
newspaper article. 159 F.R.D. at 355-56. The Restatement
(Second) of Torts § 581 (1977) states that a different rule
applies to radio broadcasts: "One who broadcasts defamatory
matter by means of radio or television is subject to the same

_____

[7] The defendants also cite to Zeran v. America Online, Inc., 129
F.3d 327, 331 (4th Cir. 1997). The Court agrees with the
plaintiff that Zeran is inapposite here because Zeran focused on
federal immunity to defamation suits under 47 U.S.C.
§ 230(c)(1), governing the liability of interactive computer
services, as opposed to the liability of radio broadcast
distributors. Id. at 330-31.

liability as an original publisher." The commentary to the Restatement explains why radio broadcasting companies are treated differently from print republishers, news dealers, bookstores, and telegraphs companies, which all merely convey defamatory words published by a third party:

> Although radio and television broadcasting companies are engaged in the transmission of the human voice and likeness and must to a great extent rely upon matter prepared for them by others, they are publishers more nearly analogous to a newspaper or the publisher of a book than to a telegraph company. They are not engaged solely in rendering the service of transmission to those who seek it. For their own business purposes they initiate, select and put upon the air their own programs; or by contract they permit others to make use of their facilities to do so, and they cooperate actively in the publication. Their activity is similar to that of a newspaper, which employs its own reporters or writers to prepare matter to be published, or by contract agrees to publish matter, such as advertisements, prepared and controlled by others.
> The broadcasting company is therefore not to be regarded as engaged solely in the transmission of messages.

Restatement (Second) of Torts § 581 cmt. g (1977). The cases cited in the Restatement to support this point are all from the 1930s, and may no longer accurately describe the reality of the radio broadcasting industry in light of technological evolution.

According to a declaration from Julie Talbott, the president of Premiere, "Premiere exercises no editorial control over The Glenn Beck Radio Program, and has no right or ability to control, manage, modify or oversee the content of The Glenn Beck Radio Program." Talbott Decl., Docket No. 116, at 2.

However, the plain language of contract between Mercury and
Premiere, suggests a more complicated relationship. The contract
states that Glenn Beck "shall perform all Services subject to
Premiere's direction and control and in strict accordance with
all reasonable rules and policies of Premiere . . . ." <u>Id.</u> at
Ex. 1, ¶ 4(A). The contract later states that Mercury shall:

> own and control the content of the Program and Premiere
> agrees that it shall not alter the content thereof in
> connection with its distribution, except as necessary
> . . . to comply with Premiere policies and standards
> applicable to programming such as the Program (subject
> to meaningful consultation between [Glenn Beck] and
> Premiere with Premiere's decision controlling and
> provided such modifications to the content do not
> constitute a material change to any of the provisions of
> this agreement) . . . .

<u>Id.</u> ¶ 4(D). The defendants have not provided any of Premiere's
policies governing The Glenn Beck Show. Based on the unclear
evidence with respect to whether Premiere has the right to
editorial control over the show, and the sparse briefing on such
a complex issue regarding publisher, republisher, and
distributor liability, the Court **DENIES** the defendants' motion
for summary judgment on Premiere's liability.

## ORDER

The plaintiff's Motion to Compel the identity of the
confidential sources (Docket No. 78) is **ALLOWED** in part and
**DENIED** in part. The Court orders the defendants to disclose the
identities of Sources 1 and 2 subject to a protective order. If

Source 3 also told the defendants that the plaintiff was the
financier behind the Boston Marathon bombing, then the
defendants must also disclose Source 3's identity. The
defendants are not required to disclose the identities of
Sources 4, 5, and 6.

The defendants' motion for summary judgment (Docket No. 97)
is **ALLOWED** in part and **DENIED** in part. The Court concludes that
the plaintiff is not a limited-purpose nor involuntary public
figure, and based on the current record, that the fair report
privilege does not apply. The Court **ALLOWS** the motion for
summary judgment on the defamation claim (Count I) with respect
to the statement "blowing the legs off of our citizens" because
that statement was not of and concerning the plaintiff. The
Court otherwise **DENIES** the motion for summary judgment on the
defamation claim. The motion for summary judgment on the claims
for punitive damages (Count II) and unjust enrichment (Count
III) is **ALLOWED**.


/s/ PATTI B. SARIS
_____
Patti B. Saris
Chief United States District Judge