UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ABDULRAHMAN ALHARBI, )<br><br>Plaintiff, )<br><br>v. )<br><br>GLENN BECK; THE BLAZE, INC.;<br>MERCURY RADIO ARTS, INC.; AND<br>PREMIERE RADIO NETWORKS, INC., )<br><br>Defendants. ) | CIVIL ACTION NO.<br>1:14-cv-11550-PBS |

## JOINT PRETRIAL MEMORANDUM

Pursuant to the Local Rule 16.5 and the Court's Order for Pretrial Conference dated August 10, 2016, Plaintiff Abdulrahman Alharbi ("Plaintiff") and Defendants Glenn Beck, TheBlaze, Inc., Mercury Radio Arts, Inc., and Premiere Radio Networks, Inc. (collectively, "Defendants") respectfully submit this Joint Pretrial Memorandum. Plaintiff and Defendants respectfully reserve the right to supplement the information provided herein.

1. **NAMES, ADDRESSES, AND TELEPHONE NUMBERS OF TRIAL COUNSEL**

    A. **Plaintiff**

| Name | Address | Telephone Number |
|---|---|---|
| Peter J. Haley | Nelson Mullins LLP<br>One Post Office Square<br>Boston, MA 02109 | 617-573-4714 |
| Gregory J. May | Nelson Mullins LLP<br>One Post Office Square<br>Boston, MA 02109 | 617-217-4612 |

### B.      Defendants

| Name | Address | Telephone Number |
|------|---------|------------------|
| Michael J. Grygiel | GREENBERG TRAURIG, LLP<br>One International Place<br>Boston, MA 02110 | 518-689-1406 |
| Zachary C. Kleinsasser | GREENBERG TRAURIG, LLP<br>One International Place<br>Boston, MA 02110 | 617-310-6293 |

## 2.      CONSISE SUMMARY OF THE POSITIONS ASSERTED BY PLAINTIFF AND DEFENDANTS

### A.      Plaintiff's Summary

This is an action for defamation based on the Defendants' publicly broadcast statements that, among other things, the Plaintiff provided funding to carry out the bombings at the Boston Marathon on April 15, 2013.   Three years have passed since those attacks.  The Plaintiff has been acknowledged to be an innocent bystander by the Secretary of Homeland Security and by everyone else.  The man, who together with his deceased brother, was responsible for the attacks, Dzhokhar Tsarnaev, has been convicted of those crimes and sentenced to death.

The Defendants, absent any evidence at all, continue to proclaim that the Plaintiff provided funding to carry out the attack.  There was no basis for the statements made about the Plaintiff in the immediate aftermath of the attacks and there is no basis for those statements today.  No documents. No testimony. Nothing. The statements were false and there is nothing that will prove or show otherwise.

The Defendants' actions in broadcasting the statements were reckless, negligent and inconsistent with any standard of reason.

The acts that the Defendants stated the Plaintiff were responsible for were criminal, evil and horrific. They resulted in the death and maiming of innocent men, women and children.  The

Plaintiff continues to live with the consequences of the Defendants' actions and continues to suffer the harm inflicted; impairment of reputation and standing in the community, personal humiliation and mental anguish and suffering.

### B.    Defendants' Summary

This free speech litigation arises out of the terrorist bombings that took place near the finish line of the 2013 Boston Marathon.  The tragic incident − in which three people were killed and hundreds were wounded − received immediate and pervasive press coverage not only in the greater Boston metropolitan area, but throughout the nation and the world.  In the immediate aftermath of the attack, Plaintiff, a Saudi Arabian citizen, was identified by federal law enforcement authorities as a "suspected terrorist" in connection with the bombings.  He was extensively interrogated, his apartment was searched, his computer was seized, and he was fingerprinted and provided a DNA sample to the FBI.  In the broadcast statements complained of, Defendants examined Plaintiff's role at the center of a public controversy arising from the massive law enforcement investigation of this deadly attack on one of the nation's most historic and revered athletic events.

Plaintiff alleges that he was defamed by Defendants' reporting of and commentary on the above and related events, which were based on the government's designation of Plaintiff as a terrorist as confirmed by a comprehensive network of sources.  His claims abandon the First Amendment by placing off limits speech concerning both the government's investigation into a terrorist attack and its efforts in protecting homeland security, matters of paramount public concern and importance.  Simply put, Plaintiff's claims would deny Defendants − and anyone else choosing to exercise their right to freedom of speech in the course of criticizing the

government's efforts at combating terrorism − the protections guaranteed by the United States Constitution and Massachusetts Declaration of Rights.

Defendants expect the evidence at trial to establish, among other things, the following:

First, the evidence will demonstrate that Defendants undertook painstaking measures to verify the information they received from government and other sources establishing Plaintiff's involvement in the bombing. Through a network of reliable on-the-record and confidential sources, Defendants comprehensively vetted, cross-checked, and verified each and every statement at issue. Accordingly, the evidence will demonstrate that Plaintiff cannot satisfy the negligence fault standard.

Second, the evidence will demonstrate that certain of the statements complained of by Plaintiff are true based on the government's identification of Plaintiff as a "suspected terrorist" who was "armed and dangerous," and as reflected in Plaintiff's Event File, which classified Plaintiff under INA 212(a)(3)(B) as someone "inadmissible to the U.S." because of likely terrorist activity. Because Plaintiff cannot prove statements on certain of the broadcasts as false, a verdict must enter in favor of Defendants on Plaintiff's defamation claim.

Third, the evidence will demonstrate that certain of the statements complained of by Plaintiff – including the description of Plaintiff as a "bad man" and as the "worst of the worst" – are non-actionable expressions of opinion.

Fourth, the evidence will demonstrate that certain of the statements complaint of by Plaintiff were taken directly from information contained in the government's TECS II database documents and Event File, official government records. The evidence will also demonstrate that Defendants' reporting about these official government records was fair and accurate. Thus, in

view of the fair report privilege, a verdict must enter in Defendants' favor on Plaintiff's defamation claim.

Fifth, the evidence will demonstrate that as a mere distributor, Premiere cannot be held liable for defamation.

Finally, the evidence will demonstrate that Plaintiff's reputation was not diminished and he suffered no emotional harm attributable to the broadcasts.  To the contrary, no one thought any less of Plaintiff, and Plaintiff was not denied any educational or other opportunities because of the broadcasts.  Because Plaintiff cannot recover presumed damages divorced from any showing of actual reputational injury, Plaintiff has no damages.

## 3. FACTS ESTABLISHED BY PLEADINGS OR STIPULATIONS OR BY ADMISSIONS OF COUNSEL

The parties have preliminarily agreed to the following statements as agreed-upon facts. The parties specifically reserve the right to amend, alter, and supplement this list based on the Court's pre-trial rulings in this matter.

1. Plaintiff is a citizen of Saudi Arabia.

2. On April 15, 2013, Plaintiff was a 20 year old English language student living in Revere, Massachusetts and attending school at the New England School of English.

3. At approximately 2:50 p.m. on April 15, 2013, two bombs exploded near the finish line of the Boston Marathon.

4. The Boston Marathon bombing received immediate and pervasive press coverage not only in the greater Boston metropolitan area, but throughout the nation and the world.

5. Law enforcement officials immediately commenced an intensive and sweeping investigation.

6. Plaintiff was admitted to Brigham & Women's Hospital on April 15, 2013.

7. Upon his arrival at the hospital on the afternoon of April 15, 2013, Plaintiff was "immediately" questioned by law enforcement, including FBI agents.

8.     While in the hospital, law enforcement authorities collected fingerprints and a DNA sample from Plaintiff.

9.     The FBI took numerous photographs of Plaintiff's apartment, and collected laptops, an iPad, multiple mobile phones, a USB drive, several digital cameras, and paperwork (including bank records, a checkbook, and identification documents).

10.     Plaintiff was discharged from the hospital on April 20, 2013.

11.     The Glenn Beck radio and television programs, which are broadcast on TheBlaze network, feature topical coverage and discussion of political, social, and cultural events of general interest to the public.

12.     The Glenn Beck television programs are produced by the Defendant TheBlaze, Inc.

13.     Premiere syndicates ninety radio programs and services to more than 5,500 radio affiliations across the nation.

14.     Pursuant to an agreement between Mercury and Premiere, Premiere is the distributor of *The Glenn Beck Radio Program*.

15.     A recurrent theme is the inefficiency and ineptitude of United States government investigations in high-profile matters, in particular those implicating national security.

16.     On Friday, April 19, 2013, Mr. Beck stated during his radio program – although he refrained from identifying Plaintiff on the broadcast – that Plaintiff was a "very bad, bad, bad man."

17.     To prepare for the Monday, April 22, 2013 radio broadcast, a staff conference call was scheduled for Sunday, April 21, 2013.

18.     On April 23, 2013, then-Secretary of Homeland Security Janet Napolitano was asked about Plaintiff during a congressional briefing. She stated as follows:

> He was not on a watch list. What happened is this student was – really, when you back it up, he was in the wrong place at the wrong time. He was never a subject. He was never even really a person of interest. Because he was being interviewed, he was at that point put on a watch list. And then, when it was quickly determined he had nothing to do with the bombing, the watch listing status was removed.

19.     Mr. Beck appeared as a guest on Bill O'Reilly's Fox News Program on April 25, 2013 and stated that Plaintiff was designated as a terrorist, who was "armed and dangerous," according to government documents TheBlaze had received from confidential sources.

20.     On May 1, Beck stated on the air that Plaintiff was "involved" in the attacks.

21.     On May 8, 2013, Mr. Beck, referring to the Plaintiff, stated on the air: "You had the Saudi that they know in advance, and you know who the Saudi is? The money man. That's who the Saudi is. He's the – he's the guy who actually paid for it. He's the money man."

## 4.     CONTESTED ISSUES OF FACT

The contested issues of fact include, but are not limited to, the following:

1.     Whether Plaintiff was involved in Boston Marathon bombing.

2.     The nature and extent of Plaintiff's involvement in the Boston Marathon bombing, if any.

3.     Whether Plaintiff attended the Boston Marathon as a mere spectator to watch the event.

4.     Whether, beginning at around 11:00 p.m. on April 15, 2013, the FBI and other law enforcement officials with the assent of the Plaintiff conducted an extensive search of Plaintiff's apartment located in Revere, Massachusetts.

5.     Whether Plaintiff was a "person of interest," "subject," or "target" in connection with the government's investigation of the Boston Marathon bombings.

6.     Whether law enforcement authorities considered Plaintiff to be a "suspected terrorist" and/or "armed and dangerous."

7.     Whether law enforcement authorities classified Plaintiff under INA 212(a)(3)(B) as someone "inadmissible to the U.S." because of likely terrorist activity.

8.     Whether law enforcement authorities entered information concerning Plaintiff into the "TECS II" database beginning after the Boston Marathon bombings.

9.     Whether law enforcement authorities created one or more "Event Files" concerning Plaintiff after the Boston Marathon bombings.

10.     Whether the U.S. government determined that Plaintiff's visa should be revoked.

11.     The composition of terrorist cells.

12.     Whether Plaintiff provided financing in connection with the Boston Marathon bombings.

13.     Whether Plaintiff provided the "go order" for the Boston Marathon bombings.

14.     Whether Secretary Napalitano's testimony on April 23, 2013 is consistent with the manner in which Plaintiff was treated by the government and with the events that occurred at the Boston Marathon.

15.     Whether Secretary Napolitano's testimony on April 23, 2013 is consistent with the information provided to Defendants by confidential sources, including congressional staff.

16.     Whether Mr. Weasel had direct contact with six confidential sources in gathering information for the allegedly defamatory broadcasts.

17.     Whether Mr. Cheatwood had direct contact with one of the six confidential sources in gathering information for the allegedly defamatory broadcasts.

18.     Whether the six confidential sources were only willing to cooperate pursuant to a promise of strict confidentiality.

19.     Whether the information concerning the six confidential sources that Mr. Weasel provided in his declaration submitted in support of their summary judgment motion is accurate.

20.     Whether Mr. Beck met with or spoke to any of the confidential sources.

21.     Whether Plaintiff granted one or two interviews to the *Al Hayat* newspaper.

22.     Whether Plaintiff granted an interview to the *Okaz* newspaper.

23.     Whether Plaintiff's accounts to *The Islamic Monthly* and *Al Hayat* were accurate, or whether they were embellished and exaggerated.

24.     Whether Plaintiff entered the United States on an F-1 student visa three weeks after the commencement of the academic program at the University of Findlay in Ohio for which he obtained his visa.

25.     Whether, after Plaintiff's decision not to attend the University of Findlay, the college that issued Plaintiff's visa-related paperwork, Plaintiff's SEVIS form was automatically terminated.

26.     Whether the FBI and other law enforcement agencies described Plaintiff's conduct after the bombs exploded as "suspicious behavior post-blast."

27.     Whether the FBI reported that Plaintiff was "running from the scene."

28.     Whether the House of Representatives Homeland Security Committee's report investigating the Boston Marathon bombing characterized Plaintiff's conduct "near the site of the explosions" as "suspicious[]."

29.     Whether Plaintiff's injuries were "superficial and required no treatment."

30.     Whether Defendants learned from confidential sources that law enforcement officials from the FBI, Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), the Massachusetts State Police, and the Boston Police identified the plaintiff as a person of interest, a subject, and a target of their investigation into the Boston Marathon bombing.

31.     Whether, on April 15 and 16, several other news organizations, such as Fox News and the *New York Post*, published online articles reporting that the plaintiff was a "person of interest" and a "potential suspect."

32.     Whether, on or around April 16, 2013, Plaintiff was designated as a person who has engaged or "is likely to engage" in terrorist activity in the United States under § 212(a)(3)(B)(i)(II) of the Immigration and Naturalization Act (INA), 8 U.S.C. § 1182(a)(3)(B)(i)(II).

33.     Whether, on the evening of April 16, 2013, Plaintiff was visited in the hospital by a representative of the Saudi Arabian Embassy.

34.     Whether Mr. Beck has over four decades of experience in the professional broadcasting industry.

35.     Whether George ("Joe") E. Weasel, III has more than 25 years of experience as a professional journalist, including five years (1998-2003) as an adjunct professor of journalism and ethics at The Ohio State University.

36.     Whether Joel Cheatwood has more than three decades of experience in the news broadcasting industry, including as Executive Director of Development for CNN; Senior Vice President of Program Development with Fox News; and Executive Vice President of News for CBS.

37.     Whether, at the time of the broadcasts challenged by Plaintiff, Mr. Cheatwood was the President and Chief Content Officer for TheBlaze.

38.     Whether, in that capacity, Mr. Cheatwood was responsible for overseeing all content produced on TheBlaze's various platforms, including broadcasts of Mr. Beck's television show and the Internet streaming of Mr. Beck's radio program.

39.     Whether Mr. Cheatwood was responsible for setting the policy and practice for the use of confidential source information at TheBlaze.

40.     Whether, as a matter of standard practice, TheBlaze's editorial staff conducted two editorial meetings, led by Mr. Beck and Mr. Cheatwood, before each day's broadcasts.

41.     Whether, in addition to the daily editorial meetings, Mr. Cheatwood was in frequent communication with Mr. Beck and TheBlaze's investigative journalists.

42.     Whether TheBlaze's reporters, including Mr. Weasel, provided information and content from their newsgathering to Mr. Cheatwood, who acted as gatekeeper to TheBlaze's broadcasts concerning the government's investigation of Plaintiff.

43.     Whether Weasel took notes of his discussions with TheBlaze's six confidential sources on post-its, which he then discarded.

44.     Whether, in addition to taking notes, Weasel and his confidential sources engaged in a detailed series of contemporaneous e-mail exchanges.

45.     Whether Cheatwood "acted as gatekeeper to TheBlaze's broadcasts," and vetted the information and materials provided by Weasel and other staff members.

46.     Whether Mr. Beck's statement on the April 22, 2013 radio broadcast that Plaintiff had received a "2123B tag" as a "proven terrorist" was based on Plaintiff's Event File and the high level of proof warranted for 212(a)(3)(B) status.

47.     Whether, on April 22, 2013, Mr. Beck stated on the air that Plaintiff was involved in recruiting the Tsarnaev brothers and either funded or gave the "go order" for the bombings. That broadcast included the following statements referring to the Plaintiff:

"[T]here are at this hour three − three people involved in the bombings in Boston."

"This is somebody--if you get a 2123B tag, it means that you have demonstrated yourself to be a proven terrorist and engaged in proven terrorist activity. It was created by the NCTC field watch commander at four p.m. and he was tagged as a 3B."

"I believe this man in the hospital, his mission was to recruit fighters that are already in the country. That way they can't be tracked [across] international borders. Once he recruits, that he could fund and provide the go order when the time came. These two that were captured and killed on Friday would've been easy targets for an Al Qaeda recruiter."

48.     Whether, in a letter dated April 22, 2013, Senator Chuck Grassley raised a series of questions about the revocation of Plaintiff's visa and whether the revocation was based on the 212(a)(3)(B) designation.

49.     Whether, on April 24, 2013, Mr. Beck stated on the air that law enforcement officials had "opened a 212(3)(b) on [Plaintiff]" and "designated him a terrorist"; that the creation of the Event File meant that Plaintiff was "actively engaged in terrorist activity"; that a

212(a)(3)(B) designation means an individual is the "worst of the worst"; and that Plaintiff was "armed and dangerous."

50.     Whether, in response to the statement that Plaintiff was the "moneyman," statement, Mr. Beck's co-host asked: "Do you think, I mean, is this, is this speculation, or are you reporting or somewhere in between, is that what we're learning?" and Mr. Beck responded "He's the money man."

51.     Whether Plaintiff granted interviews to the press after April 15, 2013.

52.     Whether, on or around April 19, while he was in the hospital, the plaintiff granted a telephone interview to the reporter Dawood al-Shirian for a Saudi television program called "8 O'Clock with Dawood."

53.     Whether, in the interview, Plaintiff stated that he was the first individual to be transported to the hospital by ambulance, that his injuries were "minor."

54.     Whether Plaintiff was interviewed by the newspaper *Al Hayat*, which subsequently published two separate articles about the plaintiff on April 19 and 23.

55.     Whether the August 19, 2013 article focused on the explosion and initial investigation.  Plaintiff told the *Al Hayat* newspaper that he was "very mildly injured."

56.     Whether Plaintiff granted an interview to Amina Chaudary, the Editor-in-Chief of *The Islamic Monthly*.

57.     Whether, on May 21, a transcript and audio recording of the interview, two photographs of the plaintiff at the finish line of the Boston Marathon, and a commentary written by Ms. Chaudary titled "Abdulrahman Ali Alharbi In His Own Voice" were posted to *The Islamic Monthly* website.

58.     Whether, on March 23, 2014, five days before Plaintiff filed his Complaint in this matter, Plaintiff asked Ms. Chaudary that his interview from the previous year be deleted from *The Islamic Monthly*'s website.

59.     Whether Messrs. Beck, Cheatwood, and Weasel believed at the time of the broadcasts, and continue to believe to this day, that the factual statements challenged by Plaintiff are true and accurate in all respects.

60.     Whether, after his discharge from the hospital, Plaintiff sought any follow-up counseling or medical treatment.

61.     Whether upon Plaintiff's discharge from the hospital, there were restrictions on Plaintiff's activities.

62.     Whether, shortly after his discharge from the hospital, Plaintiff posted a message to his Facebook page that he was "fine."

63.     Whether, after his discharge from the hospital on April 20, 2013, Plaintiff was asked by law enforcement officials to submit to a polygraph examination, and whether Plaintiff declined to do so on advice of counsel.

64.     Whether upon meeting with his friends on April 20, 2013, after leaving the hospital, Plaintiff told them that he was "feeling good."

65.     Whether Plaintiff was denied any educational or other opportunities because of the statements made by Mr. Beck.

66.     Whether Plaintiff continued and successfully completed his education at the New England School of English and was accepted at and began studying at Suffolk University after the broadcasts.

67.     Whether, although Plaintiff was accepted into Roger Williams University in Rhode Island, Plaintiff decided he wanted to remain in Boston.

68.     Whether, in the television interview Plaintiff granted from his hospital room to Saudi Arabian journalist Dawood al-Shirian, Plaintiff confirmed that his injuries from the Boston Marathon bombing were "minor" and "not to be worried about."

69.     Whether Plaintiff attended any support group meetings held by the Boston Public Health Commission.

70.     Whether Plaintiff received any medical or psychiatric treatment because of the broadcast statements he disputes.

71.     Whether Plaintiff has mentioned any dreams about "what the media was saying" to his family, friends, or anybody else.

72.     Whether any of Plaintiff's friends think any less of Plaintiff as a result of the broadcasts Plaintiff disputes.

73.     Whether Plaintiff lost any friends as a result of the broadcasts.

74.     Whether the broadcast statements Plaintiff disputes interfered with Plaintiff's family relationships.

75.     Whether Plaintiff can identify when any such dreams began, or the last time he had such a dream.

76.     Whether Plaintiff received $300,000 from the One Fund Boston.

77.     Whether the Defendants were motivated by increased revenue for their programming in making the statements about the Plaintiff.

78.     Whether the Defendants had information that indicated that the Plaintiff funded the Boston Marathon attacks or had any involvement at all in that activity.

79.     Whether the Federal Bureau of Investigation determined that the Plaintiff had no involvement in the attacks.

80.     Whether The Defendants had contact with any source and received new information concerning the Plaintiff between May 1 and May 8, 2013.

81.     Whether The Defendants acted reasonably in broadcasting information about the Plaintiff.

82.     Whether the Plaintiff has been injured by the statements made by the Defendants, and whether those injuries include a diminished reputation in the community, personal humiliation and mental anguish.

83.     Whether the Plaintiff received numerous disparaging messages as a result of the Defendants' broadcasts.

84.     Whether the Plaintiff continues to fear for his safety and feel tormented as a result of the Defendants' broadcasts.

85.     Whether Plaintiff entered the United States on an F-1 student visa three weeks after the commencement of the academic program at the University of Findlay in Ohio for which he obtained his visa.

86.     Whether, after Plaintiff's decision not to attend the University of Findlay, the college that issued Plaintiff's visa-related paperwork, Plaintiff's SEVIS form was automatically terminated.

87.     Whether TheBlaze, Inc. is wholly owned by the Defendant Mercury Radio Arts, Inc. and whether Mercury Radio Arts, Inc. licenses the use of the program to the Defendant Premiere Radio Networks, Inc. for distribution.

88.     Whether, under the written agreement between Premiere and Mercury, Mercury receives an annual minimum payment and profit sharing, and whether profit sharing is based upon advertising sales made by Premiere in connection with The Glenn Beck Radio Program.

89.     Whether, in addition to revenue from the Agreement, Mercury generates revenue advertising sales relating to The Glenn Beck Radio Program.

90.     The information about the Plaintiff was also broadcast on TheBlaze television channel and made available through TheBlaze websites.

5.    **KEY ISSUES OF LAW, INCLUDING EVIDENTIARY QUESTIONS, TOGETHER WITH SUPPORTING AUTHORITY**

The parties have agreed to provide brief summaries of what they believe to be the key issues of law.  Other issues of law have been addressed in the parties' dispositive motions and pretrial motions.

   A.    **Plaintiff**

The Plaintiff incorporates by reference as if fully set forth herein, the Plaintiff's prior briefing in this matter in support of the Motion to Compel and in opposition to the Defendants' motion for summary judgment and the Plaintiff's motions in limine submitted herewith.

   Liability

Under the applicable negligence standard, "the defendants are required to act 'reasonably in checking on the truth or falsity … of the communication before publishing it." Jones v. Taibbi, 400 Mass. 786, 799 (1987), quoting Appleby v. Daily Hampshire Gazette, 395 Mass. 32, 36 (1985).  The Defendants made no such inquiry other than an alleged reliance on "confidential sources."  For the reasons set forth in the Plaintiff's Motion to Compel [Docket Nos. 78, 81] and the Court's Memorandum and Order of August 9, 2016 [Docket No. 133] the Plaintiff is without any ability to verify or confirm the alleged information.  Given the Defendants' failure to comply with the Order allowing in part the Motion to Compel any use of the information or testimony concerning reliance upon information allegedly provided by confidential sources would be manifestly unfair and unjust and should be prohibited.  Absent the use of such information, as a matter of law, the Defendants have failed to establish any basis to support the contention that they acted reasonably in making the statements that the Plaintiff was the "money man" who funded the Boston Marathon bombings.   Judgment should enter for the Plaintiff on liability.

The Defendants broadcast a statement to the public concerning the Plaintiff. The statement – the Plaintiff funded the 2013 Boston Marathon attacks – was defamatory in that it could damage the Plaintiff's reputation, the Defendant was at fault in making the statement (in absence of any reliance on confidential sources), the statement – that the Plaintiff committed a crime  is actionable without economic loss. Alharbi v. Beck, 62 F. Supp. 3d 202, 206. [citations omitted]

Damages

The plaintiff's burden in action for defamation is to establish that the statement could cause damage to his or her reputation in the community. Ravnikar v. Bogojavlensky, 438 Mass. 627, 629 (2003).  A statement is considered damaging to one's reputation if it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Id. at 630, quoting Restatement (Second) of Torts § 559 (1977).   Defamatory statements that do no require proof of economic loss are "statements that constitute libel…; statements that charge the plaintiff with a crime; statements that allege that the plaintiff has certain diseases; and statements that may prejudice the plaintiff's profession or business." Id.  If such a statement is made, the plaintiff "may recover noneconomic losses, including emotional injury and damage to reputation." Id.

Actual injury "includes…harm inflicted by impairment of reputation and standing in the community, personal humiliation and mental anguish and suffering."  Alharbi v. theblaze, 2016 WL 4203402* 18 (2016) citing Draghetti v. Chmielewski, 416 Mass. 808, 626 N.E. 2d 862, 868 (1994).

### B.      Defendants

1.      <u>Whether Plaintiff can satisfy the negligence fault standard in view of the painstaking measures Defendants undertook to verify the information they received from government and other sources establishing Plaintiff's involvement in the bombing.</u>

Plaintiff is required to come forward with proof of negligence with respect to Defendants' broadcast statements. *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 858 (1975) ("we hold that private persons, as distinguished from public officials and public figures, may recover compensation on proof of *negligent* publication of a defamatory falsehood") (emphasis in original). The negligence fault standard established in *Stone* offers "greater protection than [defendant] would have had at common law." *Schrottman v. Barnicle*, 386 Mass. 627, 633 (1982). It "is not an abstract concept" and "cannot be proven in a vacuum." *Gilbert,* 1995 WL 809550, at *3 ("To establish fault, the plaintiff must prove that the defendant knew the statement was false or, in the exercise of reasonable care, should have known that the defamatory statement was false.") (footnote omitted). The negligence fault standard has been aptly summarized as follows:

> The test should be whether, under the facts and circumstances existing at the time the [publisher] receives [the] information, the [publisher] is made aware or placed on guard as to possible error. That is, the [publisher] should not rely on information from a source which [it] knows, or which [it] should reasonably believe, is suspect or unreliable. In those circumstances, [it] would owe a duty to investigate further.

*Bates v. Times-Picayune Publ'g Corp.*, 527 So.2d 407, 411 (La. Ct. App., 4th Cir. 1988). Simply put, whether the statements complained of were "in fact true is not the issue − it is whether reasonable minds could find . . . *that [defendants] did not act reasonably*" in publishing

them. *Fuchs v. Scripps Howard Broad Co.*, 170 Ohio App. 3d 679, 699 (2006) (emphasis in original); *see also Jones v. Taibbi*, 400 Mass. 786, 799 (1987).

To prevail under the negligence standard adopted in *Stone v. Essex County Newspapers*, 367 Mass. at 858, Defendants must establish that they acted "reasonably in checking on the truth or falsity . . . of the communication before publishing it." *Restatement (Second) of Torts*, § 580B, cmt. g (1977); *Benson v. Griffin Television*, 593 P.2d at 514 ("The real controversy centers on whether the Station's reporter had a reasonable basis for his report that implicated the Plaintiff in a crime."). Accordingly, where, as here, the complained of statements "reasonably reflect[] what a reporter could have concluded based on the undisputed facts," and the publisher "displayed no indifference or negligence regarding their accuracy," courts have not hesitated to grant summary judgment for defendants in defamation actions" governed by a negligence fault standard. *Id.*

The evidence at trial will demonstrate that TheBlaze's reportage on the government's identification of Plaintiff as a terrorist in connection with the Boston Marathon bombing entailed an unprecedented level of diligence at every phase of the newsgathering and editorial processes. TheBlaze cross-checked, verified, tested and confirmed every piece of information concerning Plaintiff's involvement in the bombing through a comprehensive network of confidential and nonconfidential sources, including law enforcement personnel involved in the investigation, counter-terrorism experts, members of the intelligence community, and elected officials. In no case did the verification process result in contradictory information or other grounds on which reasonably to question the information that was broadcast.

Further, the evidence at trial will demonstrate that TheBlaze scrupulously adhered to its policy governing the use of confidential sources, a paradigmatic reporting practice when sensitive

government information is involved.  Staff editorial meetings to review and assess the available information were conducted before each days' broadcasts.  At all times, TheBlaze's newsgathering and reporting went well above and beyond due consideration for the standards of information gathering and dissemination mandated by responsible journalistic practices, precluding a finding in Plaintiff's favor on his defamation claim.

       2.    <u>Whether certain of the statements complained of by Plaintiff are true based on the government's identification of Plaintiff as a "suspected terrorist" who was "armed and dangerous," and as reflected in Plaintiff's Event File, which classified Plaintiff under INA 212(a)(3)(B) as someone "inadmissible to the U.S." because of likely terrorist activity.</u>

Among the fundamental elements of any defamation claim is the constitutional requirement that a plaintiff must prove that the allegedly actionable statements are false.  *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775-76 (1986).  If the statements complained of are true, a defamation claim fails as a matter of law.  *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 42 (1st Cir. 1998) ("Truth is an absolute defense to a defamation action under Massachusetts law.").  Substantial truth is all that is necessary for a defendant to defeat a defamation charge; truth need not be established to a literal degree.  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991) (standard "concentrates upon substantial truth").  A statement is substantially true if it would not have "a different effect on the mind of the reader from that which the pleaded truth would have produced."  *Id.* at 517.  Thus, if a statement is "substantially true," it cannot be defamatory.  *Reilly v. Assoc. Press*, 797 N.E.2d 1204, 1211 (Mass. App. Ct. 2003).

Plaintiff alleges that the following broadcast statements are defamatory:

- Plaintiff was "involved" in the Boston Marathon bombing as a terrorist suspect (April 22 and 24, 2013 and May 1, 2013)

18

- Plaintiff was "tagged" as a "proven terrorist" (April 22, 2013)

- Plaintiff was "actively engage[d] in terrorist activity" and "armed and dangerous" (April 24 and 25, 2013)

The evidence at trial will demonstrate that the foregoing statements were based on the government's (1) identification of Plaintiff as a "suspected terrorist" who was "armed and dangerous" as stated in the TECS II database documents; and (2) as reflected in Plaintiff's Event File, his classification under INA 212(a)(3)(B) as someone "inadmissible to the U.S." because likely to have engaged in terrorist activity. Their truth is confirmed by those official documents, as well as by information provided from TheBlaze's network of sources explaining the stringent level of proof required for a so-called "(3)(B)" classification. It is unaffected by DHS Secretary Napolitano's conspicuous waffling to the Senate Judiciary Committee on April 23, 2013, about Plaintiff's watch list status, and her demonstrably incorrect statements that Plaintiff "was never a subject" and "never even really a person of interest" in the investigation. The evidence will also demonstrate that Plaintiff has never been officially cleared as a suspect in the Boston Marathon bombing investigation, and that he remained under investigation by the JTTF well *after* April 23, 2013, and at least through October of 2014, more than 18 months since the tragedy occurred.

Because Plaintiff cannot prove statements on certain of the broadcasts as false, a verdict must enter in favor of Defendants on Plaintiff's defamation claim.

3.    <u>Whether certain of the statements complained of by Plaintiff – including the description of Plaintiff as a "bad man" and as the "worst of the worst" – are non-actionable expressions of opinion.</u>

"Defamation is the publication, . . . of a statement concerning the plaintiff which is false and causes damage to the plaintiff." *Yohe v. Nugent*, 321 F.3d 35, 39 (1st Cir. 2003). Only

statements of fact, however, are capable of being false.  Statements of opinion − utterances that do not convey an assertion of fact − are constitutionally protected, and therefore are not actionable as defamation.  *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1016 (1st Cir. 1998) ("If the challenged statement is one of opinion rather than fact, then under the First Amendment it generally cannot give rise to a defamation claim.").  "[O]nly statements that are 'provable as false' are actionable; hyperbole and expressions of opinion unprovable as false are constitutionally protected."  *Veilleux v. NBC*, 206 F.3d 92, 108 (1st Cir. 2000).  When a statement is imprecise, inherently subjective, and not readily capable of being proven true or false, it is a statement of opinion that cannot form the basis of a defamation action.  *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 128, 130 (1st Cir. 1997) ("quintessentially subjective" language, such as "rhetorical hyperbole," "imaginative expression," and "loose, figurative" statements, cannot be the basis of a defamation claim).

In view of these established constitutional principles, Plaintiff cannot prevail at trial on his claim that subjective characterization of Plaintiff as a "very bad, bad, bad man" (April 19, 2013, broadcast) and the "worst of the worst" (April 24, 2013, broadcast) are actionable statements.  *See Stetter v. Blackpool, LLC*, 2010 WL 1531082, *1 (D. Ariz. Apr. 15, 2010) (dismissing claims for defamation on basis that "calling someone a 'bad man' is not an actionable statement of fact that can be proven true or false, but a non-actionable expression of a subjective opinion"); *Serian v. Penguin Group (USA), Inc.*, 2009 WL 2225412, *9 (N.D. W. Va. July 23, 2009) ("The statement[] that [Plaintiff] is … a 'bad businessman' [is] subjective opinion[] that [is] not actionable as defamation."); *Cargill Inc. v. Progressive Dairy Sols., Inc.*, 2008 WL 2235354, *11 (E.D. Cal. May 29, 2008) ("Statements that a [] Defendant is "bad" are not defamatory, as it is a statement of opinion that is not provable false."); *Marshall Invs. Corp.*

*v. R.P. Carbone Co.*, 2006 WL 2644959, *4 (E.D. La. Sept. 13, 2006) (finding statement that counterclaimant was a "bad person" protected opinion); *Chau v. Lewis*, 935 F.Supp.2d 644, 661 (S.D.N.Y. 2013) (statement that collateralized debt obligations were the "worst of the worst" is "non-actionable pure opinion"), *aff'd*, 771 F.3d 118 (2d Cir. 2014); *Smith v. Humane Soc'y of the U.S.*, 2015 Mo. App. LEXIS 684, *26 (Mo. Ct. App. June 29, 2015) (statement that plaintiff's kennel was among the "worst" was opinion).

4.    Whether certain of the statements complaint of by Plaintiff were taken directly from information contained in the government's TECS II database documents and Event File, official government records, and whether Defendants' reporting about these official government records was fair and accurate.

Massachusetts applies the fair report privilege to "allow[] the news media to serve as a check on the power of government by giving the public the opportunity to be informed citizens and voters." *ELM Med. Lab., Inc. v. RKO General, Inc.*, 403 Mass. 779, 783 (1989).  The privilege "establishes a safe harbor for those who report on statements and actions so long as the statements or actions are official and so long as the report about them is fair and accurate." *Howell v. Enterprise Pub. Co.*, 455 Mass. 641, 651 (2010).  It is well-established that the fair report privilege protects published reports of official government action, including enforcement action undertaken by executive branch agencies. *Id.* at 660.  Further, the law is clear that fair and accurate reports of official documents made by government sources are immunized from defamation liability when they are fairly and accurately reported − even if the sources are confidential and the documents non-public. *Id.* at 656 ("the privilege also covers proceedings and actions taken out of the public view so long as they are official") (footnote omitted);

*Ingenere v. ABC*, 1984 U.S. Dist. LEXIS 23523 (D. Mass. 1984) (television broadcast privileged when it relied on government investigative memoranda and letters not available to the public).

The evidence at trial will demonstrate that many of the statements challenged by Plaintiff were taken directly from information contained in the government's TECS II database documents and Event File, and that Defendants were fair and accurate in reporting the government's charges against Plaintiff.  The protection afforded by the fair report privilege does not depend on whether the descriptions of Plaintiff in the TECS II database documents and Event File are themselves true − *i.e.*, whether in fact Plaintiff was a "suspected terrorist" who was "armed and dangerous," and deemed "inadmissible to the U.S." because likely to have engaged in terrorist activity.  The actual state of affairs is entirely beside the point for purposes of applying the privilege, where accuracy "refers only to the factual correctness of the events reported and not to the truth about the events that actually transpired."  *Yohe v. Nugent*, 321 F.3d at 44; *Ingenere*, 1984 U.S. Dist. LEXIS 23523, at *5-6 ("If this privilege applies, defendant, in order to prevail, need not show that the allegations in its broadcast were true *or even that defendant believed them to be true*; as long as the news story was a fair and accurate report of the [government] documents, it is privileged.") (emphasis supplied).

5.      Whether Premiere, as a mere distributor, Premiere can be held liable for defamation.

Massachusetts follows the general rule that "one who only delivers or transmits defamatory matter published by a third person is subject to liability if, but only if, he knows or had reason to know of its defamatory matter."[1]  *Nicholson*, 159 F.R.D. at 356 (Alexander, M.J.)

---

[1]      The rationale for this rule is that any duty of distributors to screen products for potentially defamatory material would be onerous and potentially have a chilling effect on speech.  *Boladian v. UMG Recordings, Inc.*, 123 F. App'x 165, 169 (6th Cir. 2005); *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 139 (2d Cir. 1984) ("Obviously, the national distributor of hundreds of periodicals has no duty to monitor each issue of every periodical it distributes.

(applying Massachusetts law, internal quotation marks and citations omitted); *accord, Restatement (Second) of Torts* § 581; *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) ("Distributors cannot be held liable for defamatory statements contained in the materials they distribute unless it is proven at a minimum that they have actual knowledge of the defamatory statements upon which liability is predicated.").

The evidence at trial will demonstrate that Premiere was merely a distributor of *The Glenn Beck Radio Program*, as it exercises no editorial control over, and cannot preview or screen, *The Glenn Beck Radio Program*, and because Premiere had no prior knowledge of the statements at issue in this litigation, or the facts supporting those statements.

6. <u>Whether Plaintiff's reputation was diminished and suffered emotional harm attributable to the broadcasts complained of.</u>

Presumed damages are not recoverable under Massachusetts law. "[D]amages for defamation in this Commonwealth may be assessed only for actual injury and only on a compensatory basis." *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 851 (1975). *See also* 37 Mass. Practice Series, Tort Law § 7.11 (3d ed. 2009) (it is essential for a libel plaintiff "to prove actual injury if he is to recover more than nominal damage. The old rule of 'presumed damages' is no longer constitutionally acceptable."). In expanding the holding of *Gertz v. Robert Welch, supra*, the Supreme Judicial Court has similarly recognized that a windfall recovery unrelated to actual damages has no rational nexus to the appropriate goal of compensating a defamation plaintiff for actual injury to reputation.

We reaffirm the following as the controlling principles in this Commonwealth. ***In a case of defamation the plaintiff's recovery is***

---

Such a rule would be an impermissible burden on the First Amendment."); *Auvil v. CBS 60 Minutes*, 800 F.Supp. 928, 932 (E.D. Wash. 1992) (rejecting argument that local affiliates had duty to censor: "More than merely unrealistic in economic terms, it is difficult to imagine a scenario more chilling on the media's right of expression and the public's right to know.").

> ***limited to actual damages, which are compensatory for the wrong done
> by the defendant.*** Where specific harm is alleged to have resulted from
> the defendant's tortious conduct, such harm may be pleaded and damages
> recovered. Otherwise, the plaintiff is limited to compensatory damages
> for actual injury, which include mental suffering and harm to reputation.
> ***Punitive damages are prohibited, even on proof of actual malice.***

*Stone*, 367 Mass. at 860 (emphasis supplied) (citations omitted). The decision in *Stone* concluded

that "[b]ecause of constitutional considerations, and the potential difficulties in assessing fair

compensation in such cases, . . . both trial and appellate judges have a special duty of vigilance in

charging juries and reviewing verdicts to see that damages are no more than compensatory." 367

Mass. at 861; *Tosti v. Ayik*, 394 Mass. 482, 499 (1985).

Based on *Stone* and its progeny, the law in this Commonwealth could hardly be clearer:

in order to protect the "First Amendment values…at stake" (*Stone*, 367 Mass. at 861), a

defamation plaintiff "is entitled ***only to fair compensation for his actual damages*** . . . ." *Tosti*,

394 Mass. at 496 (emphasis supplied). *See also Draghetti v. Chmielewski*, 416 Mass. 808, 815

(1994) (same); *Shafir v. Steele*, 431 Mass. 365, 373 (2000) (same); *Lakian v. Globe Newspaper

Co.*, 399 Mass. 379, 383 (1987) (same).

The evidence at trial will demonstrate that Plaintiff's reputation has not been damaged as

a result of the broadcasts. Plaintiff will not be able to identify a single person that mentioned any

of the broadcasts to him. Nor will there be any evidence that the broadcasts interfered with

Plaintiff's family relationships, or that he lost any friends, or that his friends think any less of

Plaintiff. Further, the evidence at trial will show that Plaintiff continued and successfully

completed his education at New England School of English and was accepted at and began

studying at Suffolk University after the broadcasts. Although accepted into Roger Williams

University in Rhode Island, Plaintiff decided he wanted to remain in Boston. In addition, the

evidence will demonstrate that shortly after the broadcasts, Plaintiff applied for and received

$275,000 from the Boston One Fund, notwithstanding the One Fund's knowledge that Plaintiff "was accused by the media."

Finally, the evidence will establish that Plaintiff has not suffered any mental or emotional distress relating to the challenged broadcasts.  Plaintiff received no medical or psychiatric treatment because of the broadcasts.  Although support group meetings were available to him, Plaintiff never attended any such meetings.  The evidence will demonstrate that while Plaintiff may have had dreams about "what the media was saying," he cannot state when such dreams began or the last time that he had such a dream; that he ever sought medical or psychological assistance for his alleged dreams; or that he ever mentioned his dreams to his family, his friends, or anybody else.

Because the evidence at trial will establish that Plaintiff has no competent evidence of actual harm, he is limited to the recovery of nominal damages as a matter of law.  *Shafir v. Steele*, 431 Mass. at 373 ("However, if a plaintiff cannot prove damages but can prove libel, the plaintiff is entitled to nominal damages."); *Lakian v. Globe Newspaper Co.*, 399 Mass. at 383 (nominal damages may be awarded where "proven actual injury was so insignificant as not to be reasonably measured in dollars") (footnote omitted).

7.     Whether Plaintiff should be permitted to offer into evidence unauthenticated Facebook, Twitter, or website postings that attack Plaintiff as involved in terrorism in the Boston Marathon bombing.

The web postings suffer from multiple defects that preclude their admission into evidence.  First, they postings are inadmissible hearsay under Rules 801 and 802.  Second, Plaintiff cannot authenticate the postings as required by Rule 901.  Third, Plaintiff the postings fail to meet the basic requirement of relevance under Rule 401.  And finally, the postings should

be excluded under Rule 403, as they create a severe risk of prejudice and confusion.  It would be grossly unfair to Defendants to admit anonymous or unauthenticated web insults and invective directed at Plaintiff into the trial.  There is no way to prove such postings were in any way related to or caused by Defendants' statements at issue in the case.  The postings should be excluded at trial.  *See, e.g.*, *Miles v. Raycom Media, Inc.*, No. 1:09CV713-LG-RHW, 2010 WL 4791764, at *3 (S.D. Miss. Nov. 18, 2010) (excluding postings in an employment discrimination case and ruling that "[b]ecause the Facebook page and the comment to the article constitute unsworn statements made by third parties that are offered to prove the truth of the matter asserted, they constitute inadmissible hearsay that cannot be relied on by the Court"); *Loussier v. Universal Music Grp., Inc.*, No. 02 CIV. 2447(KMW), 2005 WL 5644421, at *4 (S.D.N.Y. July 14, 2005) (excluding, as evidence of damages, printouts of internet reviews showing that a song was still being talked about three years after its release as hearsay); *Boback Sausage Co. v. A&J Seven Bridges, Inc.*, 805 F.Sup.. 2d 503, 520 (N.D. Ill. 2011) ("musings of unidentified internet posters" are inadmissible hearsay); *Internet Specialties W., Inc. v. ISPWest*, 2006 WL 4568796, at *1 (C.D. Cal. Sept. 19, 2006) (granting motion in limine to exclude printouts of third-party websites in a trademark infringement case; "print-outs are inadmissible unless properly authenticated"); *Blue Bell Creameries, L.P. v. Denali Co., LLC*, 2008 WL 2965655, at *5 (S.D. Tex. July 31, 2008) (court "declines to consider" Internet blog postings as evidence in trademark infringement action because they "lack sufficient indicia of reliability").

8.      Whether any alleged defamatory statements published by Defendants, other than the six that were disclosed in Plaintiff's Answers to Defendants' First Set of Interrogatories, should be permitted into evidence.

Since March 31, 2015, the case has focused solely on six statements, dated April 19, 2013 to May 8, 2013, which Plaintiff identified in his interrogatory responses.   These are the same six statements that the Court summarized and ruled on in its recent decision on summary judgment.   Plaintiff has not filed any supplement to the relevant interrogatory answer, nor did he identify any other alleged defamatory statements in responding to Defendants' summary judgment motion.   Discovery is closed, and Plaintiff should not now be allowed to add additional alleged defamatory statements to the trial.   It would be unfair and extremely prejudicial to require Defendants to defend themselves at trial against allegations about undisclosed alleged defamatory statements that were not previously the subject of discovery or motion practice.   *See, e.g.*, Fed. R. Civ. P. 26(e), 37(c); *Boback Sausage Co. v. A&J Seven Bridges, Inc*., 805 F.Sup.. 2d 503, 520 (N.D. Ill. 2011) (granting summary judgment and applying Rule 37(c)(1) to exclude statements from witnesses who were not disclosed in interrogatory answers);  *Westefer v. Snyder*, No. CIV. 00-162-GPM, 2009 WL 3672500, at *1 (S.D. Ill. Oct. 30, 2009) (excluding evidence concerning other lawsuits brought by plaintiffs under Rule 37(c) because this evidence was not disclosed in response to defendants' interrogatories); *Miller ex rel. Miller v. Ford Motor Co*., No. 2:01CV545FTM-29DNF, 2004 WL 4054843, at *6 (M.D. Fla. July 22, 2004) (granting motion *in limine* to the effect that "Evidence of the existence or contents of any document, photograph, motion picture film, videotape, computer disc or other item which has not been previously disclosed and produced in discovery is inadmissible without a prior order of the Court").

9.   Whether evidence of Plaintiff's alleged emotional distress or other "parasitic" damages absent competent proof of actual reputational harm should be allowed into evidence.

It is well settled that defamation law protects one's interest in reputation.  *See Monitor Patriot Co. v. Roy*, 401 U.S. 265, 275 (1971) ("[D]amage to reputation is, of course, the essence

of libel."); *see also Time, Inc. v. Hill*, 385 U.S. 374, 384 n. 9 (1967) (observing  that, in libel case, "primary harm being compensated is damage to reputation;" in privacy case, on the other hand, "primary damage is the mental distress from having been exposed to public view"). Therefore, "damage to one's reputation is the essence and gravamen of an action for defamation." *Gobin v. Globe Publ'g Co.*, 649 P.2d 1239 (Kan. 1982).  Thus, actual injury in the form of emotional distress or attendant medical expenses can be compensated in a defamation action ***only*** if the plaintiff first demonstrates that the complained of statements in the broadcast actually caused him to suffer reputational harm.  *See, e.g., Garziano v. E.I. DuPont de Nemours & Co.*, 818 F.2d 380, 395 (5th Cir. 1987) (Mississippi law); *Pfannestiel v Osborne Publ'g. Co.*, 939 F.Supp. 1497, 1501-02 (D. Kan. 19960 (Kansas law); *Kenney v. Wal-Mart Stores, Inc.*, 100 S.W.2d 809, 814-18 (Mo. 2003); *Faulkner v. Arkansas Children's Hosp.*, 69 S.W.2d 393, 402-03 (Ark. 2002); *see generally* RESTATEMENT (SECOND) OF TORTS, § 623 (1977) (one liable for defamation, *i.e.*, including actual harm to reputation, "is liable also for emotional distress and bodily harm that is proved to have been caused by the defamatory publication").

Here, Plaintiff did not receive any medical or psychiatric treatment because of the broadcast statements he disputes; Plaintiff did not suffer any economic loss; Plaintiff's education was not interfered with in any way; the complained of statements did not interfere with Plaintiff's family relationships; Plaintiff testified that he had no recollection of anyone ever mentioning to him the April 19, April 22, and April 24, 2013, broadcasts he disputes, nor could he recall anyone mentioning Glenn Beck's appearance on Bill O'Reilly's Fox News television program on April 25, 2013; and, the only individuals Plaintiff could identify who had spoken to him about the broadcasts were his friends, who he testified did not think any less of him.  In the face of this uncontradicted evidence, any presumption that Plaintiff suffered harm to reputation

disappears, just as presumptions in other factual contexts do.  *See, e.g.*, *Doolin v. U.S.*, 918 F.2d 15, 18-19 (2d Cir. 1990) (presumption of delivery of check at time of delivery to post office disappears when proof of no receipt is offered); *Reeves v. General Foods Corp.*, 682 F.2d 515, 521-23 (5th Cir. 1982) (presumption of age discrimination disappears when legitimate reason for terminating employee is presented); *Shakespeare Co. v. Silstar Corp. of Am., Inc.*, 906 F.Supp. 997, 1011 n. 17 (D.S.C.), *aff'd*, 110 F.3d 234 (4th Cir. 1997) (presumption of likelihood of confusion is trademark infringement case disappears when evidence is presented showing defendants sought to reproduce a functional attribute).

10.     Whether evidence of Defendants' editorial views and political beliefs should be excluded on the grounds that they are irrelevant and prejudicial, and would raise serious First Amendment concerns.

Due to Defendant Glenn Beck's status as a nationally syndicated social and political commentator, Plaintiff is likely to attempt to introduce evidence concerning the editorial policies and political beliefs of either Beck or the other Defendants.  Plaintiff may endeavor to do so under the guise of establishing that Defendants had a social or political "motive" for defaming him.  This evidence, if proffered, is irrelevant to any fact at issue in this litigation and would be extremely prejudicial to Defendants.  Any attempt by Plaintiff to make the media's beliefs and editorial stances a subject of this litigation is, in fact, a misguided effort aimed at chilling free expression and punishing Defendants for taking, at times, controversial positions or positions at odds with Plaintiff's own religious beliefs or political views.  Such blatant politicization of this trial should not be tolerated and the evidence should be excluded.  *See* Fed. R. Evid. 403; *Med-Sales Assocs., Inc. v. Lebhar-Freidman, Inc.*, 663 F.Supp. 908 (S.D.N.Y. 1987) (existence of editorial viewpoint insufficient to establish fault); *see Janklow v. Newsweek, Inc.*, 788 F.2d 1300,

1306 (8th Cir. 1986) (even in the context of libel litigation, "[c]ourts must be slow to intrude into the area of editorial judgment"); *see also Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("[P]olitical belief and association constitute the core of those activities protected by the First Amendment.").

11.   Whether evidence of Defendants' economic motivation to broadcast and/or to earn profits from broadcasts should be allowed into evidence.

Plaintiff may seek to introduce evidence showing that Defendants believed the story concerning law enforcements investigation into Plaintiff would garner a large audience and assistant them in maintaining their competitive position in the market.  They may also argue that this evidence of Defendants' economic motivation is somehow relevant to his defamation claim and, specifically, that it can be used to show that Defendants acted negligently.  The evidence is not probative of any issue in dispute, however, and should be excluded.

Courts have regularly rejected the use of such evidence in libel cases.  News organizations in this country are almost always privately owned.  Their ability to exercise their First Amendment rights and provide the public with needed information depends on their ability to make a profit.  If a departure from the applicable standard of care could be shown merely be presenting evidence of a profit motive, the First Amendment would provide only illusory protection.  Moreover, that a defendant is motivated to broadcast a story by the potential for profit does not itself demonstrate whether the defendant acted with requisite care.  *See, e.g.*, Fed. R. Evid. 403; *Harte-Hanks Comm'cs, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) ("Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice.  The allegedly defamatory statements at issue in [*New York Times v.*] *Sullivan* were themselves published as part of a paid advertisement.  If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases

from *New York Times* to *Hustler* [*v. Falwell*] would be little more than empty vessels.");

*Prozeralik v. Capital Cities Comm'cs*, 82 N.Y.2d 466, 482 (1993) (Levine, J., concurring in part

and dissenting in part) (emphasizing danger of allowing evidence of profit motive to be put

before a jury).

6.    **PROBABLE LENGTH OF TRIAL, INCLUDING EXPECTED LENGTH OF EACH WITNESS'S DIRECT EXAMINATION.**

   A.    **Plaintiff**

   The Plaintiff estimates that the trial will take approximately five (5) full trial days.

   Estimated time for direct examination:

   Peter Kowenhoven - 1 hour
   Matthew Carey - .5 hour
   Glenn Beck – 3 hours
   Joel Cheatwood – 1 hour
   George (Joe) Weasel – 3 hours
   Misty Kawecki – 1 hour
   Julie Talbot – 1 hour
   Abdulrahman Alharbi – 4 hours

   B.    **Defendants**

   Defendants estimate that trial will take approximately ten full trial days.  Defendants

expect that the direct examination for Glenn Beck will last approximately 4 hours; that the direct

examination of Joel Cheatwood will last approximately 4 hours; that the direct examination of

Joe Weasel last approximately 4 hours; that the direct examination of Julie Talbott will last

approximately 1 hour; and that the direct examination of Steve Emerson will last approximately

3 hours.  Defendants expressly reserve the right to modify or supplement these estimates.

7.    **WITNESSES AND PURPOSE OF TESTIMONY**

   The parties specifically reserve the right to call any witness listed by the other party, to

call additional witnesses for purposes of impeachment or rebuttal, to call additional witnesses for

purposes of verification of documents and things not otherwise admissible, and to amend, alter, and supplement this list based on the Court's pre-trial rulings.

### A.    Plaintiff's Witnesses

| Witness | Purpose of Testimony |
|---|---|
| Peter Kowenhoven | FBI Records and results of investigation |
| Keeper of Records, Department of Homeland Security | Verification of Government Records |
| Keeper of Records, U.S. Immigration and Customs Enforcement | Verification of Government Records |
| Keeper of Records, U.S. Customs and Border Protection | Verification of Government Records |
| Keeper of Records, Federal Bureau of Investigation | Verification of Government Records |
| Keeper of Records, United States Attorney, Boston | Verification of Government Records |
| Matthew Carey | Responding officer, Boston Police Department – Fact Witness |
| Keeper of Records, Brigham and Womens Hospital | Verification of Medical Records |
| Michael Frederick, M.D. | Physician at Discharge |
| Vihas Patel, M.D. | Attending Physician |
| Glenn Beck | Defendant – Fact Witness |
| Joel Cheatwood | Defendant employee – Fact Witness |
| George (Joe) Weasel | Defendant employee – Fact Witness |
| Misty Kawecki | Defendant employee – Fact Witness |
| Julie Talbot | Defendant employee – Fact Witness |
| Abdulrahman Alharbi | Plaintiff – Fact Witness |

B.    **Defendants' Witnesses**

| Witness | Purpose of Testimony |
|---|---|
| Abdulrahman Alharbi | To provide testimony concerning the following matters:  the allegations set forth in the Amended Complaint; the government's investigation of the Boston Marathon Bombing; the government's investigation of Plaintiff; news articles concerning the investigation of Plaintiff in connection with the Boston Marathon bombing; Plaintiff's access to news media in connection with the Boston Marathon bombing; interviews given by Plaintiff in connection with the Boston Marathon bombing; interviews given by Plaintiff's friends and family in connection with the Boston Marathon bombing; Plaintiff's immigration status; and Plaintiff's alleged damages. |
| Glenn Beck | To provide testimony concerning the following matters:  Mr. Beck's extensive experience in the professional broadcasting industry; TheBlaze's broadcasts concerning the Boston Marathon bombing; statements made by Defendants concerning Plaintiff; TheBlaze's standard editorial review procedures; the newsgathering process undertaken in connection with Defendants' reporting on the Boston Marathon bombing; and the information relied upon by TheBlaze in reporting on the government's investigation of Boston Marathon bombing. |
| Joel Cheatwood | To provide testimony concerning the following matters:  Mr. Cheatwood's extensive experience in the professional broadcasting industry; TheBlaze's broadcasts concerning the Boston Marathon bombing; statements made by Defendants concerning Plaintiff; TheBlaze's standard editorial review procedures; the newsgathering process undertaken in connection with Defendants' reporting on the Boston Marathon bombing; and the information relied upon by TheBlaze in reporting on the government's investigation of Boston Marathon bombing. |
| Joe Weasel | To provide testimony concerning the following matters:  Mr. Weasel's extensive experience in the professional broadcasting industry; TheBlaze's broadcasts concerning the Boston Marathon bombing; statements made by Defendants concerning Plaintiff; TheBlaze's standard editorial review procedures; the newsgathering process undertaken in connection with Defendants' reporting on the Boston Marathon bombing; and the information relied upon by TheBlaze in reporting on the government's investigation of Boston Marathon bombing. |

| Witness | Purpose of Testimony |
|---|---|
| Julie Talbott | To provide testimony concerning the following matters: Premiere's contractual relationship with Mercury; Premiere's distribution and syndication of *The Glenn Beck Radio Program*; and Premiere's lack of editorial control over *The Glenn Beck Radio Program*. |
| Steve Emerson | To provide testimony concerning the following matters: Mr. Emerson's extensive experience in the professional broadcasting industry; Mr. Emerson's reporting in connection with the Boston Marathon bombing; the information relied upon by Mr. Emerson in reporting on the Boston Marathon bombing; and the government's investigation of the Boston Marathon bombing. |

## 8.   PROPOSED EXHIBITS

The parties specifically reserve the right to seek to introduce documents listed by the other party, to introduce, or use at trial, additional documents for purposes of impeachment or rebuttal, to seek to introduce other documents that are copies, versions, or support or amend the documents listed, and to amend, alter, and supplement this list based on the Court's pre-trial rulings.  In addition, the parties have agreed to meet and confer about the admissibility of each party's proposed exhibits in advance of the September 19, 2016 pretrial conference.

The Plaintiff specifically calls to the Court's attention those exhibits that have been redacted by the Defendants in whole or part and the Plaintiff's continuing objection to those redactions and reservation of right to object to the introduction of any such documents based on the Court's action on Plaintiff's motion for entry of sanctions and motions in limine.

### A.   Plaintiff's Proposed Exhibits

The Plaintiff's proposed exhibits are set forth on **Exhibit A** appended hereto.

### B.   Defendants' Proposed Exhibits

Defendants' proposed exhibits are set forth on **Exhibit B** attached hereto.

Respectfully submitted,

Counsel for Plaintiff,                         Counsel for Defendants,


/s/ *Peter J. Haley*                           /s/ *Zachary C. Kleinsasser*
Peter J. Haley, Esq. (BBO # 543858)            Michael J. Grygiel (admitted *pro hac vice*)
peter.haley@nelsonmullins.com                  grygielm@gtlaw.com
NELSON MULLINS RILEY &                         Zachary C. Kleinsasser (BBO # 664291)
SCARBOROUGH LLP                                kleinsasserz@gtlaw.com
One Post Office Square                          Emily C. Hannigan (BBO # 687935)
Boston, MA  02109                              hannigane@gtlaw.com
Tel:  (617) 573-4714                           GREENBERG TRAURIG, LLP
Fax:  (617) 573-4750                           One International Place
                                               Boston, Massachusetts 02110
                                               Tel:  (617) 310-6000
                                               Fax:  (617) 897-0993


Dated:    September 7, 2016


## LOCAL RULE 7.1 CERTIFICATION

The Parties are filing this Motion jointly.

/s/ *Zachary C. Kleinsasser*



## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing on September 7, 2016.

/s/ *Zachary C. Kleinsasser*